JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Heather Lennox
Lisa Laukitis
Steven Bennett
Michael D. Silberfarb

- and -

JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio  43215
Telephone:  (614) 469-3939
Facsimile:  (614) 461-4198
Todd S. Swatsler
Robert W. Hamilton

Attorneys for Debtors and
Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- x
                                                              :
In re                                                         :      Chapter 11
                                                              :
Hostess Brands, Inc., et al.,[1]                              :      Case No. 12-22052 (RDD)
                                                              :
                                      Debtors.                :      (Jointly Administered)
                                                              :
------------------------------------------------------------- x
```

## DEBTORS' SUPPLEMENTAL BRIEF IN SUPPORT OF
## 1113/1114 MOTION ADDRESSING CERTAIN ERISA ISSUES

---

[1]      The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Hostess Brands, Inc. (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

## TABLE OF CONTENTS

                                                                                             **Page**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

      A.    THE APPROACH TO THE NEW EMPLOYER POOL IN THE IBT LBF
            RAISES SERIOUS ERISA CONCERNS THAT COULD
            POTENTIALLY TRAP HOSTESS IN SERIOUSLY UNDERFUNDED,
            CRITICAL STATUS MEPPs .............................................................................. 2

      B.    THE IBT LBF's PROPOSED APPORTIONMENT RULE IN THE CASE
            OF MASS WITHDRAWAL REALLOCATION LIABILITY FACIALLY
            CONFLICTS WITH THE APPLICABLE PBGC REGULATION, AND
            IS SUBJECT TO SERIOUS RISK THAT IT WILL NOT LEGALLY
            APPLY IN THE EVENT OF A MASS WITHDRAWAL .................................. 12

CONCLUSION ......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

### CASES

*Auer v. Robbins,*
519 U.S. 452 (1997) ........................................................................................21

*Christensen v. Harris County,*
529 U.S. 576 (2000) ........................................................................................21

*Lee v. Bankers Trust Co.,*
166 F.3d 540 (2d Cir. 1999) .............................................................................3

*Wise v. Ruffin,*
914 F.2d 570 (4th Cir. 1990) ..........................................................................21

### STATUTES

ERISA § 4203, 29 U.S.C. § 1383 .............................................................................3

ERISA § 4207, 29 U.S.C. § 1387 .............................................................................9

ERISA § 4211, 29 U.S.C. § 1391 .............................................................................3

ERISA § 4219, 29 U.S.C. § 1399 ........................................................................8, 10

ERISA § 4301, 29 U.S.C. § 1451 ........................................................................8, 10

### OTHER AUTHORITIES

29 C.F.R. § 4207 .......................................................................................................9

29 C.F.R. § 4211.23 ..................................................................................................4

29 C.F.R. § 4219.1 ..................................................................................................11

29 C.F.R. § 4219.11 ...........................................................................................13, 20

29 C.F.R. § 4219.12 ................................................................................................13

29 C.F.R. § 4219.15 ......................................................................................... passim

29 C.F.R. § 4219.16 ................................................................................................21

29 C.F.R. § 4281.13 ................................................................................................13

51 Fed. Reg. 10300, 10316 (Mar. 25, 1986) ..........................................................20

NYI-4449390

## TABLE OF AUTHORITIES

### (continued)

**Page**

73 Fed. Reg. 79628-79637 (Dec. 30, 2008)...................................................................................18

S. Rep. No. 1076, 96th Cong., 2d Sess. (Apr. 1980) .......................................................................3

NYI-4449390

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

Hostess Brands, Inc. and the other above-captioned debtors and debtors in possession (collectively, "Hostess" or the "Debtors") respectfully submit this statement in response to the Court's request for additional legal analysis of the risk that IBT's last, best and final proposal respecting pensions ("IBT LBF") (Trial Ex. T-214 at ¶(P) & App. I) "violates a regulation or at least gives third parties more than a colorable argument that it does."  1113(c) Hr'g Tr. 196:16-17, Apr. 19, 2012 ("Apr. 19 Hr'g Tr.")[2]

## INTRODUCTION

1.      There are two key features of the IBT LBF for which there is more than a colorable argument of violating ERISA law:  (1) the approach that a MEPP would use to apply the so-called "New Employer Pool" method to calculate withdrawal liability; and (2) the approach a MEPP would use to apportion reallocation liability to Hostess in the event such a MEPP incurs a mass withdrawal.  As explained in greater detail below, the New Employer Pool concept that IBT is proposing (and which several critical status Teamsters' MEPPs have adopted) is premised on a legal fiction that violates the statutory scheme as to when an employer withdraws from a MEPP.  Additionally, the IBT's proposed approach to apportion mass withdrawal reallocation liability directly conflicts with the applicable PBGC regulation, and was expressly rejected by the PBGC in 2008 in connection with a series of regulatory changes to the mass withdrawal reallocation rules.

---

[2]      Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Motion of Debtors and Debtors in Possession to (a) Reject Certain Collective Bargaining Agreements and (b) Modify Certain Retiree Benefit Obligations, Pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code [Docket No. 174] (the "1113/1114 Motion").

NYI-4449390

2.       Each of these novel features is a creative attempt by the IBT to allay Hostess'

concern that, were it to re-enter seriously underfunded MEPPs, it would renew the risk of

significant future withdrawal liability and mass withdrawal reallocation liability.  Each

prescribes a process to determine Hostess' withdrawal and mass withdrawal liability that is

different from the normative rules found in the applicable statue or regulation.  No court has yet

to address whether either of the features conforms to – or is prohibited by –  those rules.  They

are legally untested, and each feature would reduce Hostess' future liability risk by shifting it to

other MEPP contributing employers.  Because ERISA's multiemployer plan rules include an

express grant of standing to employers to challenge practices that violate the statutory scheme,

the adversely impacted employers would be permitted to challenge their application

post-implementation.  Given the serious arguments that these protocols are legally improper,

Hostess (and by extension an investor) has a bona-fide concern that a court would enjoin a

MEPP's use of them at some point in the future.  The prospect that these purported protections

will not immunize Hostess from the risk of large and unquantifiable future withdrawal and mass

withdrawal liability attendant to Hostess' re-entering critical status MEPPs buttresses Hostess'

broader conclusion that the IBT LBF pension proposal remains a serious hindrance to the

sustainability of a reorganized Hostess.

## **ARGUMENT**

**A.      THE APPROACH TO THE NEW EMPLOYER POOL IN THE IBT LBF RAISES
SERIOUS ERISA CONCERNS THAT COULD POTENTIALLY TRAP HOSTESS
IN SERIOUSLY UNDERFUNDED, CRITICAL STATUS MEPPs.**

3.       When a contributing employer to an underfunded MEPP completely withdraws

from such MEPP,  ERISA requires that the MEPP trustees determine and assess withdrawal

liability.  For these purposes, a complete withdrawal occurs when the contributing employer

2

"*permanently* ceases to have an obligation to contribute under the plan," or "*permanently* ceases

all covered operations under the plan."  Employee Retirement Income Security Act of 1974, as

amended ("ERISA") § 4203(a), 29 U.S.C. § 1383(a) (emphasis added).  The word "permanent"

modifies both possible conditions for a complete withdrawal.  It is not defined in ERISA, and in

interpreting the word "permanent" a court would be expected to apply the word's ordinary,

common meaning.  *Lee v. Bankers Trust Co.,* 166 F.3d 540, 544 (2d Cir. 1999) ("[i]t is axiomatic

that the plain meaning of a statute controls its interpretation").[3]

4.      After an employer incurs a complete withdrawal, ERISA requires that such

withdrawing employer be assessed its then allocable share of the MEPP's unfunded vested

benefits.  ERISA specifies four different methods that a MEPP may adopt to calculate the

amount of unfunded vested benefits to allocate to the withdrawing employer.  ERISA

§§ 4211(b), (c), 29 U.S.C. §§ 1391(b), (c).  In addition, ERISA § 4211(c)(5)(A), 29 U.S.C.

§ 1391(c)(5)(A),  authorizes the PBGC to prescribe a procedure to allow MEPPs to adopt

alternative methods other than those set forth in ERISA § 4211.

5.      Consistent with the statutory grant of authority, the PBGC has promulgated a

regulation that allows a MEPP to apply to the PBGC for approval of an alternative method of

allocating unfunded vested benefits to determine the amount of withdrawal liability, and the

regulation provides that the PBGC will approve such alternative method if it determines that the

alternative "would not significantly increase the risk of loss to plan participants or beneficiaries

---

[3]      The relevant statutory history of ERISA § 4203(a), 29 U.S.C. § 1983, provides that a mere temporary
cessation of covered operations or the obligation to contribute should not be treated as a complete
withdrawal. *See* S. Rep. No. 1076, 96th Cong., 2d Sess. at 12, 13 (Apr. 1980) (plan sponsor must determine
"that the cessation of covered operations or obligation to contribute is not merely temporary"); *see also
Western Dominion Coal Co. and UMW 1950 and 1975 Pension Plans*, 6 Empl. Ben. Cases 2353 (Arb.
1985) (same).

NYI-4449390

or to the PBGC." 29 C.F.R. § 4211.23(a).  This regulation does not, however, offer guidance on the predicate question of whether the employer has actually incurred the withdrawal that necessarily gives rise to the assessment and allocation of liability.  It merely addresses the question of what methods a MEPP may employ to allocate unfunded vested benefits *after* an employer has legally withdrawn.  It assumes for such purposes that there has been a complete withdrawal.  Indeed, the PBGC has consistently taken the position that it will not rule or advise on the *ex ante* issue of whether there has been a withdrawal for ERISA § 4203 purposes.  *See, e.g.,* PBGC Op.  87-8 (1987); PBGC Op.  84-14 (1984).

6.  One of Hostess' serious concerns in re-entering critical status MEPPs is that re-entry effectively traps Hostess into uncertain and unquantifiable exposure to sharp increases in contribution rates, excise taxes when a MEPP's annual contributions are insufficient to improve funding, and mass withdrawal liability.  1113(c) Hr'g Tr. 58:7-12, Apr. 18, 2012 (the "Apr. 18 Hr'g Tr.") (Testimony of G. Rayburn).[4]  More specifically, if Hostess re-enters a seriously underfunded MEPP whose financial condition continues to worsen,  its only ability to eliminate these risks would be to completely withdraw (assuming union agreement to permit it).  But such a withdrawal would result in Hostess being liable for its then allocable share of the unfunded vested benefits, which in a teetering MEPP would be significant and could result in a "spring back" of withdrawal liability amounts as much or far greater than those which Hostess currently confronts and for which it will seek discharge in these chapter 11 cases.  *See* Apr. 18 Hr'g Tr. 179:19-180:20, 181:11-21, 222:15 223:5 (Testimony of M. Hofing).  Hostess would thus find itself in the Catch-22 of either (i) confronting enormous withdrawal liability, or (ii) remaining in

---

[4]  *See* Trial Ex. D-97 (Hofing Decl.) at ¶¶ 11 and 24 (explaining contribution volatility risk in critical status MEPPs), 12 n.6 and 24 (explaining excise tax risk in critical status MEPPs), and 14 (explaining mass withdrawal liability risk).

4

the critical status MEPP and confronting steep contribution increases, excise taxes, and continuing exposure to future mass withdrawal liability.

7.      The IBT LBF makes an effort to address that concern.  A centerpiece of the IBT LBF is the concept of using a New Employer Pool to allocate unfunded vested benefits in any post-reentry calculation of withdrawal liability.  Specifically,  the IBT LBF provides that Hostess only would be required to re-enter MEPPs to which it previously contributed if such MEPP agrees, *inter alia,* "to adopt a New Employer Pool or amend its existing New Employer Pool (the 'New Employer Amendments')."  *See* Trial Ex. T-214 at ¶ (P)(1).  At least two MEPPs very recently adopted the New Employer Pool concept for allocating unfunded vested benefits following a withdrawal:  the Central States Teamsters Fund, and the New England Teamsters & Trucking Industry Fund ("NETTI").  *See* Apr. 18 Hr'g Tr. 187:23-188:4, 191:13-19 (Testimony of M. Hofing) (acknowledging that Central States and NETTI "have established new employer pool . . .  structures").  The IBT LBF intends that other MEPPs would adopt the same protocols and enable Hostess to re-enter as a new employer.

8.      Essentially, under the New Employer Pool approach, the MEPP creates two notional pools of assets and liabilities exclusively for purposes of determining an employer's liability upon a complete withdrawal.  If the employer is deemed to be in the New Employer Pool, and thereafter withdraws, its allocable share of unfunded vested benefits at such withdrawal will be determined by "the assets and liabilities allocated to the new employer pool." *See id.* 221:2-9 (Testimony of M. Hofing)[5]

---

[5]      As a practical matter, any such underfunding would arise if an employer's contributions and investment earnings fall short of the present value of the pension benefits earned by such employer's employees, or to the extent that other employers in the New Employer Pool withdraw from such MEPP and are unable to pay their withdrawal liability.

NYI-4449390

9.      A further explication of how the New Employer Pool concept works is in the publicly available description that NETTI has posted on its web-site entitled "Process For Current Contributing Employers Transitioning To New Employer Status" ( "NETTI New Employer Pool Process," attached hereto as Exhibit 1).[6]  NETTI describes its New Employer Pool arrangement as follows:

> The Trustees created the Pension Fund's second withdrawal liability pool [NETTI's term for "New Employer Pool"] as a means to minimize the likelihood of withdrawal liability for the employers participating in the second withdrawal liability pool. The liabilities created within the second withdrawal liability pool from the accrual of benefits will be measured against the assets allocated to the second withdrawal liability pool by contributions and investment earnings.  The combined experience of the New Employers . . . *and the Current Contributing Employers who negotiate to transition into the second withdrawal liability pool* will be analyzed annually in a separate and distinct calculation from the original first withdrawal liability pool.

NETTI New Employer Pool Process at 15 (emphasis added).

10.      It is clear from this explanation that the NETTI New Employer Pool arrangement is designed not merely to attract employers that never previously contributed to that MEPP, but also to encourage "Current Contributing Employers [to] negotiate transition into the second withdrawal liability pool" from the original first withdrawal liability pool . *See id.* at 15.  NETTI explains the steps that current contributing employers should take to migrate from the original withdrawal liability pool into the second withdrawal liability pool: (i) "notify its local union" that its wishes to migrate into the Pension Fund's second withdrawal liability pool, (ii) "negotiate with the local union pension contribution rates," (iii) "negotiate with the local union and Pension

---

[6]      The NETTI New Employer Pool Process is available at http://www.nettipf.com//pdf_files/newplanspd.pdf.

Fund regarding future benefit accruals," and (iv) most crucially, "[a]gree to pay your withdrawal liability as assessed in the first withdrawal liability pool." *Id*.

11.    In other words, the NETTI New Employer Pool arrangement essentially is a device by which existing contributors are provided an opportunity to shield themselves in any future withdrawal from increases in underfunding in the old pool of assets and liabilities, through an agreement in which they would allegedly "withdraw" and pay off their existing withdrawal liability, and then promptly "re-enter" the MEPP assigned to the New Employer Pool. Everything would be arranged in advance, including the contribution and pension accrual rates upon re-entry. NETTI's New Employer Pool rules do not specify or suggest that a current contributing employer would cease contributions even temporarily, let alone permanently, prior to re-entering the MEPP. A contributing employer's pre-arranged re-entry into the MEPP and its assignment to the New Employer Pool is designed to be simultaneous with the alleged withdrawal that gives rise to the need for re-entry.

12.    But not every existing contributing employer will either be financially able or allowed to migrate from the original withdrawal liability pool into the second withdrawal liability pool. A current contributing employer that does not have the financial ability to pay off its current withdrawal liability would not be admitted.[7] Furthermore, as NETTI has made clear, "[t]he Trustees reserve the right to accept or reject negotiated arrangements for Current Contributing Employers transitioning into the Pension Fund's second withdrawal liability pool. The Trustees will review the analysis relating to . . . Current Contributing Employer's projected financial health and stability of their industry, and other factors deemed relevant for managing

---

[7]    This would presumably include not merely financially weak employers, but profitable employers that are large contributors to a critical status MEPP for whom the balance sheet impact of a large withdrawal liability assessment and cash flow burden of paying off that assessment render the option infeasible.

7

the Pension Fund's second withdrawal liability pool to incur no future withdrawal liability." *Id.*
at 16.

13.     Current contributing employers that cannot migrate to the New Employer Pool
will continue to be at risk for the underfunding in the old employer pool, and although the
contributors that do migrate to the New Employer Pool will be required to pay off their allocable
share of unfunded vested benefits in order to be admitted to the New Employer Pool, such
employers, unlike those that remain in the old employer pool, would be immunized from any
future increases in the underfunding in such old pool.  *See* Apr. 18 Hr'g Tr. at 185:15-22,
221:2-9 (Testimony of M. Hofing).  The employers that remain in the old employer pool will be
left to fund any liabilities (including so-called orphan liabilities relating to prior terminated
employers),  for which the now exiting employers' withdrawal payments are insufficient.[8]  As
the IBT expert Harry Wilson conceded in his trial testimony in response to questioning, a key
objective of the IBT LBF New Employer Pool approach is to "materially change the risk profile
of a company in the new pool *as opposed to a company in the old pool*."  *See* Apr. 19 Hr'g Tr.
54:19-22 (emphasis added).

14.     For those employers saddled with the more significant risk profile in the old pool,
there is recourse.  ERISA's multiemployer plan rules grant employers the right to sue when a
MEPP undertakes acts that violate the multiemployer plan rules of ERISA.  Section 4301(a)(1)
of ERISA, 29 U.S.C. § 1451, states in pertinent part that an "an employer . . . who is adversely
affected by the act or omission of any party under this subtitle with respect to a multiemployer

---

[8]     *See* Ex. D-97 (Declaration of M. Hofing) at ¶ 20 (explaining orphan liabilities); *see also* Apr. 18 Hr'g Tr.
166:14-167:2 (Testimony of M. Hofing) (same).

plan . . . may bring an action for appropriate legal or equitable relief or both." [9]   Current

contributing employers for which migration into the New Employer Pool is not reasonably

available have a strong legal argument at their disposal to attack the legality of the approach to

the New Employer Pool taken by NETTI and Central States and potentially other MEPPs.

They can credibly argue that the New Employer Pool approach is based on a legal fiction: *i.e.,*

currently contributing employers that "withdraw" from the MEPP and immediately "re-enter"

into the New Employer Pool have not incurred a "complete withdrawal" from the MEPP at all.

There is not even a temporary cessation of the obligation to contribute, and nothing remotely

approaching a "permanent" cessation that is necessary to effect a withdrawal.  Although MEPPs

assuredly do not want to allow existing contributing employers to migrate to and have the

protection from allocation of future underfunding provided by the New Employer Pool method

without paying the MEPP for  such privilege, these MEPPs have designed a program based on

the conceit of a "withdrawal" and immediate "re-entry" in order to effect the migration.

15.     ERISA § 4207(a), 29 U.S.C. § 1387(a), and PBGC regulations at 29 C.F.R.

§ 4207, expressly provide that if an employer completely withdraws from a MEPP, is amortizing

its withdrawal liability, and then subsequently re-enters and resumes contributions at a sufficient

level, the MEPP is required to waive the remaining withdrawal liability.  *See, e.g.,* 29 C.F.R.

§§ 4207.1 (general rule), 4207.5(a) (MEPP required to abate all of employer's withdrawal

liability upon re-entry if the contribution base units with respect to which it has obligation to

contribute during year following re-entry are at least 30% of prior contribution base units prior to

withdrawal).  Yet the basic premise that underlies NETTI's and Central States' New Employer

---

[9]      ERISA § 4301 is part of Subtitle E of Title IV of ERISA, and contains the rules governing multiemployer
plan withdrawal and mass withdrawal liability.  *See* 29 U.S.C. §§ 1301-1453.

Pool re-entry approach is to offer certain employers a shield from old pool liabilities in return for payment of "withdrawal" liability that is neither abated nor otherwise compromised upon "re-entry." These MEPPs' skirting of the abatement rules is further indication that their model is not predicated upon a true "withdrawal" and "re-entry" and is legally flawed.

16.    Were Hostess to re-enter such a MEPP and be assigned to the New Employer Pool, it would thereafter be at risk that any time a sophisticated contributing employer seeks but is denied entry into the New Employer Pool, or is financially unable to migrate, it sues under ERISA § 4301, 29 U.S.C. § 1451, on the ground that such denial adversely affects its interests, and unfairly benefits those employers that migrate into the New Employer Pool in a manner that contravenes the statutory rules. Section 4301 of ERISA, 29 U.S.C. § 1451, expressly provides that, in such case, the employer could seek equitable relief. The adversely affected employer would seek a declaration that the approach used to operate the New Employer Pool method is in conflict with ERISA's multiemployer plan rules. It also would likely seek an injunction collapsing the New Employer Pool and re-creating a single pool of all MEPP assets and liabilities for purposes of allocating unfunded benefits following a withdrawal, in order to create a level playing field for all existing employer contributors. In such a case, Hostess would lose the protection of the New Employer pool method for allocating any withdrawal liability, and it would face precisely the Catch-22 described above and which it needs to avoid.

17.    To be sure, use of a New Employer Pool solely as a method to allocate unfunded vested benefits in the event of an employer's statutory withdrawal is not legally objectionable. Rather, it is the approach certain MEPPs have taken to operate the New Employer Pool method that is legally problematic. There does not appear to be any concern over the legality of a MEPP adopting a New Employer Pool method that is limited to employers that never historically

10

contributed to such MEPP, or to employers that incurred a complete withdrawal according to the statutory standard, and some time later re-enter the MEPP (in which case, an employer that is paying its withdrawal liability and re-enters the MEPP would be entitled to an abatement).[10]

18.    But there is no indication in the record that the IBT LBF would condition Hostess' re-entry into MEPPs only to those that restrict operation of the New Employer Pool to truly new employers, or to those that previously contributed, incurred a complete withdrawal in accordance with ERISA § 4203, and then re-entered.  Indeed, the IBT intends that under the IBT LBF Hostess would be required to re-enter MEPPs like NETTI and Central States, and any other MEPP that makes the New Employer Pool available to contributing employers that engage in the fiction of "withdrawal" and "re-entry."  In recognition of Hostess' express concern about the legal uncertainty respecting this form of New Employer Pool, the IBT LBF also includes an additional purported protection designed to allay Hostess' fears.  Hostess will be allowed to withdraw and exit any MEPP that it re-enters if "[t]here is a final, non-appealable order of a court of competent jurisdiction holding that a MEPP's New Employer Amendments are substantively illegal in a material respect and such illegality cannot be corrected through reasonable measures."  Trial Ex. T-214 at ¶ (P)(2)(b)(viii).  Although the proposal was well-intended, the protection is illusory.  The problem is that if a legal challenge succeeds in obtaining an injunction that collapses the two pools and requires *ab initio* the use of a single pool for

---

[10]    Although not established in the record, it appears that the PBGC has approved use of the New Employer Pool method at both NETTI and Central States, pursuant to 29 C.F.R. § 4211.23(a).  As indicated *supra*, at ¶ 5, that regulation speaks only to alternative methods to allocate unfunded vested benefits and calculate liability if an employer has completely withdrawn, and not the predicate issue of whether there has been a lawful withdrawal.  The PBGC letters approving NETTI's and Central States' adoption of the New Employer Pool method would not pass judgment on the legality of the separate issue of whether NETTI and Central States are operating the New Employer Pool method in a manner so that employers immediately migrate from the old pool to the new pool through the legal fiction of a withdrawal and re-entry.

purposes of allocating unfunded vested benefits, the exit right granted Hostess would be useless.

Its right to withdraw and exit, if thereafter utilized, would result in the calculation of withdrawal

liability based on the single pool.

19.     At bottom, the New Employer Pool method contained in the IBT LBF, and the

approach critical status MEPPs like Central States and NETTI have employed in implementing

it, is filled with legal uncertainties.  There is a serious legal risk that it will not work in operation,

and thus will not materially alter Hostess' risk profile upon re-entry to a poorly funded, critical

status MEPP.  Were a reorganized Hostess to re-enter such MEPPs under these circumstances, it

would face significant financial exposure in the form of increased contributions, excise taxes and

mass withdrawal liability.

**B.      THE IBT LBF's PROPOSED APPORTIONMENT RULE IN THE CASE OF MASS WITHDRAWAL REALLOCATION LIABILITY FACIALLY CONFLICTS WITH THE APPLICABLE PBGC REGULATION, AND IS SUBJECT TO SERIOUS RISK THAT IT WILL NOT LEGALLY APPLY IN THE EVENT OF A MASS WITHDRAWAL.**

20.     Another serious concern for Hostess in re-entering seriously underfunded, critical

status MEPPs relates to Hostess' potential liabilities in the event of a mass withdrawal.  A mass

withdrawal occurs if a MEPP terminates by the withdrawal of every employer contributor, or

substantially all the employers withdraw pursuant to an agreement.  *See* ERISA § 4219(c)(1)(D),

29 U.S.C. § 1399(c)(1)(D); *see also* 29 C.F.R. § 4219.1(b)(1).  As Hostess explained in its

Statement in Response to the Statement of PBGC in Response to Debtors' Reference to Part

4219 of the Code of Federal Regulations in Debtors' Omnibus Reply Memorandum [Docket

No. 714] at 2, 3, when a MEPP nears insolvency there is a risk MEPP trustees may have a

fiduciary duty to involuntarily terminate all remaining employers and intentionally trigger a mass

withdrawal, in order to increase cash flow into the MEPP through the imposition of mass

withdrawal liability.

21.     In the case of a mass withdrawal, an affected employer is not only assessed

withdrawal liability as a consequence of its withdrawal, but also is thereafter assessed a separate,

***additional*** liability due to the departure of all employers (*i.e.*, due to the mass withdrawal).  *See*

*id.* at ¶ 14.  This is known as mass withdrawal "reallocation liability."  29 C.F.R. § 4219.11.[11]

Furthermore, not only is an employer liable for reallocation liability if it withdrew as part of the

mass withdrawal termination or as part of an agreement to withdraw, but any employer that

withdrew within the two plan years preceding the year of the mass withdrawal also is liable for

reallocation liability.  29 C.F.R. § 4219.12(c).  In other words, mass withdrawal reallocation

liability applies a two-year look-back to sweep in additional liable employers.  *Cf.* Apr. 18 Hr'g

Tr. 179:19-180:20, 181:11-21, 222:15-223:5 (Testimony of M. Hofing) (describing reallocation

liability).

22.     Essentially, an employer's reallocation liability is determined in three steps.  First,

approximately a year after the mass withdrawal occurs (which the applicable regulations call the

"mass withdrawal valuation date"), the MEPP trustees are required to recalculate the "total

unfunded vested benefits" of the entire pension plan trust.  *See* ERISA § 4219(c)(1)(D)(ii), 29

U.S.C. § 1399(c)(1)(D)(ii).  Thus, in a mass withdrawal, reallocation liability is not determined

based on different notional pools of assets and liabilities.  The entire pension trust underfunding

is recalculated and allocated to employers.  Moreover, in recalculating total unfunded vested

benefits, the MEPP must use interest rates and actuarial assumptions to value liabilities that are

prescribed by the PBGC.  *See* 29 C.F.R. § 4219.15(b) (attached hereto as Exhibit 2); 29 C.F.R. §

4281.13(a); *see also* Trial Ex. D-97 (Hofing Decl. at ¶ 14).  The mandated PBGC rates are

---

[11]     In the mass withdrawal context, therefore, there is an assessment of initial withdrawal liability, followed by a recalculation of that original assessment by addition of  reallocation liability.

typically very conservative, and the recalculated unfunded vested benefits for purposes of

relocation liability are likely to be far higher than the determination of unfunded vested benefits

for purposes of calculating a withdrawing employer's regular withdrawal liability. *See* Apr. 18

Hr'g Tr. 180:1-7 (Testimony of M. Hofing).[12]  Second, after recalculating the MEPP's total

unfunded vested benefits, the MEPP must then "fully allocate those unfunded vested benefits

among all employers liable for reallocation liability."  29 C.F.R. § 4219.15(a).  Third, a MEPP

must then add to an employer's allocable share of these recalculated, unfunded vested benefits its

portion of other employers' allocated shares that the MEPP determines to be uncollectible.

29 C.F.R. § 4219.15(c)(2).

     23.     PBGC regulations set forth the general rule for determining a liable employer's

allocable share of reallocation liability.  29 C.F.R. § 4219.15(c)(1).  The employer's allocable

share is the amount of the total recalculated unfunded vested benefits multiplied by a fraction,

the numerator of which is the "yearly average of the employer's contribution base units during

the three plan years preceding the employer's withdrawal," and the denominator of which is the

total contribution base units during that three year period for all employers liable for reallocation

liability.  *Id.*  For these purposes, a "contribution base unit" – often called "CBU" – is the unit

with respect to which an employer is obligated to contribute to the plan.  For example, as is the

case in most Teamster MEPPs, if contributions are required for each hour worked, the

employer's total employee hours that give rise to MEPP contributions will be its CBUs for that

year.

---

[12]     The currently-required rates are found at http://www.pbgc.gov/prac/interest/ida.html  (requiring discount rates of 3.11%  for liabilities  up to 20 years and 3.36% thereafter).

24.     Hostess employs approximately 7,000 workers who participate in IBT MEPPs.

*See* Apr. 18 Hr'g Tr. 24:18-21 (Testimony of G. Rayburn).  In several of the severely

underfunded, critical status MEPPs, such as the Central States, NETTI, and the Local 550

Teamsters Funds, Hostess is a significant contributor when measured on a CBU basis. In the

event of a mass withdrawal and imposition of reallocation liability, application of the prescribed

CBU fraction is likely to mean a significant allocation and assessment: Hostess' share of total

CBUs will be large, and so too will its share of reallocation liability as determined under the rule

prescribed in 29 C.F.R. § 4219.15(c)(1).

25.     Even assuming that Hostess were to reach agreement with its unions to re-enter

critical status MEPPs at a significantly reduced contribution rate from the prior negotiated rates,

because mass withdrawal reallocation liability is allocated based on CBUs and not contributions,

if a reorganized Hostess continues to employ approximately the same number of IBT represented

employees who work roughly the same number of hours following re-entry into critical status

MEPPs, it could face exposure to the same proportionate amount of reallocation liability as it did

prior to bankruptcy.  *See* Apr. 18 Hr'g Tr. 179:19-180:20, 181:11-21, 222:15-223:5 (discussing

prospect that in a mass withdrawal, the liabilities that Debtors may discharge in this proceeding

will "spring back" in the form of reallocation liability).

26.     Given Hostess' concern about the significant reallocation liability it would face in

the event that critical status MEPPs incur a mass withdrawal, the IBT LBF seeks to protect

Hostess by requiring that it would need only to re-enter those MEPPs that create and apply a new

method for determining an employer's share of reallocation liability, one that uses a completely

different fraction.  Specifically, the IBT LBF provides that "in the event Hostess is included in a

15

mass withdrawal, the MEPP will allocate mass withdrawal liability proportionate to each employer's initial withdrawal liability."  Trial Ex. T-214 at ¶ (P)(2)(a).

27.    The idea behind this approach is tied to Hostess' participation in the New Employer Pool.  As discussed *supra*, at ¶ 11, the New Employer Pool method for calculating regular withdrawal liability is intended to shield employers from legacy underfunding in the old pool and ensure that unfunded vested benefits allocable in the event a New Employer withdraws would be minimal.[13]  By apportioning reallocation liability based not on CBU history but on an employer's initial withdrawal liability relative to all other employers' initial withdrawal liability, the resulting fractions for Hostess and other participating employers in the New Employer Pool should be far less than their resulting fractions if the general rule of 29 C.F.R. § 4219.15(c)(1) were to apply.   The IBT LBF says as much: "the mass withdrawal will not result in the re-allocation of Old Employer Pool unfunded liabilities to New Employers like Hostess."  *Id.* Indeed, as Mr. Wilson testified, this proposal is intended by IBT to cause Hostess' reallocation liability to be virtually zero.  *See generally* Apr. 19 Hr'g Tr. 58:24-60:22 (Testimony of H. Wilson).

28.    The legal risk discussed *supra,* at Section A, that the New Employer Pool approach employed by MEPPs like NETTI and Central States would be found illegal and inoperative, also jeopardizes the effectiveness of IBT's proposed solution to reallocation

---

[13]    This is not necessarily the case, and it would be risky for an employer that enters a properly implemented New Employer Pool to assume that there would be no or minimal withdrawal liability.  As Mitchell Hofing testified, whether there would be underfunding attributable to the New Employer Pool would still depend on the appropriate actuarial assumptions and asset investment performance of the MEPP.  If a MEPP uses aggressive investment return assumptions to support the pension accrual rates, and actual returns fall short of such rates, there is likely to be underfunding in the New Employer Pool.  *See*  Trial Ex. D-97 (Hofing Decl.) at ¶ 21; Apr. 18 Hr'g Tr. 164:7-19 (Testimony of M. Hofing).   But Hostess concedes  that such withdrawal liability should be far less than if an employer participating in a severely underfunded, critical status MEPP remained in the old employer pool.

liability.  That is, if the New Employer Pool is inoperative, then Hostess' initial withdrawal

liability would be based not on the assets and liabilities in the New Employer Pool but the assets

and liabilities in the MEPP as a whole.  In such a case, Hostess' initial withdrawal liability would

be much higher.  To then apportion reallocation liability based on such initial withdrawal

liability relative to all employers' initial withdrawal liability would cause Hostess to have a very

significant reallocation liability.

29.      Yet even on a stand-alone basis the IBT's proposed solution has a serious legal

problem.  To be sure, PBGC regulations make clear that a MEPP need not use the CBU fraction

rule set forth in 29 C.F.R. § 4219.15(c)(1) to apportion reallocation liability.  Specifically, 29

C.F.R. § 4219.15(d) states that a MEPP may adopt rules to calculate an employer's allocable

share of reallocation liability "in a manner other than that prescribed in paragraph (c)(1) of the

section."  But that regulation further requires that any such alternate rule must "allocate the

plan's unfunded vested benefits to substantially the same extent the prescribed rules would," and

must "operate and be applied uniformly with respect to each employer."  29 C.F.R. § 4219.15(d).

30.      The IBT LBF apportionment proposal conflicts directly with the plain meaning of

the language of this regulation.  Although proposed in good faith to meet Hostess' concern, the

IBT LBF proposal is precisely intended to avoid apportioning reallocation liability to Hostess "to

substantially the same extent the prescribed rules would."  29 C.F.R. § 4219.15(d).  It is intended

to cause Hostess to incur very little if any reallocation liability.  In contrast, the many hours

worked by Hostess' approximately 7,000 employees participating in IBT MEPPs would yield a

significant number of CBUs, and thus a potentially significant ratio under the generally

prescribed rule of 29 C.F.R. § 4219.15(c)(1).  The IBT LBF proposal, if adopted by the MEPPs,

on its face would fail to satisfy the requirement that an alternative reallocation liability

17

apportionment rule yield substantially similar results to the rule prescribed in 29 C.F.R. §
4219.15(c)(1).

31.    Crucially, in late 2008, the PBGC rejected the use of apportioning reallocation
liability based on initial withdrawal liability.  Prior to 2009, the prescribed rule for apportioning
reallocation liability in a mass withdrawal was not the current rule based on the employer's CBU
ratio.  In fact, the pre-2009 prescribed rule to apportion reallocation liability in 29 C.F.R.
§ 4219.15(c)(1) was the very initial withdrawal liability fraction rule that IBT is proposing here.
*See* 29 C.F.R. § 4219.15(c)(1) (2008 ed.) (attached as Exhibit 3).  But in late 2008, the PBGC
chose to amend 29 C.F.R. § 4219.15(c)(1).  It expressly abandoned an apportionment rule based
on initial withdrawal liability in favor of the current CBU fraction rule.  *See* Methods for
Computing Withdrawal Liability; Reallocation Liability Upon Mass Withdrawal; Pension
Protection Act of 2006, 73 Fed. Reg. 79628-79637 (December 30, 2008) (to be codified at 29
C.F.R. pts. 4001, 4211 and 4219).  The preamble to the final rule change makes clear that the
PBGC rejected the initial withdrawal liability fraction because of concern over the inequity of
the original rule, and the risk presented by the rule's effect of shifting reallocation liability to a
smaller group of contributing employers otherwise liable in the event of a mass withdrawal:

> PBGC believes the current allocation fraction for reallocation
> liability **must be modified to address those situations in which
> employers** – who would otherwise be liable for reallocation
> liability – **have little or no initial withdrawal liability** . . . and,
> therefore have a zero (or understated) reallocation liability. . . .
>
> **PBGC believes the absence of initial withdrawal liability should
> not generally exempt an otherwise eligible employer from
> reallocation liability.  By shifting reallocation liability away from
> some employers, the current regulation increases the allocable
> share of other employers in a mass withdrawal,** increases the risk
> of loss of benefits to participants, and increases the financial risk to
> PBGC.  To ensure that reallocation liability is allocated broadly,
> among all liable employers, PBGC is amending § 4219.15(c) . . . to
> replace the current allocation fraction based on initial withdrawal

18

liability with a new allocation fraction for determining an employer's allocable share of reallocation liability.

*Id*. at 79633, 79634 (emphasis added).[14]

32.     Not only is the IBT LBF rule proposed for Hostess precisely the apportionment rule that the PBGC *rejected* in 2008, but the IBT's expressed intent for its proposed method to determine Hostess' reallocation liability is to accomplish precisely the consequences that caused the PBGC to reject that very same method in favor of the CBU fraction test.  Assuming the New Employer Pool would be operated as IBT intends, it would reduce the withdrawal liability of Hostess (and the other New Employer Pool participants) to small levels, which in turn would cause them to incur small reallocation liabilities.  Yet PBGC regulations make clear that in apportioning reallocation liability, all recalculated unfunded vested benefits must be allocated to employers. 29 C.F.R. § 4219.15(a).  So by reducing the amount of reallocation liability New Employer Pool participants like Hostess would receive, MEPP trustees would necessarily need – as the PBGC itself recognized in 2008 – "to increase[] the allocable share of other employers in a mass withdrawal."  73 Fed. Reg. at 79634.  It is difficult to see how a court could hold that a rule so antithetical to the design and intent of 29 C.F.R. § 4219.15(c)(1) would nonetheless apportion reallocation liability "to the same extent that the prescribed rule would." [15]

---

[14]     The current rule to apportion reallocation liability based on CBUs went into effect for mass withdrawal  on or after January 29, 2009.  *Id*. at 79634.

[15]     Hostess recognizes that 29 C.F.R. § 4219.15(d) also contains a sentence that if a MEPP's application of an alternative rule to apportion reallocation liability "would increase the reallocation liability of any employer, they may be effective with respect to that employer earlier than three full plan years after their adoption only if the employer consents to the application of the rules to itself."  This sentence does not authorize a MEPP, following  a three-year wait, to apply an apportionment  rule contrary to the "substantially to the same extent" requirement in the first sentence of the regulation. Indeed, a reading of § 4219.15(d) to allow a  material increase in an employer's reallocation liability as long as it went into effect three years after adoption would cause the  "substantially to the same extent" requirement to be a nullity.  Furthermore, the regulatory history indicates that the three year rule was put into the regulation because the PBGC did not want an employer that withdrew two years prior to a mass withdrawal to have its mass withdrawal reallocation liability increased, in any amount, by a change in the apportionment rules made after it had

33.    It is not difficult at all to identify the employers that would be motivated to bring a legal challenge to the IBT LBF's proposed apportionment rule.  Employers stuck in the old employer pool (even assuming the New Employer Pool could withstand legal challenge) would have far larger initial withdrawal liability amounts precisely because the unfunded vested benefits in the old employer pool, including orphan liabilities, would be exclusively attributable to them.  In the event of a mass withdrawal, application of the IBT LBF initial withdrawal liability fraction to them would result in a much larger share of the reallocation liability.

34.    Thus, significant employer contributors to a critical status MEPP, to the extent that they remain in the old employer pool, would be severely adversely affected by the IBT-LBF proposal.  And as detailed above, ERISA § 4301 would grant such employers standing to sue to enjoin use of the IBT's proposed apportionment rule.  An adversely affected employer would not have to wait until the actual assessment of reallocation liability to bring its challenge.  Such a legal challenge could be brought at virtually any time after the MEPP trustees were to amend the MEPP to adopt such a rule.  Alternatively, such legal challenge could be brought once the MEPP has declared a mass withdrawal and prior to the date the MEPP actually imposes reallocation liability, so as to enjoin *ex ante* an actual imposition of reallocation liability based on the legally invalid approach contemplated by the IBT LBF.  *See generally* 29 C.F.R. §  4219.11 (b)(3) (requiring reallocation liability to be determined and imposed within one year after issuance of

---

(continued…)

withdrawn.   *See* 51 Fed. Reg. 10300, 10316 (Mar. 25, 1986) (to be codified at 29 C.F.R. pts. 2640 and 2647).  The logical reading of the entirety of 29 C.F.R. § 4219.15(d) is that alternate apportionment methods that cause modest increases in an employer's reallocation liability may not go into effect, absent the employer's permission, for three years following adoption, and under no circumstances can the alternate rule yield results that are not at least substantially similar to those reached by the prescribed rule of 29 C.F.R. §  4219.15(c)(1).

20

the actuary report for the plan year in which the mass withdrawal is declared).[16]

35.    At bottom,  the proposed apportionment ratio for reallocation liability set forth in the IBT LBF is filled with legal uncertainties.  There is a serious legal risk that, sooner or later, it would be challenged by other employers participating in the MEPPS and that the courts will enjoin the MEPPs' trustees from using that apportionment ratio when calculating reallocation liabilities upon a mass withdrawal.  Thus, the proposed rule will not materially alter Hostess' risk profile upon re-entry to a poorly funded, critical status MEPP.  Were a reorganized Hostess to re-enter such MEPPs under these circumstances, it would face significant financial exposure to mass withdrawal liability.[17]

---

[16]    If an old pool employer waits until it is actually assessed reallocation liability, it may attack the assessment exclusively through arbitration.  29 C.F.R. § 4219.16(g).  If a challenge to the legitimacy of a MEPP's use of the IBT proposed apportionment ratio were raised in arbitration, it is possible the arbitrator would be constrained only to alter  the challenging employer's reallocation liability.  But were an arbitrator to reject use of the IBT proposed apportionment fraction and order a recalculation of such employer's reallocation liability, the MEPP trustees would then have a fiduciary obligation to recalculate and re-assess the reallocation liability of the New Employer Pool employers like Hostess. To fail to do so would run afoul of the requirement in ERISA § 4219(c)(1)(D)(ii), 29 U.S.C. § 1399(c)(1)(d)(ii) that in the case of  a mass withdrawal "the total unfunded vested benefits of the plan shall be **fully allocated** among all such employers."  (emphasis added.)

[17]    Even in the unlikely case that  the affected MEPPs were to obtain an opinion letter from PBGC stating that the IBT's proposed apportionment ratio satisfied 29 C.F.R. § 4219.15(d), the legal risk still would be material.  An agency's  interpretation of its own regulations is not entitled to deference, nor is it controlling if it is inconsistent with the regulation. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000)(agency opinion not entitled to deference if it is essentially an attempt to "create de facto a new regulation" rather than promulgate or change a regulation). And of course, the PBGC is not bound by an opinion letter.  It is free to change its position.  Indeed, *Wise v. Ruffin*, 914 F.2d 570, 580 (4th Cir. 1990), involved a change in PBGC position with respect to a question regarding initial withdrawal liability, where it first issued an opinion letter taking one position and three years later publishing a Notice of Interpretation in the Federal Register taking a conflicting position. So, even were PBGC to issue an opinion letter supporting the IBT's proposal, in future years it would be free to take a different position.

21

## <u>CONCLUSION</u>

36.    For the foregoing reasons, and for those reasons previously detailed in the

1113/1114 Motion, in the Debtors' Omnibus Reply Memorandum in Support of the 1113/1114

Motion [Docket No. 444], and by the Debtors at the final evidentiary hearing on the 1113/1114

Motion, the 1113/1114 Motion should be granted.


Dated: May 9, 2012
     New York, New York           Respectfully submitted,


        /s/ Corinne Ball
        Corinne Ball
        Heather Lennox
        Lisa Laukitis
        Michael D. Silberfarb
        JONES DAY

        222 East 41st Street
        New York, New York  10017
        Telephone:  (212) 326-3939
        Facsimile:  (212) 755-7306

        - and -

        Todd S. Swatsler
        Robert W. Hamilton
        JONES DAY
        325 John H. McConnell Boulevard
        Suite 600
        Columbus, Ohio  43215
        Telephone:  (614) 469-3939
        Facsimile:  (614) 461-4198

        ATTORNEYS FOR DEBTORS AND
        DEBTORS IN POSSESSION

NYI-4449390

Exhibit 1

# New England Teamsters & Trucking Industry Pension Fund

I. Alternative Schedule of Benefits for Members Working for New Contributing Employers

II. Process for Current Contributing Employer Transitioning to New Employer Status

| **Union Trustees** | **Employer Trustees** |
|---|---|
| David W. Laughton, Co-Chairman | William M. Vaughn, III, Co-Chairman |
| Robert E. Bayusik | J. Leo Barry |
| Gerald F. Gross | Frank Keller |
| Sean M. O'Brien | |

We are pleased to announce an Alternate Schedule of Benefits that will apply to Contributing New Employers who begin their first participation with the Pension Fund on or after October 1, 2010. This Alternate Schedule of Benefits was developed with the intention of eliminating the possibility of future withdrawal liability and will not apply to current plan participants of the Pension Fund. This Alternate Schedule of Benefits will be part of the existing New England Teamsters & Trucking Industry Pension Fund. The Alternative Schedule of Benefits is summarized in Part I of this document.

In addition, the Pension Fund has created a second pool for withdrawal liability purposes. New Employers joining the Pension Fund on or after October 1, 2010 and who negotiate the Alternative Schedule of Benefits will automatically be part of the second withdrawal liability pool. Current Contributing Employers may be able to join the second withdrawal liability pool, subject to certain conditions, as outlined in Part II of this document.

We, as Trustees of the Pension Fund, have the ultimate authority to determine the right to benefits, the amount of benefits and whether a person qualifies for participation in the Pension Fund. This authority includes the crediting of Service and the right to discontinue or modify the Pension Fund. In particular you should note that no Local Union Officer, Business Agent, Local Union Employee, New Employer, New Employer Representative, Fund Office Employee, Fund Consultant, or Attorney can change the terms of the Pension Fund or commit the Trustees of the Pension Fund unless they have the express authority of the Trustees.

When granting acceptance for participation to a New Employer the Trustees may impose any terms and conditions we consider necessary or appropriate to preserve the actuarial soundness of the Plan and to preserve an equitable relationship between the basis of contributions of all Contributing Employers and the benefits provided for all Participants. Such conditions may include but shall not be limited to the granting of a lower scale of benefits.

While we have taken great care to ensure the accuracy of this summary, it is written in much simpler language than the Pension Fund document. Therefore, there may be an unintended conflict between this summary and the Rules and Regulations of the Pension Fund. In the event of any such conflict, the Rules and Regulations of the Pension Fund will prevail.

The Trustees continuously monitor the Pension Fund aided by their professional advisors. They work together to ensure that the Pension Fund is financed soundly and operated in a consistent and uniform manner. The benefits provided by the Pension Fund are very valuable to both you and your family and we want to ensure that you understand the value of the Pension Fund. If you have any questions or require additional information regarding the Pension Fund and your benefits, we invite you to write to the Pension Fund Office. Notices, government filings and other information about the Pension Fund are posted to our website *www.nettipf.com.*

The Board of Trustees

October, 2010

1

## LAYOUT OF THIS BOOK

This book defines certain terms precisely. You should bear in mind that the defined terms may not correspond with the plain English connotation of the word. Throughout this book the defined terms start with an Upper Case Letter.

### PART 1 – New Employers Alternative Schedule of Benefits

**Section 1** describes definitions of key terms.

**Section 2** describes the conditions for becoming a participant.

**Section 3** describes the calculation of your Pension Credit.

**Section 4** describes how you can become Vested.

**Section 5** describes the computation of your Accrued Benefit.

**Section 6** describes Retirement and Retirement Benefits.

**Section 7** describes termination of Covered Employment.

**Section 8** describes death before retirement.

**Section 9** describes optional forms of payment.

**Section 10** describes procedures for claiming your benefit.

**Section 11** describes statutory disclosure information.

**Section 12** describes information about the Pension Fund.

### PART II – Current Employers Transition Into Second Withdrawal Liability Pool

## PART I – New Employers Alternative Schedule of Benefits

## SECTION 1 - DEFINITIONS

### Actively Engaged in Covered Employment

You are Actively Engaged in Covered Employment if you earned at least 18 months of Pension Credit in the last 36 months. For retirement benefits the last 36 months ends on the last day of Covered Employment. For death benefits the last 36 months ends the day before the month of death.

In the event that you did not earn 18 months of Pension Credit in the last 36 months because you were disabled and receiving disability income benefits from any New Employer paid disability program (e.g. Federal, State, Workers Compensation, local union health and welfare fund) the 36 months will be extended and the months during which you received disability income will be excluded from the test period.

However, if your Collective Bargaining Agreement provides you with Pension Credit after the date of disability up to 12 months of such Pension Credit will count toward the required 18 months.

### Calendar Year

The Calendar Year consists of the 12 months from January 1 to the following December 31.

### Collective Bargaining Agreement

Collective Bargaining Agreement means a negotiated agreement between your local union and your New Employer that includes an hourly rate of contributions to the Pension Fund.

2

## Contribution Rate

Contribution Rate means the hourly rate of contributions required to be paid by your New Employer to the Pension Fund as agreed to in a Collective Bargaining Agreement.

## Disqualifying Employment

You engage in Disqualifying Employment if, during a month, you work 49 or more hours for an New Employer not participating in the Pension Fund performing a job covered by the Pension Fund that is also in the geographic area covered by the Pension Fund. Paid non-work time counts towards the 49 hours. When you reach age 70 no employment will be considered Disqualifying Employment.

## Employee

You are an Employee if you are covered by a Collective Bargaining Agreement that requires a New Employer to make contributions to the Pension Fund on your behalf. You are not an Employee if you are an owner or an officer of your New Employer. However, you are an Employee as an owner/operator if you are under the direction and control of your New Employer. A valid owner/operator relationship occurs when your New Employer pays your Social Security tax, workers compensation insurance, and other expenses incidental to employment and pays for your wages and equipment rental separately.

## Fund

Fund means the New England Teamsters & Trucking Industry Pension Fund created April 11, 1958 and amended effective October 1, 2010 to create a schedule of benefits for New Employers.

## Fund Year

The Pension Fund Year consists of the 12 months from October 1 to the following September 30.

## Hour of Service

The Pension Fund uses Hours of Service in figuring the amount of Pension Credit you accrue each year and whether you have earned a Year of Vesting Service. An Hour of Service is each hour that your New Employer is obligated to make contributions to this Fund. Hours of Service include each hour as an Employee that you are paid or entitled to payment by an New Employer, including time on paid vacation, paid holidays, periods of absence on account of illness, off-the-job injury or on-the-job injury for which contributions are due to the Pension Fund. Hours of Service also include hours for which back pay and/or retroactive contributions is awarded or agreed to by a New Employer.

## New Employer

A New Employer is a New Employer who is <u>first</u> required to make contributions to the Pension Fund on or after October 1, 2010 for work by an Employee either through a Collective Bargaining Agreement or by written agreement with the Trustees.

## Normal Retirement Age

Your Normal Retirement Age is the later of age 65 and the 3rd anniversary of the date you participated in the Pension Fund.

## Participant

Participant means a pensioner or an Employee who meets the requirements for participation (see ***Section 2***) or a former

3

Employee who has a vested right to a pension under this Fund (see *Section 4*).

**Pension Credit**

Pension Credit is service with a New Employer during which contributions were payable to the Pension Fund on your behalf (see *Section 3*).

**Qualified Spouse**

Your spouse is the person to whom you are considered married under applicable law. A former spouse may also be considered a spouse under the terms of a qualified domestic relations order granted as part of a divorce proceeding. Your spouse is a Qualified Spouse if you have been married for at least one year at the time your pension commences. If you have been married for less than one year, your spouse will become a Qualified Spouse on the first anniversary of your marriage. If you marry or re-marry after your pension has started your spouse will generally not become a Qualified Spouse. The one exception to this rule is if you were married at retirement, elected a Husband & Wife with Pop-Up, and your wife died. In this case you may again opt for a Husband & Wife with Pop-Up, with your new spouse as beneficiary, after being re-married for one year.

## SECTION 2 - PARTICIPATION IN THE PLAN

In order to earn a benefit from the Pension Fund you must first qualify to be a Participant in the Pension Fund.

**Becoming a Participant**

You become a Participant on January 1 or July 1 after you first meet all of the following requirements:

- You are an Employee;
- You are Actively Engaged in Covered Employment;
- You have completed 12 consecutive months of Covered Employment from your date of hire; and
- You completed at least 1,000 hours of service with the New Employer during the 12 consecutive months from your date of hire.

**Termination of Participation**

You will cease to be a Participant if you do not complete at least 500 Hours of Service in Covered Employment in any Calendar Year and you have not reached vested status. Participation ceases on the last day of that Calendar Year. Solely for the purpose of determining whether you remain a Participant, you will be deemed to work 40 hours in Covered Employment for each week (or partial week) that you receive Workers Compensation.

**Reinstatement of Participation**

If your Participation has terminated, you will become a Participant once you again meet the requirements for Participation. The 12 consecutive month period will be the Calendar Year instead of the 12 months from your date of hire.

## SECTION 3 - PENSION CREDIT

**Pension Credit**

Pension Credit is granted on the basis of Hours of Service for which your New Employer has an obligation to contribute under an approved Collective Bargaining Agreement.

4

The number of months of Pension Credit you earn each Calendar Year is determined using the following table.

| Hours of Service To Pension Credit Table | |
| --- | --- |
| Hours of Service in Calendar Year | Months of Pension Credit in Calendar Year |
| Less than 750 | 0 |
| 750 to 999 | 6 |
| 1,000 to 1,199 | 7 |
| 1,200 to 1,399 | 8 |
| 1,400 to 1,599 | 9 |
| 1,600 to 1,799 | 10 |
| 1,800 to 1,999 | 11 |
| 2,000 or more | 12 |

**Pension Credit for Military Service**

The Pension Fund grants Pension Credit for Participants who serve in the armed forces of the United States to the extent required by law. Military service includes service in the Armed Forces, the Armed Forces Reserves, the Army National Guard and the Air National Guard while engaged in active and inactive duty training and full time National Guard duty. If you leave Covered Employment to enter military service you must resume Covered Employment with your New Employer after your honorable discharge from military service in order to qualify for Pension Credit. The deadline for you to report back to work depends on how long your Military Service lasted. For Military Service of less than 31 days you must report to work during the next regular work period after your Military Service ends. For 31 to 180 days you must apply for re-employment within 14 days. For Military Service over 180 days you must

apply for re-employment within 90 days. You also need to notify the Trustees of your return from military service and provide the Trustees with such evidence they require to verify your period of military service. In the event that your New Employer commences participation in the Pension Fund while you are in military service, you will be treated as if in full time employment and will earn Pension Credit, provided you have a timely return to your New Employer after your honorable discharge and that you were in full-time employment when your military service commenced.

## SECTION 4 - VESTING IN YOUR BENEFIT

In order to receive a benefit from the Pension Fund you must first become vested in the Pension Fund.

**Vesting Conditions**

You become vested by accumulating 3 years of Vesting Service or 3 years of Pension Credit or by attaining Normal Retirement Age. You earn 1 year of Vesting Service for each Calendar Year in which you complete at least 1,000 Hours of Service in Covered Employment. You also earn vesting service if you work in non-Covered Employment with the same New Employer provided that such non-Covered Employment is continuous with, and immediately before or immediately after, a period of Covered Employment.

*Vesting Example 1*

You are employed by a New Employer on October 20, 2010 and by July 1, 2011 you complete at least 1,000 Hours of Service and become a Participant. You did not earn 1,000 Hours of Service in 2010, but you earned at least 1,000 Hours

5

of Service in 2011, 2012 and 2013. On December 31, 2013 you have 3 years of Vesting Service, and are fully vested in your benefit.

*Vesting Example 2*

You are employed by a New Employer on October 20, 2010 and by July 1, 2011 you complete at least 1,000 Hours of Service and become a Participant. You do not earn 1,000 Hours of Service in 2010. You earn 750 Hours of Service in 2011, 2012, 2013 and 2014. During this time you earned no years of Vesting Service but earn a total of 24 months of Pension Credit. In 2015 and 2016 you earn at least 2,000 Hours of Service. On December 31, 2016 you have 2 years of Vesting Service which is less than the 3 years required to be fully vested.

**Leaving Covered Employment Prior to Vesting**

If you leave Covered Employment before becoming vested you will not be entitled to a benefit from the Pension Fund. However, your Vesting Service and Pension Credit Service are not cancelled even if you leave Covered Employment before becoming vested. Therefore, if you re-join the Pension Fund you may add to your Vesting Service.

## SECTION 5 - ACCRUAL AND ACCRUED BENEFIT

**Accrued Benefit**

Pension benefits are based on your Pension Credit Accrual.

**Limit on Pension Credit**

The number of years of Pension Credit taken into account when calculating your Accrued Benefit is based on your contribution rate. If your New Employer contributes on your behalf at a rate below $3.76 per hour, your Pension Credit is limited to 25 years. If your New Employer contributes on your behalf at a rate at or above $3.76 per hour, your Pension Credit is limited to 33 years. If you have more years of Pension Credit than your Pension Credit limit, then the number of years up to your Pension Credit limit which produce the highest Accrued Benefit will be used in the calculation.

*Pension Credit Example 1*

You have 30 years of Pension Credit in 2040 and your Collective Bargaining Agreements have never required a Contribution Rate of more than $2.50 per hour. Your Pension Credit is limited to 25 years.

*Pension Credit Example 2*

In 2035 through 2040 your Contribution Rate is increased to at least $3.76 per hour. You are allowed to earn an extra year of Pension Credit in each of these five years so that the limit on your Pension Credit increases to 30 years.

**Pension Credit Accrual**

The amount of benefit you earn each year is based on the highest contribution rate that applied to you during that Calendar Year, provided you earned at least 600 Hours of Service at that contribution rate. If you do not earn 12 months of Pension Credit in a Calendar Year, your accrual is calculated by multiplying the applicable monthly Pension Credit Accrual by the ratio of the months of Pension Credit to 12.

| Pension Contribution Rates and Pension Accrual Values Minimum Pension Contribution Rate of $1.00 | | | |
|---|---|---|---|
| *Contribution Rate* | *Pension Accrual* | *Contribution Rate* | *Pension Accrual* |
| $1.00 | $40 | $3.50 | $140 |
| $1.25 | $50 | $3.75 | $150 |
| $1.50 | $60 | $4.00 | $160 |
| $1.75 | $70 | $4.50 | $180 |
| $2.00 | $80 | $5.00 | $200 |
| $2.25 | $90 | $5.50 | $220 |
| $2.50 | $100 | $6.00 | $240 |
| $2.75 | $110 | $6.50 | $260 |
| $3.00 | $120 | $7.00 | $280 |
| $3.25 | $130 | $7.50 | $300 |

The Pension Fund accepts contribution rates in 5¢ increments. Your pension accrual will be based on your negotiated contribution rate. The contribution rates and pension accruals in the table above are illustrative.

*Pension Accrual Example*

You started working in Covered Employment in 2011 and earned one year of Pension Credit in each Calendar Year until December 31, 2016. Your New Employer contributed at a rate of $2.00 in 2011 and 2012, $2.25 in 2013 to 2014, and $2.50 in 2015 and 2016. Your Accrued Benefit is $540 per month (2 years x $80 + 2 years x $90 + 2 years x $100) payable at age 65.

## SECTION 6 - RETIREMENT

### General Requirements

In addition to meeting the specific eligibility requirements applicable to each pension benefit you must make timely application for a benefit as described in **Section 10**.

### Qualifying for a Normal Retirement Pension

You will qualify for a normal retirement pension upon reaching Normal Retirement Age of 65 and achieving vested status.

### Qualifying for an Early Retirement Pension

You will qualify for an early retirement pension upon reaching age 55 as long as you have accrued at least 15 years of Pension Credit and accrued at least 6 months of Pension Credit after age 49.

### Qualifying for a Late Retirement Pension

You will qualify for a late retirement pension by deferring your pension beyond Normal Retirement Age of 65 and achieving vested status.

### Commencing Your Pension

Your pension will commence after you complete a pension application described in **Section 10** and you elect the form in which you want your pension payable described in **Section 9**.

### Calculations

If as a result of the calculations described below, your monthly pension benefit is not a whole dollar amount, it will be increased to the next dollar. The early retirement factor table only shows factors at whole ages. If your age at early

7

retirement is not a whole number of years, the applicable factor will be found by interpolation.

## Amount of Normal Retirement Pension

The monthly amount of normal retirement pension is your Accrued Benefit at the time of your retirement.

## Amount of Early Retirement Pension

The monthly amount of your Early Retirement Pension is your Accrued Benefit multiplied by the early retirement factor from the table below.

| Early Retirement Pensions | |
|---|---|
| Age at Retirement | Early Retirement Factor |
| 65 | 100% |
| 64 | 95% |
| 63 | 90% |
| 62 | 85% |
| 61 | 80% |
| 60 | 75% |
| 59 | 67% |
| 58 | 59% |
| 57 | 51% |
| 56 | 43% |
| 55 | 35% |

## Amount of Late Retirement Pension

The monthly amount of your late retirement benefit is the larger of your monthly Accrued Benefit at the time of your late retirement using your Pension Credit at the date of your late retirement or your monthly Accrued Benefit at your Normal Retirement Age actuarially adjusted to your late retirement age.

## Employment after Retirement

You must inform the Pension Fund Office if you engage in any employment after you have commenced receiving benefits and prior to age 70. The notification must be sent to the Pension Fund Office no later than 15 days after starting work. If the employment is deemed to be Disqualifying Employment you will not receive a benefit while so employed. In addition, if you engage in Disqualifying Employment before your Normal Retirement Age your benefit may be suspended for three months following your Disqualifying Employment. Furthermore, if you fail to notify the Pension Fund Office of your employment, or willfully misrepresented the nature of your employment, your benefit may be suspended for an additional 6 months. When you cease to be in Disqualifying Employment your benefit will recommence in the same amount and in the same form as you were receiving prior to your Disqualifying Employment. If the employment is Covered Employment you will continue to receive your pension provided you do not work more than 48 hours per month. When your Covered Employment ceases you may be entitled to a larger pension because you earned additional Pension Credit. The additional benefit will be calculated solely with regard to the Pension Credit earned after your first retirement. However, your total Pension Credit cannot exceed the maximum limit described above.  If you work 49 or more hours per month in Covered Employment your benefit will be suspended. Upon cessation of Covered Employment your benefit will be re-calculated to reflect any additional Pension Credit earned. Your benefit will be the larger of:

8

1. The pension computed as if you are retiring for the first time and reduced to reflect the payments received before your benefit was suspended.

2. An additional benefit will be calculated solely with regard to the Pension Credit earned after your first retirement and added to your initial benefit. However, your total Pension Credit cannot exceed the maximum limit described in ***Section 5***.

### Non-Duplication with Other Benefits

You will not receive your pension while you receive weekly accident and sickness benefits from any jointly administered, collectively-bargained trust fund or other New Employer-financed, temporary-disability insurance plan. If you are under age 65, your pension may be adjusted to ensure that you receive the value of your Normal Retirement Age pension. If you receive or are entitled to receive workers compensation benefits your pension will be reduced by the amount of workers compensation. These reductions will cease when you reach age 65. If your workers compensation benefits have ended your pension will be restored. Your workers compensation may end due to a lump sum settlement, a structured settlement, or a final award for permanent disability.

### SECTION 7 - TERMINATION OF COVERED EMPLOYMENT

### Benefits on Termination of Employment

If you leave Employment before meeting the requirements for an immediate pension but after meeting the vesting requirements (***Section 4***) you qualify for a pension from the Pension Fund. If you have less than 15 years of Pension Credit you must wait until age 65 before you can start receiving your benefit. If you have more than 15 years of Pension Credit you can commence your pension at any time after age 55.

### Amount of Benefit

If you have less than 15 years of Pension Credit your benefit will be the Normal Retirement benefit. If you have more than 15 years of Pension Credit your benefit will be the Normal Retirement or Early Retirement benefit, whichever you choose. See ***Section 6*** for a description of these benefits.

### Death Benefits after Termination of Employment

If you die before your pension commences your spouse will become entitled to a surviving spouse benefit. The benefit payable is calculated as the survivor's part of the 50% Husband & Wife pension that you could have elected to receive had you lived long enough to retire. If you had over 15 years of Pension Credit your spouse may elect to commence the surviving spouse's pension at any time after your 55th birthday. If you had less than 15 years of Pension Credit the pension will start at your 65th birthday.

### Rounding of Calculations

If your monthly pension benefit is not a whole dollar amount, it will be increased to the next dollar.

### Keep in Touch

Your right to a pension is a valuable benefit. If your permanent address changes please notify the Pension Fund so that we can send you notices about your benefit.

9

**General Requirements**

You must make timely application for your benefit to commence as described in *Section 10*. After your benefit commences it may be suspended if you engage in Covered Employment or Disqualifying Employment. The rules for suspension of benefits may be found in *Section 6.*

## SECTION 8 - DEATH BEFORE RETIREMENT

**Surviving Spouse Annuity**

If you die while Actively Engaged in Covered Employment after becoming vested in your benefit, your Qualified Spouse will become entitled to a surviving spouse benefit. If you had been married less than one year at your death your spouse cannot become a Qualified Spouse.

If you are eligible for early retirement, the benefit payable is calculated as the survivor's part of the 50% Husband & Wife pension that you could have elected to receive had you retired on your date of death. Alternately, your Qualified Spouse may elect to commence the surviving spouse's pension at any time between the date you would have first become eligible to retire and your 65th birthday.

*Surviving Spouse Annuity Example*

You are currently age 60 and have an accrued benefit of $2,000 per month. You are eligible to retire on an Early Pension of $1,500 per month ($2,000 x 75% early retirement factor). If you die while Actively Engaged in Covered Employment your Qualified Spouse may elect to receive an immediate pension $675 per month (50% share of $1,500 x 90% conversion factor). Alternately your Qualified Spouse could elect to defer

the pension until your 65th birthday and receive $900 per month (50% share of $2,000 x 90% conversion factor).

## SECTION 9 - OPTIONAL FORMS OF PAYMENT

When you commence receipt of your benefits you can elect between several optional forms.

The Pension Fund offers three forms of benefit. If you make no election your benefit will be payable in the 100% Husband & Wife with Pop-Up form if you are married and in the Single Life form if you are not married. If you are married less than a year, your pension will be payable in the Single Life form until your first wedding anniversary and then converted to the 100% Husband & Wife with Pop-Up form.

The benefit calculations set out in the retirement and termination sections of this book are all in the Single Life form. Conversion factors are used to convert the Single form into the other available forms.

**Spousal Consent**

If you are married and do not select a Husband & Wife form of payment your spouse must consent to your election.

**Single Life**

Under the Single Life form you receive a monthly benefit for your lifetime equal to 100% of your Accrual Benefit. On your death no further payments are made.

**Husband & Wife Pensions**

The Husband & Wife with Pop-Up pension pays a benefit on your death to your Qualifying Spouse, however if your spouse predeceases you your pension pops-up to your original Single

10

Life pension. The amount your spouse receives can be either 50% or 100% of the amount payable while you are alive. The conversion factors to convert your Single Life pension to Husband & Wife pension depend on your age and your spouse's age at your retirement date.

Your Qualifying Spouse is the spouse to whom you were married when your benefit commenced. If you remarry after your pension commences your new spouse can only become a Qualifying Spouse in the following circumstances:

- Your original Qualifying Spouse died, and

- You elect a new Husband & Wife with Pop-Up pension within 12 months of remarriage. Your new spouse will become a Qualifying Spouse on your first wedding anniversary and your popped-up Single Life pension will be converted to the elected Husband & Wife with Pop-Up pension.

*Husband & Wife Pension Example 1*

Your Single Life pension is $3,000 per month. Your 50% Husband & Wife pension with Pop-Up is $2,400 per month ($3,000 x 80%) payable while you and your spouse are alive. On your death your Qualifying Spouse, if alive, receives a monthly benefit of $1,200 ($2,400 x 50%) payable for life.

*Husband & Wife Pension Example 2*

Your Single Life pension is $3,000 per month. Your 50% Husband & Wife with Pop-Up pension is $2,400 per month ($3,000 x 80%) payable while you and your spouse are alive. On your Qualifying Spouse's death your benefit, if alive, pops-up to $3,000 per month.

**Rounding of Calculations**

If as a result of the calculations described below, your monthly pension benefit is not a whole dollar amount, it will be increased to the next dollar.

## SECTION 10 - CLAIMING YOUR BENEFIT

There are certain administrative procedures that you must follow to claim your benefit.

**Application to Start Your Pension**

You should contact the Pension Fund Office either in writing or by telephone to obtain the application forms. When contacting the Pension Fund Office provide your Social Security Number and a current permanent address. An application will only be processed if you will meet the requirements for a pension on your proposed retirement date.

**Timing of the Application**

The processing of a retirement application takes time. The Pension Fund Office prefers to receive notification of your retirement about 6 months before your planned retirement date. Generally, a pension may not commence until one month has passed from the date the Pension Fund Office receives your completed application form, because the Pension Fund Office needs to include all your Hours of Service worked up to your actual retirement date in calculating your benefit.

**Completing the Application Package**

The application package contains the forms necessary to apply for a benefit, including a description of the choices you have regarding the form of your pension and what you must do to

11

get it. The financial impact of each of the available forms is also illustrated. You will be asked to specify your last day of Covered Employment and your planned date of retirement. Additionally you will be asked for a list of all New Employers you worked for and the dates of Covered Employment so that the Pension Fund Office may verify its records. You must also complete a Social Security form authorizing the Social Security Administration to disclose a detailed history of your employment history which will be used only in the event that the Pension Fund Office records and your list of Employment differ substantially.

### Filing a Claim for Death Benefits

Your surviving spouse, Designated Beneficiary or their representative should contact the Pension Fund Office as soon as possible after your death. The Pension Fund Office will inform them of the information required to process the benefit.

## SECTION 11 - STATUTORY DISCLOSURES

### Pension Benefit Guarantee Corporation

Your pension benefits under this multiemployer plan are insured by the Pension Benefit Guaranty Corporation (PBGC). The PBGC is a Federal insurance agency. The PBGC provides insurance cover to insolvent multiemployer plans through loans. A plan is considered insolvent if it does not have sufficient money to pay benefits due up to the PBGCs insurance limits. The maximum benefit that the PBGC guarantees is set by law. The guarantee equals your years of service multiplied by the sum of 100% of the first $11 of your accrual rate and 75% of the next $33 of your accrual rate. If you have 30 years of service the maximum monthly benefit

that the PBGC will guarantee is $1,072.50. The guarantee covers retirement pensions and termination pensions. The guarantee also includes the surviving spouse's death benefit. The guarantee does not cover non-vested benefits, increases in benefits or new benefits established within 5 years of insolvency or benefits in excess of PBGCs maximum.

If you want more information on the PBGCs multiemployer guarantee program contact the Pension Fund Office or the PBGC. The PBGCs address is:

Technical Assistance Division
1200 K Street, NW Suite 930
Washington DC, 20005-4026

Or call 1-800-400-7242 *(TTY/TDD* 1-800-877-8339 and ask to be connected to 800-400-7242) and ask for the Technical Assistance Division. You can also find information on the internet at *www.pbgc.gov*.

### Your Rights Under ERISA

The Pension Fund was established as the result of Collective Bargaining Agreements and its purpose is to improve the security and well-being of all Participants. As a Participant in the New England Teamsters & Trucking Industry Pension Fund you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Fund Participants shall be entitled to:

- Examine, without charge, at the plan administrators office and at specified locations, such as qualified worksites and union halls, all plan documents, including insurance contracts and Collective Bargaining Agreements, and a copy of the latest

annual report (Form 5500 Series) filed by the Pension Fund with the U.S. Department of Labor.

- Obtain copies of all plan documents upon written request to the plan administrator. The administrator may make a reasonable charge for the copies. Receive a summary of the Pension Funds annual financial report. The plan administrator is required by law to furnish you with a copy of this summary annual report. Obtain a statement telling you whether you have a right to receive a pension at Normal Retirement Age (age 65, or, if later, your 3rd anniversary of your Participation in the Pension Fund) and if so, what your benefits would be at Normal Retirement Age if you stop working under the Pension Fund now. If you do not have a right to a pension, the statement will tell you how many more years you have to work to get a right to a pension. This statement must be requested in writing and is not required to be given more than once every twelve (12) months. The Pension Fund must provide the statement free of charge.

In addition to creating rights for Fund Participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the Pension Fund, have a duty to do so prudently and in the interest of you and other Fund Participants and beneficiaries. No one, including your New Employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension ·benefit or exercising your rights under ERISA.

If your claim for a pension benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.  Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Fund documents or the latest annual report from the Pension Fund and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the Pension Funds decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. If it should happen that Fund fiduciaries misuse the Pension Funds money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

If you have any questions about your Fund, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor,

13

listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

## SECTION 12 – INFORMATION ABOUT THE PENSION FUND

### Fund Information

*Fund sponsor:* The Pension Fund sponsor is the Board of Trustees.

*Fund administrator:* The Pension Fund administrator is the Board of Trustees.

*New Employer Identification Number (EIN):* 04-6372430

*Fund Number:* 001

*Type of Fund:* The Pension Fund is a multiemployer defined benefit pension plan.

*Contributions to the Pension Fund:* Contributions to the Pension Fund are made by participating New Employers under terms set out in Collective Bargaining Agreements.

*Contracts covered:* The Pension Fund covers Employees represented by these Teamster Locals that have contracts requiring contributions: 25, 42, 59, 82, 122, 145, 170, 191, 251, 259, 340, 404, 443, 493, 559, 597, 633, 653, 671, 677 and 1035.

*Assets of the Pension Fund:* The assets of the Pension Fund are held in a trust administered by the Board of Trustees. The Board delegates management of the assets to professional investment managers and monitors the investments with assistance of independent investment advisors.

*Administration:* The Pension Fund employs a staff of administrators to collect and maintain the necessary records of Participants to calculate benefits and to answer questions about the Pension Fund.

*Withdrawal liability:* New Employers negotiating the Alternative Schedule of Benefits will automatically be placed in the Pension Fund's second withdrawal liability pool. The Trustees will manage and monitor this second withdrawal liability pool with the expressed goal of zero withdrawal liability in the second withdrawal liability pool.

*Fund address:* The Pension Funds address, for both correspondence and legal process, is

New England Teamsters & Trucking Industry Pension Fund
1 Wall Street, 4th Floor
Burlington, MA 01803
Telephone: 781-345-4400 or 800-447-7709

Internet: *www.nettipf.com*

14

## PART II – Current Employers Transition Into Second Withdrawal Liability Pool

Current Contributing Employers already contributing to the Pension Fund as of October 1, 2010 may negotiate to transition into the Pension Fund's second withdrawal liability pool.

The Trustees created the Pension Fund's second withdrawal liability pool as a means to minimize the likelihood of withdrawal liability for the employers participating in the second withdrawal liability pool. The liabilities created within the second withdrawal liability pool from the accrual of benefits will be measured against the assets allocated to the second withdrawal liability pool by contributions and investment earnings. The combined experience of the New Employers electing the Alternative Schedule of Benefits and the Current Contributing Employers who negotiate to transition into the second withdrawal liability pool will be analyzed annually in a separate and distinct calculation from the original first withdrawal liability pool.

The process by which Current Contributing Employers may negotiate to transition into the Pension Fund's second withdrawal liability pool, include, but are limited to the following steps:

- Notify the local union and/or the Pension Fund that you wish to explore a transition into the Pension Fund's second withdrawal liability pool.

- Agree to pay your withdrawal liability as assessed in the first withdrawal liability pool. This payment can either be made in a lump sum or according to a monthly schedule.

- Negotiate with the local union pension contribution rates. Employers who participate in the second withdrawal liability pool are not subject to the Pension Fund's Maintenance of Benefits requirements. Therefore, annually increasing pension contribution rates are not required.

- Negotiate with the local union and Pension Fund regarding future benefit accruals, based on negotiated pension contribution rates. The Pension Fund, with assistance from their actuaries, will determine the future benefit accruals based on an analysis of the bargaining parties' demographics, projected future experience, projected financial health and other relevant factors it deems appropriate to manage the second withdrawal liability pool for no withdrawal liability.

- Identify and negotiate transition rules with respect to vesting requirements, retirement age and eligibility and ancillary benefits.

- Identify and communicate special situations which may restrict a transition into the second withdrawal liability pool, such as a PBGC-qualified sale of assets of the contributing employer to an unrelated third party; possible 5-year free look exemption of withdrawal liability; possible construction industry withdrawal liability exemption; or inclusion of new bargaining unit into second withdrawal

15

liability pool without withdrawal of original bargaining unit from the first withdrawal liability pool.

- In order to demonstrate through actuarial projections that no withdrawal liability will be created within the second withdrawal liability pool by a Current Contributing Employers that is transitioning into the second withdrawal liability pool, certain benefit provisions or ancillary pension benefits may be altered, based on the bargaining parties' demographics and actuarial projections.

- The Pension Fund encourages any Current Contributing Employer who is considering transitioning to the second withdrawal liability pool to seek professional advice from attorneys, actuaries and/or benefits consultants. The Pension Fund is committed to a transparent negotiating process. The bargaining parties may wish to direct the advisors from both sides of the negotiating table to interact directly, thereby eliminating unwanted filters.

The Trustees reserve the right to accept or reject negotiated arrangements for Current Contributing Employers transitioning into the Pension Fund's second withdrawal liability pool. The Trustees will review the analysis relating to pension contributions; demographics of the bargaining party; proposed pension accruals, benefit structure and ancillary benefits; withdrawal liability payment terms; Current Contributing Employer's projected financial health and stability of their industry; and other factors deemed relevant for managing the Pension Fund's second withdrawal liability pool to incur no future withdrawal liability.

16

Exhibit 2

### § 4219.14 Amount of liability for 20-year-limitation amounts.

An employer that is liable for 20-year-limitation amounts shall be liable to the plan for an amount equal to the present value of all initial withdrawal liability payments for which the employer was not liable pursuant to section 4219(c)(1)(B) of ERISA. The present value of such payments shall be determined as of the end of the plan year preceding the plan year in which the employer withdrew, using the assumptions that were used to determine the employer's payment schedule for initial withdrawal liability pursuant to section 4219(c)(1)(A)(ii) of ERISA. Any liability for 20-year-limitation amounts determined under this section shall be limited by section 4225 of ERISA to the extent that section would have been limiting had the employer's initial withdrawal liability been determined without regard to the 20-year limitation.

### § 4219.15 Determination of reallocation liability.

(a) *General rule.* In accordance with the rules in this section, the plan sponsor shall determine the amount of unfunded vested benefits to be reallocated and shall fully allocate those unfunded vested benefits among all employers liable for reallocation liability.

(b) *Amount of unfunded vested benefits to be reallocated.* For purposes of this section, the amount of a plan's unfunded vested benefits to be reallocated shall be the amount of the plan's unfunded vested benefits, determined as of the mass withdrawal valuation date, adjusted to exclude from plan assets the value of the plan's claims for unpaid initial withdrawal liability and unpaid redetermination liability that are deemed to be uncollectible under § 4219.12(c)(1) or (c)(2).

(c) *Amount of reallocation liability.* An employer's reallocation liability shall be equal to the sum of the employer's initial allocable share of the plan's unfunded vested benefits, as determined under paragraph (c)(1) of this section, plus any unassessable amounts allocated to the employer under paragraph (c)(2), limited by section 4225 of ERISA to the extent that section would have been limiting had the employer's re-

allocation liability been included in the employer's initial withdrawal liability. If a plan is determined to have no unfunded vested benefits to be reallocated, the reallocation liability of each liable employer shall be zero.

(1) *Initial allocable share.* Except as otherwise provided in rules adopted by the plan pursuant to paragraph (d) of this section, and in accordance with paragraph (c)(3) of this section, an employer's initial allocable share shall be equal to the product of the plan's unfunded vested benefits to be reallocated, multiplied by a fraction—

(i) The numerator of which is the yearly average of the employer's contribution base units during the three plan years preceding the employer's withdrawal; and

(ii) The denominator of which is the sum of the yearly averages calculated under paragraph (c)(1)(i) of this section for each employer liable for reallocation liability.

(2) *Allocation of unassessable amounts.* If after computing each employer's initial allocable share of unfunded vested benefits, the plan sponsor knows that any portion of an employer's initial allocable share is unassessable as withdrawal liability because of the limitations in section 4225 of ERISA, the plan sponsor shall allocate any such unassessable amounts among all other liable employers. This allocation shall be done by prorating the unassessable amounts on the basis of each such employer's initial allocable share. No employer shall be liable for unfunded vested benefits allocated under paragraph (c)(1) or this paragraph to another employer that are determined to be unassessable or uncollectible subsequent to the plan sponsor's demand for payment of reallocation liability.

(3) *Contribution base unit.* For purposes of paragraph (c)(1) of this section, a contribution base unit means a unit with respect to which an employer has an obligation to contribute, such as an hour worked or shift worked or a unit of production, under the applicable collective bargaining agreement (or other agreement pursuant to which the employer contributes) or with respect to

1130

which the employer would have an obligation to contribute if the contribution requirement with respect to the plan were greater than zero.

(d) *Plan rules.* Plans may adopt rules for calculating an employer's initial allocable share of the plan's unfunded vested benefits in a manner other than that prescribed in paragraph (c)(1) of this section, provided that those rules allocate the plan's unfunded vested benefits to substantially the same extent the prescribed rules would. Plan rules adopted under this paragraph shall operate and be applied uniformly with respect to each employer. If such rules would increase the reallocation liability of any employer, they may be effective with respect to that employer earlier than three full plan years after their adoption only if the employer consents to the application of the rules to itself. The plan sponsor shall give a written notice to each contributing employer and each employee organization that represents employees covered by the plan of the adoption of plan rules under this paragraph.

[61 FR 34102, July 1, 1996, as amended at 73 FR 79636, Dec. 30, 2008]

### §4219.16 Imposition of liability.

(a) *Notice of mass withdrawal.* Within 30 days after the mass withdrawal valuation date, the plan sponsor shall give written notice of the occurrence of a mass withdrawal to each employer that the plan sponsor reasonably expects may be a liable employer under §4219.12. The notice shall include—

(1) The mass withdrawal valuation date;

(2) A description of the consequences of a mass withdrawal under this subpart; and

(3) A statement that each employer obligated to make initial withdrawal liability payments shall continue to make those payments in accordance with its schedule. Failure of the plan sponsor to notify an employer of a mass withdrawal as required by this paragraph shall not cancel the employer's mass withdrawal liability or waive the plan's claim for such liability.

(b) *Notice of redetermination liability.* Within 30 days after the date as of which the plan sponsor is required under §4219.11(b)(2) to have determined

the redetermination liability of employers, the plan sponsor shall issue a notice of redetermination liability in writing to each employer liable under §4219.12 for *de minimis* amounts or 20-year-limitation amounts, or both. The notice shall include—

(1) The amount of the employer's liability, if any, for *de minimis* amounts determined pursuant to §4219.13;

(2) The amount of the employer's liability, if any, for 20-year-limitation amounts determined pursuant to §4219.14;

(3) The schedule for payment of the liability determined under paragraph (f) of this section;

(4) A demand for payment of the liability in accordance with the schedule; and

(5) A statement of when the plan sponsor expects to issue notices of reallocation liability to liable employers.

(c) *Notice of reallocation liability.* Within 30 days after the date as of which the plan sponsor is required under §4219.11(b)(3) to have determined the reallocation liability of employers, the plan sponsor shall issue a notice of reallocation liability in writing to each employer liable for reallocation liability. The notice shall include—

(1) The amount of the employer's reallocation liability determined pursuant to §4219.15;

(2) The schedule for payment of the liability determined under paragraph (f) of this section; and

(3) A demand for payment of the liability in accordance with the schedule.

(d) *Notice to employers not liable.* The plan sponsor shall notify in writing any employer that receives a notice of mass withdrawal under paragraph (a) of this section and subsequently is determined not to be liable for mass withdrawal liability or any component thereof. The notice shall specify the liability from which the employer is excluded and shall be provided to the employer not later than the date by which liable employers are to be provided notices of reallocation liability pursuant to paragraph (c) of this section. If the employer is not liable for mass withdrawal liability, the notice shall also include a statement, if applicable, that the employer is obligated to continue

1131

Exhibit 3

would have been limiting had the employer's initial withdrawal liability been determined without regard to the 20-year limitation.

§ 4219.15 Determination of reallocation liability.

(a) *General rule.* In accordance with the rules in this section, the plan sponsor shall determine the amount of unfunded vested benefits to be reallocated and shall fully allocate those unfunded vested benefits among all employers liable for reallocation liability.

(b) *Amount of unfunded vested benefits to be reallocated.* For purposes of this section, the amount of a plan's unfunded vested benefits to be reallocated shall be the amount of the plan's unfunded vested benefits, determined as of the mass withdrawal valuation date, adjusted to exclude from plan assets the value of the plan's claims for unpaid initial withdrawal liability and unpaid redetermination liability that are deemed to be uncollectible under § 4219.12(c)(1) or (c)(2).

(c) *Amount of reallocation liability.* An employer's reallocation liability shall be equal to the sum of the employer's initial allocable share of the plan's unfunded vested benefits, as determined under paragraph (c)(1) of this section, plus any unassessable amounts allocated to the employer under paragraph (c)(2), limited by section 4225 of ERISA to the extent that section would have been limiting had the employer's reallocation liability been included in the employer's initial withdrawal liability. If a plan is determined to have no unfunded vested benefits to be reallocated, the reallocation liability of each liable employer shall be zero.

(1) *Initial allocable share.* Except as otherwise provided in rules adopted by the plan pursuant to paragraph (d) of this section, and in accordance with paragraph (c)(3) of this section, an employer's initial allocable share shall be equal to the product of the plan's unfunded vested benefits to be reallocated, multiplied by a fraction—

(i) The numerator of which is the sum of the employer's initial withdrawal liability and the employer's redetermination liability, if any; and

(ii) The denominator of which is the sum of all initial withdrawal liabilities

and all the redetermination liabilities of all employers liable for reallocation liability.

(2) *Allocation of unassessable amounts.* If after computing each employer's initial allocable share of unfunded vested benefits, the plan sponsor knows that any portion of an employer's initial allocable share is unassessable as withdrawal liability because of the limitations in section 4225 of ERISA, the plan sponsor shall allocate any such unassessable amounts among all other liable employers. This allocation shall be done by prorating the unassessable amounts on the basis of each such employer's initial allocable share. No employer shall be liable for unfunded vested benefits allocated under paragraph (c)(1) or this paragraph (c) to another employer that are determined to be unassessable or uncollectible subsequent to the plan sponsor's demand for payment of reallocation liability.

(3) *Special rule for certain employers with no or reduced initial withdrawal liability.* If an employer has no initial withdrawal liability because of the application of the free-look rule in section 4210 of ERISA, then, in computing the fraction prescribed in paragraph (c)(1), the plan sponsor shall use the employer's allocable share of unfunded vested benefits, determined under section 4211 of ERISA at the time of the employer's withdrawal and adjusted in accordance with section 4225 of ERISA, if applicable. If an employer's initial withdrawal liability was reduced pursuant to section 4209(a) or (b) of ERISA and the employer is not liable for *de minimis* amounts pursuant to § 4219.13, then, in computing the fraction prescribed in paragraph (c)(1) of this section, the plan sponsor shall use the employer's allocable share of unfunded vested benefits, determined under section 4211 of ERISA at the time of the employer's withdrawal and adjusted in accordance with section 4225 of ERISA, if applicable.

(d) *Plan rules.* Plans may adopt rules for calculating an employer's initial allocable share of the plan's unfunded vested benefits in a manner other than that prescribed in paragraph (c)(1) of this section, provided that those rules allocate the plan's unfunded vested

HeinOnline 1010

benefits to substantially the same extent the prescribed rules would. Plan rules adopted under this paragraph shall operate and be applied uniformly with respect to each employer. If such rules would increase the reallocation liability of any employer, they may be effective with respect to that employer earlier than three full plan years after their adoption only if the employer consents to the application of the rules to itself. The plan sponsor shall give a written notice to each contributing employer and each employee organization that represents employees covered by the plan of the adoption of plan rules under this paragraph.

### §4219.16   Imposition of liability.

(a) *Notice of mass withdrawal.* Within 30 days after the mass withdrawal valuation date, the plan sponsor shall give written notice of the occurrence of a mass withdrawal to each employer that the plan sponsor reasonably expects may be a liable employer under §4219.12. The notice shall include—

(1) The mass withdrawal valuation date;

(2) A description of the consequences of a mass withdrawal under this subpart; and

(3) A statement that each employer obligated to make initial withdrawal liability payments shall continue to make those payments in accordance with its schedule. Failure of the plan sponsor to notify an employer of a mass withdrawal as required by this paragraph shall not cancel the employer's mass withdrawal liability or waive the plan's claim for such liability.

(b) *Notice of redetermination liability.* Within 30 days after the date as of which the plan sponsor is required under §4219.11(b)(2) to have determined the redetermination liability of employers, the plan sponsor shall issue a notice of redetermination liability in writing to each employer liable under §4219.12 for *de minimis* amounts or 20-year-limitation amounts, or both. The notice shall include—

(1) The amount of the employer's liability, if any, for *de minimis* amounts determined pursuant to §4219.13;

(2) The amount of the employer's liability, if any, for 20-year-limitation

amounts determined pursuant to §4219.14;

(3) The schedule for payment of the liability determined under paragraph (f) of this section;

(4) A demand for payment of the liability in accordance with the schedule; and

(5) A statement of when the plan sponsor expects to issue notices of reallocation liability to liable employers.

(c) *Notice of reallocation liability.* Within 30 days after the date as of which the plan sponsor is required under §4219.11(b)(3) to have determined the reallocation liability of employers, the plan sponsor shall issue a notice of reallocation liability in writing to each employer liable for reallocation liability. The notice shall include—

(1) The amount of the employer's reallocation liability determined pursuant to §4219.15;

(2) The schedule for payment of the liability determined under paragraph (f) of this section; and

(3) A demand for payment of the liability in accordance with the schedule.

(d) *Notice to employers not liable.* The plan sponsor shall notify in writing any employer that receives a notice of mass withdrawal under paragraph (a) of this section and subsequently is determined not to be liable for mass withdrawal liability or any component thereof. The notice shall specify the liability from which the employer is excluded and shall be provided to the employer not later than the date by which liable employers are to be provided notices of reallocation liability pursuant to paragraph (c) of this section. If the employer is not liable for mass withdrawal liability, the notice shall also include a statement, if applicable, that the employer is obligated to continue to make initial withdrawal liability payments in accordance with its existing schedule for payment of such liability.

(e) *Combined notices.* A plan sponsor may combine a notice of redetermination liability with the notice of and demand for payment of initial withdrawal liability. If a mass withdrawal and a withdrawal described in §4219.18 occur concurrently, a plan sponsor may combine—

HeinOnline 1011