JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball
Heather Lennox
Lisa Laukitis
Veerle Roovers

- and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Ryan T. Routh

Attorneys for Debtors
and Debtors in Possession


# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                             :
In re                                                        :    Chapter 11
                                                             :
Hostess Brands, Inc., *et al.*,[1]                           :    Case No. 12-22052 (RDD)
                                                             :
                                      Debtors.               :    (Jointly Administered)
                                                             :
-------------------------------------------------------------x


### OMNIBUS OBJECTION OF DEBTORS AND DEBTORS IN POSSESSION TO MOTIONS OF NINE PENSION FUNDS AND THE BCT REQUESTING ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

---

[1]     The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Hostess Brands, Inc. (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Hostess Brands, Inc. ("Hostess") and its five domestic direct and indirect

subsidiaries, as debtors and debtors in possession (collectively with Hostess, the "Debtors"),

hereby object to the following motions (collectively, the "Motions"):

(i)     the Motion of the Automobile Mechanics' Local 701 Union and Industry Pension
        Fund for Order Pursuant to 11 U.S.C. §§ 503 and 1113(f) (Docket No. 682), filed
        by the Automobile Mechanics' Local 701 Union and Industry Pension Fund (the
        "Mechanics' Fund");

(ii)    the Motion of the Central Pension Fund for Entry of an Order Allowing and
        Directing Payment of Administrative Expense Claim (Docket No. 595), filed by
        the Central Pension Fund (the "Central Fund");

(iii)   the Motion of the Trustees of the RWDSU and Industry Pension Fund for an
        Order Directing Payment of Employee Benefit Contributions or, in the
        Alternative, Allowing an Administrative Expense Claim (Docket No. 737), filed
        by the Board of Trustees of the Retail, Wholesale and Department Store
        International Union and Industry Pension Fund (the "RWDSU Fund");

(iv)    the Motion of the I.A.M. National Pension Fund for an Order Directing Payment
        of Post Petition Employee Benefit Contributions and Allowing an Administrative
        Expense Claim for Unpaid Amounts (Docket No. 774), filed by the I.A.M.
        National Pension Fund (the "IAM Fund");

(v)     the Motion of the IUOE Stationary Engineers Local 39 Pension Trust Fund for an
        Order Directing Payment of Post Petition Employee Benefit Contributions and
        Allowing an Administrative Expense Claim for Unpaid Amounts (Docket
        No. 786), filed by the IUOE Stationary Engineers Local 39 Pension Trust Fund
        (the "IUOE Fund");

(vi)    the Motion of the IUOE Stationary Engineers Local 39 Annuity Trust Fund for an
        Order Directing Payment of Post Petition Employee Benefit Contributions and
        Allowing an Administrative Expense Claim for Unpaid Amounts (Docket
        No. 788), filed on behalf of the IUOE Stationary Engineers Local 39 Annuity
        Trust Fund (the "IUOE Annuity Fund");

(vii)   the Motion of the United Food and Commercial Workers Unions and Employers
        Midwest Pension Fund for Order Pursuant to 11 U.S.C. §§ 503 and 1113(f)
        (Docket No. 852), filed by the United Food and Commercial Workers Unions and
        Employers Midwest Pension Fund (the "UFCW Midwest Fund");

(viii)  the Motion of the Bakery, Confectionery, Tobacco Workers and Grain Millers
        International Union for an Order Directing Payment of Post Petition Employee

Benefit Contributions and Allowing an Administrative Expense Claim for Unpaid Amounts (Docket No 863), filed by the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union (the "BCT");

(ix)    the Motion of Bakery and Sales Drivers Local Union No. 33 Industry Pension Fund for Entry of an Order Allowing and Directing Payment of Administrative Expenses (Docket No. 874), filed by the Bakery and Sales Drivers Local Union No. 33 Industry Pension Fund (the "Bakery Drivers Fund"); and

(x)    the Motion of Mid-Atlantic Regional Council of Carpenters' Annuity Fund for Entry of an Order Allowing and Directing Payment of Administrative Expenses (Docket No. 901), filed by the Mid-Atlantic Regional Council of Carpenters' Annuity Fund (the "Carpenters' Fund," and together with the Mechanics' Fund, the Central Fund, the RWDSU Fund, the IAM Fund, the IUOE Fund, the IUOE Annuity Fund, the UFCW Midwest Fund, the Bakery Drivers Fund and the B&C Fund (as defined below), the "Funds").

In support of this Omnibus Objection, the Debtors respectfully represent as follows:

**Preliminary Statement**

1.    First, in its motion, the BCT ignores the critical fact that the fund to which the Debtors had contributed on behalf of their BCT-represented employees – the Bakery and Confectionery Union and Industry International Health Benefits and Pension Fund (the "B&C Fund")[2] – *terminated the Debtors' participation in the B&C Fund and assessed withdrawal liability against the Debtors effective as of December 10, 2011, a month before the Petition Date.* Therefore, no Postpetition Date Contributions (as defined below), including no True Postpetition

---

[2]    Certain of the BCT CBAs require payments to the "Bakery and Confectionary Union and Industry International Health and Benefits Fund," the "Bakery and Confectionary Union and Industry International Pension Fund," the "International Pension Fund," the "BCT Pension Fund" and the "Bakery, Confectionary Tobacco Worker's Pension Fund."  See Overview of applicable collective bargaining agreements ("CBAs") with the BCT, which is attached hereto as Exhibit A and is incorporated herein by reference.  Upon the Debtors' information and belief, all of these names refer to the B&C Fund.  Pursuant to the B&C Fund's proofs of claim filed against each of the Debtors, "Hostess and its affiliated Debtors are obligated to make monthly contributions to the B&C Fund pursuant to approximately 117 . . . CBAs executed by and between the Debtors and local unions for the . . . BCT."  See B&C Fund Proofs of Claim nos. 2652, 2654, 2656, 2657, 2658 and 2659.  Each B&C Fund Proof of Claim is attached hereto as Exhibit B-1, B-2, B-3, B-4, B-5 and B-6, respectively, and is incorporated herein by reference.

Contributions (as defined below), to the B&C Fund are due, and the BCT Motion should be denied.[3]

2.      Second, the Motions should be denied to the extent the requested contributions are calculated with respect to prepetition service dates of the Debtors' employees. Indeed, in accordance with the applicable law in this Circuit, contributions accrued as a result of employees' services performed prior to a debtor's petition date give rise to unsecured prepetition claims and not to administrative expense claims. Specifically, according to the Debtors' calculations, an aggregate amount of $89,489.50 of the <u>monthly</u> contributions requested by the Funds constitutes contributions calculated with respect to prepetition service dates (the "<u>Pre-Petition Date Contributions</u>"). An overview of the Pre-Petition Date Contributions based on the Debtors' calculations is attached to the Declaration of Laurie Reed in support of this Omnibus Objection (the "<u>Reed Declaration</u>") that was filed contemporaneously herewith and is incorporated herein by reference.

3.      Further, for pension plans that are not defined contribution plans,[4] some of the contributions that became due after the Petition Date (the "<u>Postpetition Date Contributions</u>") are not attributable to postpetition services rendered by the Debtors' employees. Indeed, while a portion of the Postpetition Date Contributions is likely attributable to new benefits earned by the Debtors' employees during the postpetition period and used to fund such employees' postpetition

---

[3]        Moreover, pursuant to 110 of the Debtors' applicable 111 CBAs with the BCT that contemplate the Debtors' making contributions to the B&C Fund, the Debtors expressly are required to pay pension contributions to the B&C Fund and not to the BCT or its members. Additionally, 105 of the BCT CBAs state that such requirement is the "sole and total agreement" or the "only binding agreement" between the BCT and the Debtors with respect to "pensions or retirement." <u>See</u> <u>Exhibit A</u>. Accordingly, there is no basis, as suggested in the BCT Motion, for the Debtors to pay any contribution amounts directly to employees. <u>See</u> BCT Motion, ¶ 16.

[4]        The IUOE Annuity Fund and the Carpenters' Fund are defined contribution, rather than defined benefit, pension plans. Accordingly, contributions falling due after the Petition Date, other than Pre-Petition Date Contributions, would qualify to be treated as administrative claims.

pension accruals (the "True Postpetition Contributions"), another portion (the "Underfunding Contributions") is used to make up the underfunding at the Funds due to historical investment losses and insufficient contributions received by the Funds (not only from the Debtors but from other employers as well) during prior periods.  Indeed, several of these funds are categorized as "Seriously Endangered" or in "Critical" status under the Pension Protection Act.[5]  As the Underfunding Contributions are made on account of employees' prepetition services – and, in fact, are also made on account of underfunding attributable to non-Debtor employees – they should not be accorded administrative expense status.

4.      Finally, before the Court can order the payment of True Postpetition Contributions, the amount of any such contributions must be ascertained as it is not known at this time, and none of the Movants have provided any evidence to establish such amount.  The Debtors submit that the Court should establish discovery to ascertain any amounts of True Postpetition Contributions, and, if the parties cannot agree on such amounts, establish a further briefing schedule and set these matters for hearing thereafter.  Because the payment of any True Postpetition Contributions, if any, is not included in the Debtors' postpetition budget that was approved by the postpetition lenders (the "DIP Budget"), and given the present uncertainty (as discussed below) with respect to the Debtors' CBAs and the pensions established thereby, after the amounts of any True Postpetition Contributions are ascertained, the Debtors submit that any such administrative claims be addressed in connection with the resolution of the Debtors' several

---

[5]      According to the Department of Labor website, the Mechanics' Fund are categorized as "Seriously Endangered," and the B&C Fund, the Bakery Drivers Fund, the UFCW Midwest Fund and the IUOE Fund are listed in "Critical" status.  See http://www.dol.gov/ebsa/criticalstatusnotices.html.  The "Critical" status of the B&C Fund can be found at:  http://www.bctrustfunds.org/images/20120427_-_Red_Zone_Notice.pdf.  The "Critical" status of the Bakery Drivers Fund can be found at http://www.dol.gov/ebsa/pdf/c-notice042312003.pdf.

1113 Motions, which, if such resolution is consensual, is likely to be in connection with a

chapter 11 plan.

## **Background**

5.       On January 11, 2012 (the "Petition Date"), the Debtors commenced their

reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been

consolidated and are being administered jointly for procedural purposes only.

## **The 1113 Process**

6.       Since the commencement of these chapter 11 cases, the Debtors' intent to

reject all of their CBAs, including the CBAs that contemplate contributions to the Funds, has

been abundantly clear.  On the Petition Date, the Debtors filed the Motion of Debtors and

Debtors in Possession, Pursuant to 11 U.S.C. §§ 105(a), 1113(d) and 1114(k) for Entry of a

Scheduling Order in Connection with the Debtors' Motions to Reject Collective Bargaining

Agreements and Modify Retiree Benefits (Docket No. 24) (the "1113 Scheduling Motion") to

establish the time frame for the trial related to the rejection of *all of* their CBAs (the "1113

Process").  An order approving the Scheduling Motion was entered on January 19, 2012 (Docket

No. 126) (as amended, the "Scheduling Order").  The Scheduling Order authorized the Debtors

to conduct a staggered 1113 Process for all of their CBAs.

***The Debtors' CBAs***
***with the IBT and BCT***

7.       In accordance with the Scheduling Order, the Debtors first filed, on

January 25, 2012, the Motion of Debtors and Debtors in Possession to (A) Reject Certain

Collective Bargaining Agreements and (B) Modify Certain Retiree Benefit Obligations, Pursuant

to Sections 1113(c) and 1114(g) of the Bankruptcy Code (Docket No. 174) (the "IBT/BCT 1113

Motion").  The IBT/BCT 1113 Motion sought the rejection of all CBAs with (a) the International

Brotherhood of Teamsters (the "IBT") and (b) the BCT.  The IBT/BCT 1113 Motion

contemplated proposals in which the Debtors would withdraw from all of their multiemployer

pension funds ("MEPPs"), including the Bakery Drivers Fund and the Carpenters' Fund, and

confirmed the withdrawal from the B&C Fund.

    8.  On February 13, 2012, the BCT notified this Court that it would not

oppose the entry of an order rejecting its CBAs with the Debtors that had not been terminated on

the date of any such order.  See Response of the Bakery, Confectionary, Tobacco Workers and

Grain Millers International Union and Its Affiliated Local Unions Representing Debtors'

Employees to Motion of Debtors and Debtors in Possession to (A) Reject Certain Collective

Bargaining Agreements and (B) Modify Certain Retiree Benefit Obligations, Pursuant to

Sections 1113(c) and 1114(g) of the Bankruptcy Code (Docket No. 298).

    9.  The Court held an evidentiary hearing with regard to the IBT/BCT 1113

Motion from April 17 through April 19, 2012.

    10.  On May 4, 2012, the Court entered the Order (I) Granting Debtors' Motion

to (A) Reject Certain Collective Bargaining Agreements and (B) Modify Certain Retiree Benefit

Obligations Pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code as to the Bakery,

Confectionary, Tobacco Workers and Grain Millers International Union Collective Bargaining

Agreements Described Herein; and (II) Granting BCT's Motion to Dismiss the Debtors'

1113/1114 Motion as to the Terminated BCT Collective Bargaining Agreements Described

Herein (Docket No. 848) (the "BCT Rejection Order").  By the BCT Rejection Order and the

Court's subsequent ruling on May 14, 2012, the Debtors are authorized to reject 109 BCT CBAs.

Eight BCT CBAs had terminated prior to the BCT Rejection Order and, therefore, were not subject to rejection.

11.     On May 14, 2012, the Court denied the IBT/BCT 1113 Motion with respect to the IBT CBAs.  <u>See</u> Transcript of May 14, 2012 hearing, at 130.  If they are unable to reach an agreement with the IBT, and in accordance with the guidance provided at the May 14 hearing, the Debtors may file a renewed motion under section 1113 of the Bankruptcy Code with respect to the IBT CBAs.

***The Debtors' CBAs***
***<u>with 10 Other Unions</u>***

12.     The second stage of the 1113 Process commenced on April 23, 2012 when the Debtors filed their motion, as contemplated by the Scheduling Order, that sought the rejection of their remaining CBAs with ten other unions (the "<u>Other Unions</u>") and included proposals seeking to withdraw from the MEPPs associated with these CBAs.  <u>See</u> Second Motion of Debtors and Debtors in Possession to Reject Certain Collective Bargaining Agreements Pursuant to Section 1113(c) of the Bankruptcy Code (Docket No. 777) (the "<u>Second 1113 Motion</u>").  Specifically, by the Second 1113 Motion, the Debtors seek to reject, among other CBAs:  (a) one CBA with the United Automobile, Aerospace and Agricultural Implement Workers of America; (b) eight CBAs with the Retail Wholesale and Department Store Union; (c) 31 CBAs with the International Association of Machinists and Aerospace Workers; (d) seven CBAs with the International Union of Operating Engineers & Service Employees; and (e) 15 CBAs with the United Food and Commercial Workers Union, in each case including the CBAs that govern the contributions to the Funds.  The Second 1113 Motion is scheduled to be heard on June 5, 2012.

## The Pension Contributions to the Funds

13.     Thirty-seven of the Debtors' CBAs include the requirement to make

pension contributions to the Funds other than the B&C Fund.[6]  In addition, 110 of the BCT

CBAs require the Debtors to make contributions to the B&C Fund – and only the B&C Fund.

See Exhibit A.  Accordingly, and contrary to the BCT's suggestion, the Debtors do not make, and

have no obligation to make, contributions directly to the BCT or its members employed by the

Debtors.

14.     The Debtors ceased making contributions to the Funds prior to the Petition

Date – in the Summer of 2011.

## The B&C Fund Terminated the Debtors' Participation, and Assessed Withdrawal Liability, as of December 10, 2011

15.     By letter dated December 12, 2011, the B&C Fund notified the Debtors

that the Debtors had effected a total withdrawal from the B&C Fund as of December 10, 2011.

A copy of the December 12, 2011 letter is attached hereto as Exhibit C and incorporated herein

by reference.  Specifically, the B&C Fund advised the Debtors that:

> Hostess Brands, Inc. has effected a total withdrawal from the
> [B&C] Fund by ceasing contributions, thereby subjecting it to
> withdrawal liability under … ERISA … as amended …
>
> … we have computed Hostess Brands, Inc. liability to the [B&C]
> Fund to be in the amount of $919,806,165 as of
> December 10, 2011.

See Exhibit C.  By letter dated December 15, 2011, the B&C Fund further advised the Debtors

---

[6]     The Central Pension Fund submitted as Exhibit 1 to its Motion the Collective Bargaining Agreement
between Interstate Brands Corporation and the International Operating Union of Engineers, Local No. 101,
Springfield, MO, Engineers, for the period August 8, 2004 through August 9, 2008, and the Extension
Agreement between Interstate Brands Corporation and the International Operating Union of Engineers,
Local No. 101, extending the terms of the Collective Bargaining Agreement through February 16, 2008
(collectively, the "Springfield CBA").  The Debtors do not believe that the Springfield CBA requires
contributions to the Central Fund.

that:

> Effective December 10, 2011 your participation in the [B&C] Fund
> was terminated due to your failure to contribute to the Fund for
> 120 days or more.   Article II, Section 2.02, of the Rules and
> Regulations of the [B&C] Fund confers upon the Trustees the
> power to terminate in the event of continued delinquency.
>
> Your delinquency is in violation of the Collective Bargaining
> Agreements between Hostess Brands Inc. and various BCTGM
> Local Unions.  This termination in no way releases you from your
> obligation to contribute on any unpaid contributions you may
> legally owe the [B&C] Fund.

A copy of the December 15, 2011 letter is attached hereto as <u>Exhibit D</u> and incorporated herein by reference.

## **Omnibus Objection**

16.    The Funds and the BCT are seeking, pursuant to sections 503(b), 507(a) and 1113(f) of the Bankruptcy Code, orders:  (a) directing the immediate payment by the Debtors of contributions as specified in the respective Motions and (b) granting the Funds and the BCT administrative expense claims with regard to Postpetition Date Contributions going forward.

17.    For the reasons described below, such requests should be denied (a) to the extent the requested contributions do not constitute True Postpetition Contributions and (b) insofar the Funds and the BCT request immediate payment of an administrative expense claim.  Further, the BCT's motion should be denied because the B&C Fund assessed withdrawal liability against the Debtors prior to the Petition Date and, therefore, no further contributions are due to the B&C Fund.

A.    **The Requests for Allowance of Administrative Expense Claims Based on Unpaid Contributions Should Be Denied to the Extent Such Contributions Are Based on Prepetition Services**

*Pursuant to Sections 503 and 507,*
*Administrative Expense Claims Are*
<u>*Narrowly Construed and Must Benefit the Estate*</u>

18.    Section 507 of the Bankruptcy Code establishes the priority of claims and expenses against a debtor's estate.  "When determining whether a particular claim or class of claims is entitled to priority, a court must be 'guided in reaching [its] decision by the equal distribution objective underlying the Bankruptcy Code, and the corollary principle that provisions allowing preferences must be tightly construed.'"  <u>See</u> <u>In re A.C.E. Elevator Co., Inc.</u>, 347 B.R. 473, 478 (Bankr. S.D.N.Y. 2006) (quoting <u>Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.</u>, 547 U.S. 651, 667 (2006)); <u>see also</u> <u>Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.</u>, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").  "[S]trict construction of the terms 'actual' and 'necessary' keeps 'administrative expenses at a minimum . . . to preserve the estate for the benefit of all its creditors.'"  <u>In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey</u>, 160 B.R. 882, 889 (Bankr. S.D.N.Y. 1993) (quoting <u>In re Drexel Burnham Lambert Group Inc.</u>, 134 B.R. 482, 488 (Bankr. S.D.N.Y. 1991)).

19.    To receive administrative priority status pursuant to sections 503 and 507 of the Bankruptcy Code, an expense must (a) arise from a transaction between the creditor and the debtor and (b) benefit the debtor in the operation of its business.  <u>McFarlin's</u>, 789 F.2d at 101 ("[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-

possession in the operation of the business.'") (quoting In re Mammoth Mart, Inc., 536 F.2d 950,

954 (1st Cir. 1976)); see also In re CIS Corp., 142 B.R. 640, 643 (S.D.N.Y. 1992); A.C.E.

Elevator, 347 B.R. at 478; Finley Kumble, 160 B.R. at 889; In re New York Trap Rock Corp.,

137 B.R. 568, 572 (Bankr. S.D.N.Y. 1992); In re Drexel Burnham Lambert Group Inc., 134 B.R.

482, 489 (Bankr. S.D.N.Y. 1991).  Accordingly, "a debt is not entitled to priority simply because

the right to payment arises after the debtor in possession has begun managing the estate."

McFarlin's, 789 F.2d at 101; see also Finley Kumble, 160 B.R. at 889 ("A claim is not entitled to

priority simply because the right to payment arose after the commencement of the reorganization

proceeding.").  A presumption exists that creditors act primarily in their own interests and not for

the benefit of the estate, and creditors must, therefore, demonstrate the validity of an

administrative claim by a preponderance of the evidence.  Finley Kumble, 160 B.R. at 890.

***Pension Contributions Based on Prepetition Services,***
***Even if They Become Due Postpetition, Are Not***
***Entitled to Administrative Expense Priority***

20.    Pension contributions that are attributable to services performed prior to

the Petition Date give rise to prepetition claims.  The fact that such contributions became due

after the Petition Date does not change this analysis.  See McFarlin's, 789 F.2d at 101 ("debt is

not entitled to priority simply because the right to payment arises after the debtor in possession

has begun management of the estate"); LTV Corp. v. Pension Benefit Guar. Corp.(In re

Chateaugay Corp.), 130 B.R. 690, 697 (S.D.N.Y. 1991) (same), subsequently withdrawn and

vacated by consent order, 1993 U.S. Dist. LEXIS 21409 (S.D.N.Y. June 7, 1993); Finley

Kumble, 160 B.R. at 893 (holding that a contribution obligation owed to a pension plan on

account of prepetition services was properly classified as a general unsecured claim because no

benefit had accrued to the estate); see also A.C.E. Elevator, 347 B.R. at 480 (stating that the

Supreme Court, in Howard Delivery Serv., 547 U.S. at 668, noted that employer contributions to

pension and welfare plans, together with wages, remunerate employees for prior services

rendered).

           21.      The Second Circuit, as well as a majority of courts, has refused to grant

administrative priority status to pension obligations that accrued on account of prepetition

services.  See Air Line Pilots Ass'n, Int'l. v. Shugrue (In re Ionosphere Clubs), 22 F.3d 403, 407

(2d Cir. 1994).  In Ionosphere Clubs, the Second Circuit confirmed that the priorities of section

507 of the Bankruptcy Code apply to claims arising under CBAs.  Id.[7]  Specifically, the Second

Circuit held that:

> Judicial ordering of benefit claims pursuant to § 507 is not
> equivalent to employer avoidance of obligations under a collective
> bargaining agreement.  The collective bargaining agreement is
> respected, but the financial obligations issuing from it are accorded
> priority consistent with the Bankruptcy Code.  Moreover,
> application of the priority scheme does not conflict with the
> purpose of section 1113.

Id.  Section 1113 of the Bankruptcy Code "does not address the priority to be accorded claims

arising from a debtor's obligations under a CBA." Id. at 408.  Therefore, Congress intended that

the priorities set forth in section 507 of the Bankruptcy Code would apply.  Id.  Thus, only

claims accruing as a result of postpetition work may be accorded administrative expense status;

in contrast, claims accruing as a result of prepetition work are not eligible for such priority

status.  Id. at 405-408;[8] see also A.C.E. Elevator, 347 B.R. 473 (delinquent multiemployer

---

[7]     Therefore, prepetition amounts owed under a CBA are not accorded administrative expense priority unless such CBA is assumed.  See A.C.E. Elevator, 347 B.R. at 483 (holding that delinquent contributions to multiemployer employee benefit plans that related to prepetition services were not entitled to administrative priority, but stating that assumption of CBA could give rise to a postpetition administrative claim if the debtors did not cure existing defaults upon assumption); see also Adventure Res., Inc. v. Holland, 137 F.3d 786, 798 (4th Cir. 1998) (finding that when a chapter 11 debtor assumed existing collective bargaining agreement, but did not cure existing defaults, any claims arising from debtor's failure to cure were entitled to administrative expense priority).

[8]     Ionosphere Clubs cites to, and concurs with, the Third Circuit's Roth decision.  In re Roth Am., Inc., 975 F.2d 949, 956-58 (3d Cir. 1992) (section 1113 does not create a superpriority claim pursuant to section

pension plan payments not entitled to administrative expense priority because payments were in

respect of hours worked by employees prior to the petition date and did not meet

section 503(b)(1)(A)'s requirement of "actual, necessary costs" to administer the estate).

***Not All Postpetition Date Contributions
Are Attributable to Postpetition Service;
Only True Postpetition Contributions Are***

22.    Each contribution made by an employer to an underfunded multiemployer

defined benefit pension or benefit plan is made, at least in part, to reduce the underfunding in the

plan that relates to previously accrued benefits stemming from prior service.  See McFarlin's,

789 F.2d at 104 ("An employer's withdrawal liability payment . . . is the means by which the

employer funds benefits that his employees have 'earned' by their past service *and that he would

normally finance through **continuing contributions** to his employees' pension plan*.") (emphasis

added); accord In re Marcal Paper Mills, Inc., 650 F.3d 311, 318 (3rd Cir. 2011) ("*Instead of

financing the deferred compensation* [withdrawal liability] **through monthly contributions**, as it

would do if it continued to participate in the multiemployer fund, the withdrawing employer is

---

(continued…)

1113 for unpaid prepetition collective bargaining agreement obligations).  Many other courts have
concluded that prepetition obligations pursuant to collective bargaining agreements do not constitute
administrative expense claims.  See Jordan v. Rayman, Martin & Fader, Inc. (In re Rayman, Martin &
Fader, Inc.), 170 B.R. 286, 291 (D. Md. 1994) (superpriority status for claims under a CBA not established
by section 1113); In re Family Snacks, Inc., 249 B.R. 915, 922 (Bankr. W.D. Mo. 2000) (characterizing
Ionosphere Clubs as the "better view"), aff'd in part, rev'd on other grounds, 257 B.R. 884 (8th Cir. B.A.P.
2001); In re Fleming Packaging Corp., 2004 Bankr. LEXIS 1384, at *10–12 (Bankr. C.D. Ill. Aug. 31,
2004) ("claims for wages and benefits due under a [collective bargaining agreement] are not, ipso facto,
entitled to treatment as administrative expenses but are to be accorded priority consistent with
Section 507"); In re Certified Air Techs., Inc., 300 B.R. 355, 369 (Bankr. C.D. Cal. 2003) ("Had Congress
intended for § 1113 to create a super-priority for pre-petition wage and benefit claims arising under a CBA,
it would have either included language in § 1113 similar to that incorporated into § 1114 or amended § 507
to reflect the change it intended."); Int'l Brotherhood of Teamsters, AFL–CIO v. Kitty Hawk, Inc. (In re
Kitty Hawk, Inc.), 255 B.R. 428, 436 (Bankr. N.D. Tex. 2000) ("The Court chooses to follow the Roth
American and Ionosphere II courts because their decisions are consistent with this Court's view of its
obligation to avoid construing the Code in a fashion that creates conflict between and among the various
provisions of the Code or a reading of the Code that causes one section (here, section 1113) to nullify other
sections (sections 503 and 507).").

required to make a lump sum payment to the fund.") (emphasis added).

23.     How much of an employer's monthly MEPP contributions for a current

year are attributable to (a) the current year's pension accruals and (b) prior years' underfunding

payments is determined on an annual basis by the plan's actuaries and trustees based on the

current funding status of the particular MEPP (the more underfunded the plan is, the more that a

particular contribution will be used to satisfy past underfunding) and whether the MEPP is in

"critical status" and what the terms of the rehabilitation plan are.  See I.R.C. § 432(e)(1), (e)(3),

(e)(4) (requiring MEPP in critical status to develop and implement a "rehabilitation plan," which

must include increases in contributions, reductions in benefits, or both, so as to sufficiently

reduce current underfunding over the following ten years to allow MEPP to exit critical status).

24.     Thus, the Underfunding Contribution portion of the Debtors' monthly

contribution payments for their defined benefit MEPPs that came due postpetition are designed

to compensate the Funds for the underfunded portion of pension obligations accrued on account

of services rendered prior to the Petition Date.  Therefore, each Postpetition Date Contribution

for a defined benefit MEPP must be allocated among:  (a) Pre-Petition Date Contributions, which

are clearly unsecured claims; (b) Underfunding Contributions, which, too, would be unsecured

claims; and (c) True Postpetition Contributions that are attributable to postpetition services,

which qualify as administrative expenses.

25.     The analysis is akin to the decisions addressing whether a debtor is

required to make minimum funding contributions that come due postpetition for single-employer

defined benefit pension plans.  Courts, including those in this Circuit, have held that the portion

of postpetition minimum funding contributions that are attributable to prepetition services (for

the underfunding) constitute general unsecured claims, and the portion of each of those

contributions attributable to postpetition employee services (sometimes referred to as "normal

cost") have administrative claim status.  See, e.g., Finley Kumble, 160 B.R. at 891 (stating, in the

single employer plan context, that "the obligation to pay minimum funding requirements is a

prepetition claim not entitled to priority insofar as it relates to prepetition labor by [d]ebtor's

employees . . . .  Although it appears that most of [the] minimum funding claim amount is related

to prepetition employment, some of the [c]laim amount is also based on postpetition

consideration [and] merits priority treatment."); see also Ionosphere Clubs, 22 F.3d at 407-408

(the priorities of section 507 mandate that obligations under a CBA that accrued prior to the

petition date be accorded unsecured status); A.C.E. Elevator, 347 B.R. 473 (recognizing the need

to split pre- and postpetition pension obligation amounts); accord Pension Benefit Guar. Corp. v.

Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811, 821 (6th Cir. 1997) (claim for

minimum funding contribution not entitled to administrative status for prepetition services);

Pension Benefit Guar. Corp. v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah,

Inc.), 150 F.3d 1293, 1300 (10th Cir. 1998) (same); In re Kent Plastics Corp., 183 B.R. 841, 847-

48 (S.D. Ind. 1995) (same).

       26.     The Debtors intend to treat all True Postpetition Contributions as

administrative expenses; however, the amount of any such True Postpetition Contributions is

currently unknown.  The determination of the proper amount of any True Postpetition

Contributions will necessitate discovery, including of the Funds' actuaries, and further analysis

and calculation.  The Debtors propose that the Court establish a discovery schedule to assist the

parties in reaching an agreement on these amounts.  In the event a mutually agreeable amount

cannot be reached by the Debtors and the Funds, the Debtors propose that the Court hold a

further hearing to determine such amounts.

**B.      The B&C Fund Terminated the Debtors' Participation,
and Assessed Withdrawal Liability, Effective December 10, 2011;
Therefore, the BCT's Motion Should Be Denied**

27.      Pursuant to the Debtors' CBAs with the BCT, prior to the Petition Date,
the Debtor was to make monthly contributions to the B&C Fund.  However, as noted above, the
B&C Fund terminated the Debtors' participation in the B&C Fund effective as of
December 10, 2011 and, after determining that the Debtors effected a permanent withdrawal
from the B&C Fund as of December 10, 2011, assessed withdrawal liability against the Debtors.
See Exhibits C and D.  Therefore, the Debtors' obligation to make contributions to the B&C
Fund ceased as of that date, over a month before the Petition Date.  In addition, as noted above,
contrary to the BCT's suggestion, the Debtors do not make, and have no obligation to make,
contributions directly to the BCT or its members employed by the Debtors.

28.      When a contributing employer to an underfunded MEPP completely
withdraws from such MEPP, the Employee Retirement Income Security Act of 1974, as
amended ("ERISA"), requires that the MEPP trustees determine and assess withdrawal liability.
For these purposes, a complete withdrawal occurs when the contributing employer
"**permanently** ceases to have an obligation to contribute under the plan," or "**permanently**
ceases all covered operations under the plan."  ERISA § 4203(a), 29 U.S.C. § 1383(a) (emphasis
added).  The word "permanent" modifies both possible conditions for a complete withdrawal.
It is not defined in ERISA, and in interpreting the word "permanent" a court would be expected,
of course, to apply the word's  ordinary, common meaning.  Lee v. Bankers Trust Co., 166 F.3d
540, 544 (2d Cir. 1999)("[i]t is axiomatic that the plan meaning of a statute controls its
interpretation").[9]

---
[9]      The relevant statutory history of ERISA § 4203(a), 29 U.S.C. § 1983, provides that a mere temporary
cessation of covered operations or the obligation to contribute should not be treated as a complete

29.    After an employer incurs a complete withdrawal, ERISA requires that such withdrawing employer be assessed its then-allocable share of the MEPP's unfunded vested benefits.  Indeed, the B&C Fund, on December 15, 2011, assessed withdrawal liability for Hostess in the amount of $919,806,165.00.[10]  In making their decision that Hostess had effected a total withdrawal from the B&C Fund, the Fund trustees, as fiduciaries of the Fund, necessarily had to determine that the Debtors "*permanently cease[d]* to have an obligation to contribute to the plan."

30.    Thus, Hostess' obligations to contribute to the B&C Fund permanently ceased prepetition, and the BCT employees' benefit accruals permanently ceased as of the time that the B&C Fund made its determination and assessed withdrawal liability in December 2011. The BCT CBAs incorporate the B&C Fund Declaration of Trust dated September 11, 1955 (the "B&C Fund Trust") and make Hostess a party thereto.  The Debtors are bound by any actions taken by the B&C Fund pursuant to the B&C Fund Trust.  See Bakery and Confectionery Union and Indus. Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1026 (4th Cir. 1997) (finding that an employer was bound by the actions of the trustees of the B&C Fund pursuant to the B&C Fund Trust).  Accordingly, the B&C Fund's termination of the Debtors' participation in the Fund and the assessment of withdrawal liability are binding on the Debtors and the BCT.  The BCT cannot now take a position contrary to one made by the B&C Fund's fiduciaries acting in

---

(continued…)

       withdrawal. See S. Rep. No. 1076, 96th Cong., 2d Sess. at 12, 13  (April 1980) (plan sponsor must determine based on the available evidence "that the cessation of covered operations or obligation to contribute is not merely temporary"); see also Western Dominion Coal Co. and UMW 1950 and 1975 Pension Plans, 6 Empl. Ben. Cases 2353 (Arb. 1985) (same).

[10]      The Debtors reserve their right to dispute this amount as part of the claims resolution process.

accordance with ERISA and the B&C Fund's own rules and regulations.  For these reasons, the

BCT's Motion should be denied in its entirety.

**C.      The Debtors Are in Compliance with Section 1113 of the Bankruptcy Code**

       31.      The Funds and the BCT assert that that the Debtors' current non-payment

of the full Postpetition Date Contribution amounts violates section 1113(f) of the Bankruptcy

Code.  Section 1113(f) states that:

> No provision of this title shall be construed to permit a trustee to
> unilaterally terminate or alter any provisions of a collective
> bargaining agreement prior to compliance with the provisions of
> this section.

11 U.S.C. § 1113(f).

       32.      The fundamental principle that the Debtors are not required to pay, as

administrative expense claims, obligations that accrued prior to the Petition Date is not altered by

section 1113(f) of the Bankruptcy Code.  Indeed, a debtor's failure to pay prepetition obligations

pursuant to a CBA, such as contributions attributable to prepetition services, does not terminate

or alter such CBA in violation of section 1113(f) of the Bankruptcy Code.  See Ionosphere

Clubs, 22 F.3d at 407 (the payment of benefit claims in accordance with the priorities of

section 507 is not the equivalent of neglecting obligations under a CBA); A.C.E. Elevator, 347

B.R. at 483 (adherence to Bankruptcy Code with respect to when, and when not, to pay claims in

full does not equate to unilateral alteration of collective bargaining agreement in derogation of

section 1113(f)); accord In re Moline Corp., 144 B.R 75, 79 (Bankr. N.D. Ill. 1992) (a debtor's

failure to make pre- and postpetition payments with regard to employee medical expenses and

accrued vacation pay for laid-off employees that such debtor was obligated to make under a

CBA did not equate to an alteration or termination and was not a violation of section 1113(f)).

Instead, a debtor's failure to pay a prepetition obligation under a CBA does not violate section

1113(f) but merely results in the creation of a claim; the priority of such claim is determined by section 507 of the Bankruptcy Code.  See Ionosphere Clubs, 22 F.3d at 407; Moline Corp., 144 B.R. at 79.

33.    As the Pre-Petition Date Contributions and the Underfunding Contributions constitute prepetition claims, and since the amount of any True Postpetition Contributions is not yet determined (but the Debtors would intend to treat such claims as administrative expenses once the amount of such claims is known), the Debtors are in compliance with section 1113(f) of the Bankruptcy Code.[11]

**D.    The Funds' and BCT's Request for Immediate Payment of Administrative Expense Claims Should be Denied**

34.    As set forth above, to the extent any contributions are entitled to administrative expense status, the Debtors intend to treat them as such after reconciliation.  As the payment of True Postpetition Contributions is not included in the Debtors' DIP Budget and given the present uncertainty with respect to the Debtors' CBAs and the pensions established thereby, after the amounts of any True Postpetition Contributions are ascertained, the Debtors' submit that any such administrative claims be addressed in connection with the resolution of the Debtors' several 1113 Motions, which, if such resolution is consensual, is likely to be in connection with a chapter 11 plan.[12]

---

[11]    The RWDSU Fund further alleges that the Debtors have violated section 1113(b)(1)(A) by continuing "to pay post-petition trade creditors and its secured lenders in full, but has refused to pay employee benefit fund contributions to the [RWDSU Fund] …"  See RWDSU Motion, ¶ 17.  This is an argument properly addressed in the context of the Second 1113 Motion.

[12]    The IAM Fund, IUOE Fund and IUOE Annuity Fund state that these Funds will suffer irreparable harm if the Debtors cease contributions since the Funds' participants are entitled to be paid regardless of whether the Debtors make contributions.  See IAM Fund's Motion, ¶¶ 15-16, IUOE Fund's Motion, ¶¶ 14-15; IUOE Annuity Fund's Motion, ¶¶14-15.  The Debtors submit that the Funds are run by fiduciaries who can take action in order to prevent irreparable harm to the Funds, including terminating the Debtors' participation therein as was done by the B&C Fund.

35.     The Bankruptcy Code "neither expressly prohibits nor expressly

authorizes paying administrative expenses earlier than upon the effective date of a plan or the

winding up of the administration of the case and the distribution of all of the property of the

estate."  COLLIER ON BANKRUPTCY ¶ 503.03[2] (Alan N. Resnick & Henry J. Sommer eds., 16th

ed.).  Accordingly, "the timing of distributions for administrative expense payments, other than

at the close of the case, is within the discretion of the Court."  In re Shihai, 392 B.R. 62, 67

(Bankr. S.D.N.Y 2008); Local 144 Hospital Welfare Fund v. Baptist Med. Ctr. of N.Y., Inc (In re

Baptist Med. Ctr. of N.Y., Inc.), 52 B.R.. 417, 426 (E.D.N.Y. 1985) (finding that bankruptcy

judge properly exercised her discretion in postponing payment of administrative claims), aff'd.,

781 F.2d 973 (2d Cir. 1986).  The payment of administrative expenses "should be used to ensure

the 'orderly and equal distribution among creditors and the need to prevent a race to a debtor's

assets . . . . '"  Shihai, 392 B.R. at 67 (citation omitted)..

36.     Courts in this District and others have refused to compel immediate

payment of administrative expense claims related to postpetition pension fund contributions.  See

In re Jewish Memorial Hosp., 13 B.R. 417, 420-21 (Bankr. S.D.N.Y. 1981) (deferring full

payment of debt owed to pension and employee health and benefit funds and instead directing

debtor to make payments on an ongoing basis out of funds available after payment of essential,

necessary expenses of operation); Baptist Med. Ctr., 52 B.R. at 426 (affirming order of the

Bankruptcy Court staying pension and employee health and benefit funds from compelling

payment of unpaid contributions to pension and employee health and benefit plans,

notwithstanding the fact that administrative expenses of other creditors were being paid, in order

to preserve the orderliness and equitable goals of the bankruptcy proceeding and to preserve the

debtor's ability to continue to operate); see also Journeymen Plasterers Protective and Beneficial

Soc'y Local No. 5 v. Energy Insulation, Inc. (In re Energy Insulation, Inc.), 143 B.R. 490, 496

(N.D. Ill. 1992) (affirming bankruptcy court's decision denying compulsion of pension fund's

postpetition administrative expense contribution amounts and declining to find that section 1113

implied compulsion of such payment).

     37.  For these reasons the Funds' and the BCT's request for immediate payment

of any Postpetition Date Contributions should be denied.  The BCT's request should also be

denied since no Postpetition Date Contributions are due to the B&C Fund.

**<u>Conclusion</u>**

For all of the reasons set forth herein, the Debtors respectfully request that the

Motions be denied to the extent they seek (i) the allowance of an administrative expense priority

claim for any Pre-Petition Date Contributions or Underfunding Contributions and (ii) to compel

immediate payment of any True Postpetition Contributions.  The Debtors further propose that the

Court establish a discovery schedule to assist the parties in reaching an agreement on the amount

of any True Postpetition Contributions.  In the event that the Debtors and the Funds cannot agree

on such amounts, the Debtors propose that the Court holder a further hearing to determine such

amounts.

Dated:  May 23, 2012
      New York, New York

                                         Respectfully submitted,

                                           /s/ Corinne Ball
                                      Corinne Ball
                                      Heather Lennox
                                        Lisa Laukitis
                                        Veerle Roovers
                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York  10017
                                        Telephone:  (212) 326-3939
                                        Facsimile:  (212) 755-7306

                                        - and -

                                        Ryan T. Routh
                                        JONES DAY
                                        North Point
                                        901 Lakeside Avenue
                                        Cleveland, Ohio  44114
                                        Telephone:  (216) 586-3939
                                        Facsimile:  (216) 579-0212

                                        ATTORNEYS FOR DEBTORS AND
                                        DEBTORS IN POSSESSION