Jeffrey R. Freund
Zoe L. Palitz
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street N.W., 10th Floor
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (212) 842-1888

*Counsel to Bakery, Confectionary, Tobacco
Workers and Grain Millers International Union and
Affiliated Local Unions Representing Debtors'
Employees*

**Hearing Date and Time:**
**June 19, 2012 at 10:00 a.m. E.T.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOSTESS BRANDS, INC., et al.,[1] | ) | Case No. 12-22052 (RDD) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**SUPPLEMENTAL MEMORANDUM OF THE BAKERY, CONFECTIONARY, TOBACCO WORKERS AND GRAIN MILLERS INTERNATIONAL UNION IN SUPPORT OF MOTION FOR AN ORDER DIRECTINGPAYMENT OF POST PETITION EMPLOYEE BENEFIT CONTRIBUTIONS AND ALLOWING AN <u>ADMINISTRATIVE EXPENSE CLAIM FOR UNPAID AMOUNTS</u>**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

  The Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, on

behalf of its thirty-five local unions who are the "authorized representatives" of certain of the

Debtors' employees and retirees (collectively, "BCTGM" or "the Union"), files this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number are as follows: (i) Hostess Brands, Inc. (0322); (ii) IBC Sales Corporation (3634); (iii) IBC Services, LLC (3639); (iv) IBC Trucking, LLC (8328); (v) Interstate Brands Corporation (6705; and (vi) MCF Legacy, Inc. (0599).

supplemental memorandum in support of its motion for an order compelling immediate payment

by the Debtors (collectively, "Hostess" or "the Company") of all post-petition, collectively

bargained payments designated to have been made to the BCTGM pension funds ("Pension

Wage Deferrals") arising from post-petition work performed by BCTGM-represented

employees.

## Preliminary Statement

1.      At the May 30, 2012, hearing on the BCTGM's motion, the Court reserved its

ruling to give the parties an opportunity to submit an additional memorandum to answer

particular questions raised during the hearing.  In this memorandum, BCTGM will address three

of those questions.

2.      In Part A, we respond to Debtors' contention that the Bakery and Confectionery

Union and Industry International Health Benefits and Pension Fund ("B&C Fund" or "the

Fund") plan documents relieve Hostess of its obligations under the BCTGM collective

bargaining agreements ("CBAs") upon the Fund's termination of Hostess' participation.  In Part

B, we answer the Court's question as to whom Debtors should pay the withheld Pension Wage

Deferral amounts.  Finally, in Part C, we explain why the BCTGM's claim for Pension Wage

Deferral meets the long-established test for administrative expense priority and why the cases

involving single-employer plans and withdrawal liability, upon which Hostess exclusively relies,

are inapposite.

## Argument

### A.  The Fund's Termination Decision Does Not Relieve Hostess of its Contractual Obligations to the BCTGM

3.      Hostess contends that the language of the B&C Fund Agreement and Declaration

of Trust ("Trust Agreement") supports its contention that, upon its termination by the Fund,

Hostess ceased to have any pension obligations to the BCTGM under its CBAs.  The Trust

Agreement does no such thing.  Article V, Section 2 of the Trust Agreement provides that

contributions to the Fund "shall continue to be paid as long as the Employer is so obligated

pursuant to the Collective Bargaining Agreement with the Local Union *or until he ceases to be*

*an Employer within the meaning of this Agreement and Declaration of Trust . . . ."  See* Debtors'

Omnibus Objection, Dkt. No. 1003 (May 23, 2012), Exhibit B-1 at p. 18 (emphasis added).

Article XII, Section 1 then explains the circumstances by which "[a]n Employer . . . ceases to be

an Employer within the meaning of this Agreement and Declaration of Trust . . . ."  *Id.* at p. 21.

Under that Section, that status change will occur in one of two ways:  when the Employer is "no

longer obligated, pursuant to a Collective Bargaining Agreement with a Local Union, to make

contributions to this Pension Fund, *or, as determined by the Trustees, when he is delinquent in*

*his contributions or reports to the Pension Fund.*"  *See id.* (emphasis added).

      4.      Notably, Article V, Section 2 and Article XII, Section 1 are both phrased in the

disjunctive.  The disjunctive "separates words or phrases in the alternate relationship, indicating

that either of the separated words or phrases may be employed without the other. The use of the

disjunctive usually indicates alternatives and requires that those alternatives be treated

separately."  1A Sutherland Statutory Construction § 21:14 (7th ed. 2011); *see also Portside*

*Growth and Opportunity v. Gigabeam Corp.*, 557 F. Supp. 2d 427, 431 (S.D.N.Y. 2008) (noting

"the ordinary presumption that the term 'or' expresses an alternative" in a contract); *United*

*States v. Smith*, 785 F. Supp. 52, 54 (S.D.N.Y. 1992) ("[A] contract containing an option 'to

purchase Greenacre for $5,000, Blackacre for $4,000, or Greenacre and Blackacre for $8,000'

would be viewed as plainly disjunctive, and plainly providing the promisee with three

options . . . .").

5.      Hostess' argument ignores this structure and rule of construction entirely.

Hostess contends that, because it "*is delinquent in [its] contributions or reports to the Pension*

*Fund*" as provided for in the second of the disjunctive phrases in Article XII, Section 1, it ceased

to be an "Employer" within the meaning of the second disjunctive phrase in Article V, Section 2

of the Trust Agreement.  We do not dispute that.  But Hostess then argues that, as a result of the

Trustees' decision, the Company is no longer "*obligated, pursuant to a Collective Bargaining*

*Agreement with a Local Union*" – as provided for in the first of the disjunctive phrases in Article

V, Section 2 and Article XII, Section 1 of the Trust Agreement – to the bargain it struck with the

BCTGM.  The document says no such thing and actually evinces the opposite intention.

6.      Because it is phrased in the disjunctive, the Trust Agreement says nothing at all

about an employer's "obligat[ions] pursuant to the Collective Bargaining Agreement with the

Local Union" if its obligations to the Fund cease.  The Trust Agreement describes two separate

"alternative[]" circumstances, *see* <u>Sutherland</u> § 21:14, under which Hostess may cease

contributions to the Fund: (1) when it is no longer obligated to make contributions pursuant to a

CBA; *or* (2) when it ceases to be an Employer under the Trust Agreement.  Then, the Trust

Agreement describes two separate "alternative[]" circumstances under which Hostess could

cease to be an Employer within the meaning of the Trust Agreement: (1) when it is no longer

obligated to make contributions pursuant to a CBA; or (2) when the Trustees deem it to be

delinquent.

7.      When the Trustees terminated Hostess, they did so because they determined that

Hostess was delinquent in its obligations to the Fund.  They did not terminate Hostess because it

ceased to be obligated to the BCTGM under CBAs.  Indeed, there is no question that at the time

the Trustees terminated Hostess' participation in the Fund, it *was* obligated pursuant to its CBAs

to make negotiated pension payments for the benefit of its employees for every hour each employee worked.  Those CBAs were in effect when the Fund terminated Hostess.  They remain in effect today.  Nothing the Fund did affected Hostess' contractual obligations to its employees.  In other words, the Trustee's determination that Hostess was "delinquent," *see* Article XII, Section 1, and therefore no longer an "Employer" under the Trust Agreement, *see* Article V, Section 2, invokes only the second of two alternative scenarios laid out in the Trust Agreement.  While such a determination by the Trustees was sufficient to terminate Hostess' obligation to the Fund, it does not by its terms mean that the Company is no longer "obligated pursuant to the Collective Bargaining Agreement with the Local Union," *see id.*

8.    This reading of the Trust Agreement – which allows the Trustees to terminate Hostess' obligations to the Fund, but has no effect on Hostess' obligation to the Union – is the only one that is consistent with the basic common law principles regarding the rights of third-party beneficiaries cited in our Reply Brief.  *See* Reply Brief at ¶¶ 16-17.  It is also the only reading consistent with the principles announced in *N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 336 (1981), that pension fund "trustees do not bargain with each other to set the terms of the employer-employee contract; they can neither require employer contributions not required by the original collectively bargained contract, *nor compromise the claims of the union or the employer with regard to the latter's contributions*."  *Id.* (emphasis added); *see also* Reply Brief at ¶¶ 12-15 (discussing cases finding that a pension fund cannot, as a third-party beneficiary, alter the rights of the union or the obligations of the employer under a CBA).

**B.  Even if Hostess is Unwilling or Unable to Reenter the Fund, the CBA Can be Reformed to Allow the Company to Meet its Collectively-Bargained Obligations to its Workers**

9.      The Fund has agreed to reaccept Hostess into the Fund in the event that the Debtors are compelled to pay all Pension Wage Deferrals that have accrued post-petition as administrative expenses.  *See* Memorandum of the B&C Fund, Dkt No. __ (June 15, 2012).  In that event, the Fund has also agreed to allow BCTGM-represented employees to accrue pension credits for the hours they have worked since December 10, 2011, the date on which the Fund initially terminated Hostess' participation.

10.     But even if that were not the case, the Court is entitled to reform the CBAs to ensure that Debtors' BCTGM-represented employees are fully compensated for their post-petition labor.  Bankruptcy courts "are essentially courts of equity," *Katchen v. Landy*, 382 U.S. 323, 327 (1966), and "[t]he essence of equity . . . has been its flexibility to tailor each decree to the necessities of the specific case." *LiButti v. U.S.*, 178 F.3d 114, 121 (2d Cir. 1999).  And "[w]hen . . . a contract becomes impossible or impracticable to perform, the court makes adjustments to fashion an equitable remedy for the parties."  30 Williston on Contracts § 77:116 (4th ed. 2012). *See Unihealth v. U.S. Healthcare, Inc*., 14 F. Supp. 2d 623, 637-38 (D.N.J. 1998) ("[A]lthough the Agreement . . .was frustrated, Unihealth has already performed its contractual duties by rendering hospital services in 1992 and 1993.  The Court is therefore left with the task of framing an equitable remedy for the parties . . . . There is no doubt that courts have the power to adjust or 'reform' contracts by supplying missing terms that adhere to the parties' original purpose and intent. Courts have recognized this authority in various situations, including cases where contracts were deemed void due to frustration, impracticability, or mistake" (citations omitted)).

11.     Here, Hostess should be required to make restitution to the BCTGM-represented employees for post-petition Pension Wage Deferral contributions wrongfully withheld.  *See* Restatement (Second) of Contracts ("Restatement"), § 272(1) (1981) ("In any case governed by the rules stated in this Chapter [on impracticability], either party may have a claim for relief including restitution . . . ." (emphasis added)).  Restitution restores to a party the value of any benefit it has conferred on another.  *See S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95 (2d Cir. 1978) ("A historic equitable remedy was the grant of restitution by which defendant is made to disgorge ill-gotten gains or to restore the status quo, or to accomplish both objectives" (internal citations and quotation marks omitted)); Restatement, § 344(c) (defining a party's restitution interest as "his interest in having restored to him any benefit that he has conferred on the other party").

12.     Restitution is measured by "the extent to which [the Debtors'] property has been increased in value or his other interests advanced."  *See* Restatement, § 371(b); *see also* Restatement (Third) of Restitution and Unjust Enrichment, § 49(4) (2011) ("When restitution is intended to strip the defendant of a wrongful gain, the standard of liability is . . . the amount of the profit wrongfully obtained.").  The BCTGM-represented employees' restitution interest can be readily measured by calculating the money Hostess has saved by breaching its CBAs and withholding Pension Wage Deferral payments.  *See S.E.C. v. Cavanagh*, 445 F.3d 105, 116-17 (2d Cir. 2006) ("'[D]isgorgement' is a well-established remedy in the Second Circuit . . . . [D]isgorgement has been used . . . to prevent wrongdoers from unjustly enriching themselves through violations[.]"); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011) ("'[R]estitution, . . . concentrates on the defendant— preventing unjust enrichment, disgorging wrongfully held gains, and restoring them to the

plaintiff.' . . . Unjust enrichment applies, not only where a person 'receives money or property, but, also, where he otherwise receives a benefit.'" (citations omitted)).  While the BCTGM (and the Court) would require additional information from the Debtors regarding the number of hours worked by BCTGM-represented employees post-petition to calculate an exact figure,[2] we believe that Hostess has withheld at least $14,000,000 in post-petition Pension Wage Deferrals.  *See* BCTGM Motion, Dkt. No. 863 (May 9, 2012) at ¶ 9.

13.    These common law principles instruct the Court to reform the CBAs to allow Pension Wage Deferral payments to be made *directly to employees* as wages or, e.g., as contributions to a new defined-contribution plan created for this purpose.  Doing so recognizes the underlying economic realities of the collective bargaining process, in which local unions have often chosen to substitute wages for benefits of an equal value.  In negotiating CBAs, employers are generally indifferent to the allocation of wages and benefits, as long as the total compensation is the same. Requiring Hostess to remit delinquent Pension Wage Deferrals directly to its current employees, therefore, would require no more of Hostess than it originally bargained for, while disgorging the benefit that it improperly derived from breaching its CBAs and violating the terms of § 1113(f).[3]

---

[2] While Hostess was a participant in the Fund, it submitted monthly remittance reports showing the number of hours worked by active employees, on which pension contributions were due.  Hostess ceased providing these remittance reports in December 2011.  *See* Declaration of Steven Brock ("Brock Decl."), Dkt. No. 1032-1 (May 29, 2012) at ¶ 3.

[3] It is important to note that restitution would be appropriate even if Hostess were correct that its repeated breach of its CBAs and expulsion from the Fund, somehow extinguished its contractual obligation to make Pension Wage Deferral payments.  "The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another."  *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir. 1984).  This doctrine applies even in the absence of a binding contract.  *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("If the plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in *quantum meruit* to assure a just and equitable result where the
(continues)

14.     The Court need not, however, determine the precise contours of such a remedy at this time.  It need only recognize that BCTGM has an administrative claim for the amount of Hostess' unpaid post-petition Pension Wage Deferral contributions, and direct the parties to negotiate an appropriate payment mechanism.  When faced with the difficultly of fashioning a tricky contractual modification, courts routinely require parties to return to the bargaining table.  For example, in *Unihealth*, the district court concluded that specific performance was not appropriate, but "acknowledge[d] that the remedy of judicial modification [of a contract] should not be undertaken lightly[.]"  *Unihealth*, 14 F. Supp. 2d. at 639-40.  The court appointed a special master to help the parties "negotiate an alternate pricing system that is . . . suitable to the parties' original goals" and help the court fix a remedy "[i]n the event that these efforts fail and the parties are unable to reconcile their differences[.]"  *Id.* at 641; *see also Westec Sec. Services, Inc. v. Westinghouse Elec. Corp.*, 538 F. Supp. 108, 127 (E.D. Pa. 1982) ("Now that the parties are apprised of the court's conclusions with respect to the effective contours of the covenant, it may well be that their respective views on the question of the form of remedy will come into clearer focus."); Robert A. Hillman, *Court Adjustment of Long–Term Contracts: An Analysis Under Modern Contract Law*, 1987 DUKE L.J. 1, 19 & n. 97 (1987) (before modifying a contract, the court may order parties to engage in good faith bargaining to reach a reasonable agreement).  Given the parties long history of amicable labor negotiations, the BCTGM is hopeful that the parties would be able to fashion a remedy without the need for a special master or further intervention by this Court.

---

defendant received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them. Such a recovery for unjust enrichment is permissible when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it. . . ." (citations and quotation marks omitted)).

**C. Hostess' Assertion that Some Amount Less than the Full Amount of its Unpaid Pension Wage Deferrals is the Amount that Should be Treated as an Administrative Claim is Without Merit**

15.      The majority of the May 30, 2012 hearing was spent discussing Hostess' argument that only the portion of its monthly pension contributions that a fund would use to cover its "normal costs" should be accorded administrative expense priority.  This argument injects a new requirement into the long-established *Mammoth Mart* test for determining what qualifies as an administrative expense, and deviates impermissibly from the Bankruptcy Code.  While we addressed this argument in our Reply Brief at paragraphs 24 through 30, we now provide additional analysis in response to the matters discussed at the May 30, 2012 hearing.

16.      Section 503(b)(1)(A) of the Bankruptcy Code allows, as "administrative expenses," claims for the "actual, necessary costs and expenses of preserving the estate, including- (i) wages, salaries, and commissions for services rendered after the commencement of the case[.]"  It is well-established that pension contributions "complete a pay package," *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 654 (2006), and are thus part of "wages, salaries, and commissions" covered by section 503(b)(1)(A).  *See In re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 480 (Bankr. S.D.N.Y. 2006) ("Moreover, as noted by the Supreme Court in *Howard Delivery Service*, employer contributions to pension and welfare plans, . . . together with wages, remunerate employees for services rendered.").

17.      In the Second Circuit, the test for administrative expense priority is two-pronged, simple and straightforward.  An expense is administrative if it (1) "arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession," and (2) "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."  *Trustees of the*

*Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 101 (2d Cir. 1986). Here, no one disputes the first prong of the test – there was admittedly a daily labor transaction between the Debtors and their BCTGM-represented employees. As to the second prong – what "consideration support[s]" those employees' "right to payment" – the answer is expressly laid out in the CBA. For one hour worked by a BCTGM-represented employee in, e.g., the Knoxville Bakeshop facility, Hostess is obligated to make a $2.46 pension contribution. *See* Brock Decl. at ¶ 10. Under well-established bankruptcy principles, that is the end of the inquiry.

18.     The question *McFarlin's* directs this Court to consider is what a BCTGM-represented employee, as a creditor, has to do to earn his right to a $2.46 payment. The CBAs offer a clear answer: work for one hour. Because the hour was worked post-petition, it was "supplied to and beneficial to the debtor-in-possession." As the Third Circuit recently explained in *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 317 (3d Cir. 2011),

> it is clear that the covered employees were required to perform work post-petition in order to keep [the Debtor] in operation, unquestionably conferring a benefit to the estate. Pursuant to the continued-CBA and pension plan, Marcal promised to provide pension benefits in exchange for that post-petition work. . . . [T]he amount owed to the TENJ Pension Fund is based upon Marcal's decision to take advantage of work provided by covered employees. In turn, the portion of that employee work that occurred post-petition was wholly dependent upon [the Debtor's] decision to employ covered teamsters while operating as a debtor-in-possession. It is simply not seemly for Marcal LLC to disclaim responsibility for the vested benefits Marcal created by choosing to use covered employees to perform post-petition work.

The same is true of Hostess. Hostess' BCTGM-represented employees have been working every day to keep it in business, "unquestionably conferring a benefit to the estate." *Id*. The amount Hostess owes for that benefit is measured by the CBA. Hostess, having received the benefit, cannot now assert that the BCTGM-represented employees' work is actually worth less than it bargained for.

19.     How the B&C Fund (or any other administrative expense claimant) *uses* the

contribution is simply not part of the *McFarlin's* test for determining whether an expense is

entitled to administrative treatment.  In no circumstance does the bankruptcy court look to how

the creditor uses money it claims as an administrative expense.  A simple example makes the

point plainly.  Hostess has ongoing post-petition contractual obligations to make premium

payments on its health insurance policies for the benefit of its union and management employees.

The price Hostess pays for this insurance is determined – as is the case for any insured – based

on Hostess' pre-petition claims experience, the carrier's pre-petition administrative costs, and its

pre-petition anticipated profit margin, among other things.  Yet no court would consider parsing

the monthly post-petition premium costs charged to Hostess to determine whether some, all or

none of that premium is attributable to, or going to be used for, the carrier's pre-petition

administrative costs, pre-petition claims payments, or pre-petition anticipated profit margin.  The

carrier might use that premium payment to pay its overhead expenses, to pay bonuses to its

employees for excellent work the previous year, or to cover the cost of claims unrelated to

Hostess.  The point is that the law does not ask where the money is going.  All that matters is that

Hostess gets contractually agreed-upon post-petition insurance coverage for its employees who

work post-petition for a contractually agreed-upon price.

20.     The same is true with post-petition pension contributions; Hostess gets post-

petition pension plan coverage (just like its post-petition insurance coverage in the example

above) for its employees who work post-petition[4] by paying post-petition the agreed-on price for

---

[4] While Hostess did not receive that coverage, Fund has stated that it will provide the
coverage when it receives payment of this administrative expense.  And as we have
demonstrated, even if that was not the case, Hostess cannot be excused from its obligations to
(continues)

12

that coverage.  How the insurance company, on the one hand, and the Fund, on the other, set

their rates and what they do with those premiums, plays no role in determining their priority in

bankruptcy.

### i.    Hostess' Single-Employer Authority is Inapposite

21.    At the May 30, 2012 hearing, the Court asked whether the cases upon which

Hostess relies describing the priority accorded to minimum funding payments of single-employer

plans are applicable to the Pension Wage Deferral contributions that form the basis of the

BCTGM's claim.  They are not.

22.    The cases, which consider the Pension Benefit Guarantee Corporation's

("PBGC") claims for minimum funding contributions owed by the sponsor of a single-employer

plan pursuant to section 412(a) of the Internal Revenue Code ("IRC"), arise in an entirely

different procedural context from the present situation.  Under the IRC, a single-employer "plan

shall be treated as satisfying the minimum funding standard for a plan year if . . . the employer

makes contributions to or under the plan for the plan year which, in the aggregate, are not less

than the minimum required contribution determined under section 430 for the plan for the plan

year[.]"  *See* 26 U.S.C. § 412(a)(2)(A).  To the extent that in any year an employer has not made

contributions sufficient to meet that standard, the statute authorizes the PBGC to collect the

additional required amount – the "minimum funding contributions."  *See, e.g.*, *In re

Sunarhauserman, Inc.*, 126 F.3d 811, 814-15 (6th Cir. 1997) ("The minimum funding rules

require the plan sponsor to maintain a ledger account, termed the 'funding standard account.'

The sponsor's annual contribution must be sufficient to eliminate any 'accumulated funding

---

properly compensate its employees for post-petition work based on its own improper conduct.
*See supra* Part B; *see also* Reply Brief at ¶¶ 19-23.

deficiency' in the plan's funding standard account. That is, the account must have a zero or positive balance 'as of the end of the plan year'" (citations omitted)). It was these statutory contributions that the PBGC sought to recover in the cases relied on by Hostess.

23.    In a single-employer plan, the employer makes a contractual promise to the union (in a collectively bargained plan) or to its employees directly (in a non-union setting) that it will provide a specified level of pension benefits upon retirement. The amount of the employer's contribution necessary to provide that promised benefit is set by section 412(a)(2)(A), rather than by contract. And it is determined each year by looking backwards, after the close of a plan year, to determine what contributions are necessary to fund new benefit accruals and any underfunding attributable to prior years. The amount of the employer's required minimum funding contribution, therefore, varies each year depending on the amount needed to fully fund currently accruing benefits and to make up for any underfunding. For example, if there is no funding shortfall in a particular plan year, an employer is only required to contribute enough to cover the plan's normal cost for the year. *See* ERISA § 303(c)(6) and IRC § 430(c)(6).[5]

24.    In a multi-employer plan, by contrast, the contributing employer promises to make a set dollar per hour contribution to the Fund which, in turn, promises to pay a certain level of benefits to the employer's employees based on the negotiated contribution rate. The determination of what the contribution rate will be is forward-looking: that is, the union and the employer negotiate every contract cycle to establish the employer's contribution rate for the following contract term.

---

[5] Indeed, a single employer plan may be so well funded that in any given year no contributions are required to cover that year's pension benefit accruals.

25.    In the case of the B&C Fund, the amount of the monthly Pension Wage Deferral contributions is governed by the various BCTGM CBAs. The rates set by the Fund for various levels of pension benefits were set in 1991 and have not changed since. *See* Brock Decl., ¶ 9. During that time, however, the funded status of the B&C Fund has changed dramatically. In 1992, the plan was fully funded; in 1999, the Fund was overfunded (128%); in 2003, the Fund was 82% funded; in 2005, the Fund was 93% funded; and percent; and last year, the Fund was 83.6% funded. But throughout this period, Hostess' contribution obligation remained the same. Hostess has never been asked to pay more to make up for previous years' underfunding of had contributions returned because the Fund was over-funded.

26.    The importance of this difference is highlighted in the cases cited in paragraphs 13 and 14 of our Reply Brief. For example, in *Merlino's Macaroni, Inc. v. Local 9, Bakery, Confectionery & Tobacco Workers Int'l Union*, No. C92-1405R, slip. op. at 1-3 (W.D. Wash. 1993),[6] the court held that a pension fund could not authorize an employer to reduce its contributions below the amount required in the CBA, even if the employees would still receive the same level of benefits. This makes sense in the context of a multi-employer plan, where the employer's contribution rate is fixed by contract. In the single-employer plan context, however, where the employer is only contractually required to provide a set level of benefits, the amount of the contribution naturally rises and falls with the needs of the plan.[7]

---

[6] The district court order and arbitration award were attached to the Reply Brief as Attachment 2.

[7] While Debtors' counsel argued strenuously about the distinction between defined-benefit and defined-contribution plans, in effect, the *Merlino's* decision suggests that Hostess' obligation to the BCTGM is similar to a defined-contribution plan. The Company's contribution rate is set by contract, regardless of whether that is insufficient or, even too much, to pay for the

(continues)

27.    This is particularly relevant here, because in the single-employer context, there is

no fixed dollar amount that is considered part of employees' total compensation package.  In *In*

*re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 891

(Bankr. S.D.N.Y. 1993), the court found that "Debtor did not promise pension benefits to induce

its employees, with the possible exception of the thirty-eight who remained in its employ, to

remain on the job postpetition."  That was true, because as long as the plan received sufficient

contributions to ensure that debtor's thirty-eight remaining employees would ultimately receive

pension benefits, the debtor's contractual obligation to its post-petition employees was fulfilled.

But in a collectively bargained multi-employer pension plan, the employer – in its CBAs with its

union – promises to make a fixed contribution, for which the Fund promises to provide a

particular benefit.  In the context of a bankruptcy, that promise induces its employees to remain

on the job post-petition and to look to the fund for the ultimate payment of their pension benefits,

which accrue each hour the employees work post-petition.  So too here: because Hostess is

obligated by contract to contribute a fixed amount for every hour worked, its entire Pension

Wage Deferral contribution obligation arises directly from that post-petition labor and is

therefore entitled to treatment as an administrative expense.[8]

_____

promised benefit level.  The burden is on the plan, not the employer, to produce the promised
benefits.

[8] The fact that debtors who participate in multi-employer plans have fixed contractual
obligations, tied to hours worked by active employees, that do not change with the funding status
of the plan, explains why such debtors have routinely continued to pay the full amount of their
post-petition pension obligations.  *See, e.g.*, *Marcal*, 650 F.3d at 313 ("One of those obligations
was that DIP Marcal continue to make contributions to the TENJ Pension Fund on behalf of
covered employees. DIP Marcal made all such contributions from November 30, 2006, the date
of its Chapter 11 petition, until May 30, 2008, when DIP Marcal's assets were sold to Marcal
Paper Mills, LLC."); *In re HNRC Dissolution Co.*, 396 B.R. 461, 466 (B.A.P. 6th Cir. 2008)
("While operating postpetition, the Debtors paid all necessary wages and made all required
(continues)

28.     This is not to say that multi-employer plans do not have minimum funding requirements under the IRC.  Indeed, they do.  Section 412(a)(2)(C) of the IRC provides that a multi-employer "plan shall be treated as satisfying the minimum funding standard for a plan year if–. . . the employers make contributions to or under the plan for any plan year which, in the aggregate, are sufficient to ensure that the plan does not have an accumulated funding deficiency under section 431 as of the end of the plan year."  *See* 26 U.S.C. § 412(a)(2)(C).  Like single employer plans, to meet the minimum funding requirements, a multi-employer plan's funding standard account "must have a zero or positive balance 'as of the end of the plan year.'"  *In re Sunarhauserman, Inc.*, 126 F.3d at 815.  But as the actuarial report Debtors offered into evidence at the hearing reveals, last year the "[m]inimum contribution with interest" Hostess was "required" to make "to avoid a funding deficiency" was zero.  *See* Declaration of Heather Lennox, Dkt. 1034 (May 29, 2012), Exhibit B - Part 2 at p. 121.[9]  Hostess has never been asked to make a payment for minimum funding contributions pursuant to section 412(a)(2)(C).  Thus, while there is a direct statutory counterpart to the minimum funding contributions sought by the PBGC pursuant to section 412(a)(2)(A) in the cases cited by Hostess in which the PBGC unsuccessfully sought administrative expense treatment of these contributions – contributions of the type that could be required of Hostess under section 412(a)(2)(C) – in this case those contributions are zero.

---

contributions for benefits due to employees under the NBWCAs."); *McFarlin's, Inc.*, 789 F.2d at 100 ("Thereafter it maintained its alteration department for a time, employing persons covered by the collective bargaining agreement and making all required contributions to the Fund.").

[9] The Form 5500 for the 2012 plan year will contain an identical actuarial report. Because the Fund's Trustees have not yet approved the actuarial report, we have not filed a copy of it with the Court.  But the actuarial report has recently been prepared and we represent to the Court that, like the prior year's report that is in evidence, it reflects a minimum funding contribution of zero.

### ii.    Hostess' Pension Wage Deferral Obligations Are Not Like Withdrawal Liability

29.    At the May 30, 2012 hearing, counsel for the Debtors asserted that a portion of Hostess' Pension Wage Deferrals should be treated like withdrawal liability, which the Second Circuit has held to be a pre-petition obligation, even when assessed post-petition. The reasoning of the withdrawal liability cases demonstrates the fallacy of this argument.

30.    First, a claim for withdrawal liability is far more analogous to the PBGC's claim for minimum funding contributions in the single-employer context than the BCTGM's claim for post-petition Pension Wage Deferrals. Like single-employer minimum funding obligations, the amount of an employer's withdrawal liability is determined by statute, not contract. *McFarlin's*, 789 F.2d at 99 ("'Withdrawal liability' is a term used to describe an employer's obligation . . . to make a lump sum payment of additional money to the fund . . . . The obligation was created by Congress . . . ."). And like single-employer minimum funding obligations, the amount of withdrawal liability rises and falls with the economic success of the plan.[10] Thus, like single-employer minimum funding obligations, there is no fixed amount of withdrawal liability that is part of an employee's compensation for an hour of work. Here, by contrast, the fixed amount of Hostess' Pension Wage Deferral payments is part of the employees' bargained-for compensation, irrespective of their right to benefits. *See* Reply Brief at ¶¶ 12-15.

31.    Moreover, withdrawal liability is backward-looking by design. Congress established the withdrawal liability requirement "to ensure that employers could not avoid their obligation to provide a promised benefit by withdrawing, thereby hurting their employees and the entire pension fund's health." *Marcal*, 650 F.3d at 316. This statutory obligation "has a

---

[10] For most of the 1990s, employers who withdrew from the B&C Fund had no withdrawal liability due to the performance of the Fund.

retroactive aspect, since withdrawal liability 'imposes on the withdrawing employer a share of

unfunded vested liability proportional to the employer's share of contributions to the plan during

the years of its participation[.]'" *Central States, S.E. & S.W. v. Midwest Motor Express*, 181

F.3d 799, 803-04 (7th Cir. 2005) (quoting *Concrete Pipe & Products of Cal., Inc. v.*

*Construction Laborers Pension Trust Fund for S. Cal.*, 508 U.S. 602, 610 (1993)). Because "the

employer's lump sum payment in satisfaction of his withdrawal liability is made to guarantee

pension benefits *already earned* by those employees covered by the Plan[,] the Second Circuit

held that "[t]he consideration supporting the withdrawal liability is, therefore, the same as that

supporting the pensions themselves, the *past labor* of the employees covered by the Plan."

*McFarlin's*, 789 F.2d at 101-02 (emphasis added).

32.    Hostess' Pension Wage Deferral obligation is not backward-looking – it is

focused on the present. Under the CBAs, employees are entitled to a specific dollar contribution

for each hour worked. The obligation to make the payment arises at the moment the labor is

provided – and, in the case of the contributions requested here, that labor was provided post-

petition. This is, therefore, not at all akin to a claim for withdrawal liability which comes due

post-petition, but is "based on the withdrawing employer's contributions to the Plan prior to the

year before the employer withdraws." *McFarlin's*, 789 F.2d at 103.[11] These are claims that have

---

[11] In overly simplified terms, an employer's withdrawal liability is determined by comparing that employer's contributions for at least five plan-years prior to the year in which the employer withdraws to all contributions to the plan during those years, multiplied by the total unfunded liability of the plan at the end of the plan-year prior to the employer's withdrawal. The conclusion, therefore, that withdrawal liability is a general unsecured claim is premised on the fact that, if an employer withdraws less than a year into the bankruptcy, the contribution calculation is all based on pre-petition labor as a definitional matter. *See McFarlin's*, 789 F.2d at 103-04 ("Since withdrawal liability is based on the withdrawing employer's contributions to the Plan prior to the year before the employer withdraws, McFarlin's withdrawal liability is related to the years 1975–81. The consideration supporting its withdrawal liability was, therefore, the
(continues)

19

come due post-petition only because BCTGM-represented "employees were required to perform work post-petition in order to keep [Hostess] in operation." *Marcal*, 650 F.3d at 317. They are therefore entitled to administrative expense priority.

### Conclusion

For the foregoing reasons, as well as for the reasons stated in our opening and reply briefs, this Court should accord the BCTGM an administrative claim for Pension Wage Deferrals arising from post-petition work performed by BCTGM represented active employees and direct the Debtors to immediately make these payments.

<div style="margin-left:40%;">

Respectfully submitted,

/s/ Jeffrey R. Freund
Jeffrey R. Freund
Zoe L. Palitz
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St., N.W., 10th Floor
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888

*Counsel for the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union and Affiliated Local Unions Representing Debtors' Employees*

</div>

Dated: June 15, 2012

---

work of employees in the alteration department during those earlier years. Since McFarlin's did not file for bankruptcy . . . until March 1982, this consideration was not furnished for the benefit of the debtor in possession or for the continuation of McFarlin's business after it went into bankruptcy" (citation omitted)).

## CERTIFICATE OF SERVICE

I, Jeffrey R. Freund, certify that I am over 18 years of age and that on this the tenth day

of April 2012, I caused to be served, (i) on chambers via hand and email delivery (ii) on all

counsel of record by ECF and (iii) upon the parties listed below by email and USPS First Class

Mail, a true and correct copy of the following:

- Supplemental Memorandum of the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union in Support of Motion for an Order Directing Payment of Post-Petition Employee Benefit Contributions and Allowing an Administrative Claim for Unpaid Amounts

Paul K. Schwartzberg, Esq.
33 Whitehall Street, 21st Fl.
New York, NY 10004
paul.schwartzberg@usdoj.gov
*Office of the United States Trustee*

Hostess Brands, Inc.
12 E. Armour Blvd.
Kansas City, MO 64111
Attn: Kent Magill, Esq. (kent.magill@hostessbrands.com)
Jolyn Sebree (jolyn.sebree@hostessbrands.com)
*Debtors*

Jones Day
222 East 41st Street
New York, NY 10017
Attn: Corinne Ball, Esq. (cball@jonesday.com)
Heather Lennox, Esq. (hlennox@jonesday.com)
Lisa Laukitis, Esq. (llaukitis@jonesday.com)
Veerle Roovers, Esq. (vroovers@jonesday.com)
-and-
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Attn: Ryan T. Routh, Esq. (rrouth@jonesday.com)

Thompson & Knight, LLP
900 Third Avenue, 20th Floor
New York, NY 10022
Attn: Ira L. Herman, Esq. (ira.herman@tklaw.com)

Stinson Morrison Hecker LLP
1201 Walnut, Suite 2900
Kansas City, MO 64106
Attn: Paul M. Hoffmann, Esq. (phoffmann@stinson.com)
*Counsel to Debtors*

Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
Attn: Joshua K. Brody, Esq. (jbrody@kramerlevin.com)
Thomas Moers Mayer, Esq. (tmayer@kramerlevin.com)
*Counsel to the Official Committee of Unsecured Creditors*

Paul Hastings Janofsky & Walker LLP
75 E 55th St
New York, NY 10022
Attn: Rick Denhup, Esq. (rickdenhup@paulhastings.com)
Leslie Plaskon, Esq. (leslieplaskon@paulhastings.com)
-and-
600 Peachtree St NE Ste 2400
Atlanta, GA 30308
Attn: Cassie Coppage, Esq. (cassiecoppage@paulhastings.com)
Jesse H. Austin III, Esq. (jesseaustin@paulhastings.com)
*Counsel to General Electric Capital Corporation, as Agent*

Paul Weiss Rifkind Wharton & Garrison LLP
1285 Ave of Americas
New York, NY 10019-6064
Attn: Alan Kornberg, Esq. (akornberg@paulweiss.com)
Brian Hermann, Esq. (bhermann@paulweiss.com)
Diane Meyers, Esq. (dmyers@paulweiss.com)
-and-
2001 K St NW
Washington, DC 20006
Attn: Craig Benson, Esq. (cbenson@paulweiss.com)
*Counsel to Silver Point Finance LLC, as Agent*

Thompson & Knight, LLP
900 Third Avenue, 20th Floor
New York, NY 10022
Attn: Ira L. Herman, Esq. (ira.herman@tklaw.com)
Jennifer A. Christian, Esq. (jennifer.christian@tklaw.com)
*Counsel to BNY Mellon, as Trustee*

Debevoise & Plimpton LLP
919 Third Ave
New York, NY 10022
Attn: George Maguire, Esq. (gebmaguire@debevoise.com)
Steven Gross, Esq. (srgross@debevoise.com)
Joseph P Moodhe, Esq. (jpmoodhe@debevoise.com)
*Counsel to Investors I, LLC, IBC Investors II, LLC and IBC Investors III, LLC*

Cohen, Weiss and Simon, LLP
330 West 42nd Street - 25th Floor
New York, NY 10036
Attn: Richard M. Seltzer, Esq. (rseltzer@cwsny.com)
*Counsel to Interstate Bakeries Corporation-International Brotherhood of Teamsters Negotiating*
*Committee*

Willkie Farr & Gallagher LLP
787 Seventh Ave
New York, NY 10019
Attn: Matthew Feldman, Esq. (mfeldman@willkie.com
Paul Shalhoub, Esq. (pshalhoub@willkie.com)
*Counsel to the International Brotherhood of Teamsters*

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178-0600
Attn: James L. Garrity, Jr., Esq. (jgarrity@morganlewis.com)
-and-
1701 Market Street
Philadelphia, Pennsylvania 19103
Attn: John C. Goodchild, III, Esq. (jgoodchild@morganlewis.com)
Rachel Jaffe Mauceri, Esq. (rmauceri@morganlewis.com)
*Counsel to Klosterman Baking Company,  Pan-O-Gold Baking Company, BBU, Inc., United*
*States Bakery,  Northeast Foods, Inc., Schwebel Baking Company, Alpha Baking Co., Inc.,*
*Interbake Foods, LLC*

Eckert Seamans Cherin & Mellott LLC
10 Bank Street, Suite 700
White Plains, NY 10606
Attn: Riyaz G. Bhimani, Esq. (rbhimani@eckertseamans.com)
-and-
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801
Attn: Ronald S. Gellert, Esq. (rgellert@eckertseamans.com)

McGrath North Mullin & Kratz, PC LLO
Suite 3700, First National Tower
1601 Dodge Street
Omaha, Nebraska 68102-1627
Attn: Robert P. Diederich, Esq. (rdiederich@mcgrathnorth.com)
*Counsel to ConAgra Foods*

Loizides, P.A.
1225 King Street, Suite 800
Wilmington, DE  19801
Attn: Christopher D. Loizides, Esq. (loizides@loizides.com)

Beckman Lawson LLP
201 W. Wayne Street
Fort Wayne, IN  46802
Attn: Adam L. Hand, Esq. (ahand@beckmanlawson.com)
*Counsel to Perfection Bakeries, Inc.*

Buchanan Ingersoll & Rooney PC
1290 Avenue of the Americas, 30th Floor
New York, NY  10104-3001
Attn: Robert S. Hawkins, Esq. (robert.hawkins@bipc.com)
Tanya D. Bosi, Esq. (tanya.bosi@bipc.com)
*Counsel to Amoroso's Baking Company*

Schiff Hardin LLP
666 Fifth Avenue, 17th Floor
New York, NY 10103
Attn: Keith N. Costa, Esq. (kcosta@schiffhardin.com)
Alyson M. Fiedler, Esq. (afiedler@schiffhardin.com)
-and-
233 S. Wacker Drive, Suite 6600
Chicago, IL  60606
Attn: Eugene J. Geekie, Jr., Esq. (egeekie@schiffhardin.com)
Jeffrey D. Eaton, Esq. (jeaton@schiffhardin.com)
*Counsel to Lewis Brothers Bakeries Incorporated and Chicago Baking Company*

Lowenstein Sandler PC
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
-and-
65 Livingston Avenue
Roseland, New Jersey 07068
Attn: Sharon L. Levine, Esq. (slevine@lowenstein.com)
Philip J. Gross, Esq. (pgross@lowenstein.com)
*Counsel to I.A.M. National Pension Fund, Bakery & Confectionery Union & Industry
International Pension Fund*

Wick Streiff Meyer Oboyle & Szeligo PC
1450 Two Chathem Center
Pittsburgh, PA 15219
Attn: Vincent P. Szeligo, Esq. (vszeligo@wsmoslaw.com)
*Counsel to The Western Pennsylvania Teamsters and Employers Pension Fund*


Dated: Washington, DC
      June 15, 2012

                /s/ Jeffrey R. Freund
                Jeffrey R. Freund
                BREDHOFF & KAISER, P.L.L.C.
                805 Fifteenth Street N.W., 10th Floor
                Washington, D.C. 20005
                Telephone: (202) 842-2600
                Facsimile: (212) 842-1888