JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Heather Lennox
Lisa Laukitis
Veerle Roovers

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Ryan T. Routh

Attorneys for Debtors
and Debtors in Possession


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11
                                                            :
Hostess Brands, Inc., *et al.,*[1]                          :    Case No. 12-22052 (RDD)
                                                            :
                              Debtors.                      :    (Jointly Administered)
                                                            :
------------------------------------------------------------x


### SUPPLEMENTAL BRIEF OF DEBTORS AND DEBTORS IN POSSESSION WITH RESPECT TO MOTIONS OF NINE PENSION FUNDS AND THE BCT FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

---

[1]    The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Hostess Brands, Inc. (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to the discussion that occurred at the May 30, 2012 hearing, Hostess

Brands, Inc. ("Hostess") and its five domestic direct and indirect subsidiaries, as debtors and

debtors in possession (collectively with Hostess, the "Debtors"), hereby submit this

Supplemental Brief addressing issues raised by the Court in connection with the defined benefit

Funds' and the BCT's Motions for payment of administrative expenses.[2]

## PRELIMINARY STATEMENT

1.      The principal issue before the Court is whether contributions that the

Debtors are scheduled to make postpetition to the defined benefit multiemployer pension plans in

which they are participants are entitled to administrative expense priority under sections 503 and

507 of the Bankruptcy Code.  The answer – as courts have repeatedly recognized in the context

of single employer defined benefit plans – is clear:  to the extent those contributions fund

pension benefits that were earned postpetition, they are entitled to administrative expense

priority, but insofar as they fund benefits earned prepetition (or are a cost of administering the

fund), they are not.  See, e.g., In re Finley, Kumble, Wagner, Heine, Underberg, Manley,

Myerson & Casey, 160 B.R. 882, 893 (Bankr. S.D.N.Y. 1993); Pension Benefit Guar. Corp. v.

Sunarhauserman, Inc. (In re Sunarhauserman, Inc.), 126 F.3d 811, 821 (6th Cir. 1997).

2.      These cases and a number of others that reach the same result are

dispositive.  As a matter of both economic substance and actuarial principles, there is simply no

difference between single employer and multiemployer defined benefit pension plans with

respect to the issue presented here.  In both instances, an employer's pension contributions

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Debtors'
Omnibus Objection to the Motions (Docket No. 1003).

COI-1477469

necessarily include: (1) amounts needed to fund pension benefits earned during the current period, (2) amounts needed to address any underfunding that exists as to pension benefits earned prior to the current period and (3) costs of administering the fund. Courts have held that, to the extent an employer's pension contributions go to fund benefits earned after the petition date, they are entitled to administrative expense priority. But to the extent that the contributions address the underfunding of benefits that were earned prepetition or cover general administrative expenses, they are not.

3.       In all instances but three (discussed below) the contributions for which the defined benefit Funds seek payment include not only amounts needed to fund pension benefits that were earned postpetition by Hostess employees, but also amounts that will be applied to reduce underfunding of benefits earned prepetition by employees of Hostess and many other employers, as well as costs of administering the Funds. As the movants, the Funds bear the burden of proving to the Court the specific amounts of the contributions they seek that relate to postpetition benefits. If they cannot meet that burden, their administrative expense claim requests should be denied in their entirety.

4.       As noted above, there are three exceptions. First, the Bakery Drivers Fund was "frozen" effective January 1, 2007, which means that, since that date, the plan has had no new benefit accruals and, thus, no "normal cost" (see "normal cost" discussion below at ¶ 6). Accordingly, 100% of contributions currently owed to the Bakery Drivers Fund are necessarily being used to fund previously-earned benefits or to pay for the costs of administering the plan. Hofing Rep. at 8, note 10. Second, the B&C Fund terminated Hostess' participation in that fund effective December 10, 2011, and assessed withdrawal liability. As a consequence, the Debtors' obligation to make contributions to the B&C Fund terminated as of that date, and neither the

COI-1477469

B&C Fund nor the BCT has any claim for an administrative expense.  <u>Third</u>, because the

contribution owed to the IAM Fund is not sufficient to cover the benefits that were earned

postpetition, none of that contribution is allocated to underfunding.  Thus, the IAM Fund

contribution, except for amounts relating to the Fund's costs of administration, is entitled to

priority under sections 503 and 507.

**BACKGROUND**

A.    **Defined Benefit Pension Plans**

5.    Defined benefit pension plans are employer-funded retirement plans

created for the benefit of both active and inactive participating employees.  Under a defined

benefit pension plan, a pension fund is obligated to pay a specified benefit to employees covered

by the plan upon their retirement and in accordance with the terms of the plan document.  Thus,

as employees earn their retirement benefits over time, the pension fund is accumulating fixed

liabilities that will become due as employees retire and begin collecting their pensions.  All

defined benefit plans are funded through contributions made by employers that have employees

participating in the plan.  Hofing Rep. at ¶ 9.

6.    Defined benefit pension plans apply the employers' contributions to

satisfy three separate categories of costs.  First, the contributions are used to pay for the expenses

of administering the plan, including, for example, investment advisor and legal fees.  Second, the

contributions are used to pay for the value of the new benefits that accrue for participants each

year.  Although there can be some variation in how the value of those benefits is determined,

actuaries refer to that value as the "normal cost" of the plan.  If, after satisfying both

administrative costs and the normal cost, there are any funds remaining from the contribution

made by employer(s), those funds are used to satisfy underfunding or to create or increase a

surplus.  Hofing Rep. at ¶ 10.

COI-1477469

7.      Thus, at any given point in time, a defined benefit pension plan uses contributions made by employer(s) to satisfy one of three categories of costs:  costs of administering the fund, the "normal cost," and the costs of underfunding.  The percentage of contributions allocated to each category of costs varies by plan and depends on a variety of factors, including a plan's funding levels.  Hofing Rep. at ¶ 11.

**B.      Single Employer And Multiemployer Defined Benefit Plans**

8.      Defined benefit pension plans fall into one of two primary categories: single employer pension plans and multiemployer pension plans.  Under a single employer plan, a single employer contributes to the pension trust fund so that it can provide specified pension benefits to such employer's employees upon their retirement.  Hofing Rep. at ¶ 12.

9.      Multiemployer pension plans provide defined pension benefits to employees or retirees of more than one unrelated employer.  Under a multiemployer pension plan, contributing employers jointly contribute to the pension trust fund so that fund can provide specified pension benefits to the employers' employees upon retirement.  Federal labor law requires multiemployer pension plans to be managed and operated by a board of trustees consisting of union and employer representatives.  Hofing Rep. at ¶ 13; N.L.R.B. v. Amax Coal Co., 453 U.S. 322, 325 (1981) ("Section 302(c)(5) of the LMRA [29 U.S.C. § 186(c)(5)] permits employers and unions to create employer-financed trust funds for the benefit of employees, so long as employees and employers are equally represented by the trustees of the funds.").

10.      For both single employer and multiemployer pension plans, ERISA sets forth the minimum level of employer contributions that the pension funds must obtain each year.[3]  The minimum funding requirements are based on a formula that takes into account the

---

[3]      Internal Revenue Code ("IRC") § 430 sets forth the minimum funding standards for single employer plans. 26 U.S.C. § 430.  The IRC defines the minimum required contribution as the sum of the plan's target

COI-1477469

sum of the accruing pension benefits, the annual administrative costs, and amortization costs

associated with a plan's underfunding, to the extent such underfunding exists.  Hofing Rep. at

¶ 14.

11.     Under current law, there are some differences in the minimum funding

requirements for single employer and multiemployer pension plans.[4]  The primary difference is

that single employer pension plans are now required to cure underfunding at a faster rate than are

multiemployer pension plans.  Compare 26 U.S.C. § 430(c) (providing a seven- year

amortization period for shortfalls) with 26 U.S.C. § 431(b)(2)(B) (generally providing a 15-year

amortization period for shortfalls for multiemployer plans).[5]  However, because the minimum

funding rules require both multiemployer pension plans and single employer pension plans to

avoid a funding deficiency by ensuring that contributions cover both normal costs and any

underfunding, there is no actuarial or economic impact associated with this difference.  Hofing

---

(continued…)

normal cost plus the shortfall amortization charge, 26 U.S.C. § 430(a)(1), and requires a single employer
plan to make a contribution that is not less than the minimum required contribution.  26 U.S.C.
§ 412(a)(2)(A).  See also 26 U.S.C. § 430(b) (defining target normal cost as the sum of the present value of
benefits accrued during the plan year and the amount of plan-related expenses for the year); 26 U.S.C. §
430(c) (defining shortfall amortization and providing seven-year period for amortization) and Report by
The Joint Committee on Taxation:  Technical Explanation of HR 4.  The "Pension Protection Act of 2006,"
as Passed By The House on July 28, 2006, and as Considered By The Senate on Aug. 3, 2006,
(the "Joint Committee Report") , at 9-10 (describing the Pension Protection Act's changes to single
employer pension plan funding rules).  The Joint Committee Report is attached as Exhibit A to the
appendix that the Debtors have filed simultaneously herewith (the "Appendix").

IRC § 431 provides the analogous rules for multiemployer plans.  It requires each multiemployer plan to
establish a funding standard account, which is charged with normal costs and amortization amounts and
credited with contributions.  See generally 26 U.S.C. § 431 (b).  A multiemployer plan must avoid an
"accumulated funding deficiency" by ensuring that the charges to the funding standard account do not
exceed the credits to the account.  26 U.S.C. § 412(a)(2)(C); 26 U.S.C. § 431(a).

[4]     Notably, however, prior to 2008, when the Pension Protection Act became effective, the ERISA funding
requirements for the two types of plans were nearly identical.

[5]     In two specific situations not relevant here, I.R.C. § 431(b) provides for either a five-year or 20-year
amortization period for multiemployer pension plans.

COI-1477469

Rep. at ¶ 15; see also Joint Committee Report at 9-10 (describing single employer funding) and

42-47 (describing multiemployer funding).

**C.    Contribution Calculation Formula**

12.    Although there are some minor variations from CBA to CBA, in general

the amount of the Debtors' contributions to each Fund is determined in accordance with a

formula or at a rate set forth in the relevant CBA(s).  That formula or rate requires Hostess to

contribute a specified amount to a Fund for specified intervals of time worked by its employees.

See, e.g., BCT Local 65, Tulsa Bake Shop CBA Art. 15.B (Appendix Exhibit B-1) ("For each

hour or portion thereof, which an employee works . . . the Employer shall make a contribution as

stated in paragraph C. to the Pension Fund up to a maximum of 40 hours in any week.").  In most

cases, the amount so calculated is payable to the Fund on a monthly basis.  Id. at Art. 15.E

("Contributions provided for herein shall be paid monthly and shall be accompanied by a

completed remittance report.").

13.    Employees have no right to any portion of the Debtors' pension

contribution payment.  Their only rights are to the pension benefits provided by the pension

plans as determined from time to time by the trustees of the plans.  Indeed, one of the CBAs

expressly states that "***no employee shall have the option to receive*** instead of the benefits

provided for by the Agreement and the Declaration of Trust ***any part of the payment of an***

***Employer***." IUOE Local 627 CBA Art. 14, § 5 (Appendix Exhibit B-2) (emphasis added).

14.    The amounts a multiemployer pension fund collects in contributions from

participating employers, calculated as set forth above, are used to fund:  (i) pension benefits

earned currently; (ii) pension benefits earned previously that are underfunded; (iii) and the fund's

costs of administration.  The pension contribution formula is subject to change whenever a new

CBA is negotiated or if the Pension Protection Act requires a surcharge.  Moreover, in certain

instances where there is significant underfunding, a Fund's trustees can require participating

employers to increase their contributions.  See, e.g., id. at Art. 14, § 4; IAM Local 1060 CBA

Art. 14, § 7 (Appendix Exhibit B-3).

**D.    Analysis Of The Funds In Issue**

15.    Of the eight defined benefit pension Funds for which administrative

expense claims are sought, seven are currently underfunded on both an actuarial basis and a

market value basis (the IAM Fund is not underfunded on an actuarial basis, although it is

substantially underfunded when its assets are valued on a current market value basis[6]).  Thus, as

to those seven, any contributions that exceed the Fund's normal costs and the costs of

administering the Fund are being applied to underfunding that exists with respect to previously-

earned pension benefits.  The most recent available data indicates that current contributions are

being applied by the Funds as follows:

---

[6]    See Credit Suisse Equity Research, Crawling Out of the Shadows:  Shining a Light on Multiemployer
Pension Plans (Mar. 26, 2012) at 5 (finding IAM Fund to be only 57.5% funded when funding level is
calculated using fair value of IAM Fund's assets), attached as Exhibit C to the Appendix.

COI-1477469

| Fund | Normal Cost | Costs of Administering Fund | Underfunding Reduction |
|---|---|---|---|
| Bakery Drivers Fund | 0.0% | 20.9% | 79.1% |
| B&C Fund | 38.5% | 5.0% | 56.5% |
| IAM Fund | 91.0% | 9.0% | 0.0% |
| Mechanics' Fund | 39.5% | 8.9% | 51.6% |
| UFCW Midwest Fund | 57.5% | 0.0% | 42.5% |
| Central Fund | 34.4% | 2.1% | 63.5% |
| IUOE Fund | 56.5% | 2.2% | 41.3% |
| RWDSU Fund | 66.3% | 21.7% | 12.0% |

Hofing Rep. at ¶ 23.  In other words, with respect to the Central Fund, for example, 34.4% of the contributions it is currently collecting are funding benefits earned in the current period, 63.5% are funding previously-earned benefits, and 2.1% are paying general administrative costs.[7]

## ARGUMENT

**A.**     **The Funds Are Entitled To Administrative Expense Priority Only Insofar As Contributions Are Funding Pensions Earned Postpetition By Hostess Employees.**

**1.**     **Contributions Used To Fund Pension Benefits That Were Earned Prior to the Petition Date Are Not Entitled to Administrative Priority Even If They Become Due After the Petition Date.**

16.     Courts, including courts in this Circuit, have held that contributions that are payable to a pension fund postpetition are entitled to administrative priority only to the extent they reflect normal costs, i.e., the costs associated with funding benefits earned postpetition. Pension contributions applied to fund benefits earned prepetition (which would occur if the plan is underfunded) constitute general unsecured claims and are not entitled to administrative expense priority.

---

[7]     This analysis relates to contributions of all participating employers and is intended to demonstrate how total contributions to the Funds are being applied.

COI-1477469

17.     These decisions are founded on the principle that, to the extent pension contributions due postpetition are applied to fund pensions earned prepetition, the consideration provided (i.e., the labor that was performed at the time the pension benefit was earned) occurred prepetition.  Conversely, to the extent the contribution funds a benefit earned postpetition, the labor being exchanged for the earned pension benefits also occurred postpetition.  See Finley, Kumble, 160 B.R. at 891 ("the obligation to pay minimum funding requirements is a prepetition claim not entitled to priority insofar as it relates to prepetition labor by [d]ebtor's employees . . . . Although it appears that most of [the] minimum funding claim amount is related to prepetition employment, some of the [c]laim amount is also based on postpetition consideration [and] merits priority treatment."); see also Air Line Pilots Ass'n, Int'l. v. Shugrue (In re Ionosphere Clubs), 22 F.3d 403, 407-08 (2d Cir. 1994) (priorities of section 507 mandate that obligations under CBA that accrued prior to petition date be accorded unsecured status); In re A.C.E. Elevator Co., Inc., 347 B.R. 473, 480-82 (Bankr. S.D.N.Y. 2006) (recognizing need to split pre- and postpetition pension obligation amounts); accord Sunarhauserman, 126 F.3d at 821 (claim for minimum funding contribution not entitled to administrative status for prepetition services); Pension Benefit Guar. Corp. v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.), 150 F.3d 1293, 1300 (10th Cir. 1998) (same); In re Kent Plastics Corp., 183 B.R. 841, 847-48 (S.D. Ind. 1995) (same).

18.     Contributions attributable to underfunding are analogous to the withdrawal liability that is imposed on an employer that exits a multiemployer pension plan, which courts have also consistently held is wholly or mostly a prepetition expense.  See, e.g., Trustees of Amalgamated Insurance Fund v. McFarlin's, 789 F.2d 98, 103-04 (2d Cir. 1986).  To the extent there is any distinction between withdrawal liability and minimum funding, "it is a distinction

10

without a difference for the purposes of determining when a claim arises.  A minimum funding

obligation, like withdrawal liability, is merely a substitution for the continuing contributions that

the plan sponsor should have made prepetition to fund accrued benefits." <u>Finley, Kumble</u>, 160

B.R. at 892.  Both withdrawal liability and current contributions to a multiemployer pension plan

(where that plan is underfunded) are meant to pay in whole or in part for previously-earned

benefits.  Thus, there is no analytical distinction between withdrawal liability and current

contributions that are used to pay for benefits earned prepetition.

19.     These precedents make it clear that, under the priority rules set forth in the

Bankruptcy Code, a pension fund does not have an administrative expense claim for

contributions due postpetition if those contributions are being applied to underfunding that exists

as to pension benefits that were earned prepetition as a consequence of prepetition labor.

**2.      For Purposes of Determining Administrative Expense Claims, There Is No Difference Between Single Employer Pension Plans and Multiemployer Pension Plans.**

20.     Confronted with this persuasive body of law, the Funds argue that the

cases the Debtors rely upon are inapposite because they involve single employer pension plans.

But that is a rhetorical distinction without an analytical difference.  Indeed, for purposes of the

issue presented here, there are no meaningful differences between single employer and

multiemployer plans.

21.     As detailed above, both single employer and multiemployer defined

benefit pension plans use employer contributions to pay for three separate categories of costs:

the costs of administering the fund, the "normal cost" and the costs of underfunding.  As is the

case with single employer pension plans, only contributions that are payable to a multiemployer

pension fund on account benefits earned postpetition qualify as an administrative expense claim.

22.     Contrary to the assertions of several of the Funds, the differences in funding requirements between single employer and multiemployer pension funds do not change this result.  As described above and in the Hofing Report, both single employer plans and multiemployer plans are subject to ERISA funding standards and minimum contribution rules.  See IRC §§ 412, 430-431; Hofing Report at ¶ 14.  In both situations, ERISA mandates that the minimum annual employer contributions be determined based on the sum of the currently accruing benefits, the annual administrative costs, and amortization costs associated with prior accrued pensions that are not fully funded  (to the extent such underfunding exists).  Hofing Report at ¶ 14.

23.     To be sure, under current law, the annual minimum contributions are determined somewhat differently for the single employer and multiemployer pension plans.  This is primarily due to recently-added ERISA provisions that require single employer plans to cure underfunding of previously-earned pensions more rapidly than multiemployer plans are required to cure such underfunding.  See 29 U.S.C. § 1083.  In both instances, however, any funding deficits relating to previously-earned pensions must be cured over time.  See 29 U.S.C. § 1083(c)(2)(A) (single employer plans); 29 U.S.C. § 1084(b)(2) (multiemployer plans).  Thus, from an economic and actuarial perspective, there is no meaningful distinction between single employer and multiemployer pension plans.[8]  Hofing Report at ¶ 15.

---

[8]     In its reply brief, the BCT attempts to distinguish between the funding requirements of single employer and multiemployer plans by arguing that a description of funding requirements in the Sunerhauserman decision is inapplicable to multiemployer pension plans.  But the BCT is wrong.  When Sunerhauserman was decided, the funding requirements applicable to multiemployer and single employer pension plans were nearly identical.  Hofing Report at note 4;  see also Joint Committee Report, at 42; Cress v. Wilson, 2008 WL 5397580, *4-5 (S.D.N.Y. 2008) (explaining funding rules pre-Pension Protection Act).  Effective in 2008, the Pension Protection Act modified the funding requirements for single employer plans but did not change the requirements for multiemployer plans.  As a result, Sunerhauserman's description of funding requirements, in general, remains applicable to multiemployer pension plans.  Hofing Report at note 4.

COI-1477469

24.     Indeed, as noted above, courts have already determined that withdrawal liability (which exists only in the context of multiemployer plans), is wholly or largely a prepetition expense.  That is the case because withdrawal liability is designed to fund previously-earned pension benefits (i.e., a company's employees cannot accrue pensions currently if such company previously permanently withdrew from its participation in the plan; see discussion infra, at ¶¶ 40-41).  There is no principled reason to treat withdrawal liability any differently than postpetition payments that likewise go to funding pension benefits earned prepetition.

**3.     The Funds' And The BCT's Argument That Hostess' Entire Contribution Is Entitled to Administrative Expense Priority Because of the Manner In Which the Contribution Is Calculated Is Wrong.**

25.     Notwithstanding the foregoing, the Funds and the BCT have asserted that postpetition contributions should be afforded administrative expense priority due to the manner in which such contributions are calculated.  In particular, the Funds and the BCT claim that, because the governing CBAs require the Debtors to contribute a specified amount to the Funds per each hour worked by a covered employee (or per day or week, as the case may be), the contributions are, in effect, current wages and thus entitled to priority treatment.  See, e.g., May 30, 2012 Hearing Transcript [Docket No. 1076] ("Hrg. Tr.") at 140 (statement of Jeffrey Freund, counsel for the BCT) ("It's all wages.  As long as it's for post-petition services it's entitled to administrative priority.").

26.     But the Funds' and the BCT's analysis is fundamentally flawed.  To be sure, the CBAs specify a ***method of calculating*** the amount that the Debtors will pay to the Funds and, in most instances, require the Debtors to contribute a fixed amount over a given period of time (say, for example, $1.80 for each hour worked, or $30.00 per week).  However, as at least one of the Funds has acknowledged, those contributions are not tied to a particular employee or benefit.  See Hrg. Tr. at 182 (statement of Marc Tenenbaum, counsel for the Bakery

Drivers Fund and the Carpenter's Fund) ("There is no direct tie between the contribution and the benefit."). A particular contribution does not fund any particular employee's benefits and is not "compensation" to that employee. Nor is such amount withheld from an employee's paycheck to make the contribution.

27.    The plain language of the Funds' trust agreements and the underlying CBAs further supports this view. For example, the IAM Fund Trust states that "[c]ontributions paid into this Pension Trust Fund *shall not constitute or be deemed wages due to Employees*, nor shall the Pension Fund be liable for or subject to the debts, contracts, or liabilities or the IAM or its affiliated or Local and District Lodges, Employers, Employees, or beneficiaries." IAM Fund Trust Agreement Art. V, § 6 (Appendix Exhibit B-4) (emphasis added); <u>see also</u> Bakery Drivers Fund Trust Agreement Art. VI, § 2 (Appendix Exhibit B-5) ("The Employers' contributions to be paid into the Pension Trust Fund *shall not constitute or be deemed wages due to Employees* nor shall the Pension Trust Fund be liable for or subject to the debts, contracts or liabilities of the Union, the Employers, or Employees.") (emphasis added).

28.    Similarly, the RWDSU Fund Trust Agreement provides that:

> No [e]mployee, or other person, . . . nor any person claiming through them, shall have any right, title or interest in any of the income or property of any character received or held by or for the account of the Fund . . . and no person shall have any right to any benefit provided by the Plan, nor shall any person be entitled to any payment or other equity in the assets of the Fund unless and until the Board determines that he or she fulfills all the requirements for a benefit in accordance with specific provisions of the Plan."

RWDSU Fund Trust Agreement, Section XIII.16 (Appendix Exhibit B-6); <u>see also</u> IUOE Fund Trust Agreement Art II, § 2.03 (Appendix Exhibit B-7) ("No Employee shall be entitled to receive any part of the contributions made or required to be made to the Fund in lieu of the benefits provided by the Plan.").

COI-1477469

29.     These provisions are particularly noteworthy given that the majority of the

CBAs specifically incorporate (or bind the parties to comply with) the Funds' trust agreements.[9]

For example, the BCT Local 65, Tulsa Bake Shop CBA provides that "[t]he [e]mployer hereby

agrees to be bound as a party to the terms and provisions of the [BCT Fund Trust]."  BCT Local

65, Tulsa Bake Shop CBA Art. 15.A (Appendix Exhibit B-1); see also RWDSU Local 441,

Birmingham, AL Production, Art. 13, § 5 (Appendix Exhibit B-8) ("The parties hereto agree to

become parties to the Agreement and Declaration of Trust dated April 23, 1962, which

established the said Fund, by executing the standard form of Participating Agreement adopted by

the Trustees."); BCT Local 37, Henderson Bake Shop CBA Art. 20, § 3 (Appendix Exhibit B-9)

("The Employer hereby agrees to become a party to the Agreement and Declaration of Trust

establishing the said Bakery and Confectionery International Union and industry International

Pension Fund, and agrees to be bound by all the terms and provisions of said Agreement.");

IUOE Local 101, Kansas, City Engineers Art 16 § 1 (Appendix Exhibit B-10) ("Employer agrees

to be bound by the Agreement and Declaration of Trust entered into as of September 7, 1960,

establishing the Central Pension Fund of the International Union of Operating Engineers and

Participating Employers and by any amendments to said Trust Agreement."); IAM Local 818 Art

XI § 1(D) (Appendix Exhibit B-11) ("The I.A.M. Lodge and the Employer adopt and agree to be

bound by, and hereby assent to, the Trust Agreement, dated May 1, 1960, as amended, creating

the I.A.M. National Pension Fund in establishing and administering the foregoing Plan pursuant

---

[9]     A table with the relevant provisions from each applicable CBA is attached as Exhibit D to the Appendix. Relevant excerpts from the BCT CBAs and Other Union CBAs are attached as Exhibit E-1 and Exhibit E-2 to the Appendix, respectively.

to the said Trust Agreement, as currently in effect and as the Trust and Plan may be amended

from time to time.").[10]

30.    As these provisions and simple common sense make clear, neither the

Debtors nor the Funds intended for the Debtors' pension contributions to constitute "wages."

Indeed, the notion that pension contributions are separate and distinct from wages is firmly

embedded in the Bankruptcy Code.  Section 507 of the Bankruptcy Code sets forth the priority to

be afforded various claims.  Subsection (a)(4) assigns fourth priority to "wages, salaries, or

commissions" earned prepetition.  Subsection (a)(5), in turn, assigns fifth priority to

"contributions to an employee benefit plan" due prepetition.  So the Bankruptcy Code recognizes

that pension contributions are not part of wages and assigns them a lower priority.

31.    Clearly then, when a Hostess employee works an hour that obligates the

Debtors to make a $1.80 pension contribution to one of the Funds, that employee has not

received $1.80 in wages, nor is that $1.80 in pension contribution obligation a benefit of

employment.  Rather, it is the pension credit that is earned (i.e., accrues) from the hour of labor

worked  that constitutes the benefit of employment.  And if that hour of labor was worked

prepetition, and the pension credit that is earned from such hour of labor occurred prepetition,

then so too the benefit of employment arises prepetition, notwithstanding when the contributions

are made to fund such prepetition benefit of employment.  In such a case, the  $1.80 per hour rate

---

[10]    At least one published circuit court decision has held that, where these types of provisions are present, the
multiemployer plan provisions supersede all collective bargaining agreement provisions relating to
pensions.  In Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d
1018, 1021 (4th Cir. 1997), the plan trustees declared by formal resolution and pursuant to a multiemployer
fund trust agreement that participating companies would be required to pay contributions based on
severance pay.  Id.  The resolution contradicted a specific provision of the underlying collective bargaining
agreement, which purported to exclude pension payments for severance pay.  Id.  The court held, however,
that, in light of the collective bargaining agreement's "standard clause," which incorporated the trust
agreement into the CBA, the exclusion could not be enforced.  Id. at 1023.

that is to be paid postpetition is merely the formulaic means to calculate  the contribution the *employer* will make to fund the benefit of employment.  It is not itself a benefit of employment.

32.    Thus, in instances in which the Debtors' current contributions will be applied to fund not only pension benefits earned currently, but also benefits earned prior to the current period, there can be little doubt that the portion of the contribution used to fund a prior accrued benefit is part of the exchange of such prior accrued pension for the prior-provided labor.  As numerous courts have recognized, if that labor was provided prepetition, that part of the contribution cannot be afforded administrative expense priority.

### 4.    The Funds' General Administrative Costs Are Not Entitled to Administrative Expense Priority.

33.    While courts have found that certain postpetition pension liabilities may be payable as administrative expenses when such liabilities are the result of employees' postpetition work, expenses incurred by a pension fund that do not satisfy the standard for administrative priority status under 503(b)(1)(A) are not.  In In re A.C.E. Elevator Co., Inc., this Court held that services provided by the plan trustees "in processing and calculating amounts due in respect of Plan contributions" were not "actual, necessary expenses of preserving the estate" because such services "conferred no discernable benefit on the estate."  347 B.R. at 482 (citing Finley, Kumble, 160 B.R. at 891 ("the benefit plan funding contributions at issue were not necessary to preserve the debtor's estate or to promote administration of the case.")).[11]

34.    Similarly, in this case, the administrative costs incurred by the Funds' trustees were not "actual, necessary expenses" of the Debtors, nor did these services performed for the Funds provide any discernable benefit to Hostess or its creditors.  Accordingly, to the

---

[11]    The BCT inaccurately stated that the A.C.E. matter addressed postpetition contributions.  Hrg. Tr. at 128. A.C.E. addressed only prepetition contributions, but its analysis applies equally to postpetition contributions.  See A.C.E., 347 B.R. at 478.

COI-1477469

extent the contributions in issue are allocated to those administrative costs, they fail to meet the

criteria for administrative priority status pursuant to section 503(b)(1)(A) of the Bankruptcy

Code.

**B.      The Funds Bear The Burden Of Proof As To The Amount Of Their Claim That Is Entitled To Administrative Expense Priority.**

35.      The Funds have not satisfied their burden of proof  with respect to their

claims for administrative priority.  A claimant has the burden of proof as to the validity and

amount of any claim for which it seeks administrative priority.  See In re Kollel Mateh Efraim,

LLC, 2010 WL 3782050, at *6 (Bankr. S.D.N.Y. 2010) ("The party claiming entitlement to an

administrative expense bears the burden of proof."); In re Old Carco LLC, 424 B.R. 650, 657

(Bankr. S.D.N.Y. 2010) ("The claimant has the burden of establishing entitlement to the

priority."); In re Patient Educ. Media, Inc., 221 B.R. 97, 101 (Bankr. S.D.N.Y. 1998) (same); In

re Chateaugay Corp., 102 B.R. 335, 353 (Bankr. S.D.N.Y. 1989) (same).

36.      And while a filed proof of claim constitutes *prima facie* evidence of the

validity and amount of the claim under Bankruptcy Rule 3001(f), requests for administrative

claims do not enjoy the same presumption.  See In re Winimo Realty Corp., 270 B.R. 108, 122

(S.D.N.Y. 2001); see also In re PT-1 Commc'ns, Inc., 386 B.R. 402 (Bankr. E.D.N.Y. 2007)

(citing In re Silvus, 329 B.R. 193, 205 (Bankr. E.D. Va. 2005); In re Morgan, 48 B.R. 148, 149

(Bankr. D. Md. 1985)).

37.      Here, as set forth above, the only portion of the pension contributions at

issue that are entitled to administrative priority are the normal cost relating to benefits that were

earned postpetition.  Amounts attributable to underfunding that exists as to benefits earned

prepetition, as well as the Funds' costs of administration, are not entitled to priority.

COI-1477469

38.     Despite these governing principles, the Funds have offered no evidence as to the specific amounts of the pension contributions in issue that are entitled to administrative expense priority.  In the absence of that proof, the Funds' administrative expense claims must be denied in their entirety.

**C.     Because The B&C Fund Terminated Hostess' Participation In Such Fund Prepetition, The B&C Fund Has A Prepetition Claim For Withdrawal Liability, Not An Administrative Expense Claim For Contributions.**

39.     In its Reply, the BCT argues that postpetition contributions allegedly owed to the B&C Fund under the CBA constitute administrative expense claims even though the B&C Fund assessed withdrawal liability against the Debtors prepetition.  BCT Reply at 8-9.  The applicable law provides otherwise.[12]

40.     Congress designed withdrawal liability as a substitute for the contribution stream of a withdrawing employer, so as to protect the vested benefits of an underfunded plan. See Amalgamated Ins. Fund v. William B. Kessler, Inc., 55 B.R. 735, 740 (S.D.N.Y. 1985) ("withdrawal liability is merely a substitute for the continuing contributions a withdrawing employer would otherwise make toward fully funding vested benefits."); Finley, Kumble, 160 B.R. at 892 ("A minimum funding obligation, like withdrawal liability, is merely a substitution for the continuing contributions that the plan sponsor should have made prepetition to fund accrued benefits."); In re Cott Corp., 47 B.R. 487, 493 (Bankr. D. Conn. 1984) ("The purpose of . . . withdrawal liability is to make up for the failure of the plan to receive contributions in years gone by sufficient to pay for the vested pension benefits.").

---

[12]     The BCT's motion does not make clear whether it is seeking a claim on behalf of itself or on behalf of the B&C Fund.  Under applicable law, however, only the B&C Fund would be entitled to a claim, to the extent such claim is allowed.  ERISA §§ 1132(g)(2), 1145 (fiduciary of multiemployer plan granted right to bring an action "on behalf of a plan" to enforce obligation to make contributions to multiemployer plan under either terms of plan or terms of collectively bargaining agreement).

41.    In other words, withdrawal liability and plan contributions cannot, by their very nature, be concurrent obligations.  A pension plan may receive from an employer **either** plan contributions **or** withdrawal liability payments, but not both.

42.    Here, in a letter dated December 12, 2011, the B&C Fund (the only party entitled to receive pension contributions under the provisions of Hostess' CBAs with the BCT) sent a letter to the Debtors stating that Hostess' failure to satisfy its contribution obligations to the Fund constituted a complete withdrawal from the Fund.[13]  In the same letter, the B&C Fund assessed approximately $1 billion of withdrawal liability against the Debtors.  Accordingly, as of December 12, 2011, the Debtors no longer had an obligation to make contributions to the BCT Fund.  In addition, consistent with its determination that Hostess had completely terminated its participation in the B&C Fund as of December 12, 2011, the B&C Fund notified Hostess' employees that as of December 10, 2011, they would not be able to accrue additional pension benefits.[14]  Thus, even if the B&C Fund had not assessed withdrawal liability, neither the B&C Fund nor the BCT Fund could be entitled to an administrative expense claim because **no benefits are being accrued postpetition**.  See discussion above at  ¶¶ 16-38.

43.    The BCT claims that the B&C Fund lacked authority to modify the BCT's CBAs with Hostess, see BCT Reply at 8, but that argument misses the mark.  The B&C Fund's actions were in accordance with both the CBAs and the B&C Fund Trust Agreement, which sets forth the rules governing the B&C Fund.  In particular, under the B&C Fund Trust Agreement, an employer is required to continue to contribute "**until he ceases to be an Employer** within the meaning of [the B&C Fund Trust]."  B&C Fund Trust Agreement at Art. V, § 2 (emphasis

---

[13]    The letter from the B&C Fund dated December 12,2011 is attached to the Appendix as Exhibit F.

[14]    The letter from the B&C Fund dated November 25, 2011 is attached to the Appendix as Exhibit G.

COI-1477469

added) (Appendix Exhibit B-12).  The B&C Fund Trust further provides that "[a]n Employer shall cease to be an Employer within the meaning of [the B&C Fund Trust] . . . *as determined by the Trustees, when he is delinquent in his contributions*. . . ."  Id. at Art. XII, § 1 (emphasis added).  The B&C Fund Trustees made that determination prepetition.

44.     In light of these provisions, it would be nonsensical for Hostess to have to continue making contributions merely because the B&C Fund was not a party to the underlying CBA.  Moreover, such action by the B&C Fund is neither in conflict with nor a *de facto* modification of the BCT CBAs given that virtually all of the BCT CBAs have "standard clauses," which incorporate the B&C Fund Trust Agreement by reference.  The inclusion of such clauses means that the B&C Fund Trust Agreement supersedes any contrary language in the BCT CBAs relating to pension benefits.  See Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1021 (4th Cir. 1997).

45.     Seeking some legal support for its position, the BCT argues that in Merlino's Macaroni No. C92-1405R, slip. op. at 1-3 (W.D. Wash. 1993), the court held that a pension fund cannot interfere with promises made to a union in a CBA.  See BCT Reply, at 9-10; Hrg. Tr. at 145-46.  But Merlino's Macaroni says nothing of the sort.  In that case, an employer was required under a CBA to make a pension fund contribution of 67 cents for every hour of work an employee performed.  This amount was intended to fund a pension benefit of $500 for a 40 hour work week.  When the pension trustee reduced by 25 cents the amount of contribution required to maintain the $500 weekly benefit, the employer sought to negotiate a similar reduction in the 67 cent/hour contribution set forth in its CBA.  Those negotiations failed, and the employer unilaterally reduced the amount it would contribute.  BCT Reply, Attachment 2 to Brock Declaration at 2.

46.     In arbitration, the employer argued that its history of negotiations with the union indicated that the parties had bargained for the reduced amount. Id. at 2-3.  The arbitrator found no evidence of such an agreement and ruled that the employer was bound to contribute the amount called for by the CBA. Id. at 3.  That decision was affirmed on appeal. Id. at 6.  Thus, Merlino's Macaroni did not involve a pension trustee's attempt to interfere with the terms of a CBA.  It involved a dispute over whether the language of the CBA and bargaining history of the parties implicitly required an automatic change to the designated pension contribution rate when the amount actuarially necessary to fund a particular level of benefits itself changes.

47.     Finally, at the May 30 hearing, the B&C Fund suggested that it might be willing to readmit the Debtors on the condition that the Debtors agree to pay in full any contributions that would have come due postpetition as if complete withdrawal had not occurred. See Hrg. Tr. at 146-47.  But this hypothetical scenario would offend both ERISA and the Bankruptcy Code.  As noted above, the B&C Fund determined that the Debtors effected a complete withdrawal as of December 10, 2012.  Under ERISA, a complete withdrawal occurs when a contributing employer "*permanently* ceases to have an obligation to contribute under the plan," or "*permanently* ceases all covered operations under the plan."  ERISA § 4203(a), 29 U.S.C. § 1383(a) (emphasis added).  Requiring the Debtors to now rejoin the Fund after what the Fund determined was a complete withdrawal would completely undermine this permanency component of a complete withdrawal. Id

48.     Moreover, such a result would run afoul of the Bankruptcy Code's priority scheme.  When the B&C Fund assessed withdrawal liability against the Debtors prior to the Petition Date, its claim was fully liquidated as a prepetition claim. See 11 U.S.C § 502(b) ("[the court "shall determine the amount of such claim . . . as of the date of the filing of the petition");

In re U.S. Van Lines, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996) ("as of the petition date, all debts are frozen . . . ."); Carrieri v. Jobs.com Inc., 393 F.3d 508, 527 (5th Cir. 2004) ("the rights of holders of claims and interests are fixed as of the Petition Date."). Indeed, the Debtors listed the B&C Fund as a top 40 creditor when they filed for relief under the Bankruptcy Code due to the estimated withdrawal liability. See Schedule 1 to Affidavit of Brian Driscoll (Docket No. 3). It would be manifestly inequitable to the Debtors' other creditors – secured, unsecured, and administrative alike – for the B&C Fund now to be allowed to "undo" its prepetition conduct simply to improve its position vis-à-vis the Debtors' other creditors.[15]

49.    In the end, while the B&C Fund may have a prepetition claim for the amount of the withdrawal liability it asserted against the Debtors, it has no right to administrative expense priority. Accordingly, the BCT's motion should be denied.

## CONCLUSION

50.    For all of the reasons set forth herein, the Debtors respectfully request that the Motions be denied to the extent they seek the allowance of an administrative expense priority claim for any contributions due postpetition that, in fact, would go to funding pension benefits that were earned prepetition. The Motions should also be denied to the extent they relate to the costs of administering the Funds, which likewise are not entitled to priority treatment. As the Funds bear the burden of proof, they must prove the extent to which the contributions in issue relate solely to pension benefits earned postpetition. If they cannot, their claims should be denied in their entirety, and the unpaid contributions classified as general unsecured claims.

---

[15]    In addition, for the reasons stated above, even if the B&C Fund could readmit the Debtors postpetition, its administrative claim would be limited to costs attributable to benefits that would have accrued postpetition, which are zero. See discussion above at ¶ 43. See also Appendix Exhibit F.

Dated:  June 15, 2012
      New York, New York

           Respectfully submitted,

            /s/ Corinne Ball
           Corinne Ball
           Heather Lennox
           Lisa Laukitis
           Veerle Roovers
           JONES DAY
           222 East 41st Street
           New York, New York  10017
           Telephone:  (212) 326-3939
           Facsimile:  (212) 755-7306

           - and -

           Ryan T. Routh
           JONES DAY
           North Point
           901 Lakeside Avenue
           Cleveland, Ohio  44114
           Telephone:  (216) 586-3939
           Facsimile:  (216) 579-0212

           ATTORNEYS FOR DEBTORS AND
           DEBTORS IN POSSESSION

COI-1477469