Eugene S. Friedman, Esq.
William K. Wolf, Esq.
Erinn M. Waldner, Esq.
FRIEDMAN & WOLF
1500 Broadway, Suite 2300
New York, New York 10036
(212) 354-4500
wwolf@friedmanwolf.com

Attorneys for the Board of Trustees
of the Retail, Wholesale and Department Store
International Union and Industry RWDSU Pension Fund

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

**Hearing Date: June 19, 2012 at 10:00 AM**

In re                                                     Chapter 11

HOSTESS BRANDS, INC., *et al.*,                           Case No. 12-22052 (RDD)

        Debtors.                                 The Hon. Robert D. Drain

--------------------------------------------------------X


SUPPLEMENTAL BRIEF OF THE TRUSTEES
OF THE RWDSU AND INDUSTRY PENSION FUND IN
FURTHER SUPPORT OF THE MOTION OF THE RWDSU PENSION FUND FOR
AN ORDER DIRECTING PAYMENT OF EMPLOYEE BENEFIT CONTRIBUTIONS
OR, IN THE ALTERNATIVE, ALLOWING AN ADMINISTRATIVE EXPENSE CLAIM

# Table of Contents

Page(s)

INTRODUCTION .................................................................................................    1

DISCUSSION......................................................................................................    2

I.    THE EMPLOYEE BENEFIT CONTRIBUTIONS OWED AS
      A RESULT OF POST-PETITION LABOR BY HOSTESS'
      EMPLOYEES ARE AN ADMINISTRATIVE EXPENSE ..........................    2

II.   THE COURT MUST DENY DEBTOR'S ATTEMPT TO
      REDUCE THE RWDSU PENSION FUND'S ADMINISTRATIVE
      EXPENSE CLAIM BY PRORATING IT ON THE BASIS OF
      INAPPLICABLE ACTUARIAL CALCULATIONS .................................    4

CONCLUSION.....................................................................................................    11

## Table of Authorities

Page(s)

A.C.E. Elevator Co., 347 B.R. at 480 .......................................................................    3, 8

Air Line Pilots Ass'n v. Shugrue (In re Ionosphere Clubs),
22 F.3d 403 (2d Cir. N.Y. 1994)..............................................................................    8

Alabama Power Co. v. Davis, 431 U.S. 581, 52 L. Ed. 2d 595,
97 S. Ct. 2002 (1977).................................................................................................    3

Esden v. Bank of Bos., 229 F.3d 154 (2d Cir. 2000)................................................    10

Exxon Research & Eng'g Co. v. N.L.R.B., 89 F.3d 228 (5th Cir. 1996) .................    5

In re Finley, Kumble, Wagner, Heine, Underberg, Manley,
Myerson & Casey, 160 B.R. 882 (Bankr. S.D.N.Y. 1993).......................................    8

Gastronomical Workers Union Local 610 v. Dorado Beach
Hotel Corp., 617 F.3d 54 (1st Cir. P.R. 2010) ...........................................................    9-10

Howard Delivery Serv. v. Zurich Am. Ins. Co.,
547 U.S. 651 (U.S. 2006)..........................................................................................    3

Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 119 S. Ct. 755,
142 L. Ed. 2d 881 (1999) ..........................................................................................    10

Int'l Bhd. of Painters & Allied Trades Union v. George A.
Kracher, Inc., 856 F.2d 1546, 272 U.S. App. D.C. 384 (D.C. Cir. 1988) .................    9

In re Kent Plastics Corp., 183 B.R. 841 (Bankr. S.D. Ind. 1995).............................    9

Laborers Health & Welfare Trust Fund v. Advanced Lightweight
Concrete, Co., 484 U.S. 539 (1988)..........................................................................    9-10

Marcal Paper Mills, Inc., 650 F.3d 311 (3d Cir. 2011)..............................................    7

N.L.R.B. v. Amax Coal, 453 U.S. 322 (1981)............................................................    5

Pension Benefit Guar. Corp. v. CF&I Fabricators
(In re CF&I Fabricators), 150 F.3d 1293 (10th Cir. Utah 1998) ...............................    9

Pension Benefit Guar. Corp. v. Sunarhauserman, Inc.
(In re Sunarhauserman, Inc.), 126 F.3d 811, (6th Cir. Ohio 1997)............................    8-9

Sciss v. Metal Polishers Union Local 8A, 562 F. Supp. 293 (S.D.N.Y. 1983) .........    5

UAW v. Keystone Consolidated Industries, 793 F.2d 810 (7th Cir. 1986)...............    10

United States v. Int'l Bhd. of Teamsters, 964 F.2d 180 (2d Cir. 1992) .....................    5

## STATUTES AND RULES

29 U.S.C. § 1082-1085 .............................................................................................    4-10

29 U.S.C. § 1145..........................................................................................................    4

11 U.S.C. §§ 503(b) .....................................................................................................    1-2

11 U.S.C. §§ 507(a)(2)................................................................................................    1

U.S.C. § 4971...............................................................................................................    6

F R Bkr P 1015 ............................................................................................................    11

## INTRODUCTION

Pursuant to Sections 503(b), 507(a)(2), and 1113 of the Bankruptcy Code, 11

U.S.C. §§ 503(b), 507(a)(2), and 1113, and the Order issued by the Court at the May 30, 2012

hearing, the Board of Trustees of the Retail, Wholesale and Department Store International

Union and Industry Pension Fund (the "RWDSU Pension Fund"), a Creditor of Hostess Brands,

Inc. and its applicable affiliates ("Hostess" or the "Debtor"), submit this Supplemental Brief in

Further Support of its Motion for an Order directing Hostess to make immediate payment of

$203,395.00 in employee benefit contributions that Hostess owes for the period from January 11,

2012, the day Hostess filed its petition for bankruptcy relief, through April 30, 2012, plus

employee benefit contributions it owes from May 1, 2012 forward.  See Supplemental Decl. of

Mark Davis in Further Supp. of the Mot. of the Trustees of the RWDSU and Industry Pension

Fund for an Order Directing Immediate Payment of Employee Benefit Contributions or, in the

Alternative, Allowing an Administrative Expense Claim (the "Supplemental Davis Decl."), ¶¶ 3-

6, [Dkt. No. 1030, May 29, 2012].

The Court must reject Hostess' contention that part of the instant claim is not due

to postpetition service and, instead, is attributable to underfunding based on prepetition service.

See Omnibus Objection of Debtors and Debtors in Possession to Motions of Nine Pension Funds

and the BCT Requesting Allowance and Payment of Administrative Expense Claims (the

"Objection"), ¶¶ 22-26, [Dkt. No. 1003, May 23, 2012]; Tr. of Hr'g Held on May 30, 2012

Regarding Omnibus Mots. ("Tr."), [Dkt. No 1076, May 30, 2012].  Hostess' argument fails

because the obligation to pay postpetition employee benefit contributions "springs" directly from

the postpetition service of Hostess' employees to the bankruptcy estate.  Further, as detailed

1

below, the analysis of monies owed to a single employer plan is not applicable to the

contributions owed to a multiemployer plan.

Here, the employees of Hostess have performed their service to maintain the

Debtor's operations, and there is no reason to delay the payment of the monies due on their

behalf.  Accordingly, the RWDSU Pension Fund respectfully requests that the Court order

Hostess to pay it $203,395.00 in employee benefit contributions immediately and to continue to

pay the employee benefit contributions in accord with the subject collective bargaining

agreements.[1]

DISCUSSION

I.    THE EMPLOYEE BENEFIT CONTRIBUTIONS OWED AS A RESULT OF
      POSTPETITION LABOR BY HOSTESS' EMPLOYEES ARE AN
      ADMINISTRATIVE EXPENSE

An administrative expense claim includes "the actual necessary costs and

expenses of preserving the estate, including wages, salaries, or commissions for services

rendered after the commencement of the case," 11 U.S.C. § 503(b)(1)(A), and, employee benefit

contributions, like wages, are contractually-mandated compensation for an employee continuing

to provide service to the Debtor's estate.  See Mot. of the Trustees of the RWDSU and Industry

---

[1] The collective bargaining agreements between Hostess and the local unions affiliated with the
RWDSU Pension Fund are annexed as Exhibit A to the Third Decl. of Mark Davis in Supp. of
the Mot. of the Trustees of the RWDSU and Industry Pension Fund for an Order Directing
Immediate Payment of Employee Benefit Contributions or, in the Alternative, Allowing an
Administrative Expense Claim, dated June 14, 2012 (the "Third Davis Decl.").  In response to the
Court's May 30, 2012 inquiry regarding the source in the contracts for Debtor's obligation to pay
employee benefit contributions, we note the section in each collective bargaining agreement that
memorializes that obligation.  See Third Davis Decl., Ex. A. at 8, 9, 41, 42, 79, 80, 105, 106,
131, 170, 171, 225, 226, 260, & 261; Decl. of Mark Davis in Supp. of the Mot. of the Trustees
of the RWDSU and Industry Pension Fund for an Order Directing Payment of Employee Benefit
Contributions or, in the Alternative, Allowing an Administrative Expense Claim (the "April 13,
2012 Davis Decl."), ¶¶ 5-7, Ex. A [Dkt. No. 738, April 16, 2012].

113005

Pension Fund for an Order Directing Payment of Employee Benefit Contributions or, in the

Alternative, Allowing an Administrative Expense Claim ("The RWDSU Pension Fund's

Motion"), ¶¶ 20-21, [Dkt. No. 737, April 16, 2012].

        Here, the employee benefit contributions due to the RWDSU Pension Fund are

mandated by the collective bargaining agreements as part of the total compensation package, and

represent the current cost of purchasing a pension for employees working for Hostess

postpetition. See Third Davis Decl., Ex. A, at 8, 9, 41, 42, 79, 80, 105, 106, 131, 170, 171, 225,

226, 260, & 261.  The contribution obligation for work performed by Hostess' employees from

January 11, 2012 forward is the normal cost of labor in the postpetition period and must be

granted administrative priority in the same manner as wages. See Howard Delivery Serv. v.

Zurich Am. Ins. Co., 547 U.S. 651, 655 (2006) ("[E]mployer-funded pension and welfare plans .

. . , together with wages, remunerate employees for services rendered."); Alabama Power Co. v.

Davis, 431 U.S. 581, 592 (1977) ("Funding a pension program is a current cost of employing

potential pension recipients, as are wages. The size of pension benefits is a subject of collective

bargaining, and future benefits may be traded off against current compensation."); In re A.C.E.

Elevator Co., 347 B.R. 473, 480 (Bankr. S.D.N.Y. 2006) ("employer contributions to pension

and welfare plans . . . , together with wages, remunerate employees for services rendered.").

        Thus, the Court should reject Hostess' unsupported assertion that employee

benefit contributions are not wages and find that the employee benefit contributions that Hostess

and the RWDSU Pension Fund agree are owed as a result of postpetition work are an

administrative expense. See Reply of the Trustees of the RWDSU and Industry Pension Fund to

the Omnibus Objection of Debtors and Debtors in Possession to Mots. of Nine Pension Funds

and the BCT Requesting Allowance and Payment of Administrative Expense Claims and in

3

113005

Further Supp. of the Mot. of the RWDSU Pension Fund for an Order Directing Payment of

Employee Benefit Contributions or, in the Alternative, Allowing an Administrative Expense

Claim ("The RWDSU Pension Fund's Reply"), ¶¶ 1-25, [Dkt. No. 1029, May 29, 2012].


II.    THE COURT MUST DENY DEBTOR'S ATTEMPT TO REDUCE THE RWDSU
       PENSION FUND'S ADMINISTRATIVE EXPENSE PRIORITY CLAIM BY
       PRORATING IT ON THE BASIS OF INAPPLICABLE ACTUARIAL
       CALCULATIONS

        The Court must reject Hostess' attempt to muddy the waters with arguments that

do not fit the claim at hand. In short, Debtor attempts to force an analogy between the statutory

requirement that a single employer plan make certain retrospective bridge-the-gap contributions

to cure a "funding shortfall"[2] and the ongoing contractual obligation that Debtor pay employee

benefit contributions to the RWDSU Pension Fund based on postpetition work performed by

Hostess' employees.

        Unlike single employer plans, multiemployer plans are not required to be fully-

funded or to make shortfall contributions to pay for past service liabilities. An employer must

pay employee benefit contributions to a multiemployer plan whenever work is performed

pursuant to the terms of the CBAs, regardless of the plan's funding status or actuarial cost

method. See 29 U.S.C. § 1145 (ERISA mandates payment of employee benefit contributions

---

[2] We note that the statute and, thereby, the terminology used and relied on by Debtor changed
with the enactment of the Pension Protection Act of 2006 (the "PPA"). The new funding
requirements for single employer and multiemployer plans are codified at 29 U.S.C. §§ 1082-
1085. We refer herein to the current statutory terms and provisions, which are applicable to the
disputed time periods. As discussed below, single employer plans no longer use a funding
standard account nor do they speak of accumulated funding deficiencies. Rather, in a nutshell, a
single employer plan must make sufficient contributions each plan year such that its liabilities
(past and current) do not exceed its assets. Otherwise, it faces a funding shortfall and must pay
make-up contributions amortized over seven (7) years to cure the shortfall. All of which differs
significantly from multiemployer plans, which have no such obligation. Compare 29 U.S.C. §
1083 with 29 U.S.C. §§ 1084, 1085.

4

113005

pursuant to contract). By definition, see 29 U.S.C. § 1083, a single employer plan's minimum

funding contribution is retrospective, i.e., the calculation looks back to the prior plan year's

assets and liabilities to determine whether there is a shortfall. Hostess' collectively-bargained

ongoing contribution obligation to the RWDSU Pension Fund does not correlate in any way to

past service liabilities. Rather, it is a product of negotiations between Hostess and the Union, a

wholly separate factual and legal entity from the RWDSU Pension Fund,[3] and remains fixed for

the term of the CBA, regardless of the plan's funding status.

Debtor erroneously argues that the contributions due for work performed

postpetition should be pro-rated into "normal cost" and "non-normal cost" components, granting

administrative priority only to the former category.  See Objection ¶¶ 22-26. Debtor contends

that the "normal cost" reported on the Form 5500 should be the "value of the benefit"[4] for

purposes of determining what amount of the claim is postpetition. See Tr. at 105:4-7. However,

the calculation relied on by Debtor, i.e., the "normal cost" versus the "non-normal cost," is not a

calculation that is relied on or referenced in the multiemployer plan context unless there is an

accumulated funding deficiency that lands a plan in critical or endangered status.[5] See 29 U.S.C.

---

[3] See NLRB. v. Amax Coal Co., 453 U.S. 322, 329-34 (1981) (ERISA vests authority in trustees
who are separate from the employer and union who appointed them); Exxon Research & Eng'g
Co. v. NLRB., 89 F.3d 228 (5th Cir. 1996) (benefit plan is separate legal entity from union and
employer which jointly administer it); United States v. Int'l Bhd. of Teamsters, 964 F.2d 180,
184 (2d Cir. 1992) ("A trust and its trustees are distinct from both the employer and the union.");
Sciss v. Metal Polishers Union Local 8A, 562 F. Supp. 293, 295 (S.D.N.Y. 1983) (separation
between the union and the funds is legislated; the funds are not agents of the union).
[4] By analogy, there is no basis for reducing wages to the perceived "value" of the work
performed. If the employer is obligated by contract to pay an employee $15 per hour in wages
postpetition, the bankruptcy court would have no basis for determining what it believed to be the
"true value" of the employee's postpetition work and deciding instead that he is only worth $10
per hour. Similarly, the contribution rate in the CBA is the cost of buying a pension for that
employee and is the fixed amount of his compensation package.
[5] Even then there may not be any additional required contributions or excises taxes. See 29
U.S.C. § 1085.

113005

§ 1084, 1085.  Thus, Debtor misunderstands the important distinctions between single employer
and multiemployer plans.

Single employer plans do not have a contribution rate – rather, they only have a
funding methodology, as explained by counsel for the BCTGM of the Transcript. Tr. at 126-28.
Further, there is no "surcharge," as Debtor calls it, see Tr. at 110:14-21, applied to the instant
contribution rate pursuant to the PPA because the RWDSU Pension Fund is in the "Green Zone"
and is not in endangered or critical status.[6]  See Decl. of Mark Davis in Supp. of the Objection of
the Trustees of the RWDSU and Industry Pension Fund to the Second Mot. of Debtors and
Debtors in Possession to Reject Certain Collective Bargaining Agreements Pursuant to Section
1113(c) ("May 11, 2012 Davis Decl."), ¶ 5, [Dkt. No. 907, May 11, 2012].

In addition, single employer and multiemployer plans are governed by different
minimum funding rules pursuant to ERISA and the Internal Revenue Code.  Under the PPA, a
single employer plan must be fully-funded[7] each plan year or be required to make shortfall
contributions amortized over seven (7) years to meet the required minimum funding obligations.
See 29 U.S.C. § 1083.  In contrast, multiemployer plans are not required to be fully-funded, and
participating employers are not required to make any contributions other than those contained in

---

[6] Perhaps the analogy to the "surcharge" in this context would be the excise tax applicable if the plan fails to meet the PPA's funding requirements for endangered or critical plans. See 26 U.S.C. § 4971.

[7] Under the PPA, if a single employer plan's assets are less than the "funding target," the minimum required contribution for the year is equal to the plan's "target normal cost" plus the amortization of the "funding shortfall." 29 U.S.C. § 1083(a)(1). The "funding target" is 100% of the present value of all benefits accrued or earned under the plan as of the beginning of the plan year. 29 U.S.C. § 1083(d). If the plan's assets equal or exceed the "funding target," the minimum required contribution is the "target normal cost," which is reduced by the plan assets in excess of the "funding target." 29 U.S.C. § 1083(a)(2). The "target normal cost" is the present value of benefit liabilities expected to accrue during the plan year, including increases in past service benefits attributable to current year increases in compensation. 29 U.S.C. § 1083(b). A "funding shortfall" is the excess of the plan's funding target over the plan's assets. 29 U.S.C. § 1083(c)(4).

6

113005

their CBAs for the work performed by employees. Other than withdrawal liability,[8] the only

time a contribution to a multiemployer plan is imposed by statute to make up for past liabilities is

in the case of a plan in critical or endangered status, but only if the bargaining parties fail to act

in accord with a funding improvement plan or rehabilitation plan and the trustees must impose a

default funding schedule to require increased contributions to the extent necessary to achieve the

funding improvement required by the law. See 29 U.S.C. §§ 1084, 1085. That is not the case

with the RWDSU Pension Fund. May 11, 2012 Davis Decl. ¶ 5

Moreover, the method by which the actuaries report the costs of the plan is simply

irrelevant. Debtor tries to find significance in the fact that multiemployer plans report their

"normal cost" on the form 5500 and in the actuarial certification. See Tr. at 104-06. However,

that actuarial cost method of reporting by the actuaries has no bearing on anything other than the

statutory method for determining whether the plan has an accumulated funding deficiency.[9] In

the absence of an accumulated funding deficiency, the calculation has no consequence

whatsoever. The actuaries do not set the contribution rate. As noted above, the contribution rate

is the subject of collective bargaining between the employer and the union, not the plan or its

actuaries. Thus, except in the case of a funding improvement plan or a rehabilitation plan, the

bargaining parties are free to set whatever contribution rate they negotiate.

In furtherance of its novel argument, Debtor relies on several cases in which

benefit plans, or the PBGC, have claimed administrative priority for statutorily-mandated

---

[8] Even with regard to withdrawal liability, which is based on the plan's underfunding attributable to, *inter alia*, past service liability, the portion of withdrawal liability attributable to Debtor's employees' postpetition work is entitled to administrative expense priority. See In re Marcal Paper Mills, Inc., 650 F.3d 311, 317 (3d Cir. 2011).
[9] The analysis of "normal cost" arises in the multiemployer plan context only with regard to charges to the funding standard account, see 29 U.S.C. § 1084(b), which the actuaries must calculate to determine whether the plan has an "accumulated funding deficiency." See 29 U.S.C. § 1084(a).

7

113005

minimum funding contributions to single employer plans.  The cases cited by Hostess in its

Objections ¶ 25, are inapposite because they address contributions owing either for work

performed prepetition or for minimum funding contributions that are statutorily mandated to cure

a funding shortfall in a single employer plan, neither of which is the case here.[10]  See In re

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 888-92

(Bankr. S.D.N.Y. 1993) (court denied administrative priority for claim for unpaid minimum

funding contributions to single employer plan attributable to work performed by debtors'

employees prepetition, but granted administrative priority for employee benefit contributions

attributable to work performed by debtors' 38 employees who remained working postpetition );[11]

Air Line Pilots Ass'n v. Shugrue (In re Ionosphere Clubs), 22 F.3d 403, 408 (2d Cir. 1994)

(stands for the undisputed proposition that "the priorities set forth in section 507 should apply to

[benefit plan] claims.");[12]  In re A.C.E. Elevator Co., 347 B.R. at 478-81 (court denied

administrative priority for pension fund's claim for contributions owed for work performed

entirely prepetition); Pension Benefit Guar. Corp. v. Sunarhauserman, Inc. (In re

Sunarhauserman, Inc.), 126 F.3d 811, 815-19 (6th Cir. 1997) (court divided the plan's claim for

minimum funding shortfall contributions into the actuarial amount of the statutorily-required

contribution that is attributable to normal costs and the portion of the calculation attributable to

---

[10] See Decl. of Heather Lennox Regarding Certain Form 5500 Annual Returns/Reports of
Employee Benefit Plan ("Lennox 5500 Decl."), Ex. G, at 6:9n [Dkt. No. 1034-13] (showing that
the RWDSU Pension Fund does not have a funding deficiency); compare 29 U.S.C. §§ 1083,
1084.
[11] As such, Finley, Kumble supports the RWDSU Pension Fund's claim because "contributions
due during the bankruptcy case itself that were attributable to the postpetition labor of [debtor's]
employees were considered to satisfy the Mammoth Mart test, namely, that the claim arose from
a creditor's transactions with a debtor." In re Finley, Kumble, 160 B.R. at 893.
[12] In re Ionosphere Clubs supports the RWDSU Pension Fund's claim for administrative priority
because it noted that vacation pay claims, similar to the pension fund claims at issue here, "are
accorded first-priority status as administrative expenses only to the extent the vacation pay is
attributable to postpetition work." In re Ionosphere Clubs, 22 F.3d at 408.

8

113005

non-normal costs, and granted administrative priority to the minimum funding contribution claim

for the portion of the calculation attributable to normal costs);[13] Pension Benefit Guar. Corp. v.

CF&I Fabricators (In re CF&I Fabricators), 150 F.3d 1293, 1298 (10th Cir. 1998) (court held

that single employer plan's claim for minimum funding contributions is not entitled to

administrative priority because it is based on prepetition service); In re Kent Plastics Corp., 183

B.R. 841, 847-48 (Bankr. S.D. Ind. 1995) ("Because the debtor's minimum funding liability is

based upon and related to prepetition services, as is the premium claim, the Court finds that these

claims are not entitled to administrative priority status under § 503.").[14]

      The reasoning of the First Circuit in Gastronomical Workers Union Local 610 v.

Dorado Beach Hotel Corp., 617 F.3d 54 (1st Cir. P.R. 2010), is helpful in understanding the

difference between the routine contributions owed pursuant to the collective bargaining

agreement and the shortfall contributions required by ERISA to cure an accumulated funding

deficiency, as follows:

> We agree with the employers that pension contribution obligations are contractual in
> nature. Int'l Bhd. of Painters & Allied Trades Union v. George A. Kracher, Inc., 856
> F.2d 1546, 1549, 272 U.S. App. D.C. 384 (D.C. Cir. 1988). But this tenet does not exist
> in a vacuum. Whatever a private contract may provide, ERISA continues to govern
> employers' funding obligation with respect to covered pension plans. See Laborers

---

[13]The actuarial cost method calculation discussed at length in Sunarhauserman simply does not
apply to the normal contributions owed to a multiemployer plan pursuant to a CBA. The
RWDSU Pension Fund has not made a claim for any shortfall minimum funding contributions,
nor could it, because that concept applies only to single employer plans. See 29 U.S.C. § 1082.
Further, not even a stretched analogy is possible because the RWDSU Pension Fund does not
have a funding deficiency nor is it in endangered or critical status, which could, in situations
where the bargaining parties fail to act, result in a statutorily-mandated default schedule that may
include increased contributions to ameliorate the funding deficit. See 29 U.S.C. § 1085.

[14] Kent Plastics also supports the RWDSU Pension Fund's claim for contributions due for work
performed postpetition, because it distinguished between normal contributions owing for post-
petition work and minimum funding obligations: "if the expense was related to the postpetition
work of employees of the debtor-in-possession, it would be deemed administrative. In this case,
however, the Employees' Retirement Plan was frozen six years prior to the bankruptcy filing."
In re Kent Plastics Corp., 183 B.R. at 847.

9

> Health & Welfare Trust Fund v. Advanced Lightweight Concrete, Co., 484 U.S. 539,
> 546-47 (1988). The statutory mandates operate in tandem with contractually imposed
> duties. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 442, 119 S. Ct. 755, 142 L.
> Ed. 2d 881 (1999); Int'l Union v. Keystone Consol. Indus., 793 F.2d 810, 813 (7th Cir.
> 1986). When a plan fails to meet the statutorily imposed minimum funding requirement
> for a given plan year, the employer must satisfy that requirement by making further
> payments, regardless of the terms of the CBA. See 29 U.S.C. § 1082(a)(1). The statutory
> obligation is independent of whatever arrangements private agreements may contemplate.
> See Hughes Aircraft, 525 U.S. at 442; cf. Esden v. Bank of Bos., 229 F.3d 154, 173 (2d
> Cir. 2000) (stating that "[t]he Plan cannot contract around [ERISA]").

Gastronomical Workers, 617 F.3d at 62.[15] In other words, the employer's obligation to make its

contractually-mandated contributions is independent from its requirement to cure funding

deficiencies. Thus, employee benefit fund contributions are compensation to employees for

work performed and, as explained above, are not linked in any way to the past service liabilities

of the multiemployer plan.

In short, Debtor's theory of dividing pension contributions into component

actuarial elements based on the normal cost (the value of benefits accrued for the current plan

year) and non-normal cost (past service liability and administrative expenses) arose solely in the

context of minimum funding shortfall contributions in single employer plans and simply does not

apply to the normal contractual contributions owed to a multiemployer plan for work performed

postpetition. The Debtor has presented no evidence, nor could it, that the RWDSU Pension

Fund's claim for administrative priority is based on shortfall contributions owed to meet

minimum funding requirements. As explained above, the concept does not exist in the

multiemployer context, and the Court must reject Hostess' argument.

---

[15]Similarly, regarding the difference between minimum funding obligations and contribution
rates that are required pursuant to a collective bargaining agreement, the Seventh Circuit, in
UAW v. Keystone Consol. Indus., 793 F.2d 810 (7th Cir. 1986), supported by the IRS as *amicus
curiae*, held that an employer obligated to make contributions under a CBA is not relieved of that
contractual obligation, even though the IRS granted the plan a minimum funding waiver for the
year in question. Keystone Consol. Indus., 793 F.2d at 812-18.

10

113005

CONCLUSION

For the foregoing reasons, the Trustees of the RWDSU Pension Fund respectfully

request that the Court order Hostess to pay the RWDSU Pension Fund $203,395.00 in employee

benefit contributions that Hostess owes for the period from January 11, 2012 through April 30,

2012, plus employee benefit contributions it owes from May 1, 2012 forward.[16]


Dated: June 15, 2012
       New York, New York

                                    By:    _____
                                           Eugene S. Friedman (EF-5273)
                                           William K. Wolf (WW-7906)
                                           Erinn Weeks Waldner (EW-0330)

                                           FRIEDMAN & WOLF
                                           1500 Broadway, Suite 2300
                                           New York, New York 10036
                                           Ph:    (212) 354-4500
                                           Fax:   (212) 719-9072
                                           wwolf@friedmanwolf.com

                                           Attorneys for the Board of Trustees
                                           of the Retail, Wholesale and Department
                                           Store Int'l Union and Industry Pension Fund

---

[16]In compliance with the Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, establishing Case Management and Scheduling Procedures, dated February 12, 2012 (the "Administrative Order"), the Trustees of the RWDSU Pension Fund have served Notice of this Motion by email (in electronic PDF format ) and by regular U.S. mail service, as appropriate, upon the parties designated in the Administrative Order and upon the other entities listed to receive service in this case. The RWDSU Pension Fund submits that such notice satisfies the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of this Court and the Court's Administrative Order.

113005