CHRISTIAN L. RAISNER
EMILY P. RICH
EZEKIEL D. CARDER
JORDAN D. MAZUR
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501
Telephone  (510) 337-1001
Fax  (510) 337-1023

Attorneys for Creditor IUOE Stationary
Engineers Local 39Pension Trust Funds

*Hearing Date & Time:*  June 19, 2012, 10:00 a.m.

*Supp Brief Deadline & Time*:  June 15, 2012, 5:00 pm

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re | CHAPTER 11 |
| HOSTESS BRANDS, INC., et al.[1], | No.  12-22052 (RDD) |
| Debtors. | (Jointly Administered) |

**IUOE STATIONARY ENGINEERS LOCAL 39 <u>PENSION</u> TRUST FUND'S
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR AN ORDER DIRECTING
PAYMENT OF POST-PETITION EMPLOYEE BENEFIT CONTRIBUTIONS AND
ALLOWING AN ADMINISTRATIVE EXPENSE CLAIM FOR UNPAID AMOUNTS**

---

[1]  The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parenthesis):  Hostess Brands, Inc. (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................1

II.  POINTS AND AUTHORITIES ........................................................................2

  A.   THE IUOE LOCAL 39 PF ADMINISTRATIVE EXPENSE
       CLAIM ARISES  FROM POST-PETITION WORK
       SUPPLYING CONTRACT CONSIDERATION AND
       BENEFITTING THE DEBTORS' BUSINESS OPERATIONS ...........................2

       1.   The Trust Documents Clearly Require Payment Based
            on Hours Worked ...........................................................................................2

       2.   The Pension Contributions Required to be Made Are
            Pay Substitutes ..............................................................................................5

       3.   The Pension Contributions are Contractual
            Consideration for the Post-Petition Work Performed ..................................7

  B.   THE DEBTORS HAVE NO RIGHT TO WITHHOLD PLAN
       ASSETS ......................................................................................................8

       1.   The Debtors have the limited fiduciary duty to pay over
            the earned pension contributions to the Pension Fund
            but do not have the right to withhold the contributions
            or to decide the conditions of payment. .......................................................9

       2.   The Debtors Have Engaged In "Self-Help" Forbidden
            By The Bankruptcy Code...............................................................................11

  C.   NO BASIS EXISTS TO REDUCE OR EXCUSE THE POST-
       PETITION CONTRIBUTION DUTY, AND THE DEBTORS
       CONTENTIONS LACK MERIT REGARDING "NORMAL
       COST" AND "FROZEN PLANS" .......................................................................11

       1.   The "Normal Cost" of the Pension Fund's Benefits is
            Irrelevant .......................................................................................................12

       2.   The Pension Fund is not a "Frozen Plan" ...................................................12

  D.   THE AMOUNTS ARE DUE AND OWING AND SHOULD
       BE PAID OVER IMMEDIATELY .......................................................................13

III. CONCLUSION ....................................................................................................14

## TABLE OF AUTHORITIES

**CASES**

*Central States, Southeast and Southwest Areas National Pension Fund v.*
    *McNamara Motor Express,*
    503 F. Supp. 96 (E.D. Mich. 1980) ..................................................................................14

*Gray v. Briggs,*
    45 F.Supp. 2d 316 (S.D.N.Y. 1999) .................................................................................9

*Howard Delivery Service, Inc. v. Zurich American Ins. Co.,*
    547 U.S. 651 (2006) ...................................................................................................6, 7, 8

*In re 1655 Broadway Restaurant Corp.,*
    No. 96-CV-9116, 1997 U.S. Dist. LEXIS 2479, 1997 WL 104961 (S.D.N.Y.
    March 7, 1997) ................................................................................................................11

*In re A.C.E. Elevator Co., Inc.,*
    347 B.R. 473 (Bankr. S.D.N.Y. 2006) .........................................................................2, 8

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,*
    160 B.R. 882 (Bankr. S.D.N.Y. 1993) ............................................................................7

*In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 989–91 (2d Cir.1990) .............................................11

*In re Mammoth Mart, Inc.,*
    536 F. 2d 950 (1st Cir. 1976) ..........................................................................................2

*In re Marcal Paper Mills, Inc.,*
    650 F.3d 311 (3rd Cir. 2011) ...........................................................................................8

In re Saco Local Development Corp.,
    711 F.2d 441 (1st Cir. 1983) ............................................................................................6

*LTV Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay Corp.),*
    115 B.R. 760 (Bankr. S.D.N.Y. 1990) ............................................................................8

*NYSA-ILA Medical & Clinical Services Fund v. Sabato Catucci, et al.,*
    60 F.Supp. 2d 194 (S.D.N.Y 1999) .................................................................................9

*Pension Benefit Guar. Corp. v. LTV Corp.,*
    875 F.2d 1008 (2d Cir 1989) ...........................................................................................7

*PMTA-ILA Containerization Fund v. Rose,*
    1995 U.S. Dist. LEXIS 10877, *15, No. Civ. A. 94-5635, 1995 WL 461269 .........................9

*Trustees of So. Calif. Pipe Trades Health & Welf. Trust Fund v. Temecula Mech.,*
    *Inc.,*
    438 F.Supp.2d 1156 (C.D. Cal.2006) ..............................................................................9

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Teamsters Indus. Sec. Fund v. World Sales (In re World Sales),*
    183 B.R. 872 (B.A.P. 9th Cir. Cal. 1995) ............................................................13

**Statutes**

11 U.S.C. §507..........................................................................................................6, 7

26 U.S.C. § 412.............................................................................................................12

26 U.S.C. § 431.............................................................................................................12

26 U.S.C. §§ 3101, 3102, 3111..................................................................................10

29 U.S.C. § 1082.........................................................................................................12

29 U.S.C. § 1084.........................................................................................................12

29 U.S.C. § 1132(g)(2)(ii)...........................................................................................13

29 U.S.C. § 1145 ................................................................................................... passim

547 U.S. at 659.....................................................................................................6, 7, 8

**Other Authorities**

Federal Insurance Contributions Act ........................................................................10

H. R. Rep., at 357.........................................................................................................6

**IUOE STATIONARY ENGINEERS LOCAL 39 <u>PENSION</u> TRUST FUND'S
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR AN ORDER DIRECTING
PAYMENT OF POST-PETITION EMPLOYEE BENEFIT CONTRIBUTIONS AND
ALLOWING AN ADMINISTRATIVE EXPENSE CLAIM FOR UNPAID AMOUNTS**

The IUOE Stationary Engineers Local 39 Pension Trust Fund (the "IUOE 39 PF", the

"Pension Fund", or "Fund") submits this Supplemental Brief following the Court's May 30,

2012 hearing on the Pension Fund's Motion for an Order authorizing and compelling Debtor

Hostess Brands, Inc., et al. (collectively the "Debtors" or "Hostess") to pay all post-petition

contributions to the Pension Fund, and award administrative expense status with respect to the

post-petition contributions.[2]

## I.    <u>INTRODUCTION</u>

At the hearing, the Debtors failed to offer any valid reason for their refusal to pay

promptly, as administrative expenses to the IUOE 39 PF, all of the pension contributions earned

by post-petition work of stationary engineers covered by their collective bargaining agreement

("CBA").  The Debtors' instead focused on funding and termination issues that have no

application at all to this Pension Fund, which is well funded and certified as in the Green Zone.

The Debtors also raised inapplicable arguments about frozen plans—this Pension Fund is not and

has not ever been a frozen plan.  The Debtors additionally contended that the allowed

administrative claims for pension benefits should be restricted by the "normal cost" accounting

concept used in certain situations with single employer pension plans, not with a multi-employer

pension plan ("MEPP"), as here.

The amounts of pension contributions earned by post-petition work remain undisputed,

and the CBA and Trust Agreement language requiring payment stands uncontested.  The IUOE

39 PF's Motion should be granted therefore without delay, and the Debtors should be ordered to

comply with their contractual obligations to the IUOE 39 PF going forward.

---

[2] The Pension Fund has moved this Court for such an order (Doc. No. 786-0), and argued again for such an order in
its Reply (Doc. No. 1027) and at the May 30, 2012 hearing.  The Pension Fund hereby incorporates by reference the
factual and legal arguments raised in each of those documents and at the hearing.

## II.   POINTS AND AUTHORITIES

**A.    THE IUOE LOCAL 39 PF ADMINISTRATIVE EXPENSE CLAIM ARISES
FROM POST-PETITION WORK SUPPLYING CONTRACT CONSIDERATION
AND BENEFITTING THE DEBTORS' BUSINESS OPERATIONS**

The test for assessing whether a claim is entitled to administrative priority looks at two factors: (1) whether the debtor's obligation arises out of a post-petition transaction between the debtor and the creditor, and (2) whether the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor's estate in the operation of its business. *In re Mammoth Mart, Inc.,* 536 F. 2d 950 (1st Cir. 1976).  *See also In Re A.C.E. Elevator Co., Inc.*, 347 B.R. 473, 482 (Bankr. S.D.N.Y. 2006).  Though the Debtors draw the Court's eye to questions about the way the pension funds may use the contributions, or to the Debtors' ultimate desire to escape the multi-employer pension plans it is currently obligated to, the fact remains that the transactions giving rise to the Pension Fund's claims here all occurred post-petition and the consideration was supplied to and beneficial to the debtor's estate in the operation of its business after the filing of the bankruptcy petition.

### 1.    <u>The Trust Documents Clearly Require Payment Based on Hours Worked</u>

The Debtors, by Interstate Brands Corporation, entered a collective bargaining agreement (CBA) with the IUOE Stationary Engineers Local 39 ("Local 39" or the "Union")[3] on April 20, 2003.[4]  Section 12 of the CBA states in part: "The Employer agrees to contribute into the Stationary Engineers Local 39 Pension Trust Fund [. . .] the following amounts:  Effective March 3rd, 2002 $2.75/hour **for all straight time hours worked or paid**."  (emphasis added) After setting out contribution rates for subsequent years, Section 12 continues:

> **The above contribution shall be made on or before the tenth
> (10th) day of each month, for Pension Benefits, programs and**

---

[3] The Union's members employed by Hostess are the primary workers responsible for maintaining and servicing the Debtors' equipment. The members' proficiency in keeping Hostess' bakery equipment running, minimizing problems, and quickly and efficiently addressing issues that arise with the equipment are crucially important in ensuring that the Debtors' baking operations proceed at a rate and in a manner that permit the Debtors to produce product at a necessary speed and volume.

[4] See Exhibit A to the Declaration of Emily P. Rich in Support of Motion of IUOE Stationary Engineers Local 39 Pension Trust Fund For An Order Directing Payment Of Post Petition Employee Benefit Contributions And Allowing An Administrative Expense Claim For Unpaid Amounts (the "Rich Declaration"), [Docket No. 786-2]

> **plans, as now specified, and as may be hereafter specified by
> said Trustees.** The Employer agrees to accept, assume and be
> bound by all of the obligations imposed on individual employers
> by that certain Trust Agreement (a copy of which has been
> delivered to the Employer and receipt of which is expressly
> acknowledged) and any amendments, modifications, changes or
> merges with respect to said Trust Agreement made by the parties
> thereto.
>
> [. . .]
>
> In the event that the individual Employer herein fails to pay the
> amounts of Trust Fund contributions due and owing for the period
> in which they are due and owing, the individual Employer shall
> pay in addition to the amounts due and as contributions, such
> additional liquidated damages and/or attorneys' fees as are set
> forth in the Trust Agreement to which the individual Employer is
> bound.

(Emphasis added.) The Debtors remain bound to the CBA as a result of the Extension

Agreements and Modification Agreement. (See Exhibits B-C of the Rich Declaration,

Docket Nos. 786-3 and 786-4) Neither the Extension Agreements nor the Modification

Agreement eliminates the Debtors' obligations to make contributions.

The Pension Fund is a multi-employer benefit plan established pursuant to the Trust

Agreement. *See* Rich Declaration, Exhibit D [Docket No. 786-5] Article II, Section 2.01 of the

Trust Agreement creating the Pension Fundstatesin relevant part:

> There is hereby created the Stationary Engineers Local 39 Pension
> Trust which shall consist of all contributions required by the
> Collective Bargaining Agreements to be made for the
> establishment and maintenance of the Plan, and all interest, income
> and other returns thereon of any kind whatsoever, and any other
> property received or held by reason of or pursuant to this Trust
> [. . .].

The Trust Agreement makes clear that the contributions "to be made" are property of the Pension

Fund and not to be disposed of or held at the discretion of the contributing employers.

Section 2.04 states in part:

> Neither the Employer, any Signatory Association, any Individual
> Employer, the Unions, or any Local Union, [. . .] nor any other
> person shall have any right, title or interest in or to the Fund other
> than as specifically provided in this Trust Agreement or in the
> Plan. Neither the Fund nor any contributions to the Fund shall be
> in any manner liable for or subject to the debts, contracts, or

3

> liabilities of any of the Employers, [. . .] [or] any Individual
> Employer [. . .]. No portion of the Fund shall revert to or be
> recoverable by the Employers, any Signatory Association, any
> Individual Employer, the Unions or any Local Union, except for
> such contributions, if any, as may be returned to an individual
> Employer within one year of the payment thereof as having been
> paid erroneously in excess of his obligation [. . .].

Plainly, the Debtors have no property right to the contributions made or due to be made to the

Plan, and no right to conditionally retain or withhold any contributions.

The Debtors have failed, neglected and flatly refused to make timely contributions to the

Pension Fund as required by the applicable collective bargaining documents and Trust

Agreement referenced above.  The Debtors have alleged the right to unilaterally decide to only

pay the portion of the contributions to be used for the purposes of Debtors choosing.  The plain

language of the Trust Agreement clearly requires that the Debtors pay over the contributions due

to be used at the discretion of the Trustees, not at the election of the Debtors or of any

employer.[5]

Debtors' neglect or refusal to make timely contributions pursuant to the terms of the

above-mentioned Agreements constitutes a violation of ERISA section 515, 29 U.S.C. § 1145,

which requires:

> Every employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms
> of a collectively bargained agreement shall, to the extent not
> inconsistent with law, **make such contributions in accordance
> with the terms and conditions of such plan or such agreement**.

(emphasis added)  The Debtors have argued that instead of being required to make contributions

as required by the agreements and plan documents, Debtors are instead only required to pay over

the amounts directly attributable to benefit accumulation by specific workers.  This interpretation

of Debtors' obligation directly conflicts with both the applicable binding documents and the

language of ERISA.

---

[5] The reason for this structure is indicated by Section 2.07, where the Trust Agreement states that no employer
"shall be liable or responsible for the debts, liabilities or obligations of the Fund or the Trustees." In other words, the
Pension Fund alone is obligated to provide for the benefits of the participants.  The Debtors have neither the
obligation nor the right to levy any input on the Pension Fund about how benefits are provided.

4

That the Debtors are obligated to make contributions based on the plan documents and agreements is a basic tenet of the multi-employer defined benefit plan structure. Unlike in a single employer plan or a defined contribution scheme, multi-employer defined benefit plans are designed to provide participants with a certain benefit at retirement. This provision is based not only on contributions made, but on the investments of plan professionals, the calculations of plan actuaries, and the stewardship of plan trustees, among other factors. The plan itself, rather than each individual employer, is responsible for each of these factors and the costs associated with them. While benefits for plan participants are calculated based on covered hours worked, the plan is not necessarily required to take the precise contributions made during the time that participant worked and place them in a separate account for that participant. Instead, the fund bears the responsibility for ensuring that the benefit levels are as-promised when the participant becomes eligible to receive benefits.

## 2.    The Pension Contributions Required to be Made Are Pay Substitutes

The contributions that Debtors owe represent an element of compensation to Local 39 represented employees of Debtors no less significant than wages. The CBA clearly requires contributions to be made to the Pension Fund for each straight time hour worked or paid.[6] The Debtors are not given any discretion to decide whether to pay on the basis of the Pension Fund's usage of the contributions. This structure follows from the CBA, and also conforms to the Trust Agreements' language on the definition of contributions as well as the obligation of the Pension Fund alone to provide benefits. It also purpose of ERISA §515 defining the requirement of employers to make contributions, rather than what Hostess seems to be suggesting, that participating employers are responsible only for funding certain benefit payments. The Debtors reap the benefit of investment gains, as well as the stability of participation in a fund with hundreds of contributing employers, both of which result in reduced contribution obligations as compared to a single-employer structure.

---

[6] The Pension Fund's claim does not include extra contributions for overtime hours worked or paid.

The Supreme Court recognized Congress' acknowledgment that fringe benefits "generally compliment, or 'substitute' for, hourly pay" In *Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 659 (2006), where the priority status of fringe benefit contributions was at issue.

> The current Code's juxtaposition of the wages and employee benefit plan priorities manifests Congress' comprehension that fringe benefits generally complement, or "substitute" for, hourly pay. *See* H. R. Rep., at 357 (noting 'the realities of labor contract negotiations, under which wage demands are often reduced if adequate fringe benefits are substituted"); id., at 187 ("[T]o ignore the reality of collective bargaining that often trades wage dollars for fringe benefits does a severe disservice to those working for a failing enterprise."); In re Saco Local Development Corp., 711 F.2d 441, 449 (CA1 1983) (majority opinion of Breyer, J.) (substitution of fringe benefits for wages "can normally be assumed, unless the employer is a philanthropist").

*Howard Delivery,* 547 U.S. at 659.

The contributions owed are clearly an essential aspect of the compensation package since Hostess, not a philanthropist, does not confer on the covered employees any gratuitous fringe benefits – instead, each such benefit was bargained for, agreed to, and earned.  In fact, the Supreme Court in *Howard Delivery* distinguished pension contributions from workers compensation premiums on that ground, stating that

> Unlike pension provisions or group life, health, and disability insurance plans--negotiated or granted as pay supplements or substitutes--workers' compensation prescriptions have a dominant employer-oriented thrust: They modify, or substitute for, the common-law tort liability to which employers were exposed for work-related accidents.

*Howard Delivery,* 547 U.S. at 662.  As a result, applying the analysis of the Supreme Court, the pension contributions the Debtors are obligated to make for post-petition work must be regarded as "pay substitutes" and classified as administrative expenses to the estate.

The Debtors argued at the May 30 hearing that contributions are not "wages" under the Bankruptcy Code, pointing specifically to the distinction the Code draws between wages and contributions under 11 U.S.C. §507.  The *Howard Delivery* Court makes clear: "Beyond

6

genuine debate, the main office of §507(a)(5) is to capture portions of employee compensation

for services rendered not covered by §507(a)(4)." *Howard Delivery,* 547 U.S. at 659. (internal

citations omitted). Far from using the difference between (a)(4) and (a)(5) to separate wages and

benefit contributions, the Supreme Court instead pointedly recognizes that (a)(5) is designed

specifically to capture employee compensation not already defined by (a)(4). Indeed, such a

result is logical not only from a plain reading of the statute, but under ERISA, the trust

agreement, and the CBA.

### 3. The Pension Contributions are Contractual Consideration for the Post-Petition Work Performed

The Debtors have espoused a variety of theories about what the contributions *might* be

allocable to, and what the Pension Fund *may* elect to do with the contributions once paid.

Notwithstanding these notions, nothing in the record should obscure the fact that the Debtors

entered into an agreement to promptly pay contributions based on hours worked. The CBA and

Trust Agreement do not call for contributions to be made based on funding levels or allocations,

and they do not require the Debtors to submit to the whims of the market. Instead, the

agreements call for contributions based on straight time hours actually worked or paid within a

given month. Under this arrangement, the work the Debtors have commissioned is being

performed in part for the benefit contributions, as consideration promised under the agreements.

To establish administrative priority, "a claimant must show that the debtor induced the

creditor's performance to the benefit of the estate." *In re Finley, Kumble, Wagner, Heine,*

*Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 889-890 (Bankr. S.D.N.Y. 1993). The

CBA clearly establishes that the performance of the Local 39 union members employed by

Hostess was induced by promises to pay wages and benefits under the CBA. The appropriate

inquiry, focuses on determining "when the acts that gave rise to [the employer]'s obligations

took place." *Finley, Kumble*, 160 B.R.at 892,, quoting *Pension Benefit Guar. Corp. v. LTV*

*Corp.*, 875 F.2d 1008, 1017 (2d Cir 1989) rev'd on other grounds, 496 U.S. 633. (rev'd on other

grounds). The acts giving rise to Hostess' debt subject to this Motion consist of the post-petition

7

labor of the employees.  Just as the prepetition labor gave rise to prepetition claims in *LTV*, *supra*, 875 F.2d at 1017, the post-petition labor here gives rise to an administrative expense claim.

This Court has also concluded that employer contributions remunerate employees for services rendered.  *In re A.C.E. Elevator Co.,* 347 B.R. 473, 478 (Bankr. S.D.N.Y. 2006).  Liability for benefit obligations is determined by "the date of the consideration underlying the claim."  *A.C.E. Elevator,* 347 B.R. at 481, citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986).  The Court explained that "the so-called 'triggering event' *is not* the termination of the plans by the PBGC, but rather *the pre-petition labor of LTV Steel's employees.*"  *A.C.E. Elevator*, 347 B.R. at 481-482, quoting *LTV Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay Corp.)*, 115 B.R. 760, 774-75 (Bankr. S.D.N.Y. 1990). (emphasis added by the Court in *A.C.E. Elevator*).  It follows that in this case, the triggering event is the post-petition labor of the Debtors' employees.  "[T]o the extent that a portion of the benefits correlate to the employees' post-petition service, the benefit is akin to direct compensation provided in exchange for post-petition services, which undisputedly qualifies as an administrative expense."  *In re Marcal Paper Mills, Inc*., 650 F.3d 311, 318 (3rd Cir. 2011), citing *Howard Delivery*, 547 U.S. at 659.

Following the logic of *Marcal* and *Howard Delivery*, the contributions for post-petition work are owed as consideration for that work; the contributions are undeniably a part of the compensation owed to employees for that work; and such compensation undisputedly qualifies for administrative expense treatment.  The same result should follow here, where the Local 39-affiliated employees of the Debtors have furnished and will continue to furnish labor to the Debtors on the basis of the terms of the CBA and incorporated Trust Agreements.

**B.    THE DEBTORS HAVE NO RIGHT TO WITHHOLD PLAN ASSETS**

Despite the clear obligation to pay over pension contributions in the post-petition period, the Debtors have simply withheld the contributions for their own use.  The Debtor has no right to

refuse payment that can be found in the CBA, the Trust Agreement, or, indeed in ERISA.  The

Debtors have engaged in prohibited self-help remedies.

>   **1.**   **The Debtors have the limited fiduciary duty to pay over the earned pension contributions to the Pension Fund but do not have the right to withhold the contributions or to decide the conditions of payment.**

The Trust Agreement specifies that the plan consists of: "all contributions required by the

Collective Bargaining Agreements to be made for the establishment and maintenance of the Plan

[. . .]."  With this language, the Trust Agreement creates a limited fiduciary duty for a

contributing employer, such as Hostess, to make contributions owed.  See, *e.g.*, *Trustees of So.

Calif. Pipe Trades Health & Welf. Trust Fund v. Temecula Mech., Inc.*, 438 F.Supp.2d 1156,

1162, 1165 (C.D. Cal.2006) (contributions are trust assets based on express language of trust

agreement).  This view has been adopted in the Southern District of New York:  "Courts

consistently hold that a company's unpaid debt to an ERISA fund is an "asset" of that fund when

the applicable agreement declares such debts to be fund assets."  *NYSA-ILA Medical & Clinical

Services Fund v. Sabato Catucci, et al.*, 60 F.Supp. 2d 194, 201 (S.D.N.Y 1999), citing *PMTA-

ILA Containerization Fund v. Rose*, 1995 U.S. Dist. LEXIS 10877, *15, No. Civ. A. 94-5635,

1995 WL 461269, at *5 (E.D. Pa. Aug. 2, 1995) ("[Defendant] failed to pay that money into the

Fund even after his obligation accrued.  Instead, he intentionally used the [unpaid contributions]

to meet other company obligations," in violation of ERISA).  Having control over money that

was "due and owing" to the Pension Fund is enough to establish an ERISA fiduciary obligation.

*Id.*

However, this does not transform Debtors into Trustees, and it does not grant Debtors the

authority to decide what to do with the contributions.  *See Gray v. Briggs*, 45 F.Supp. 2d 316,

326 (S.D.N.Y. 1999) ("A person may be a fiduciary with respect to certain matters but not

others, for he has that status only to the extent that he has or exercises the described authority or

responsibility").  The Debtors cannot claim to have any authority or duty under the Trust

Agreement other than the duty to submit timely contributions and reports to the Pension Fund.

Debtors' refusal to pay over the contributions earned post-petition does not have any support in the governing Trust Agreements or ERISA.

No other creditors in bankruptcy have been subjected to the test the Debtors currently propose to require of multi-employer pension funds for the establishment of administrative expense status. Application of the logic of Debtors' theories could produce havoc. For example, Hostess could continue operating and employing workers, but cease making the required contributions to comply with the Federal Insurance Contributions Act (FICA). FICA imposes a tax on "wages" that is used to fund both social security and Medicare benefits.[7]  Although an employee's Social Security and Medicare benefits are determined in part by the contributions on the employee's behalf while working, it is undisputed that the actual contributions being made are used in part to pay benefits of different beneficiaries immediately – persons who may not have even worked for the employer making the contributions – rather than held in trust until the covered employee is eligible to receive them.

Under the Debtors' approach, since the Social Security Administration and relevant federal agencies are not using the contributions solely for the provision of benefits related to the work being performed presently, the Court should allocate some portion of the workers' FICA contributions to pre-petition time periods, rendering the claims for those contributions general unsecured claim status. Such a result would, of course, lack merit, while harming the interests of the SSA and Medicare beneficiaries.

The Debtors' attempt to undermine the Pension Fund's alleged intended use of the contributions the Debtors are contractually obligated to make for post-petition work is also baseless. The Debtors may not wish to pay the contributions owed, but the contract the Debtors agreed to, which serves to induce the work being performed, clearly requires the payment of the contributions for each hour worked.

---

[7] The tax is paid by both the employee and the employer. 26 U.S.C. §§ 3101, 3102, 3111. Employers withhold the employee's share, but also make separate contributions totaling 7.65% of an employees' compensation under FICA.

2.   **The Debtors Have Engaged In "Self-Help" Forbidden By The Bankruptcy Code**

Local 39 members have supplied the Debtors with labor to maintain and operate Debtors' machinery in Sacramento, California throughout the post-petition period.  Debtors do not dispute that the work has been performed or that the claimed amounts are owed as a result.  The Debtors refusal to pay contributions postpetition has no legal excuse.  Although Debtors' counsel stated at the May 30 hearing that the Debtors "been perfectly transparent from the outset about their goals" regarding escaping multi-employer pension obligations, referencing its motions to reject or modify the contracts with, among others, the Union.[8]  However, the Debtors have not obtained an order to reject or modify the Local 39 CBA.

Unilaterally ceasing to comply with the contract, as the Debtors have done here, violates Section 1113(f), as "the debtor's failure to make payments to the funds as required under the CBA constitutes a unilateral modification of the CBA,"  *In re 1655 Broadway Restaurant Corp*., No. 96-CV-9116, 1997 U.S. Dist. LEXIS 2479, 1997 WL 104961 (S.D.N.Y. March 7, 1997), citing *In re Ionosphere Clubs, Inc*., 922 F.2d 984, 989–91 (2d Cir.1990).  The Debtors have, alone and without Court approval, made an election to not pay contributions.

Despite this misconduct, the Debtors seek credit for being "transparent" about the goal of escaping liability for pension contributions, while having already breached the obligation.  No legal authority the Debtors have cited the Debtors could have a right to choose whether to contribute to the Pension Fund, or by how much.

C.   **NO BASIS EXISTS TO REDUCE OR EXCUSE THE POST-PETITION CONTRIBUTION DUTY, AND THE DEBTORS CONTENTIONS LACK MERIT REGARDING "NORMAL COST" AND "FROZEN PLANS"**

The Debtors argue that their contribution duty can be reduced or excused altogether, based on theories that have no merit or application to the administrative expense claim of the IUOE Local 39 PF.  There is no relevance here to the Debtors' objections based on single employer pension plans, frozen plans, or plans that are unfunded or underfunded. Such concepts

---

[8] *See* Transcript of May 30, 2012 Hearing at page 101, lines 12-13.

have no applicability to the movant Pension Fund here, as it is a well-funded multi-employer

well-funded and lack merit. , or accounting concepts, plans outside the "Green Zone.

    **1.**    **The "Normal Cost" of the Pension Fund's Benefits is Irrelevant**

    The "normal cost" issue raised by the Debtors is an inapplicable one for this proceeding.

For single employer funds, the normal cost accounting is a tool used by actuaries to determine

certain funding obligations. In a single employer plan, it is not a contractual obligation but

instead a statutory one that controls on the issue of funding status.  This critical distinction gives

rise to different actuarial methods for assessing the plan and its costs.  It is necessarily distinct

because the single employer alone is responsible for maintaining the trust, providing for the

payment of plan professionals, and sustaining the plan's viability to meet its benefit obligations.

In a multi-employer fund, each of these obligations is spread out over the participating

employers.

    There is also a different statutory scheme in place to address underfunding issues.

Whereas single-employer plans are often required to make lump-sum "catch up" payments to

address underfunding, multi-employer plans are not at that same disadvantage.  For multi-

employer plans, ERISA and the Internal Revenue Code provide for minimum funding

standards.[9]  These funding standards call for sufficient contributions to be made to avoid the plan

having a funding deficiency, as defined in 29 U.S.C. § 1084 and 26 U.S.C. §431.

    Indeed, multi-employer plans are usually, if not almost always, underfunded when looked

at through the same actuarial evaluation tools as single-employer plans.  The difference is in the

specific advantage multi-employer plans have from their size and diversity of contributors,

allowing for underfunding gaps to be closed over time and through regular contributions, rather

than simply from lump-sum payments.

    Any effort to utilize some version of "normal cost" to determine allowability of earned

post-petition contributions would be speculative and misleading at best.

---

[9] *See* 29 U.S.C. §§ 1082 & 1084; 26 U.S.C. §§ 412 & 431.

## 2.    The Pension Fund is not a "Frozen Plan"

The Debtors raised the question of "frozen plans" in connection with the argument that contributions are not allocable to work being performed. This issue is a red herring as it relates to the Pension Fund. The Pension Fund is not frozen, and it never has been. The benefits to Local 39 members continue to be paid out on a regular basis, and the accruals for work being performed continue to accumulate consistent with the CBA and Trust Agreement. Whether the Debtors are correct about the nature of frozen plans or not is not an issue for decision in assessing the validity of the Pension Fund's administrative expense claim. The Pension Fund's claim arises from 5 post-petition work, performed for the consideration of wages and benefits to be provided under the applicable agreements.

## D.    THE AMOUNTS ARE DUE AND OWING AND SHOULD BE PAID OVER IMMEDIATELY

The amounts due under the CBA and trust agreement are based on hours worked and have not been disputed. They should be paid in the ordinary course going forward and should have been treated in that manner in the post-petition period. There is nothing in Debtors' Objection supporting the contention that the amounts owed are unascertained, and in fact, the Debtors' calculations seem to confirm that the amounts are established and readily knowable.

The Pension Fund is also entitled to liquidated damages for the period from January 11, 2012 through March 31, 2012 in the amount of $1,674.23. The Pension Fund is not seeking payment of any prepetition amounts. Liquidated damages are provided by contract as well as by statute. For this "we must look not only to the benefit to the estate, but also to the consideration due the creditor for providing such benefit. Such consideration must encompass the entire bargain between the parties, including performance due upon foreseen and bargained for contingencies. . . . Where the performance for which such compensation is due accrues post-petition, the payment owing by the estate must be afforded administrative priority. *Teamsters Indus. Sec. Fund v. World Sales (In re World Sales)*, 183 B.R. 872, 877 (B.A.P. 9th Cir. Cal. 1995). *See also* 29 U.S.C. § 1132(g)(2)(ii) (liquidated damages in collection of benefit plan contributions).

13

Debtors have not adequately addressed the Pension Fund's argument that it will suffer irreparable harm if the Debtors fail to pay contributions promptly.  Nothing in the Debtors' oral presentation on May 30, 2012 addressed the Pension Fund's unique hardship, described previously in the Pension Fund's moving papers and Reply.  The Pension Fund's obligations to provide pension credit and benefits without regard to whether contributions were received from the worker's employer clearly establish irreparable harm in this case, and weigh strongly in favor of allowing the Pension Fund's administrative expense claim.  In *Central States, Southeast and Southwest Areas National Pension Fund v. McNamara Motor Express*, 503 F. Supp. 96, 99 (E.D. Mich. 1980), the court found irreparable harm to the Fund where the Fund would be required to provide pension credit and benefits without regard to whether contributions were received from the worker's employer.

### III.   CONCLUSION

The Debtors have failed to make even a cursory showing of why the trust contributions, a critical aspect of compensation, should not be paid for hours worked servicing the Debtors' facilities post-petition.  The trust documents and applicable statutes make clear that the Debtors' obligations remain unchanged.  Case law also supports the Pension Fund's position.  The attempt by the Debtors to benefit from their own breach of contract at the expense of the very workers that are continuing to provide crucial services during this uncertain period for the company should not be rewarded.

Therefore, the Pension Fund respectfully requests an order directing the payment of post-petition contributions owed and requiring the continuing payment of contributions as they become due, consistent with Debtors' obligations under the Bankruptcy Code.

Dated:  June 15, 2012

WEINBERG, ROGER & ROSENFELD
A Professional Corporation

/s/   CHRISTIAN L. RAISNER

By:      CHRISTIAN L. RAISNER
Attorneys for Creditors IUOE Stationary Engineers
Local 39 Pension Trust Fund

129901/672176

14