JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball
Heather Lennox
Lisa Laukitis
Veerle Roovers

 - and -

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Ryan T. Routh

Attorneys for Debtors
and Debtors in Possession


# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------x
                                            :
In re                                       :  Chapter 11
                                            :
Hostess Brands, Inc., et al.,¹              :  Case No. 12-22052 (RDD)
                                            :
                    Debtors.                :  (Jointly Administered)
                                            :
-------------------------------------------------------------x
```

## EXPERT REPORT OF MITCHELL HOFING IN SUPPORT OF SUPPLEMENTAL BRIEF OF DEBTORS AND DEBTORS IN POSSESSION WITH RESPECT TO MOTIONS OF NINE PENSION FUNDS AND THE BCT FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

---

[1]     The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Hostess Brands, Inc. (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

I, Mitchell Hofing, declare under penalty of perjury as follows, pursuant to the provisions of 28 U.S.C. § 1746:

1.    I am a co-founder of Dexter Hofing LLC ("Dexter Hofing"), an actuarial consulting firm located at 1221 Avenue of the Americas, Suite 4200, New York, New York 10020.  I submit this expert report in support of the omnibus objection of the above-captioned debtors and debtors in possession (the "Debtors") to motions of nine pension funds and the BCT requesting allowance and payment of administrative expense claims [Docket No. 1003] (the "Objection").[2]

2.    Except as otherwise indicated, all facts set forth in this expert report are based upon my personal knowledge, my review of relevant documents, my opinion or my experience as an actuarial consultant specializing in multiemployer pension plans.

I.    **BACKGROUND AND QUALIFICATIONS**

3.    In 2011, James Dexter and I formed Dexter Hofing.  Prior to 2011, I worked for 13 years at Mercer (US), Inc., where I concentrated on providing consulting advice to employers regarding pension plans.  Since 2007, the primary focus of my work has been on multiemployer pension plan issues, including advising multiemployer pension plans themselves.

---

[2]    The defined benefit multiemployer pension plans that have requested allowance and payment of administrative expenses are:  the Automobile Mechanics' Local 701 Union and Industry Pension Fund (the "Mechanics' Fund"); the Central Pension Fund (the "Central Fund"); the Retail, Wholesale and Department Store International Union and Industry Pension Fund (the "RWDSU Fund"); the I.A.M. National Pension Fund (the "IAM Fund"); the IUOE Stationary Engineers Local 39 Pension Trust Fund (the "IUOE Fund"); the United Food and Commercial Workers Unions and Employers Midwest Pension Fund (the "UFCW Midwest Fund"); the Bakery and Sales Drivers Local Union No. 33 Industry Pension Fund (the "Bakery Drivers Fund"); and the BCT makes a request for payment of postpetition contributions to the Bakery and Confectionery Union and Industry International Pension Fund (the "B&C Fund" and together with the Mechanics' Fund, the Central Fund, the RWDSU Fund, the IAM Fund, the IUOE Fund, the UFCW Midwest Fund and the Bakery Drivers Fund, the "Funds").

Although I do not practice law, I am generally familiar with the legal rules governing the funding of multiemployer pension plans.

4.      I am an Enrolled Actuary, a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries and a Member of the American Academy of Actuaries.  I received my undergraduate degree in 1983 from Yale University, with a B.S. in mathematics, and a J.D. from New York University in 1993.

5.      My CV is attached hereto as <u>Exhibit A</u>.  I have not authored any publications in the past 10 years.  Other than my prior testimony in these cases, I have not testified as an expert in the previous four years.

6.      In connection with my work performed for the Debtors, I am charging my hourly rate of $500.  I am not being separately compensated for expert testimony in this case. My compensation, and Dexter Hofing's remuneration, does not depend upon the outcome of the Funds' motions for allowance and payment of administrative expenses.  If called on to testify, I could and would testify to the facts and opinions set forth herein.

## II.     ASSIGNMENT

7.      I have been asked by counsel for the Debtors to opine on the similarities and differences in how single employer and multiemployer pension funds allocate costs associated with:  (i) currently accruing benefits; (ii) underfunding; and (iii) administration of the funds.

8.      I also have been asked by counsel for the Debtors to determine the approximate percentage of employer contributions used by the Funds to satisfy each of these categories of costs.

## III.    DEFINED BENEFIT PLANS

9.      Defined benefit pension plans are employer-funded retirement plans

created for the benefit of both active and inactive participating employees.  Under a defined

benefit pension plan, a pension fund is obligated to pay a specified benefit to employees covered

by the plan upon their retirement and in accordance with the terms of the plan document.  Thus,

as employees earn their retirement benefits over time, the pension fund accumulates fixed

liabilities that will become due as employees retire and begin collecting their pensions.  All

defined benefit plans are funded through contributions made by employers that have employees

participating in the plan.[3]

10.     Defined benefit pension plans apply the employers' contributions to

satisfy three separate categories of costs.  First, the contributions are used to pay for the expenses

of administering the plan, including, for example, investment advisor and legal fees.  Second, the

contributions are used to pay for the value of the new benefits that accrue for participants each

year.  Although there can be some variation in how the value of those benefits is determined,

actuaries refer to that value as the "normal cost" of the plan.  If, after satisfying both

administrative costs and the normal cost, there are any funds remaining from the contribution

made by employer(s), those funds are used to satisfy underfunding or to create or increase a

surplus.

11.     Thus, at any given point in time, a defined benefit pension plan allocates

contributions made by employer(s) to satisfy one of three categories of costs:  administrative

costs, the "normal cost" and the costs of underfunding.  The percentage of contributions

---

[3]      We note that some defined benefit plans require contributions from participating employees.  However, this
is not a significant issue with respect to any of the plans here.

allocated to each category of costs varies by plan and depends on a variety of factors, including a plan's funding levels.

### A.    Categories Of Defined Benefit Pension Plans

12.    Defined benefit pension plans fall into one of two primary categories: single employer pension plans and multiemployer pension plans.  Under a single employer plan, a single employer contributes to the pension trust fund so that it can provide specified pension benefits to such employer's employees upon their retirement.

13.    Multiemployer pension plans provide defined pension benefits to employees or retirees of more than one unrelated employer.  Under a multiemployer pension plan, contributing employers jointly contribute to the pension trust fund so that the fund can provide specified pension benefits to the employers' employees upon retirement.  Federal labor law requires multiemployer pension plans to be managed and operated by a board of trustees consisting of union and employer representatives.

### B.    Funding Requirements For Defined Benefit Pension Plans

14.    For both single employer and multiemployer pension plans, ERISA sets forth the minimum level of employer contributions that pension funds must obtain each year. The minimum funding requirements are based on a formula that takes into account the sum of the accruing pension benefits, the annual administrative costs and amortization costs associated with a plan's underfunding, to the extent such underfunding exists.

15.    Under current law, there are some differences in the minimum funding requirements for single employer and multiemployer pension plans.[4]  The primary difference is

---

[4]    Notably, however, prior to 2008, when the Pension Protection Act became effective, the ERISA funding requirements for the two types of plans were nearly identical.

NYI-4454509

that single employer pension plans are now required to cure underfunding at a faster rate than are multiemployer pension plans.  However, because the minimum funding rules require both multiemployer pension plans and single employer pension plans to avoid a funding deficiency by ensuring that contributions cover both normal costs and any underfunding, there is no actuarial or economic impact associated with this difference.[5]

## IV.    Analysis Of Contributions Attributable To Each Cost Category

16.    To calculate the Funds' percentage of employer contributions attributable to each cost category, I reviewed data from two sources.  First, I reviewed each Fund's most recent annual report filed with the Department of Labor.  These reports are commonly referred to as Form 5500 reports or, more colloquially, "5500s" and contain various data about the Funds, including total employer contributions received each year.[6]  I also used each Fund's most recent actuarial valuation report ("AVR") where that information was available to me.[7]  The trustees of multiemployer pension plans use AVRs to assist them in administering the plans, determining the minimum annual required contribution, and meeting government filing requirements.  Among other things, the AVRs describe the cost of administering the MEPP, the normal cost and the actuarial method used to calculate the normal cost.

---

[5]    In its reply brief, the BCT attempts to distinguish between the funding requirements of single employer and multiemployer plans by arguing that a description of funding requirements in the Sunerhauserman decision is inapplicable to multiemployer pension plans.  But the BCT is wrong.  When Sunerhauserman was decided, the funding requirements applicable to multiemployer and single employer pension plans were nearly identical.  In 2008, the Pension Protection Act modified the funding requirements for single employer plans but did not change the requirements for multiemployer plans.  As a result, Sunerhauserman's description of funding requirements, in general, remains applicable to multiemployer pension plans.

[6]    The most recent Form 5500 reports filed by each of the MEPPs are attached hereto as Exhibits B-1 through B-8.

[7]    The most recent actuarial valuation reports are attached hereto as Exhibits C-1 through C-8.

17.    My analysis involved multiple steps.  First, I determined the total annual employer contributions made to the Funds.  This data is available in Schedule H to each Fund's 5500.[8]  Below is a chart detailing the most recently available data reflecting the total annual employer contributions received by each Fund.

| Fund | Total Employer Contributions |
|------|------------------------------|
| Bakery Drivers Fund | $932,042 |
| B&C Fund | $192,385,924 |
| IAM Fund | $331,827,659 |
| Mechanics' Fund | $26,899,548 |
| UFCW Midwest Fund | $15,739,484 |
| Central Fund | $594,012,788 |
| IUOE Fund | $49,418,055 |
| RWDSU Fund | $9,289,670 |

18.    Next, I determined the normal cost for each Fund.  Each Fund's normal cost is listed in its AVR.  Of the eight Funds I analyzed, five report their normal costs using the unit credit cost method.[9]  To determine normal cost using this method, an actuary calculates the present value of the cost of all benefits earned during the plan year and attributes those costs to the plan year.  Thus, if a Fund's normal cost is calculated using the unit credit cost method, the normal cost represents the present value of the cost of the benefits accrued during the plan year. Under the unit credit cost method, pension benefits earned by younger employees generally are reported as having lower normal costs than those earned by older employees because it is

---

[8]    In making my calculations, I used the most recent data available to me.  I used publicly available 2010 Form 5500s for all plans as well as the most recent AVRs that I could locate.

[9]    Some of these Funds reported their normal cost to include the cost of administration.  For those Funds, I calculated the cost of currently accruing benefits by subtracting the cost of administration from the reported normal cost.

NYI-4454509

assumed that the assets set aside to satisfy benefits for younger employees will have a greater amount of time to accumulate interest.

19.    The remaining three Funds – the Bakery Drivers Fund, the B&C Fund and the IAM Fund – use the "entry age normal cost method." To calculate normal cost using this method, an actuary utilizes actuarial assumptions to "smooth out" the cost of an employee's pension benefits over her entire career. Normal costs are then reported as a rough annual average of the cost of the accrued benefits for each employee's entire career. As a result, if the entry age normal cost method is used, normal costs for younger employees tend to be reported as higher than the present value, while normal costs for older employees tend to be reported as lower.

20.    For my analysis, I used the unit cost credit method because that method properly allocates the costs associated with accrued benefits to the period in which the benefits were earned for the purposes of this analysis. All other methods smooth out the cost of benefits over some other period of time. Accordingly, I adjusted the normal costs reported by the Bakery Drivers Fund, the B & C Fund, and the IAM Fund by applying mortality and interest rate assumptions consistent with the other assumptions used in the AVRs. Below is a chart of the normal costs for each of the Funds.[10]

| Fund | Normal Cost (Unit Credit Method) |
|---|---|
| Bakery Drivers Fund | $0 |
| B&C Fund | $74,029,844 |
| IAM Fund | $460,348,516 |

---

[10]    The Bakery Drivers' Fund was frozen effective January 1, 2007, which means that, since that date, the plan has had no new benefit accruals and, thus, no normal cost. Accordingly, 100% of contributions currently owed to the Bakery Drivers Fund are necessarily being used to fund previously-earned benefits or to pay for the costs of plan administration.

NYI-4454509

| | |
|---|---|
| Mechanics' Fund | $10,612,247 |
| UFCW Midwest Fund | $9,048,434 |
| Central Fund | $204,196,381 |
| IUOE Fund | $27,899,541 |
| RWDSU Fund | $6,157,067 |

21.    The third piece of data I needed for my analysis was the cost of administration of each of the Funds.  I used the actuary's administrative cost assumption.  This data is available in each Fund's AVR and is reflected in the chart below.

| Fund | Administration Costs |
|---|---|
| Bakery Drivers Fund | $195,000 |
| B&C Fund | $9,617,918 |
| IAM Fund | $29,750,000 |
| Mechanics' Fund | $2,404,479 |
| UFCW Midwest Fund | $0 |
| Central Fund | $12,527,885 |
| IUOE Fund | $1,100,000 |
| RWDSU Fund | $2,019,763 |

22.    Finally, to determine each Fund's costs attributable to satisfying underfunding, I subtracted the Fund's normal cost and administrative cost from the total annual contributions received by the Fund.  The chart below reflects the amounts attributable to each cost category for each of the Funds, including the costs attributable to reduction of underfunding.

| Fund | Total Employer Contributions | Normal Cost | Administration Costs | Costs Attributable To Reduction Of Underfunding |
|---|---|---|---|---|
| Bakery Drivers Fund | $932,042 | $0 | $195,000 | $737,042 |
| B&C Fund | $192,385,924 | $74,029,844 | $9,617,918 | $108,738,162 |
| IAM Fund | $331,827,659 | $460,348,516 | $29,750,000 | $0 |

-9-

| | | | |
|---|---|---|---|
| Mechanics' Fund | $26,899,548 | $10,612,247 | $2,404,479 | $13,882,822 |
| UFCW Midwest Fund | $15,739,484 | $9,048,434 | $0 | $6,691,050 |
| Central Fund | $594,012,788 | $204,196,381 | $12,527,885 | $377,288,522 |
| IUOE Fund | $49,418,055 | $27,899,541 | $1,100,000 | $20,418,514 |
| RWDSU Fund | $9,289,670 | $6,157,067 | $2,019,763 | $1,112,840 |

23.     As the final step of my analysis, I divided each category of pension cost by the total contributions to determine the percentage of total employer contributions that the Funds pay to each cost category.  The results of this analysis are reflected below.

| Fund | Normal Cost | Administrative Expenses | Underfunding Reduction |
|---|---|---|---|
| Bakery Drivers Fund | 0.0% | 20.9% | 79.1% |
| B&C Fund | 38.5% | 5.0% | 56.5% |
| IAM Fund | 91.0% | 9.0% | 0.0% |
| Mechanics' Fund | 39.5% | 8.9% | 51.6% |
| UFCW Midwest Fund | 57.5% | 0.0% | 42.5% |
| Central Fund | 34.4% | 2.1% | 63.5% |
| IUOE Fund | 56.5% | 2.2% | 41.3% |
| RWDSU Fund | 66.3% | 21.7% | 12.0% |

24.     The percentages in the chart above are based on aggregate costs for all contributing employers.  It may be possible to calculate the percentage of each cost category attributable to the Debtors on an individual basis, but to do so, I would need additional data that, to the extent it exists, would be in the sole possession of the Funds.  I have no reason to believe that the percentage of each cost category attributable to the Debtors would be significantly different than the percentages reflected in my analysis above.[11]

---

[11]     In addition, my analysis was performed using the most recent data available to me.  This analysis does not necessarily reflect cost distributions since January 2012, but I have seen nothing to suggest that the percentages would be significantly different for that time period.

NYI-4454509

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing declaration is true and correct.

Dated: June 15, 2012

_____ /s/ Mitchell Hofing
Mitchell Hofing

NYI-4454509