Hearing Date:  **June 19, 2012 at 10:00 a.m.**

**LOWENSTEIN SANDLER PC**
Sharon L. Levine
Wojciech F. Jung
1251 Avenue of the Americas
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

*Counsel to the I.A.M. National Pension Fund*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Hostess Brands, Inc., *et al.,*<br><br>                Debtors. | Chapter 11<br><br>Case No. 12-22052 (RDD)<br><br>(Jointly Administered) |

**THE I.A.M. NATIONAL PENSION FUND'S SUPPLEMENTAL BRIEF IN FURTHER**
**SUPPORT OF ITS MOTION FOR AN ORDER DIRECTING PAYMENT OF POST**
**PETITION EMPLOYEE BENEFIT CONTRIBUTIONS AND ALLOWING AN**
**ADMINISTRATIVE EXPENSE CLAIM FOR UNPAID AMOUNTS**

The I.A.M. National Pension Fund (the "**IAMNPF**"), by and through its undersigned

counsel, submits this supplemental brief in (i) further support of its motion (the "**Motion**")

pursuant to sections 503(b)(1)(A), 507(a)(2) and 1113(f) of title 11 of the United States Code

(the "**Bankruptcy Code**") for an order directing immediate payment by the above-captioned

debtors (collectively, the "**Debtors**") of all post petition employee benefit contributions due and

owing to the IAMNFP and awarding an administrative expense status with respect to same

[Docket No. 774], and (ii) response to the Court's instructions of May 30, 2012.

**BACKGROUND AND PERTINENT FACTS**

On April 20, 2012, the IAMNPF, a multiemployer defined benefit pension plan within

the meaning of sections (3)(2), 29 U.S.C. § 1002(2), and 3(37)(A), 29 U.S.C. § 1002(37)(A), of

the Employee Retirement Income Security Act of 1974 (as amended from time to time, "**ERISA**"), filed the Motion requesting the allowance and payment of all post petition employee benefit contributions due and owing by the Debtors to the IAMNPF under its contracts and collective bargaining agreements [Docket No. 774].    Specifically, the Motion seeks the allowance and payment of the Debtors' pension obligations accruing between the Petition Date and March 31, 2012.  The Motion also requests that the Debtors remain current in their payment obligations to the IAMNPF accruing after March 31, 2012, until such obligations are modified in compliance with the Bankruptcy Code and other applicable law.   The Debtors owe the IAMNPF no less than $81,010.15 for their April 2012 contribution obligations.   See Supplemental Declaration (the "**Martocci Suppl. Decl.**") of Joseph P. Martocci, Jr., submitted herewith, ¶ 3. A copy of the Debtors' redacted remittance reports for April 2012 is attached to the Martocci Suppl. Decl. as Exhibit 1.   As of June 1, 2012, the Debtors owe the IAMNPF no less than $312,158.67 on account of post petition accrued pension contributions through April 30, 2012, plus $6,155.95 in interest.  Martocci Suppl. Decl. ¶ 4 and Exhibit 3 annexed thereto.

The Motion is supported by the Declaration of Joseph P. Martocci, Jr., filed on May 3, 2012 (the "**Martocci Declaration**") [Docket No. 841], and specifies that the Debtors owed the IAMNPF no less than $241,928.76 in delinquent pension contributions accruing from the Petition Date through March 31, 2012 .   Martocci Declaration, pg. 2, fn. 1.

The Debtors are contractually required to make pension contributions to the IAMNPF pursuant to their CBAs[1] with the International Association of Mechanics and Aerospace Workers, AFL-CIO ("**IAM**").  Id. at ¶ 3.  The Martocci Declaration also states that, under the terms of the CBAs, the Debtors have agreed to be bound by the IAMNPF Trust Agreement, a

---

[1]  All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Martocci Declaration.

copy of which is annexed to the Martocci Declaration as Exhibit "B." Id. at ¶ 6. See also SCLs (defined below) ¶ D (stating that the Employer adopts and agrees to be bound by the Trust Agreement).

Under the Trust Agreement, the Debtors are obligated to (1) submit monthly statements to the IAMNPF reporting the hours/days for which individuals working in job classifications covered by the CBAs were entitled to receive pay and (2) remit pension contributions to the IAMNPF on behalf of those individuals for the applicable month. Id. at ¶ 7; Trust Agreement, Article V, Sections 1 and 4. The monthly remittance reports and payments of pension contributions are due on the twentieth day following the end of each calendar month. Trust Agreement, Article V, Section 4. Failure to make pension contributions within 30 days from the date of delinquency obligates the Debtors to pay liquidated damages of 20% of the amount due and simple interest at the rate of 18% per annum until payment received. Id. The remittance reports for the period from the Petition Date through March 31, 2012 are annexed to the Martocci Declaration as Exhibit "C".

The Debtors are required to contribute to the IAMNPF on behalf of the IAM represented employees working at 24 Debtor locations. Martocci Suppl. Decl. ¶ 5. These contractual obligations stem from the "Pension" provisions of the CBAs and/or "Standard Contract Language" agreements (together, the "**SCLs**") executed by the IAM (or applicable Local or District Lodge) and the Debtors. Id. See also Trust Agreement, Article V, Section 1. The following chart illustrates the locations and applicable contract provisions addressing the Debtors' contribution obligations to the IAMNPF:

| Location | Standard Contract Language | CBA |
|----------|---------------------------|-----|
| C031 – Des Moines, IA | √ | Article 12 |

| | | |
|---|---|---|
| C036 – Minneapolis, St. Paul, Hopkins, New Hope & Burnsville, MN | | Article 6 |
| CC41 – DC, MD & VA | | Article 19 |
| CC43 – Pittsburg, Butler, Delaney & Greensburgh, PA | √ | Article 14 |
| CC44 – Schiller Park, Il | √ | Article 15 |
| CC47 – Spencer, Ft. Dodge, Sioux City, IA, and Sioux Falls, SD | √ | Article 17 |
| CC49 – Somerville, Natick, Braintree & Malden, MA | √ | |
| CC50-1 & 2 – Milwaukee, WI | | Article 9 |
| CC51/CC58 – Multiple CA Locations | √ and 9/7/10 Letter | Article 16 |
| CC52 – Buffalo, NY | √ | Article 21 |
| CC56 – St. Joseph, MO | √ | Article 13 |
| CC57 – Kansas City, MO & Kansas City, KS | √ | Article 25 |
| CC62 – Little Rock & No. Little Rock, AR | | Article 18 |
| CZ03 – Independence & Lorain, OH | | Article 8 and 1/4/10 Letter |
| CZ05-1 & CZ05-3 – Toledo & Northwood, OH | | Article 9 |
| CZ06 – Akron, OH | | Article 15 and 11/12/08 Letter |
| CZ08 – Wheeling & Elm Grove, W VA | | Article XI |
| I022 – Anaheim & Glendale, CA | | Article 16 |
| I02A – Youngstown, OH | √ | Section 6 |
| I04A – Dayton, OH | | Article 16 |
| I48A – Hodgkins, IL | √ | |

Martocci Suppl. Decl. ¶ 6.  The SCLs and pertinent pages from the CBAs are annexed to the

Martocci Suppl. Decl. as <u>Exhibit 2</u>.

Each of the CBAs and SCLs sets forth the Debtors' pension contribution rates to the IAMNPF.  Martocci Suppl. Decl. ¶ 7.   As set forth above, the Debtors are required to submit pension contributions to the IAMNPF on the twentieth day following the end of each calendar month.  Trust Agreement, Article V, Section 4.  While the Debtors have continued to provide the IAMNPF with remittance reports setting forth the employees' working hours and the Debtors' pension contribution obligations for each month, the Debtors have not contributed their contractually required pension contributions to the IAMNPF since June of 2011.   Martocci Declaration, ¶ 8.

On May 23, 2012, the Debtors filed their Omnibus Objection to the Motion, and other similar motions [Docket No. 1003] (the "**Omnibus Objection**"), and a Declaration of Laurie Reed in support of the Omnibus Objection [Docket No. 1005] (the "**Reed Declaration**").

Through the Omnibus Objection and the Reed Declaration, the Debtors argue, on an omnibus basis, that the motions should not be granted because (i) certain of the contributions may be based on prepetition service dates, (ii) certain of the contributions may constitute a prepetition claim based on the underfunding of those pension plans, and (iii) the resolution of the motions should await the resolution of the Debtors' motions under section 1113 of the Bankruptcy Code with respect to the "Other Unions."  With respect to the IAMNPF, the Debtors assert that their post petition pension contribution to the IAMNPF (for the period of 1/11/12 through 3/31/12) was $239,877.34, and not $241,928.76 as set forth in the Martocci Declaration.  While the IAMNPF disagrees with this assertion, it will agree for purposes of the Motion that the Debtors owe the IAMNPF $239,877.34 for pension contributions due between January 11 and March 31, 2012, plus interest.  The IAMNPF reserves its rights in all other respects.

As set forth in the Motion, the supporting declarations and herein, none of the Debtors' arguments for the delay and/or denial of the IAMNPF's Motion have merit and should be overruled.

## ARGUMENT

### A.    The Debtors Have Continuous Contractual Obligations to the IAMNPF for Pension Contributions

The Debtors' post petition pension contribution obligations to the IAMNPF are based on their contractual agreements with the IAM and those agreements have not been suspended by the bankruptcy filing.  As set forth above, the Debtors are parties to various CBAs and SCLs by which they have obligated themselves to be bound by the Trust Agreement.  The Debtors are contractually obligated to contribute to the IAMNPF certain fixed amounts (the amounts vary for each CBA/SCL) for each hour worked by their employees.  The Debtors' employees accrue pension credit based on hours worked.

The Debtors' contribution rates to the IAMNPF do not vary from day to day, or month to month.  Rather, the contribution rates were negotiated by the Debtors and the IAM during the CBA negotiation process and remain fixed for the duration of the CBAs.  Martocci Suppl. Decl. ¶ 7.  The Debtors' contribution rates are either set forth in the applicable "Pension" article embodied in a CBA, or in a SCL.  Martocci Suppl. Decl. ¶¶ 5-7, Exhibit 2.

The Debtors' ongoing contribution obligations to the IAMNPF are part of the employees' total compensation package.  Pension contributions are similar to wages in that they are based on the hours worked by each employee.  Furthermore, when negotiating the terms of a CBA, employees and their union representatives often negotiate between the amount of set pension contributions and hourly wage rates.  In addition, employees sometimes opt to forgo wage

increases in favor of pension contributions.   In re Columbia Packing Co. v. Pension Benefit

Guaranty Corp., 81 B.R. 205, 207-08 (D. Mass. 1988) (stating that Congress recognized that in

labor negotiations, fringe benefits may be substituted for wage demands and that the

contributions are analogous to wages in that the guarantee of future benefits is often considered

by labor and management to be a form of present compensation).   As such, there can be no

doubt that pension contributions constitute a part of the employees' total compensation package

offered by the Debtors.

        The Debtors' bankruptcy filing did not terminate their contractual contribution

obligations to the IAMNPF, the same way it did not terminate the Debtors' contractual

obligation to pay their employees' salary, healthcare and other benefits.   The IAM represented

employees continue to work for the Debtors post petition and the Debtors continue to harvest the

benefits of that labor.   Section 1113 provides that the filing of a bankruptcy petition does not

abrogate the Debtors' responsibilities under a collective bargaining agreement.   11 U.S.C. §

1113(f).   Such agreements remain in effect until modified or rejected in accordance with the

statute's requirements.   See In re Ionosphere Clubs, Inc., 922 F.2d 984, 990 (2d Cir. 1990);

Teamsters Airline Division v. Frontier Airlines, Inc., 2009 WL 2168851 at * 5 (S.D.N.Y. July

20, 2009); In re Arrow Transp. Co. of Del., 224 B.R. 457, 460 (Bankr. D. Or. 1998).   In this

case, the Debtors' CBAs with the IAM have not been modified and the Debtors' pension

contribution obligations to the IAMNPF have not been terminated.   In re 1655 Broadway

Restaurant Corp., 1997 WL 104961 at *2 (S.D.N.Y. March 7, 1997) ("….the Debtor's failure to

make payments to the Funds as required under the CBA constitutes a unilateral modification of

the CBA not permitted under 11 U.S.C. 1113(f).").   As such, the Debtors should continue to

remit to the IAMNPF those pension contributions accrued post petition, as set forth in the Motion.

**B.    The Post Petition Contributions Sought in the Motion are Subject to Administrative Expense Status and Immediate Payment**

The Debtors' obligations to the IAMNPF are entitled to administrative expense status and timely payment post petition.  The Debtors agree that they owe no less than $238,877.34 in "Postpetition Date Contributions" to the IAMNPF (1/11/12 through 3/31/12) (as both terms are defined in the Omnibus Objection).  Omnibus Objection, ¶ 3; Reed Declaration ¶ 5 and Exhibit A thereto.  The Debtors assert, however, that <u>some</u> undefined portion of these Postpetition Date Contributions <u>may</u> be "used to make up the underfunding of the Funds due to historical investment losses and insufficient contributions received by the Funds . . . during prior periods." Omnibus Objection, ¶ 3.  According to the Debtors, this undefined portion of the Postpetition Date Contributions should not be accorded administrative expense status.  <u>Id</u>.

The Debtors' argument is unsupported in law or fact.  First, the Debtors' obligations to the IAMNPF are entitled to administrative expense status and timely payment because the pension contributions are attributable to services performed by the Debtors' employees solely <u>after</u> the Petition Date.  Indeed, if none of the Debtors' employees who participate in the IAMNPF performed post petition work for the Debtors, no post petition contributions would have been due.  Accordingly, it is beyond dispute that no portion of the Debtors' post petition contributions relates to, or are on account of, prepetition services.  <u>Cf</u> <u>In re A.C.E. Elevator Co., Inc.</u>, 347 B.R. 473, 475 fn. 1 (Bankr. S.D. N.Y. 2006) (contributions subject to motion were for hours worked prior to the petition date).

Second, no portion of the Debtors' pre or post petition contribution obligation is attributable to, or payable as a result of, any "underfunding" of the IAMNPF.  As noted above,

the contributions at issue in the Motion are due as a result of the post petition work performed by the Debtors' employees. The funding status of the IAMNPF has no bearing on these contribution requirements. Furthermore, as set forth in the Declaration of Phillip A. Romello in Support of the IAM's objection to the Debtors' motion seeking to reject the IAM CBAs [Docket No. 983] (the "**Romello Declaration**"), since the inception of ERISA the cumulative employer contributions to the IAMNPF have been greater than the minimum required contributions over time as defined in ERISA. Id. ¶ 6.

Finally, while its relevance to the determination of whether the IAMNPF's claim is an administrative expense, it is worth noting that the IAMNPF has never been in the "Critical Status," "Endangered Status," or in "Seriously Endangered Status" within the meaning of The Pension Protection Act of 2006. Id. at ¶ 10. In fact, the IAMNPF, which has a diverse set of over 1,700 contributing employers, is in the "green zone" due to its funded status. Id.

Notwithstanding the IAMNPF's "green zone" status under ERISA and applicable statutes, the funding status of a pension plan is irrelevant to the determination of whether pension contributions calculated on hours worked post petition (i.e., the Postpetition Date Contributions) are entitled to administrative expense status under sections 503(b), 507(a) and 1113(f) of the Bankruptcy Code. Not surprisingly, the Debtors have not cited a single case standing for the proposition that a plan's funding status or the plan's use of contractual pension contributions is relevant in determining an administrative expense status in the context of multiemployer defined benefit pension plans.

The District Court in 1655 Broadway Restaurant, infra, awarded administrative claim status to post petition delinquent pension contributions by analyzing only whether the debtor modified its CBA with the union and whether post petition obligations were paid in accordance

with the CBA.   Finding that the debtor's unmodified CBA requires timely payments to the pension fund until the CBA's termination date, the court awarded the fund an administrative expense claim for the delinquent contribution and required its payment.   1655 Broadway Restaurant, 1997 WL 104961 at *2.   See also A.C.E. Elevator Co., 347 B.R. 473 (denying administrative expense status in the context of a multiemployer pension fund because employees' service dates were prior to the petition date); In re Adventure Resources, Inc., 137 F.3d 786 (4th Cir. 1998) (post petition pension payments entitled to administrative status under an unmodified CBA).

The Third Circuit's decision in In re Marcal Paper Mills, Inc., 650 F.3d 311 (3d Cir. 2011), is instructive on this point.   In Marcal, the court held that a claim for employer's withdrawal liability attributable to post petition period is entitled to administrative expense status.   Prior to the sale of its assets and complete withdrawal from its underfunded multiemployer defined benefit pension plan, Marcal made all of its post petition contributions to the fund.   Id. at 313.   The Marcal court did not hold that the debtor's post petition contributions to the fund to satisfy its continuing obligations to the fund were contrary to law or made on account of prepetition services.   In sum, the funding status of a plan is irrelevant to the determination of whether Postpetition Date Contributions are entitled to administrative expense status under sections 503(b), 507(A) and 1113(f) of the Bankruptcy Code.   What matters is that the contribution is due under the CBA on account of work performed by employees post petition.

The court in In re Fastech Services, Inc., 2012 WL 1229893 (Bankr. C.D. Ill. Apr. 9, 2012), also did not limit an administrative expense status only to the employer's contribution obligation based on employee's post petition services.   It awarded administrative status to interest that has accrued on delinquent contribution for fringe benefits under the CBA.   Id. at * 2

(citing In re T.A. Brinkoetter & Sons, Inc., 467 B.R. 668 (Bankr. C.D. Ill. 2012);  See also In re

Fastech Services, Inc., 2012 WL 1190289 (Bankr. C.D. Ill. Apr. 12, 2012).

      The initiation of section 1113 proceeding does not change the fact that contributions on

account of post petition services – such as employees' continued work for the debtor -- are

entitled to administrative status.  A CBA may not be rejected retroactively.    In re World Sales,

Inc., 183 B.R. 872 (9th Cir. BAP 1995) (citing In re Hoffman Bros. Packing Co., Inc., 173 B.R.

177 (9th Cir. BAP 1994).  As the Ninth Circuit Bankruptcy Appellate Panel cogently observed:

> [The] rights [of the employees] accrue as services rendered on the
> basis provided for by the CBA. These rights vest post petition, and
> as indicated it would violate § 1113(f) to transform these rights
> into general unsecured claims upon subsequent rejection of the
> CBA. Hence, employees working under a CBA are insulated from
> the consequences of immediate rejection under § 365(g);
> subsection 1113(f) mandates that any conflict between § 1113 and
> other code sections must be resolved in favor of § 1113 as a whole.
> Because a CBA may not be rejected retroactively, unilateral
> breaches prior to rejection cannot be relegated to unsecured status.

Id.  Thus, unless and until rejection or modification is approved by the Court through a section

1113 proceeding, the Debtors must comply with all provisions of the CBAs.    In re Energy

Insulation, Inc., 143 B.R. 490, 495 (N.D. Ill 1992) (until a collective bargaining agreement is

rejected, the debtor must abide by its terms); In re Moline, 144 B.R. 75, 78 (Bankr. N.D. Ill.

1992) (same); In re Manor Oak Skilled Nursing Facilities, 201 B.R. 348, 350 (Bankr. W.D.N.Y.

1996) (same).

**C.**     **The Debtors' Obligations to the IAMNPF Meet the Requirements of Section 503(b)
and 507(a) of the Bankruptcy Code**

      The Debtors' obligations to the IAMNPF set forth in the Motion are entitled to

administrative expense status under section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

Section 503(b)(1)(A) provides that, after notice and a hearing, there shall be allowed

administrative expenses, other than claims allowed under section 502(f) of this title, for "the actual, necessary costs and expenses of preserving the estate". A.C.E. Elevator Co., 347 B.R. at 478; Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc., 789 F.2d 98, 101 (2d Cir. 1986). In the McFarlin decision, the Second Circuit considered whether a withdrawal liability claim can be given priority status among McFarlin's debts. Id. at 100. The court held that "an expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession … and only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." Id. at 101 (citations and quotations omitted). That right to payment obligation arises post petition is insufficient to give rise to a priority status. Id. The McFarlin court concluded that whether the debtor's "'withdrawal liability' is an administrative expense depends upon the consideration supporting the Fund's right to receive it." Id. Concluding that "the employer's lump sum payment in satisfaction of this withdrawal liability is made to guarantee pension benefits already earned by those employees covered by the Plan," the court held that "[t]he consideration supporting the withdrawal liability is, therefore, the same as that supporting the pensions themselves, the past labor of the employees covered by the Plan." Id. 101-02.

The relief sought in the Motion is wholly consistent with McFarlin. First, the delinquent pension contributions arose out of a transaction between the creditor and the debtor-in-possession: the obligation arouse out of the IAM represented employees' continued work for the Debtors post petition. Based on that post petition work, the CBAs and the SCLs require that the Debtors contribute to the IAMNPF fixed amount of funds based on the hours worked. Second, the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business: the consideration (i.e., labor)

supporting the IAMNPF's right to payment was supplied post petition (from and after January 11, 2012) as set forth in Exhibit C to the Martocci Declaration and Exhibit 1 to the Martocci Supl. Decl.  Third, the consideration (*i.e.*, labor) performed by the IAM represented employees at Hostess' 24 locations was and continues to be beneficial to the Debtors.  Marcal, 650 F.3d at 317-18 ("[i]t is clear that the covered employees were required to perform work post petition in order to keep DIP Marcal in operation, unquestionably conferring a benefit to the estate.").  The Debtors cannot operate their businesses and reorganize without the hard work of their employees.  Unlike McFarlin's withdrawal liability that was based on employee's prepetition services, the delinquent contributions subject to the Motion were fully earned by working post petition hours.

A post petition obligation arising under a collectively bargained agreement that has not been rejected under section 1113 must be paid as an administrative expense. In re Chicago Lutheran Hospital Association, 75 B.R.. 854, 856-57 (Bankr. N.D. Ill 1987). In such cases, "[p]ermitting the employees to continue to accrue benefits was necessary to the debtor-in-possession's reorganization attempt and was required by the terms of the collective bargaining agreement." Id. at 857.  See also In re Colorado Springs Symphony Orchestra Assoc., 308 B.R. 508, 519 (Bankr. D. Co. 2004) ("So long as the bargaining unit members provide consideration to a debtor-in-possession as contemplated by the collective bargaining agreement, then whatever obligation is owed to the workers under that agreement's unmodified terms, and based upon the consideration provided by the workers, is an allowable administrative expense under 11 U.S.C. § 503(b)(1)(A)."); In re WCI Steel, Inc., 313 B.R. 414 (Bankr. N.D. Ohio 2004) (debtor is required to perform all obligations under unmodified pension agreement that is a CBA, including making minimum funding contributions to the pension plan).

**D.**      **Allowance and Payment of the Debtors' Delinquent Post Petition Pension Contributions to the IAMNPF Should not be Delayed**

The allowance and payment of the IAMNPF's post petition claim should not await the resolution of the Debtors' section 1113 motion with respect to the IAM.  The Debtors' arguments to the contrary are nothing more than their attempt to delay the timing of payments currently due and those that will become due in the ordinary course.  This is not a valid reason for the withholding of payments on account of administrative expense claims.

There is no certainty that the Debtors' section 1113 motion with respect to the IAM and the "Other Unions" will ever be heard by the Bankruptcy Court.  While the Debtors filed their section 1113 motion with respect to the Other Unions on April 23, 2012 and the parties have been engaged in discovery with relation thereto, the trial date on the Debtors' section 1113 motion has continually been adjourned.  The trial date has been adjourned because the resolution of the Debtors' 1113 motion with respect to the Other Unions depends on the resolution of the Debtors' section 1113 motions and negotiations with their two major unions, the IBT and BTC.  See May 30, 2012 Hearing Transcript, 122:1-2, annexed hereto as Exhibit 1 ("**May Trans.**").  Further, the Debtors' section 1113 motion may be withdrawn.

In addition, as discussed above, section 1113(f) prohibits the Debtors' from unilaterally altering any provisions of a CBA prior to compliance with the remaining provisions of section 1113.  The Debtors' request to adjourn or delay the allowance and payment of the IAMNPF's post petition administrative claim amounts constitutes a unilateral modification of the CBAs, which require monthly contributions.

Lastly, contrary to the Debtors' suggestions, there is no assurance that the resolution of the Debtors' section 1113 motion with respect to the IAM will somehow moot the request sought in the Motion.  This is because the CBAs subject to the Debtors' section 1113 motion have been

negotiated by the Debtors and the IAM, and not the IAMNPF, which is only a third party beneficiary.  Martocci Suppl. Decl. ¶¶ 8 and 9;  Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1021 (4th Cir. 1997) ("Because an employer's obligation to a multiemployer plan usually arises through a collective bargaining agreement negotiated and agreed to by the employer and union, the multiemployer plan is, under common law contract principles, a third party beneficiary of the collective bargaining agreement."); Botto v. Friedberg, 568 F. Supp. 1253, 1258 (E.D.N.Y. 1982) ("[D]ecisions to be made in the collective bargaining arena cannot be made by pension fund trustees.").  It is the unions and not the pension funds that are involved in bargaining negotiations over the terms of collective bargaining agreements.  Martocci Suppl. Decl. ¶ 9.  Any suggestion that the Motion will be rendered moot through the resolution of the Debtors' section 1113 motion is speculative, at best.  Id.

E.      **Distinctions Between Single and Multi Employer Defined Benefits Pension Plans.**

In their Omnibus Objection, the Debtors cite cases addressing single-employer defined benefit plans and withdrawal liability and claim that the analysis in the context of multiemployer pension plan "is akin to the decisions addressing whether a debtor is required to make minimum funding contributions that come due post petition for single-employer defined benefit pension plans." See Omnibus Objection at ¶ 25; In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 891 (Bankr. S.D.N.Y. 1993).

The Debtors further state that "Courts in this circuit have held that only the portion of those contributions attributable to post petition services is entitled to an administrative claim." May Trans., 103:2-11.  According to the Debtors, this calculation is done through a proration by calculating the "normal cost."  Id. 103:12-18.  The Debtors acknowledge, however, that "normal

costs" per employer may not be readily ascertainable in the context of multiemployer plans, which by nature have more than one employer and costs are not calculated on an employer-by-employer basis.  Id. 106:9-14.

Simply put, the case law cited by the Debtors is inapposite.  First, the timing and amount of the statutory minimum funding contributions at issue in the cases cited by the Debtors were dictated by statute (and not by a contract based on hours worked).   Second, unlike the contributions at issue in the Motion, the statutory contributions at issue in the cases cited by the Debtors were not solely attributable to post petition work performed by the debtors' employees.  Finally, with respect to single-employer defined benefit plans, administrative expense status is granted to post petition obligations that not only come due but also arise post petition and this may be done through pro ration between pre and post petition services and obligations.  Conversely, with respect to multiemployer defined benefit plans, all obligations due under a CBA on account of employee's post petition services should be entitled to an administrative expense status.

*[remainder of page intentionally left blank]*

## CONCLUSION

For the reasons set forth above, in the Motion and supporting declarations, the IAMNPF respectfully requests entry of an order awarding the IAMNPF an administrative expense status for all delinquent contributions arising after the Petition Date plus accrued interest and immediate payment thereof.

Dated: June 15, 2012

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: _/s/ Sharon L. Levine_

    Sharon L. Levine
    Wojciech F. Jung
    1251 Avenue of the Americas, 17th Floor
    New York, New York 10020
    (212) 262-6700 (Telephone)
    (212) 262-7402 (Facsimile)

    -and-

    65 Livingston Avenue
    Roseland, New Jersey 07068
    (973) 597-2500 (Telephone)
    (973) 597-2400 (Facsimile)

    _Counsel to the I.A.M. National Pension Fund_

**EXHIBIT 1**
[Excerpt of 5/30/12 Transcript]

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 12-22052-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    HOSTESS BRANDS, INC.,

8

9            Debtors.

10

11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    May 30, 2012

18                    10:13 AM

19

20    B E F O R E :

21    HON ROBERT D. DRAIN

22    U.S. BANKRUPTCY JUDGE

23

24

25

### THE BROAD VIEW

The unpublished Montana bankruptcy court decision *In re Blixseth*, No. 10-00088, 2011 WL 3274042 (Bankr. D. Mont. Aug. 1, 2011) viewed *Stern v. Marshall* broadly. The debtor and her ex-husband (the defendant) entered into certain dissolution settlement agreements to divide certain personal and company assets and provide for payment of certain personal and company liabilities. The chapter 7 trustee filed an adversary proceeding against the debtor's ex-husband and certain other parties for the avoidance and recovery of fraudulent transfers pursuant to sections 544 and 548 of the Bankruptcy Code. The trustee in *Blixseth* sought the return of assets transferred from the estate only four months prior to bankruptcy under a dissolution-of-marriage agreement.

The *Blixseth* court unilaterally considered "the impact of new, intervening case law on the constitutionality of this Court's subject matter jurisdiction." *Blixseth*, 2011 WL 3274042, at *10. The *Blixseth* court chose not to read 28 U.S.C. § 157(b)(2)(C) as suggested by the narrow holding in *Stern* and held that fraudulent transfers could only be "adjudicated by an Article III court." *Blixseth*, 2011 WL 3274042, at *10-12.

The *Blixseth* court found that "[s]ince Trustee's fraudulent conveyance claim is essentially a common law claim attempting to augment the estate, does not stem from the bankruptcy itself and would not be resolved in the claims allowance process, it is a private right that must be adjudicated by an Article III court." *Blixseth*, 2011 WL 3274042, at *12. This holding, if adopted by other bankruptcy courts, has the ability to substantially limit the bankruptcy process and tools available for debtors, trustees and other fiducaries.

However, five months later, the *Blixseth* court reviewed its jurisdictional decision and *sua sponte* amended its memorandum decision and order.[1] *In re Blixseth*, 463 B.R. 896, 905

---

[1] The court initially reviewed its decision on a motion for reconsideration filed by the debtor's ex-husband, which was ultimately denied. Such motion did not seek reconsideration of the portion of the decision which held that the bankruptcy court lacked subject matter jurisdiction over the plaintiff's fraudulent conveyance claims. The court reviewed that portion of the decision *sua sponte*.

(Bankr. D. Mont. 2012). "Having now had the benefit of more time to reflect on *Stern v. Marshall*," the court concluded that its August 1, 2011 decision was flawed. *Id.* at 906. Focusing more on the limited holding in *Stern*, and the decisions of numerous other courts applying *Stern* narrowly, the *Blixseth* court determined that *Stern* "does not deprive bankruptcy courts of subject matter jurisdiction" and amended its decision to hold that the bankruptcy court had jurisdiction to enter final judgment on the fraudulent transfer adversary proceeding. *Id.*. at 907.

In *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906 (7th Cir. 2011), the United States Court of Appeals for the Seventh Circuit dismissed an appeal from a final order of the bankruptcy court decided prior to the Supreme Court's decision in *Stern*. Aurora, the defendant in *Ortiz*, was a provider of medical services. Over a five year period, Aurora filed approximately 3,200 proofs of claim in bankruptcy cases in the Eastern District of Wisconsin that allegedly made public medical treatment information about the debtors against whom the claims were filed. *Id.* at 908. Two class action lawsuits were eventually filed against Aurora, one by Ortiz and certain other debtors (the "Ortiz Debtors") in the bankruptcy court and a second in Wisconsin state court by a second pair of debtors, Kathy Bembenek and Susan Dandridge (the "Bembenek Debtors"). Each group based the claims on Wisconsin statutory law that gives individuals a cause of action when their health care information is disclosed without their permission. *Id.* Aurora removed the state court class action to the bankruptcy court.

The Ortiz Debtors asked the bankruptcy court to abstain from hearing the case they had brought in bankruptcy court, while the Bembenek Debtors sought remand to the state court. Aurora filed motions in both cases seeking to have the district court withdraw the reference from the bankruptcy judge. *Id.* at 909. The bankruptcy court denied the abstention and the remand motions, holding that the cases constituted core proceedings because the debtors' claims could only arise in a bankruptcy context and Congress included the allowance or disallowance of claims and counterclaims by the estate against persons filing claims against the estate in its definition of core proceedings. *Id.* The district court then denied Aurora's motions

to withdraw the reference because the debtors' claims were core proceedings involving

counterclaims by the debtors' bankruptcy estate against a claimant. *Id.* at 909-10.

   The bankruptcy court then proceeded to grant summary judgment to Aurora

dismissing the complaints, finding that plaintiffs had not established in the record that they had

suffered any actual damage. *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 430 B.R. 523, 534-

35 (Bankr. E.D. Wis. 2011).  Both sets of debtors and Aurora joined in a motion to allow a direct

appeal to the court of appeals under 28 U.S.C. § 157(d)(2), which both the bankruptcy court and

a panel of the Seventh Circuit approved, thus bringing the matter before the court of appeals.

*Ortiz*, 665 F.3d at 910.

   The Seventh Circuit held that it did not have appellate jurisdiction over the appeal

because, following *Stern*, the bankruptcy court lacked the constitutional authority to enter the

final order it had issued.  *Id.* at 909.  Perhaps the most interesting aspect of the decision,

however, was that the Seventh Circuit, in deciding that the bankruptcy court's final order was

invalid, took a broader view of *Stern* than most courts have.  It held that, even though the matter

was a core proceeding "arising in" a title 11 case, because the matter involved a state law claim

between private parties that did not implicate the "claims allowance process," the bankruptcy

court lacked authority to enter a final order. *Id.* at 914.

   In the case of *Emerald Casino v. Flynn (In Re Emerald Casino, Inc. )*, 467 B.R.

128 (N.D. Ill. 2012), the chapter 7 trustee filed a multitude of counterclaims, including state law

claims for breach of contract and breach of fiduciary duty, in response to proofs of claim filed by

a number of debtors' officers and directors.  After completion of the trial, the defendants moved

to withdraw the reference arguing that the bankruptcy court did not have authority to enter

judgment on account of the trustee's counterclaims.  Following *Ortiz*, the court held that even

though the claims were core, the bankruptcy courts lacked  the authority to enter a final judgment

regarding such claims. *Id.* at 133.  Although noting that some claims may be resolved in the

claims resolution process, the court held that because not all such claims would be resolved in

the claims resolution process, such overlap was not enough to escape the holding in *Stern*. *Id.*

-3-

Thus, notwithstanding the completion of the trial before the bankruptcy court, the district court

withdrew the reference because such withdrawal could, "even at this late stage," eliminate delay

and further cost for the parties, who were anxious for a judgment. *Id.* at 135.

Perhaps correctly, the *Blixseth* court reviewed its analysis of *Stern* and realized

that the Supreme Court's holding in *Stern* was "narrow" and intended to address bankruptcy

court jurisdiction only "in one isolated respect." *Stern*, 131 S.Ct. at 2620.

Read together with the Supreme Court's earlier decision in *Granfinanciera, S.A.

v. Nordberg*, 492 U.S. 33 (1989), it is clear that the Supreme Court's decision in *Stern*

demonstrates that fraudulent transfer actions cannot be finally adjudicated by non-Article III

bankruptcy courts. In *Stern*, the Supreme Court explained that "[w]hen a suit is made of 'the

stuff of the traditional actions at common law tried by the courts at Westminster in 1789 and is

brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests

with Article III judges in Article III courts.'" *Stern*, 131 S. Ct. at 2609 (quoting *Marathon*, 458

U.S. at 90 (Rehnquist, J., concurring in judgment)). Previously, in *Granfinanciera*, the Supreme

Court had stated that "[t]here can be little doubt that fraudulent conveyance actions by

bankruptcy trustees . . . are quintessentially suits at common law." *Granfinanciera*, 492 U.S. at

56. The Supreme Court made clear in *Stern* that fraudulent transfer actions were entitled to the

same Article III protections as the common law counterclaim at issue in that case. Accordingly,

though section 157(b)(1)(H) indicates fraudulent transfer actions are "core proceedings," the

decisions of the Supreme Court compel the conclusion that although bankruptcy courts have the

statutory authority to enter judgment on such actions, they lack the constitutional authority to do

so. *Stern*, 131 S. Ct. at 2601.

1          THE COURT:  So why don't you -- I mean you can

2   sent a draft of the motion to Ms. Lennox and she'll -- you

3   may still get there.

4          MR. KERNBACH:  Okay.  Yeah, that's very well.

5   Without even having to file it I'll put it all together in a

6   motion and a draft, send it up to Jones Day with the

7   attachments, and then they can review it and discuss it

8   among themselves.

9          THE COURT:  Okay.  Very well.

10          MR. KERNBACH:  All right, I think that takes care

11   of for today's purposes the Spreck matters.  May I be

12   excused, Your Honor?

13          THE COURT:  Yes.

14          MR. KERNBACH:  All right, thank you.

15          THE COURT:  Thank you.  Okay.  And then -- well,

16   let's see there a couple other ones.

17          MS. LENNOX:  The next one, Your Honor, is the

18   motion of Ms. Gats for lift stay, and that's adjourned, Your

19   Honor.

20          THE COURT:  Okay.  That's fine.

21          MS. LENNOX:  So now that takes us to the ten

22   motions from the multi-employer pension funds for request

23   for payment of an administrative expense claim.

24      (Pause)

25          MR. BENZIJA:  Good afternoon, Your Honor, Walter

Page 92

1    Benzija of Halperin Battaglia Raicht on behalf of the of the

2    International Union of Operating Engineers and Participating

3    Employers.  With me, Your Honor, in court today is also

4    Mr. Michael Crabtree (ph) who is fund counsel.

5         THE COURT:  Okay.

6         MR. BENZIJA:  Your Honor, Central Pension Fund

7    make this is motion for entry of an order pursuant to

8    section 501(b)(1)(1), 507(a)(2), and 1113(f) to both allow

9    and to compel the payment of post petition pension

10   contributions that are due under various CBAs implicated

11   with the Central Fund's plan.  These involve three locals as

12   we identified in our motion, Your Honor, Local 101, Local

13   399, and Local 627.

14        Pursuant to each of those CBAs there is a

15   requirement that on a monthly basis the debtor report number

16   of hours worked by each of the employees covered under the

17   CBA and that a -- at a specified rate per hour based on

18   those numbers of hours worked that that contribution be paid

19   to the Central Pension Fund.

20        Your Honor, as -- as the Court is very well aware

21   debtor has ceased making the pension contributions --

22        THE COURT:  Well, can I -- can I -- this fund is a

23   green fund?

24        MR. BENZIJA:  That's correct, Your Honor.

25        THE COURT:  So there's no underfunding.

Page 93

1              MR. BENZIJA:  No, Your Honor.

2              THE COURT:  Okay.  All right.  So you can go

3     ahead.

4              MR. BENZIJA:  And to that point the objection

5     that's been raise to do the issue really deals with three

6     distinct issues, as to whether or not those are true post

7     petition pension obligations.  And as we identified in our

8     motion and our supporting declarations, Your Honor, these

9     contributions both for the amount after January 11th through

10    April 30th involve actual hours worked by the employees

11    pursuant to -- and the rates are calculated pursuant to the

12    rates specified in the CBAs, which as of today have not yet

13    been terminated or otherwise modified, Your Honor.

14              The pension obligation does occur and arise during

15    the post petition period.  They are just as instrumental to

16    the employees as their wages are, Your Honor.  It is part of

17    their overall compensation, it is to compensate them for the

18    work that they're actually and currently performing for the

19    debtors, and as far as the Central Pension Fund is

20    concerned, given that they're legitimate post petition

21    obligations, that the employees are in fact being utilized

22    by the debtor, the debtor is receiving 100 percent of the

23    benefit, ergo, the employees should receive at this point

24    100 percent of the compensation that is due to them under

25    the various CBAs that are still currently in effect, Your

Page 94

1    Honor.

2              THE COURT:  Okay.

3              MR. BENZIJA:  As noted as well, Your Honor, the

4    issue of whether or not any of the post petition pension

5    obligations can be attributed to something other than to

6    post petition services as we've noted, Your Honor, the fund

7    itself is considered a green fund, ergo, there is no

8    underfunding issue here, and in any event the way that these

9    contributions are calculated, Your Honor, it makes clear

10   that they're based on the actual hours worked during the

11   specified time period, all of which fall in the post

12   petition period.

13             THE COURT:  Okay.

14             MR. BENZIJA:  And honestly, Your Honor, the last

15   point that we have to highlight is that the debtors to my

16   knowledge have not identified a valid reason for delaying

17   the payment of these contributions.

18             As they are part and parcel of the work that's

19   been performed by the employees currently it is our

20   position, Your Honor, that they be paid on a current basis

21   as many other administrative expenses are as they're

22   incurred in the Chapter 11 process.

23             There is little to justify pushing these payments

24   aside as there are for any other essential payments that are

25   made during the Chapter 11 process, such as payments to

Page 95

1   suppliers, et cetera.  There's nothing to differentiate

2   them.  And as far -- and as the CBAs continue to be in

3   effect they ought to be honored.

4          1113(f) specifies that the debtor shall not

5   unilaterally change or alter any provision of a CBA that has

6   not yet been dealt with under Section 1113.

7          1113(e) permits the debtor to upon good cause

8   shown to seek interim relief if it's necessary.

9          Here, Your Honor, such a motion hasn't been made,

10   we submit that it's not necessary, and the contributions as

11   earned be paid on a timely basis.

12          In our case, Your Honor, the aggregate through

13   April 30th is $180,553.86.

14          THE COURT:  Okay.  Why don't I hear from the

15   debtors on this one first, and then I'll hear from the other

16   objectors.

17          MR. BENZIJA:  Thank you, Your Honor.

18          THE COURT:  I mean the other movants, excuse me.

19          MR. TEELE:  Your Honor, if I might just interject

20   for one second.  For the records --

21          THE COURT:  Can you -- yeah, state who you are.

22          MR. TEELE:  I'm Jason Teele of Lowenstein Sandler,

23   I represent the IAM National Pension Fund.

24          My client is in a substantially similar position

25   as the Central Pension Fund that you just heard from, so I

Page 96

1    don't know if you want to deal with these two together --

2              THE COURT:  No, I'd rather -- I mean yours may be

3    shorter because I --

4              MR. TEELE:  It might well be.

5              THE COURT:  Let me hear from the debtors on this

6    one first.

7              MR. TEELE:  Thank you, Your Honor.

8              THE COURT:  Okay.

9              MS. LENNOX:  Your Honor, the remarks that I

10   prepared are sort of remarks for all of these, so I will be

11   responding to sort of all of the funds.

12             THE COURT:  Okay.  But -- then there is a -- some

13   of the debtor's objection doesn't apply to this fund.

14             MS. LENNOX:  Yes, it -- yes, they do.  I mean the

15   Central Pension Fund, Your Honor, if you're referring to the

16   green status?

17             THE COURT:  Yes.

18             MS. LENNOX:  The green status just means that it's

19   green, it doesn't mean that it's not underfunded at all.  In

20   fact if you look at the latest 5500 from Central Fund I

21   think it shows that it's 72, 73 percent funded.  So it is

22   underfunded.

23             So the arguments that I will make with respect tot

24   all of these funds -- all of the defined benefit MEPs are

25   going to apply to everybody.  I know that the IAM will argue

Page 97

1    that they're fully funded, but I have a concern about that

2    as well.  So --

3                THE COURT:  Okay.

4                MS. LENNOX:  -- I can go through the whole litany

5    of the argument or you can proceed with movants, however you

6    would like to do that, Your Honor.

7                THE COURT:  All right.  Well, I mean, I think I

8    understand the debtor's objection to all of these motions on

9    the basis of the -- what the debtors define as the

10   underfunding contribution portion, and I understand the

11   debtor's position, which I don't think the -- well, no,

12   that's not true -- but I understand the debtor's position

13   that payments attributable to prepetition services should

14   not be treated an as administrative claim.

15               It's not clear to me whether setting aside the

16   under -- the so-called underfunding contribution concept.

17   There's a dispute with the various funds as to whether

18   something is pre or post.

19               The funds all say -- and I'm leaving aside for a

20   second is Baker's issue which is -- where it was -- where

21   there was a withdrawal -- a deemed withdrawal, but for all

22   of those where there is still clearly an ongoing

23   contribution obligation to the Pension Fund is there a

24   dispute separate and apart from the so-called underfunding

25   contribution portion as to what's pre and what's post

Page 98

1  petition with any of these?

2           MS. LENNOX:  Well, there is -- if you're talking

3  about prepetition -- if all you're talking about, Your

4  Honor, is prorating service dates, you know, a mathematical

5  calculation that was performed by Ms. Reed (ph) on service

6  dates.

7           THE COURT:  Right.

8           MS. LENNOX:  There's probably not.

9           THE COURT:  Okay.

10          MS. LENNOX:  But that is only one tiny piece of

11  the argument, and maybe what -- maybe I should go through

12  the argument now as to explain underfunding argument to

13  you --

14          THE COURT:  Okay.

15          MS. LENNOX:  -- and sort where we are and why

16  we've taken the position we are.  So if -- so I'll just go

17  through my remarks, Your Honor.

18          THE COURT:  All right.

19          MS. LENNOX:  But before we do get into argument I

20  did mention the declaration of Lori Reed, who is our vice

21  president of shared services, and she's responsible for

22  overseeing the calculation of the debtor -- of the debtor's

23  pension contributions, and as indicated she performed a

24  simple proration on the January contribution.  We filed her

25  declaration at docket number 1005.

Page 99

1        She intended to be here today, Your Honor, but

2    after several hours in the airport they canceled her flight

3    yesterday and she couldn't get a flight here this morning,

4    but I believe she's on the phone and is available to cross.

5        So we would ask subject to cross-examination that

6    her declaration be admitted.

7        THE COURT:  And this was the declaration submitted

8    with the objection?

9        MS. LENNOX:  Yes, Your Honor.

10        THE COURT:  Is there -- is there any objection to

11    the addition of her declaration?  I think frankly you all

12    base your claims on her declaration, right?  I see people

13    nodding.  So that'll be admitted.

14        (Debtor's Exhibit No. 1 was admitted)

15        MS. LENNOX:  Thank you, Your Honor.

16        THE COURT:  And does anyone want to cross-examine

17    her on her declaration?

18        UNIDENTIFIED SPEAKER:  No, Your Honor.

19        THE COURT:  Okay.  All right.

20        MS. LENNOX:  Okay --

21        THE COURT:  Very well.

22        MS. LENNOX:  -- so Your Honor, I'll just get into

23    it.  And I think in order to understand our position and

24    understand what we're doing in this case is I think sort of

25    have to back up a little bit.

Page 100

1       We started these cases in January with a goal that

2   hasn't changed.  We were going have to either radically

3   modify our business, including our labor cross structure and

4   we'd have a defined amount of time to do it, or we would

5   move down an alternative path of asset sales and

6   liquidation.  And frankly, Your Honor, we are at that

7   inflection point now.  We're going to need a little more

8   time to figure out where these cases are going, because we

9   are in discussions with our lenders and with the IBT, but we

10  are basically at this inflection point.

11      And because we knew we were heading into this

12  process and this was the procedure that we were going to

13  have to follow, we told the Court and we told the parties on

14  day one that we were going to be moving to reject all of our

15  collective bargaining agreements, and we obtained an order a

16  few days later setting forth the schedule to do that.

17      As Your Honor knows we've been through the trial

18  on our motion to object about the BCT and IBT collective

19  bargaining agreements, we have an order authorizing us to

20  reject all eight of the Baker's collective bargaining

21  agreements, and of course the IBT motion was denied without

22  prejudice as Your Honor found that they rejected some of our

23  -- certain aspects, but not all of aspects of our proposal

24  in good faith, and as I mentioned to Your Honor, we are, the

25  debtors, the lenders, and the IBT are in discussions over

1   those aspects and over Your Honor's ruling with respect to

2   the MEPs.  So we do reserve our right to renew our motion or

3   file a new one.

4            With respect to all of our other unions, most of

5   which are the movants here today, we filed our 1113 motion

6   pursuant to Your Honor's scheduling order on April 23rd to

7   reject those agreements.  That's currently scheduled to be

8   heard next week, although I believe we're talking with the

9   parties about adjourning that motion until we see where our

10  IBT talks might take us.

11           And I only recite this, Your Honor, to make it

12  clear that the debtors in this case has been perfectly

13  transparent from the outset about their goals, about what

14  they had to do if these companies were going reorganize and

15  survive, and about our goals with respect to the collective

16  bargaining agreements, including the MEPs, and about the

17  consequences of failing to achieve those goals.

18           So in that respect I do think we distinguish

19  ourselves from the cases cited by the objectors where people

20  just stopped making contributions and they didn't bother to

21  file 1113 motions, they didn't bother to tell anybody what

22  was going on, and for those reasons the Court I think took a

23  dim view of what they had done.  That is not what we've done

24  in these cases.

25           Our main argument, Your Honor, rests on the Second

Page 102

1     Circuit decisions in (indiscernible - 02:04:27) McFarland's

2     (ph), which made it clear that Section 1113(f) of the

3     Bankruptcy Code does not trump the Bankruptcy Code priority

4     scheme.    Just because a payment comes due post petition,

5     even under a collective bargaining agreement, doesn't mean

6     that it's automatically afforded the status of an

7     administrative priority claim.

8               So to obtain that status we need two things.    We

9     need a transaction with the debtor and we need to provide

10    some benefit to the estate.

11              With respect to pension contribution payments,

12    even for pensions required under a collective bargaining

13    agreement in order for post-petition contributions to be

14    afforded administrative claim status they have to relate to

15    post petition services, they have to be for benefits being

16    accrued by an employee post petition, since it's the value

17    of those post petition services and benefits that in turn

18    provide the benefit to the debtor's estate.    And in fact

19    none of the objectors seem to be challenging that basic

20    fact, and they certainly didn't challenge it with respect to

21    the calculations based on service stays, that you could take

22    the January contributions due in February, and we prorated

23    it, we didn't pay the prepetition part of it even though it

24    was due under the collective bargaining agreements, so that

25    basic premise doesn't seem to be anathema to any of the

Page 103

1    movants.

2            And we're arguing, Your Honor, that that same

3    logic should apply if a portion of the contributions that

4    come due post-petition really relate to prepetition

5    services.

6            In the single employee plan context -- and we do

7    have one of those -- there are quarterly minimum funding

8    contributions due, and the Courts in this circuit have held

9    that only the portion of those contributions attributable to

10   post-petition services is entitled to an administrative

11   claim.

12           That post-petition piece in the single employer

13   plan context is usually figured out by calculating the

14   normal cost.  That's the actuarial term used for the value

15   of benefits that are being accrued by participants during

16   the plan year.  So you can therefore prorate a particular

17   funding contribution based on normal cost for pre and post-

18   petition periods.

19           There is no reason that we have been able to find

20   in ERISA or in other law for contributions that are being

21   made to define benefit MEPs as opposed to single employer

22   plans to be treated any differently than contributions to

23   single employer plans.

24           In fact, Your Honor, the MEPs themselves calculate

25   a normal cost, and they disclose it in the Form 550 annual

Page 104

1    reports that they file with the U.S. government every year.

2              We pulled the most recent ones that we could find

3    for each of the movants and we filed a declaration attaching

4    them, and they're publicly filed documents, Your Honor, and

5    we'd ask for that declaration with those 550's to be

6    admitted into evidence.  That's at docket number 1034.

7              THE COURT:  Okay.

8              MS. LENNOX:  Your Honor --

9              THE COURT:  Is there an objection to that?

10             UNIDENTIFIED SPEAKER:  Only to the title of the

11   form, it's Form 5500.

12             MS. LENNOX:  Oh, I'm sorry, that's correct, Your

13   Honor.

14             THE COURT:  Okay.

15             MS. LENNOX:  Little slip of the tongue will.

16             THE COURT:  All right.  All right, and this was --

17   actually it was submitted late yesterday.

18             MS. LENNOX:  It was submitted yesterday afternoon.

19             THE COURT:  It's attached to your declaration.

20             MS. LENNOX:  Correct.

21             THE COURT:  All right.  So I'll admit the forms.

22        (Debtor's Exhibit No. 2 was admitted)

23             MS. LENNOX:  To help illustrate I believe Your

24   Honor has a binder with that declaration.  Generally

25   speaking the MEPs calculation of a normal cost is recorded I

Page 105

1    found in two places.  One, it's set forth in the actuarial

2    status certification, Exhibit 3, which is called the funding

3    standard account projections, and it's also reported also at

4    line 9-B of schedule MB to the 5500.  So that should be the

5    value.  The normal cost that they report should be the value

6    of the benefits accrued by all of the participants in the

7    fund year for the full year.

8              Interestingly, if you read the instructions for

9    filling out a 5500 and its schedule there is are about six

10   or seven different ways to calculate normal costs, and I'll

11   show you where there's a difference in here.

12             So it may be that the Exhibit 3 and line B items

13   are a little different, but the MEPs also list -- before I

14   go into the example, Exhibit 3 to the actuarial status

15   certification also lists administrative expenses for the

16   Fund, that's also listed on Schedule H to the Form 550 (sic)

17   at line 2, (i)(5), and those numbers can differ as well

18   depending on how the instructions say you have to calculate

19   them.

20             And then finally the contributions that a plan

21   receives in the giving year are also listed on Schedule H to

22   the Form 5500 at lines 2-A 1 through 3.

23             So I think one can deduce -- although I'm sure the

24   actuaries will have something to say about it -- that if the

25   reported normal cost, the cost of the accruing benefits for

1    the year is less than the annual contributions, i.e., I'm

2    taking in more contributions than the benefits I'm accruing

3    for the year, if the normal cost is less than the annual

4    contributions then that overage contributions is being used

5    to pay for something, and that something is either going to

6    be the expenses of the plan or it's going to be going to

7    past underfunding for past services.  Just like it works for

8    single employer or defined benefit plans.

9         The tricky thing about a MEP of course is that the

10   normal cost is disclosed for all employers in the MEP, and

11   so we'd have to figure out how much that really would relate

12   to Hostess versus is contribution level, et cetera, et

13   cetera, and this is where I'd like to point out the example,

14   Your Honor, and this is kind of an extreme example.

15        The 5500 filed by the Bakery Drivers Local 33,

16   which is Exhibit C to my declaration, that movant's plan is

17   frozen, which means there are no benefits accruing

18   currently.  None.  And Exhibit 3 to the actuarial status

19   certification for that plan shows -- it's page 5 of the

20   single report -- shows the normal cost of zero.

21        THE COURT:  Well, when you say it's frozen, it's

22   frozen as to all beneficiaries?

23        MS. LENNOX:  That's my understanding from talking

24   with our actuary that it's frozen for all beneficiaries.

25        The normal cost listed on Exhibit 3 is zero.  The

1   normal cost listed on line 9-B is about a hundred some

2   thousand, and then we think that's because you have to put

3   expenses in line 9-B.

4           Similarly -- and we'll get into the -- I don't

5   know if you want to hear the BCT arguments now too -- but

6   our argument to with the BCT is we have no pension benefits

7   accruing for our BCT employees.  The BCT fund terminated the

8   accrual of benefits for our employees last December.  The

9   normal cost to that -- for those guys are going to be zero.

10          So the argument that we're making -- and it would

11  hold true with the other -- if you look at the normal cost

12  for the funds and you look at the annual contributions made,

13  if there's a difference between current benefits that are

14  accruing for the year, current benefits that our employees

15  would be accruing post petition and the contribution level

16  is higher than that, those contributions are going to

17  something.

18          So the argument that is made by the BCT and the

19  RWDSU and others that -- and they make this argument -- that

20  in exchange for the monthly contribution Hostess employees

21  earn an hour of pension credit attributable exclusively to

22  the contributions made for each hour worked in that month

23  can't be true --

24          THE COURT:  Well --

25          MS. LENNOX:  -- if they're not accruing any

Page 108

1    benefits.

2                THE COURT:  -- you said that the plan is quote

3    "frozen."

4                MS. LENNOX:  Uh-huh.

5                THE COURT:  What is the -- is there a more legal

6    description of that?

7                MS. LENNOX:  No, I think that's the generally

8    described ERISA plan as a -- meaning -- my understanding,

9    and it's true in the single employer context too, is when

10   you freeze a plan it means that the benefit levels are set.

11   There are no additional benefits accruing in the plan.  And

12   so any payments that are continued to be made to the plan

13   are going for something else.  They're going to pay for all

14   of the benefits that have accrued up until that time.

15               THE COURT:  Well, there are new -- there are new

16   workers who are -- let's say Hostess hires -- let's take it

17   out of the context of having been deemed to have withdrawn

18   from the -- let's use a hypothetical example of, you know,

19   Midwest pension plan.  Hostess hires a new worker who is

20   covered by this hypothetical union, Midwest CBA, they have a

21   MEP, that worker is in the MEP now as a beneficiary, he or

22   she is accruing a benefit isn't she?

23               MS. LENNOX:  If the plan is not frozen.

24               THE COURT:  Sorry?

25               MS. LENNOX:  If the plan is not frozen they will.

Page 109

1          THE COURT:  But if it's frozen that person doesn't

2     -- doesn't -- then it's not in the plan?

3          MS. LENNOX:  I --

4          THE COURT:  She's not in the plan at all?

5          MS. LENNOX:  -- I'm not sure why you'd hire a new

6     person and put them in a plan where no new benefits are

7     accruing.

8          THE COURT:  Well, that's why I'm trying to figure

9     out what it means to be frozen.

10         MS. LENNOX:  Well --

11         THE COURT:  I may it may mean that the benefits

12    are fixed at a certain level, so she's still getting an

13    accrual of whatever it is, you know, $50 a month accrued

14    benefit.  So it's not increasing, but it's just at a fixed

15    amount.

16         MS. LENNOX:  Normally when you have -- normally

17    when you freeze a plan, Your Honor, you create a different

18    plan for new employees --

19         THE COURT:  Okay.

20         MS. LENNOX:  -- because you don't put them in into

21    the frozen plan.

22         THE COURT:  All right.  So you say my hypothetical

23    wouldn't work because there wouldn't really -- she wouldn't

24    really be entitled to be in that frozen plan.

25         MS. LENNOX:  Right.  She'd go in -- right, it's my

Page 110

1    understanding they'd go into a new plan.  Normally when I've

2    dealt with clients where they've frozen a plan and they have

3    a new -- they have to put in a new plan --

4         THE COURT:  Okay.

5         MS. LENNOX:  -- for future benefits.

6         So -- so that leaves with what's really accruing

7    for our own employees?  And in some cases their continuing

8    to accrue benefits, but if they're accruing benefits at a

9    rate that is lower than the contribution levels that we're

10   supposed to make then --

11        THE COURT:  They're just paying for the

12   prepetition benefit.

13        MS. LENNOX:  Exactly.

14        Moreover, Your Honor, the contribution levels can

15   be reset either by changes to the CDA or by plan trustees or

16   actuaries as they evaluate it each year, or significantly

17   they can be required under the Pension Protection Act for --

18   at least for plans in critical status.  The Pension

19   Protection Act now requires a surcharge for critical status

20   plans to shore up the underfunding, and that would be paid

21   as part of a monthly contribution.

22        So these contribution levels can be raised, they

23   can be lowered, or they can remain static, but if they're

24   more than the amount of the benefits that are currently

25   accruing to our employees then they're going to pay for

Page 111

1   something else.  Either administrative expenses or for past

2   underfunding.

3          So regardless of how they're calculated, and there

4   had to be a calculation methodology, they had to figure out,

5   well -- they could have said you're going to put in a flat

6   $100 a month.  They basically said, okay, the calculation

7   methodology is going to be on hours worked.  But the

8   calculation methodology doesn't matter, what matters is what

9   is the level of contributions actually being used for?

10         Some of the MEPs like the Central Fund argue that

11  because they're in the green MEPs this analysis doesn't

12  apply to them, but in fact just because they're in the green

13  zone doesn't mean that they're not underfunded, but they're

14  -- I mean in fact, as I indicated, we think the central

15  states -- or the Central Pension Fund based on, you know,

16  the latest 5500 we've been able to pull up is about 73

17  percent funded.

18         Now the IAM, they're just not as underfunded as

19  those and in danger to critical status.  The IAM contends

20  that its MEP is fully funded, in fact it contends that it's

21  over funded.  But, Your Honor, if you looked at the first

22  page of Exhibit A to the declaration of Philip Mellow (ph)

23  that the IAM filed at docket number 983 -- I have a copy if

24  I may approach?

25         THE COURT:  Sure.

Page 112

1          MS. LENNOX:  If you look at the first page of

2     Exhibit A, Your Honor, that's the annual funding notice.

3          THE COURT:  Right.

4          MS. LENNOX:  The IAM National Pension Fund values

5     its assets on what's called an actuarial value basis.  I'm

6     not exactly sure what that is, but the actuaries will know.

7     And that's what's reported in that little chart, that shows

8     for 2011, 106 percent funding level.

9          If you look however at the next column they report

10    the fair market value of the assets, which is normally how

11    we value things in bankruptcy, and if you look at the fair

12    market value of the assets, the fair market value of the

13    assets as of the end of -- as of December 30th -- let's look

14    at December 30th, 2010, which the value was 8.4 million.

15    The liabilities one day later as of January 1, 2011 are

16    9.2 billion.  That's an 800 million underfunding on a fair

17    market value basis.

18          So regardless of this, the point that we're trying

19    to make here, Your Honor, is that for defined benefit MEPs

20    both the movants and the debtors have some work to do to

21    figure out how much of the monthly post-petition

22    contributions really are attributable to benefits, are

23    funded are these plans.  I mean there's an analysis that we

24    think has to be done.

25          Your Honor, I can go through the BCT argument now

Page 113

1    or I could wait till they present their papers.

2           THE COURT:  Well, no, before you turn to that I

3    think what the plans would say in response is that these

4    payments are -- are for their post-petition work, even

5    though the plan may allocate it to prepetition funding

6    obligations.  It's for their post-petition work.

7           MS. LENNOX:  And that's -- that's --

8           THE COURT:  Let me --

9           MS. LENNOX:  Sorry.

10          THE COURT:  -- see if this analogy works.  Let's

11   assume that employee X doesn't -- isn't a beneficiary or

12   participant in a multi-employer pension plan, but instead

13   has his or her own set aside pension plan, they set aside

14   funding every -- every month for their retirement.

15          MS. LENNOX:  Uh-huh.

16          THE COURT:  So she gets $500 per week and she sets

17   aside 200 of that into the pension plan -- her own pension

18   plan.  And it may be that some of that 200 is making up for

19   bad investments that happened last year, but it's still $200

20   of her pay that she got for last week's work.

21          MS. LENNOX:  I think what you're describing, Your

22   Honor, is a defined contribution plan.

23          THE COURT:  Okay.

24          MS. LENNOX:  And they're different.

25          THE COURT:  But --

Page 114

1                MS. LENNOX:  And we have two events that are --

2                THE COURT:  -- but it's still --

3                MS. LENNOX:  -- that are defined contribution

4       plans and they're different and we admit they're different.

5                THE COURT:  But as far as the pre or post

6       distinction is concerned, does it -- I mean why should the

7       fact that she's allocating 200 million -- $200 of her weekly

8       salary to a pension plan, change it from being her weekly

9       salary?

10               MS. LENNOX:  Because it's based on what is the

11      contribution being used for, and that's where the difference

12      in the plan matters.

13               When you have a defined benefit plan you've got a

14      promise that you're going get this particular pension

15      payment out in the future no matter what, there's a promise

16      to be made.  You don't have that with a DC plan.

17               And so when you're taking money -- when -- by the

18      way, we're not taking money out of anybody's paycheck,

19      that's -- that's a red herring.  This is a simple

20      calculation that says the debtors are required to

21      contribute, and that's why I'm saying this is puerile a

22      methodology to calculate what your contribution is going to

23      be.  It's not like we're taking money out of Joe's paycheck,

24      okay, and remitting it.

25               THE COURT:  Right.

Page 115

1          MS. LENNOX:  What we're saying is if Joe works 40

2     hours then we're going to make a -- you know, that times

3     $1.50 and we're going to make that.  It is a methodology to

4     establish what you're funding contribution is going to be.

5     There's a different methodology used in single employer

6     plans, but there has to be a methodology for how much

7     someone is going to contribute.  And the issue is, what are

8     you contributing it for?

9          In a DC plan you put your contributions in and you

10    take it out of your paycheck or the employer puts their part

11    of the contribution in and you get what you get at the end

12    of the day.  Your contributions go in, your investments go

13    up or down, and you get what you get, and if you have

14    nothing then you have nothing.

15         But a DB plan is different and that's why they're

16    regulated and protected so much more, is because there's a

17    promise at the end of the day that these people are going to

18    get something, and that's why there's the concept of

19    underfunding in defined benefit plans that you don't have in

20    a DC plan, because there's a benefit -- there's a promise

21    and there are liabilities and you got to be able to meet it.

22         THE COURT:  Okay.  So you're saying consistent

23    with McFarland's that a chunk of this money is really going

24    to pay benefits that are already earned prepetition.

25         MS. LENNOX:  Yes, exactly.

Page 116

1          THE COURT:  They're not there anymore, but they're

2   already earned.

3          MS. LENNOX:  That's exactly right.  Well, they

4   are, because even for plans that are frozen these people are

5   going to get a pension, it's just they're not accruing new

6   benefits.  They're there, they're going to get a pension.

7   These people are going to get a pension from DB plans.

8          THE COURT:  So in essence you're saying this is

9   like paying withdrawal liability, it's just -- it's for a --

10  an underfunded portion of the plan.

11         MS. LENNOX:  It -- well, withdrawal liability

12  basically if you read the cases, with what the Courts,

13  including McFarland's has said about withdrawal liability,

14  it's basically -- it's a debt that would normally be

15  financed over time with these contributions.  So yeah,

16  there's a part of it that's going to pay for the

17  underfunding.

18         THE COURT:  Okay.  So you were going to go to the

19  -- this unique issue for the Baker's union, which is that in

20  December they --

21         MS. LENNOX:  Right.

22         THE COURT:  -- they deemed the debtor to have

23  withdrawn from the plan.

24         MS. LENNOX:  Right.  So -- so as we set forth in

25  our objection they assessed withdrawal liability last

Page 117

1   December, they terminated our participation in the plan last

2   December, they also informed our BCT represented employees

3   by a letter dated November 25th, 2001 that their benefits

4   will cease accruing -- new benefits will not accrue after

5   December 10th, 2011.

6           THE COURT:  That's the November -- the November

7   letter says that, right?

8           MS. LENNOX:  The November 25th letter says that.

9           THE COURT:  All right.

10          MS. LENNOX:  And that was attached as exhibit I

11  believe D to the proofs claim that we filed.

12          THE COURT:  Right.

13          MS. LENNOX:  So our argument, Your Honor, that in

14  order to assess withdrawal liability the fund trustee's net

15  had to determine that they had -- the debtors had

16  permanently ceased our obligations to contribute.

17          In Section A of the reply the BCT arguing that our

18  reasoning was faulty when we alleged that, and they argue in

19  essence that our ceasing to have an obligation to contribute

20  is not the only basis for the plan trustees to terminate the

21  employer, and then they point to the trust agreement.

22          So I'd like to talk about that, Your Honor, if I

23  may.  The union --

24          THE COURT:  But they did -- well, okay, go ahead,

25  that's fine.

Page 118

1          MS. LENNOX:  The union is trying to make a

2     distinction, we think, Your Honor, by arguing this -- that a

3     distinction that under ERISA doesn't exist.

4          As we noted in our previous filings with the Court

5     on withdrawal liability a complete withdrawal from a plan

6     occurs where the employer permanently ceases to have an

7     obligation to contribute to the fund, and ERISA doesn't

8     define permanent, so the Courts require the fund to make a

9     reasonable determination that the cessation of payments is

10    going to be more than temporary, and that's what happened

11    here, that the fund determined that.

12         The trust agreement language is really just

13    another way of saying that the trustees have determined that

14    an employer has permanently ceased contributing, it doesn't

15    provide an independent or an alternative basis for expelling

16    Hostess.

17         What they -- when they do expel us, Your Honor,

18    cases have held that it does qualify as a complete

19    withdrawal under ERISA Section 4203(a), and a permanent

20    cessation of an obligation to contribute to the fund.  In

21    fact the cases that the BTC cites in paragraph 8 of its

22    reply support that argument.  That's exactly what they held.

23    The (indiscernible - 02:27:25) Ford Transfer Company case,

24    they determined that quote, "An expulsion of an employer

25    should therefore qualify as a complete withdrawal of the

Page 119

1    plan."

2              Moreover --

3              THE COURT:  They say that -- well, they say two

4    things.  One is that the -- that the notice was without

5    prejudice to the union's rights under its --

6              MS. LENNOX:  So let's talk about that.

7              THE COURT:  -- under its CBA, and second that they

8    would -- they would reinstate Hostess in a heartbeat if it

9    was going to make the contributions.

10             MS. LENNOX:  That may be a convenient argument,

11   Your Honor, but I don't think given the fact that we have an

12   order rejecting -- authorizing us to reject CBAs, and we've

13   been very clear about that, there's an offer to reinstate if

14   we choose.  That's not going to happen in this case, and

15   they know that.  So I think that's sort of --

16             THE COURT:  So let's --

17             MS. LENNOX:  -- you know, sleeves off our vest.

18             THE COURT:  So let's go to the first point, which

19   is they say --

20             MS. LENNOX:  Yes, let's --

21             THE COURT:  -- that the termination was without

22   prejudice to the union.

23             MS. LENNOX:  Right.  So let's address that.

24             The B&C fund agreement and declaration agreement

25   of trust, which is their trust agreement, is incorporated by

Page 120

1    reference into the BCT's CBAs, it's in the pension portion

2    of the CBAs, and so it's actually part of the CBA.  That

3    agreement was attached I believe as Exhibit A to the B&C

4    proof of claim that they filed that we attached.  And if I

5    may approach.

6             THE COURT:  Well, I think I have it, but if you

7    could -- I mean it's a long exhibit, so if you have the --

8             MS. LENNOX:  I do.

9             THE COURT:  -- relevant section marked that'd be

10   great.

11            MS. LENNOX:  I do, Your Honor.

12            So Article 5, Section 2 of that trust agreement

13   says "that all contributions shall continue to be paid as

14   long as the employer" -- which is a defined term -- "is so

15   obligated under the collective bargaining agreement, or

16   until he ceases to be an employer" -- defined term --

17   "within the means of this agreement."  So if you cease to be

18   an employer you don't have to contribute.

19            Article 12, Section 1 of that trust agreement then

20   goes on to say "that an employer shall cease to be an

21   employer within the meaning of this agreement when as

22   determined by the trustees when he is delinquent in his

23   contributions or reports to the pension fund."

24            Our trustees made that determination, Your Honor,

25   when they terminated our participation in the fund, and this

Page 121

1    agreement is part of our CBAs.

2          Also, and we've cited this -- is in -- is in our

3    objection to -- in our -- as Exhibit A to our objection, all

4    of the BCT CBAs say, with one exception where it's silent,

5    that the contributions were to be made to the fund and no

6    one else.  The fund has told us we don't have an obligation

7    to contribute.

8          So we think what the BCT is asking us to do is pay

9    the prepetition claims of the BCT fund.  Our employees are

10   no longer accruing benefits.  If the debtors were to pay

11   contributions now, it would only be -- go to un-

12   prepetitioned liabilities or prepetition underfunding.  The

13   Second Circuit has told us that we're not supposed to pay

14   prepetition claims.

15         But even if we did have an obligation to pay, even

16   if -- even if this didn't cut off our obligation to pay,

17   those obligations are prepetition claims and the Second

18   Circuit says you don't pay those.  1113(f) does not require

19   you to pay those.

20         The BCT does suggest that there are ways of

21   fashioning a remedy, like we could put the money into a

22   401(k) or maybe we could use it as severance or whatever,

23   those are all worthy of consideration, Your Honor, but our

24   current agreement doesn't say that and would require us to

25   get back to the bargaining table to do that, which we're

Page 122

1   willing to do, but I think people are waiting to see what

2   happens with the IBT.

3        So that is our position on the BCT.

4        And that sort of brings us full circle, Your

5   Honor.  We're not done with our 1113 processes yet for all

6   the unions other than the BCT.  And what we do with the MEPs

7   and their claims are going to be affected by that outcome,

8   whether it's judicially ordered or whether it's consensually

9   resolved.  Actually, what we do in these cases, Your Honor,

10  is going to be determined by that outcome.

11       And so before the Court would order payment of

12  what we would consider to be true administrative claims,

13  which as we've said before, we think we need a process to

14  determine what those amounts really are, we ought to see

15  where these cases are headed and see if they can be resolved

16  as part of those proceedings.

17       I think these are unique cases, Your Honor.  I

18  can't say that I've ever seen the likes of these, even from

19  the way we started it.  We've always tried to do what's

20  right with our resources in light of our uncertainty and

21  we've been transparent about doing that.  We do think that

22  there are very significant factual issues.  I realize that

23  this may be an argument of first impression in the context

24  of the MEPs, but it's not an irrational one.  It has basis

25  in ERISA.  It has basis in Second Circuit law.  I don't

Page 123

1    think anybody's made it before.

2            But we do think that it raises factual issues with

3    respect to the portions of the DB contributions that really

4    are post-petition, and we would ask the Court to go through

5    a process so we can try to figure out what that is.

6            THE COURT:  Okay.

7            MR. FREUND:  Good afternoon, Your Honor.  Jeffrey

8    Freund for the BCTGM.

9            There are two issues that relate to our claim and,

10   obviously, Ms. Lennox has -- has addressed them both.  One

11   of those two issues is applicable to all of the claims, and

12   that is the argument that some portion of contributions that

13   are due for work performed post-petition are somehow

14   magically attributable to prepetition work performed by

15   employees of Hostess.

16           I think it's fair to say that we understood and

17   anticipated that argument in our reply, and meaning no

18   disrespect to the other replies by the other funds, our

19   reply brief took that on directly.

20           THE COURT:  When you -- when you distinguish MEPs

21   from single --

22           MR. FREUND:  Exactly -- exactly right.

23           And the distinguishment is a distinguishment with

24   a difference, not without a difference.  And so while I

25   don't -- I'm not intending to necessarily have the remarks

Page 124

1   that I'm making applicable to the other funds that have

2   filed claims on this issue, and while it's conceivable that

3   they would not endorse our view.  I think that what we have

4   said accurately describes Hostess's argument and accurately

5   dismembers it.

6           Before I go to that point, I -- I want to make one

7   point fundamentally clear because it goes to our first

8   point, but I want to make sure Your Honor understands who

9   you're talking to when you see me at the podium.

10          THE COURT:  Well, you're not -- this is the union

11  speaking, not the fund, right?

12          MR. FREUND:  This is the union --

13          THE COURT:  Unlike -- unlike the other movants,

14  which are funds.

15          MR. FREUND:  This is the union speaking, not the

16  fund.  That's exactly right.

17          So -- and that will eventually come back when I

18  talk to you about the termination by the --

19          THE COURT:  Well, can I --

20          MR. FREUND:  -- of the fund.

21          THE COURT:  I -- I understand your argument on the

22  accounting, I guess that's the only way to describe it,

23  under ERISA for the annual funding for single employee

24  claims that you describe at paragraph 27, 28 of the reply.

25          MR. FREUND:  Correct.

1          THE COURT:  And then you say, "In contract, the

2    single employer funds, multi-employer funds are not subject

3    to this funding approach and require only one type of

4    payment."

5          But Ms. Lennox's point is even though it only

6    requires one type of payment, that payment has subsumed

7    within it the same elements, although it's not broken out

8    that way; that is, the single employer analysis.  Some

9    portion is to deal with unfunded liability.

10         MR. FREUND:  I would say that's -- (a) it's not

11   accurate and, (b) in any event, the regime is so markedly

12   different in the single employer plan cases which are the

13   only cases, the only cases that Hostess has relied on so as

14   to make the comparison totally inapposite.

15         A single-employer plan, and it may be that Hostess

16   has one out there.  I didn't necessarily understand that --

17   that to be the case.  But as a general matter, a single

18   employer plan, the employer is making no contributions that

19   are measured in any way by any formula which attributes a

20   dollar amount to an hour of work performed.

21         What happens in a single employer plan is that the

22   employer has -- has made through the plan a promise to

23   provide a particular level of benefits, and each year that

24   employer has to make contributions into the fund sufficient

25   to cover -- sufficient so that at the end of the day the

Page 126

1    fund will be able to provide the new benefits that have been

2    -- have accrued during that year and the new accruals that

3    have accrued during the course of that year, and sufficient

4    to make certain that all of the contributions that it had

5    made previously, which -- each of which was intended to

6    cover the full amount of the accruals in any particular year

7    were, in fact, sufficient collectively so as to bring the

8    fund into a status so that it could pay all of the benefits

9    that had previously been accrued.

10            That may mean that in any given year for a single

11   employer plan -- let me take one step back.  Essentially,

12   that creates two different kinds of contribution pots;

13   again, none of which -- none of which are measured by the

14   hours worked by employees, none of which are measured by a

15   formula attached to those hours.

16            None -- the first pot of that money is money that

17   has to be paid in order to make sure that the new accruals

18   are covered, and then the second pot of money, although it's

19   not two checks, the second pot of money is a pot of money

20   necessary to make sure that everything they did up to that

21   point has been covered.

22            Now things happen in the world with respect to

23   single employer plans that affect on a year to year basis

24   what either or both of those pots of money might turn out to

25   be.  Investment returns are better than expected.

Page 127

1    Investment returns are worse than expected.  Employees

2    retire sooner than expected.  Employees retire later than

3    expected.  Employees die sooner or retirees die sooner than

4    the actuarial tables would otherwise anticipate.  Employees

5    die or retirees die after the actuarial tables would

6    normally have anticipated.

7            New employees come into the plan at a rate

8    different than was expected either greater -- to a greater

9    extent or to a lesser extent.  And all of that will affect

10   the lump sum dollars that have to get paid by the single

11   employer into the single employer plan.  And it may be that

12   in any given year, because of the confluence of all of those

13   events, the employer will pay nothing into the plan, either

14   for the new accruals or to -- to fund the past accruals that

15   had ostensively been previously funded.

16           It may be that the employer needs to put no money

17   in in order to fund the new accruals, but has to put money

18   in to fund the past accruals.  It may be the reverse.

19   That's all done pursuant to very -- very defined provisions

20   in ERISA, all of which were the subject of litigation in the

21   four cases, the only four cases that the debtor has brought

22   to the Court's attention.

23           And in each of those cases, what was -- what was

24   at stake was the PBGC's claim for the precise calculation

25   from the year's post -- from the year's post-petition that

Page 128

1   were attributable -- that was attributable to the specific

2   calculation necessary to determine the amount of money that

3   that employer would have had to put into -- into the fund in

4   order to make up for past accruals.

5          That structure -- and -- and -- and I repeat, that

6   Hostess has cited not a single case in the multi-employer

7   universe in which this analysis has -- has occurred, in

8   which this analysis has taken place despite the fact that

9   there have been -- I think we can sort of take judicial and

10  real world notice of the fact that there have been

11  bankruptcies in cases where there are multi-employer plans

12  in place and where the issue of the administrative treatment

13  of post-petition contribution obligations has been

14  litigated.  You had one yourself in -- in AC Elevator.

15         THE COURT:  Well, this issue has never been

16  decided in -- in your client's favor either.

17         MR. FREUND:  Well, no one --  it has never been

18  decided because no one has ever thought that there was the

19  hint of an issue.

20         THE COURT:  But you were -- you were -- you were

21  in the process of explaining to me why a MEP is different in

22  terms of what the contribution is for.

23         MR. FREUND:  Well, none -- none of the mathematics

24  that I just described to you and none of the funding

25  structure that I just described to you with respect to a

1    single employer plan is applicable to a multi-employer plan.

2    A multi-employer plan does the following.  A multi-employer

3    plan, as -- as Ms. Lennox says, creates -- and as our -- the

4    declaration of Mr. Brock describes, the multi-employer plan

5    sets out, or at least our multi-employer plan, the multi-

6    employer plan to which my union negotiate -- as to which my

7    union negotiates contributions.

8            The -- a multi-employer plan creates a menu of

9    benefits; that is, a certain degree of pension benefit

10   levels that the employer and the union can negotiate as part

11   of their collective bargaining agreement and can buy with

12   dollars that they agree to contribute to the fund.  That

13   amount of money, that menu of benefits in the example that's

14   contained in Mr. Brock's declaration, a $1,300 a month

15   pension benefit, that pension benefit is purchased by the

16   bargaining parties -- the union and the employer -- through

17   an agreement to pay $2.46 an hour for every hour worked by

18   an employee during the course of a year.

19           And if an employee works a sufficient number of

20   hours as to which that $2.46 contribution is made, then the

21   employee will -- and in the B&C fund's case it's 1,500 hours

22   -- that employee will have credited to his account twelve

23   months, one year's worth, of pension service credit.  If for

24   one reason or another, the employer works fewer than 1,500

25   hours in the course of a year, pursuant to a table that sets

Page 130

1  out the number of hours of pension credit that would be

2  earned, the employee earns a fewer -- fewer numbers of

3  months of pension credit.

4          And all of those months of pension credit, when he

5  or she retires, that he or she has earned by reason of the

6  negotiated, fixed amount, not fluctuating, negotiated fixed

7  amount of contributions gets added up to determine how many

8  years of credit its service the employee has for purposes of

9  obtaining a benefit, and then he gets the benefit that was

10 promised.

11         Nothing about Hostess's contributions in that

12 respect resembles in any way the funding structure of a

13 single employer plan.

14         THE COURT:  Well, it doesn't -- it doesn't meet

15 the funding structure, but it is intended to obtain an

16 earned benefit, right?

17         MR. FREUND:  It's -- it's intended to obtain the

18 benefit that Mr. Jones, in the example that we used in our

19 -- in our -- in the declaration in our brief is intended to

20 obtain the benefit that Mr. Jones' earns for working one

21 hour post-petition, having $2.46 paid on his behalf.

22         THE COURT:  Right.  But if it's -- if it -- if it

23 is -- and that's to get him $1,300 a month.

24         MR. FREUND:  $1,300 -- if -- if he --

25         THE COURT:  If he works for --

Page 131

1          MR. FREUND:  Yes.  If he has a -- if he has a

2    sufficient number of earned credits.

3          THE COURT:  So if that $1,300 is already fixed and

4    there's not sufficient money in the plan to pay it, why

5    isn't this like withdrawal liability except to the

6    individual?

7          MR. FREUND:  I'm not sure I understand --

8          THE COURT:  I mean, in McFarland's -- in

9    McFarland's there was a specific withdrawal liability.

10         MR. FREUND:  And McFarland's was about withdrawal

11   liability.

12         THE COURT:  Right.

13         MR. FREUND:  And withdraw -- withdrawal liability,

14   again, I think there's some confusion on the part of what

15   withdrawal liability is.  Withdrawal liability is intended

16   to cover the employer's share of unfunded obligations --

17         THE COURT:  Right.

18         MR. FREUND:  -- up to the point of withdrawal.

19         THE COURT:  Right.  Okay.

20         MR. FREUND:  That's not what's at stake when we're

21   talking about ongoing contributions.  Ongoing contributions

22   are intended to be my -- create my benefit, Mr. Jones's

23   benefit --

24         THE COURT:  No.  I understand.  But let -- let's

25   assume for the moment that -- that Jones retires after

Page 132

1   having worked 25 years and he says he's entitled to $1,300 a

2   month, and it's not there.  When does his claim arise, pre

3   or post-petition?  It's pre, right?

4          MR. FREUND:  I -- when did Jones retire?  I mean,

5   what -- what's --

6          THE COURT:  Well, let's assume --

7          MR. FREUND:  -- what state of the --

8          THE COURT:  Yeah.  Let's assume he retires post-

9   petition --

10         MR. FREUND:  Right.

11         THE COURT:  -- but he retires -- he worked 25

12  years and he worked one year post-petition.

13         MR. FREUND:  All right.  Well, first of all, the

14  fund isn't -- the fund isn't --

15         THE COURT:  Isn't the debtor --

16         MR. FREUND:  The fund it's the -- the fund isn't

17  the debtor.

18         THE COURT:  I understand.  But the -- but the

19  obligation -- the obligation is a prepetition obligation,

20  right?

21         MR. FREUND:  No.  The --

22         THE COURT:  The debt -- the debt that is owed is

23  -- is 24, 25th's prepetition.

24         MR. FREUND:  But the only obligation that's at

25  stake in this proceeding is the obligation to make a payment

post-petition --

THE COURT: Right. But what is that --

MR. FREUND: -- for Mr. Jones's benefit.

THE COURT: But what is that for? Is that for a post-petition amount that --

MR. FREUND: That's to give him -- that's to give him an accrual. That's to give him an accrual of an hour's worth of credit towards his 1,500 hours of credit that for that -- for that year so that he will get a full year's worth of pension credit or less if it -- it turns out that he works less than a full year. But that's -- it's linked to his -- it's linked to his accrual of his pension benefit attributable to that hour worked. It's not linked to anything else. It's linked to that. That payment isn't made. That payment isn't made or he doesn't work that hour. He doesn't get a pension credit for having worked that hour.

THE COURT: Okay.

MR. FREUND: And -- and, again, that's why -- that's why the whole analysis that's contained in Hostess's brief is totally faulty. It has nothing to do with this structure.

The -- to make the point -- to make the point even clearer in two other respects, and we said this in our brief and we said this in our declaration, the $2.46 contribution rate that was set forth at the $1,300 benefit level or

Page 134

1    whatever the contribution rate is in that menu of benefits

2    for any other contribution -- for any other benefit level

3    with the party -- the bargaining parties might choose to

4    bargain for, that hasn't changed since 1991.

5            THE COURT:  No.  I -- I understand that.  But

6    let's -- let's go back to the single employer plan context.

7    If Jones is a beneficiary of a single employer pension plan

8    that his CBA requires the employer to pay, and $2.60 of his

9    compensation is to go into that plan, the cases say that the

10   debtor doesn't owe the whole 2.60 as a post-petition claim.

11   It only owes the portion of it that's attributable to the

12   post-petition obligation.

13           MR. FREUND:  But that's -- again, that's because

14   the funding structure and the mechanics of the plan are

15   entirely different.

16           THE COURT:  Well, it's -- but -- but the -- it's

17   easy -- it may be easier to quantify because there's --

18   they've broken out these two components.  But -- but it --

19   doesn't it stand to reason that a component of either type

20   of plan includes the underfunding part?

21           MR. FREUND:  I don't think it stands to reason --

22   it stands to reason at all.

23           THE COURT:  But isn't that how -- I mean, so

24   they're just ignoring the underfunding and they're just

25   paying current liabilities in the MEPs?

Page 135

1                MR. FREUND:  They're paying -- they're paying --

2                THE COURT:  Isn't it -- isn't it just the

3     opposite; that they've frozen the MEPs because all they're

4     doing with it is the underfunding and not the --

5                MR. FREUND:  No.  I --

6                THE COURT:  -- current amounts?

7                MR. FREUND:  The B&C fund is not frozen.

8                THE COURT:  Well, all right.  But --

9                MR. FREUND:  The B&C fund is not frozen.  The B&C

10    fund continues to exist.  You know, it's a multi-billion-

11    dollar fund.

12                THE COURT:  Well, no, I -- I -- that's why I was

13    pressing Ms. Lennox on this.  Yes, it continues to exist,

14    but her answer was the benefit levels are all now to -- to

15    -- are frozen and it's all but paid the --

16                MR. FREUND:  No, but --

17                THE COURT:  -- the underfunding.  That's what all

18    the contributions are for.

19                MR. FREUND:  Ms. Lennox got it close to being

20    right.  With respect to a frozen plan -- and, again, the B&C

21    fund is not a frozen plan.  A frozen plan provides for the

22    following, and -- and maybe some of our plans, if there are

23    any here today who are frozen can speak to it more directly.

24    Frozen plan simply means that while an employer is going to

25    continue to have a contribution obligation, employees in

Page 136

1   that plan, all of the employees covered by that plan, no

2   linger continue to accrue benefits.  They -- they have --

3   they have benefits --

4           THE COURT:  Well, okay.

5           MR. FREUND:  -- that have already accrued and are

6   -- are invested or not invested.

7           THE COURT:  So, again, they've already accrued so

8   why isn't that, to me, again, like McFarland's where the

9   Court said the employer's lump sum payment in satisfaction

10  of this withdrawal liability, and here's the key language,

11  "is made to guarantee pension benefits already earned by

12  those employees covered by the plan"?

13          MR. FREUND:  Well, you know, I can't speak -- and

14  I'm not purporting to speak for either any unions or any

15  funds who are frozen.

16          THE COURT:  Right.

17          MR. FREUND:  The B&C fund is not frozen.  It is a

18  -- it's an organic living ongoing entity that continues to

19  exist for thousands and thousands of employees because it's

20  a multi-employer plan all over the country.

21          THE COURT:  But it's just -- but is it just -- but

22  -- but those beneficiaries, are they earning in that plan

23  any new benefits --

24          MR. FREUND:  Absolutely.

25          THE COURT:  -- or are they just earning their old

1    benefits?

2         MR. FREUND:  No.  They're earning every -- every

3    hour they work they are earning new benefits.  That's the

4    difference between a frozen plan and a non-frozen plan, and

5    the B --

6         THE COURT:  Okay.

7         MR. FREUND:  -- and I think --

8         THE COURT:  And is -- is all that they're earning

9    new benefits or is some of it going to make sure that the

10   old benefits get paid?

11        MR. FREUND:  It's going to fund an entire plan

12   that has employers -- has hundreds and hundreds of employers

13   all over the country.

14        THE COURT:  Right.

15        MR. FREUND:  Each of whom have, through their

16   negotiations, negotiated a different set of benefit levels

17   and -- and consistent with a different set of benefit levels

18   have negotiated different contributions rates, is going to

19   assure that each and every one of those employees continues

20   to accrue and get the benefit of their -- of their ongoing

21   work so that when they retire, they will get -- they will

22   get paid the benefit level.  They will get paid the benefit

23   that they were promised, each of which will be reduced --

24   which will be reduced to the extent that they don't have

25   contributions made on them currently.

Page 138

1          Mr. Jones will not get an hour under the B&C plan

2    if -- assuming that the Hostess stores continue to

3    participate.  Mr. Jones will not get a single hour of

4    additional accruals post -- post Hostess ceasing to make

5    contributions, notwithstanding that he continued to work

6    while other employer -- other employees of other employers

7    as to whom contributions are made will continue to get an

8    hour of pension credit for every hour they work.

9          So they -- there are -- there are employees of --

10   of Bimbo who are working in bakeries today who are getting

11   -- having contributed to the pension fund, whatever their

12   negotiated pension amount is pursuant to their collective

13   bargaining agreement, and each hour that Mr. Smith for Bimbo

14   works for Bimbo and has a pension contribution made on his

15   behalf is continuing to accrue an additional hour's worth of

16   pension credit towards the ultimate number of hours he or

17   she needs in order to qualify her for a full-on reduced

18   pension under -- under the particular benefit structure

19   negotiated for Bimbo.

20         THE COURT:  Which some portion of what Mr. Smith

21   is contributing is going to pay for Hostess's Mr. Jones,

22   right?

23         MR. FREUND:  It's unascertainable.  Mr. Smith --

24   the point is that Mr. Smith will not get an hour of pension

25   credit unless Hostess -- unless Bimbo is a contributing

Page 139

1   employer making the $2 -- assuming the $1,300 level, making

2   the $2.46 contribution on his behalf.

3           And that -- that goes really -- that goes back to

4   another point that Ms. Lennox made which I think is worth

5   observing.  She made a distinction between a defined benefit

6   contribution plan -- a defined benefit plan and a defined

7   contribution plan.

8           Let's just take a step back from that and go -- go

9   to the fundamentals.  We know from the decided cases -- we

10  know from the declaration of Frank Hurt, and we know from

11  the way the real world works that in the collective

12  bargaining context a pension contribution is part of the

13  compensation package of an employee -- that an employee has.

14          We know in the real world that when the -- when an

15  union and an employer sit down to bargain over what the next

16  three years' economic package is going to be, the economic

17  package includes a bunch of things.  It includes an hourly

18  wage rate.  It includes the -- whatever the cost of health

19  benefits may be to the employer.  It includes the cost of

20  participating in the pension plan in order to provide a

21  pension when the employees retire.

22          And that is a package -- that is a package and

23  each of those -- each of those components have -- provide

24  different benefits to the -- to the employee and they

25  provide different benefits and costs obligations with

Page 140

1    respect to the employer.

2            So if all of the dollars -- let's just -- let's

3    just take a hypothetical and invent some numbers.  A union

4    and employer could sit down at the bargaining table and say,

5    I'm prepared to pay my employees and we're prepared to

6    accept for our employees a wage rate of $30 an hour.  That

7    $30 an hour would go into the employee's pocket.  Hostess

8    would be obligated to pay -- Hostess would get a deduction,

9    obviously, a federal tax deduction from the payment of that

10   $30 an hour.  Hostess would be, in addition, obligated to

11   pay a certain number of statutory -- statutories on top of

12   that $30.  The employee -- the employee's -- I'm sorry --

13   the employer's share of FICA, any -- any unemployment

14   compensation taxes that would be due and the like.

15           THE COURT:  Let me cut through -- you're saying

16   it's all -- it's all wages.  It's all --

17           MR. FREUND:  It's all wages.  It's all wages.

18           THE COURT:  And as long as it's for post-petition

19   service --

20           MR. FREUND:  It's all wages.  As long as it's for

21   post-petition services it's entitled to administrative

22   priority.  There's just no other -- there's no other real

23   world rational way to look at the relationship that exits in

24   -- in a multi-employer plan in a collectively bargained

25   circumstance.

Page 141

1          And, again, that's why single employer plans are

2    different because in any given year in a single employer

3    plan an employer may have zero costs associated with his

4    pension plan.  It's -- it's a risk that the employer takes

5    on when it -- when it decides that it's going to participate

6    in the single employer plan.  But it is not -- it's not an

7    ascertainable part of the economic package, an ascertainable

8    part of the economic package of any individual employee.  It

9    is not -- it is not his or her wages.

10         And that's why -- that's why it is the case -- and

11   I got back to where I started -- that's why it is the case

12   that the -- that despite hundreds of bankruptcies in this

13   country, and thousands of bankruptcies in this country and

14   hundreds of them taking place in the context of organized

15   shops, the only cases that you are seeing where the issue

16   about the so-called allocation issue, the only cases that

17   you're seeing reported, the only cases that Hostess can

18   bring to your attention are those in which the plan is a

19   single employer plan and it's precisely because of the

20   totally different paradigm that's at work in the -- between

21   a single employer plan and a multi-employer plan.

22         And -- and I -- I think when you -- you know, Ms.

23   Lennox was -- was forthright when she said it's a case of

24   first impression.  In a sense, I would say it's not a case

25   of first impression.  It's a -- and it's not a case of first

Page 142

1    impression because while there would be -- there's an

2    unlimited -- I'm overstating it.  Everything is limited by

3    whatever happened in the past.  There are -- there are --

4    there would have been numerous multi-employer pension fund

5    case bankruptcies in which this issue would or should have

6    been litigated if Ms. Lennox -- if -- if her analysis is

7    correct.  The problem is that it's simply not correct and

8    not applicable.

9            THE COURT:  Who are they supposed to make the

10   payment to given that the -- in -- in the IBTs -- I'm sorry

11   -- in the BCT's case the plan has been clear from November

12   25th; that there are no accruing benefits?

13           MR. FREUND:  Well, let me -- let me come to that

14   in a circuitous way because I think you have to peel back

15   the onion in order to get to what the answer to that

16   question should be.  So the other lawyers in my office with

17   whom I worked on this pleading added in my first draft, and

18   my first draft began with the overused adage of the orphan

19   who has come to court for sentencing for the murder of his

20   parents and begs for mercy on -- on the ground that -- I'm

21   sorry -- the child who comes to court for the sentencing for

22   the murder of his parents and begs for mercy on the ground

23   that he's an orphan.  It really -- every argument that

24   Hostess makes rings hollow when you go back to the

25   fundamental proposition that's at work here.

Page 143

1        We start with the relationships, which we pointed

2   out quite correctly is in this case the relationship of the

3   union and not the fund to Hostess as a part to the -- to a

4   collective bargaining agreement.  And in that collective

5   bargaining agreement, Hostess has promised to make certain

6   payments which are part -- which are -- for the reasons we

7   discussed earlier, are really part of the hourly wage

8   component of its employees.

9        It then takes a step -- it takes a step -- Hostess

10  takes the step which it knows is going to lead to -- or has

11  to know is going to lead to the very action that occurred in

12  this case; that is, a third party, not a party to the

13  contract, a third party taking steps to -- to terminate its

14  participation.

15       THE COURT:  It didn't happen to the other plans.

16       MR. FREUND:  I can't speak to what the trustees of

17  the other plans decided was -- was or wasn't a prudent --

18  was or wasn't a prudent action.  As you saw from our -- the

19  claim for administrative treatment of expenses, what's at

20  stake for us is what -- what would have been at stake for

21  the B&C fund is $14 million as we sit here today accruing,

22  or at least on a ledge accruing on an hourly basis going

23  forward.

24       The trustees of the -- the trustees of the fund

25  acting as trustees took the actions that they believed were

Page 144

1    prudent for purposes of managing their obligations under the

2    -- under the -- under the fund documents.  They -- they

3    apparently concluded that the risk of incurring ongoing

4    pension obligations under the circumstances created by

5    Hostess's actions was not a prudent act to take and,

6    therefore, they terminated Hostess and thereby terminated

7    the obligation to award ongoing pension credits to the Mr.

8    Jones of the world who are working under collective

9    bargaining agreements that require that contribution.

10          The -- I think we can kind of buzz through some of

11   the fundamental underlying first-year contract principals

12   that are at work here, which are, you know, endorsed by the

13   common law and law in this circuit and -- and from the

14   Supreme Court for that matter.  The fund was nothing more

15   than a third party beneficiary who is not a party to the

16   contract.  As a third party beneficiary, it has no rights to

17   -- to release --

18          THE COURT:  Well, what about --

19          MR. FREUND:  -- either -- either --

20          THE COURT:  -- Ms. Lennox's point about the trust

21   agreement stating that the obligation to fund ceases when

22   the employer is no longer an employer, defined term?

23          MR. FREUND:  Well, that's -- again, that's --

24   that's what -- (a) that's what the trust agreement -- that's

25   what the trust agreement says, but the collective bargaining

1   agreement says $2.46 of my wages that otherwise would be

2   paid to me in wages is going to be paid to -- to another

3   entity.

4            And so we show -- we brought to your attention the

5   Merlino (ph) Macaroni case which was by total happenstance

6   another -- another case arising out of this pension fund,

7   not in the context -- not -- not in the context of the -- of

8   a bankruptcy, but a case in which for a variety of reasons

9   the fund trustees concluded that the collectively bargained

10  contribution rate that had -- was contained in the direct

11  bilateral agreement between the union and the particular --

12  the local union and the Merlino shop at issue in that case,

13  that notwithstanding the dollar amount that that collective

14  bargaining agreement required to be contributed, that the

15  fund said you don't have to contribute that much anymore.

16  You -- we've reduced your contribution rate.

17           And so Merlino's reduced its contribution rate.

18  And the union filed a grievance under its collective

19  bargaining agreement, the grievance being substituted for a

20  judicial proceeding in order to determine whether there was

21  a breach of the contract.  In that -- in that case the

22  arbitrator said something that seems to me to be

23  fundamentally sound and that is that there's a promise in a

24  collective bargaining agreement to pay a set of dollars.

25  That promise is between the promisor and -- the promissee

Page 146

1   and the promisor, and a third party can't change it.  And

2   even if the fund doesn't want the money, you -- you have an

3   obligation -- you, Merlino's, have an obligation to pay it.

4          And that's no different than this --

5          THE COURT:  Pay it to whom?

6          MR. FREUND:  Well, it -- again, I'm going to

7   answer your question eventually, but I -- I want to peel

8   back another layer of the onion.

9          There's another doctrine -- there's another

10  doctrine that is applicable to contract interpretation and

11  contract breach and that is that one cannot argue that one

12  escapes contractual obligations on the basis of

13  impossibility if the promisor is the person who caused the

14  action which created the impossibility.

15         Again, Second Circuit -- basic contract law,

16  Second Circuit case law out -- outside the bankruptcy

17  context, and there's bankruptcy court adoption of that

18  fundamental principle in -- in other district.

19         So what Hostess is really saying is it is

20  impossible for us to live up to the obligations under the

21  contract because the fund has said that it's -- it has

22  terminated us.  But -- but it's terminated Hostess because

23  of Hostess's own actions creating the impossibility, and

24  because Hostess has taken those actions that have created

25  the impossibility, it cannot rely in a dispute between the

Page 147

1    union with whom it has made -- to whom it has made the

2    promise, it can't rely in a dispute with the union on the

3    doctrine of impossibility for purposes of -- of defending

4    against the claim.

5            So that gets down to the final question:  To whom

6    should the payments be made.  Ms. Lennox was quite cavalier

7    in saying -- in -- in disposing of the fact in the record

8    which is the only fact in the record on this point about the

9    fund's willingness to take Hostess back in as a full

10   participant if it cures its deficiencies and makes payments

11   going forward, and it will award pension benefits on a going

12   forward basis.  It has done that in the past. That's in the

13   declaration and it's prepared to do it in the future.

14           Hostess says it's not going to do that.  Again, it

15   can't escape its contractual obligations on the ground that

16   it -- it can't take a particular action because of its own

17   actions in creating the circumstances that get you -- that

18   gets it to that point.  It can't rely on its own improper

19   conduct in order to achieve that.

20           Ms. Lennox tries to sugarcoat that improper

21   conduct by saying that Hostess has been open, notorious

22   about -- I mean, notorious in a good sense, open and

23   transparent with respect to what it was going to do with its

24   assets.  It doesn't change the fact that it took actions

25   that it was not permitted to take under the -- under the

Page 148

1    collective bargaining agreements with the union, and that it

2    was not permitted to take under 1113(f) well prior to the

3    bankruptcy and it continues to be in that position post-

4    petition.  It simply cannot rely on that and cannot rely on

5    the consequences of that, which is the funds saying that it

6    was terminated in order to -- in order to avoid this

7    obligation.

8              THE COURT:  Well --

9              MR. FREUND:  So -- so you asked -- so you asked me

10   a question --

11             THE COURT:  I'm not sure they're saying that the

12   obligation is avoided.  I just think they're saying that you

13   have a prepetition claim for it.

14             MR. FREUND:  Well, but I -- but I have an

15   administrative claim, too.  But my -- but my point is we

16   have given -- we have -- we have given Hostess a path -- a

17   path to make these contributions to the fund.  All it has to

18   do is make up its delinquencies and make payments.  It

19   chooses not to do that.  It chooses not to do that.  But

20   that's its choice.  That is -- that's its choice arising out

21   of the -- that resulted in a breach of its collective

22   bargaining agreement with the union.

23             THE COURT:  Well, let me -- let me explore that.

24   I mean, it -- is it that easy to simply reinstate the

25   benefits and -- and have them start up again?

Page 149

1           MR. FREUND:  Absolutely.  All they have to do is

2   -- all they have to do is pay what they owe.

3           THE COURT:  Including the prepetition amounts?

4           MR. FREUND:  Including the prepetition.

5           THE COURT:  Okay.  So that's -- that's impossible.

6           MR. FREUND:  But it's -- it's impossible by using

7   -- but it's own conduct and it's --

8           THE COURT:  No.  But it -- but it's --

9           MR. FREUND:  -- created the --

10          THE COURT:  But it's impossible as a matter of

11  bankruptcy law.  It can't pay tiny bankruptcy claims with

12  hundred cent dollars.

13          MR. FREUND:  But it -- it created -- it created

14  that circumstance.

15          THE COURT:  But -- but that just means it's a

16  prepetition claim.

17          MR. FREUND:  All I'm saying is that whether

18  prepetition, post-petition, its actions are --

19          THE COURT:  No.  I

20          MR. FREUND:  -- the outcome of --

21          THE COURT:  I'm -- I'm dealing with the remedy you

22  suggest --

23          MR. FREUND:  Yes.

24          THE COURT:  -- which is that rather than -- well,

25  that it -- it would -- it would, in essence, reinstate the

Page 150

1   plan.  But that would mean assuming the obligation somehow

2   under the plan, which it can't do because it missed the

3   prepetition amounts.

4          MR. FREUND:  All right.

5          THE COURT:  Most of this money was prepetition.

6          MR. FREUND:  Well, it was -- a chunk of it is

7   prepetition.  Of the $14 million that -- that makes up our

8   administrative claim, that's all post-petition.  It has

9   whatever it has prepetition.  That's subject to --

10         THE COURT:  So --

11         MR. FREUND:  -- that's subject to a --

12         THE COURT:  So let's --

13         MR. FREUND:  -- that's subject to approval claim

14  --

15         THE COURT:  Let's assume that -- well, I -- I am

16  assuming that the plan would not invite Hostess back unless

17  Hostess paid the prepetition also because of the tax and

18  ERISA issues.

19         So what's the remedy then?

20         MR. FREUND:  Well, again, I -- there are all kinds

21  of remedies that the Court can fashion.  We -- we pointed to

22  another bankruptcy court decision from -- I believe it's

23  from this -- this district in which what was at stake was

24  the failure to have made contributions into a health

25  benefits plan prepetition -- I'm sorry -- post-petition.

Page 151

1   And what the bankruptcy court did in that case, things later

2   got adjusted on appeal because the Court of Appeals made a

3   determination that the bankruptcy court was wrong in -- in

4   not treating the payment as due and owing on an ongoing

5   basis.

6          But what the bankruptcy court did in the first

7   instance was before -- without ordering the company to make

8   ongoing payments on an ongoing basis post-petition, it said,

9   fine.  Don't do that.  Just pay the medical claims.  All you

10  have to do is pay the medical claims of the -- of the

11  employees who would have been beneficiaries of that health

12  benefits fund had the company made its contributions into

13  the health benefits fund on a timely basis.

14         So my point is that -- that it -- that bankruptcy

15  court recognized that employees had rights pursuant to the

16  collective bargaining agreement and that one had to fashion

17  a remedy in order to make sure that those rights were --

18  were protected.  The rights -- the rights here can be

19  defined in a number of ways.  One right is the right to

20  continue to accrue benefits under the plan, and we've given

21  -- we've described a methodology which you and I just went

22  through a moment ago in which Hostess can -- can do that.

23  And to the extent it can't do it, the reason it can't do it

24  is of its own making.

25         The alternative --

Page 152

1            THE COURT:  But it's the same reason that they

2     can't reinstate the third priority -- yeah.  They defaulted

3     on their third priority secured debt, too.  That's of their

4     own --

5            MR. FREUND:  That's --

6            THE COURT:  -- making, too.

7            MR. FREUND:  That's correct.

8            THE COURT:  SO they're supposed to pay that, also?

9            MR. FREUND:  That --

10           THE COURT:  I mean, come on.  That doesn't work.

11           MR. FREUND:  So -- but -- the alternatives -- the

12    alternatives as the bankruptcy court concluded in the -- in

13    I think it was -- I think it was 1655 Broadway.  I can't

14    remember which of the cases it was, but we cite it in our --

15    in a footnote in our -- in our brief.  The alternatives are

16    alternatives that can be worked out between -- can in the

17    first instance be worked out between the parties following

18    the Court's proper determination that the post-petition

19    amounts are administrative claims.

20           They -- in the absence of the parties being able

21    to work them out, and there are a number of them, Hostess

22    could establish individual 401(k) plans to accept the --

23    what would have been the $14 million worth of contributions

24    on -- and they could set them up on behalf of the individual

25    employees.  They could set them aside as a future severance

1    fund as we suggested.  They could pay them out in dollars to

2    the employees because, after all, they are their wages.

3    There are -- I don't want to say -- again, I don't want to

4    say there's an infinite number of possibilities, but it's --

5    it's not as though it requires tremendous creativity to know

6    how to translate $2.46 per hour piece of wages into

7    something that benefits an employee at the value of $.246

8    for every hour worked.

9            I think that's beyond -- that -- that -- the

10   actual fashioning of that remedy is beyond the scope of

11   today's hearing.  All I'm saying is that there is a remedy

12   and at the very minimum, at the very bottom, in the event

13   the parties are unable to solve that problem through their

14   own discussions after the Court rules that this is an

15   administrative claim, we would be back before Your Honor and

16   we would be proposing a methodology for resolving that

17   problem.

18           But the fact that it's difficult -- the fact that

19   it may be difficult, the fact that it may be -- may require

20   creativity, the fact that -- that as we sit here today we

21   can't say with certainty how it would be done is no -- with

22   all due respect, is no excuse for saying that Mr. Jones who

23   works an hour post-petition and who otherwise would have

24   been entitled to $2.46 an hour more in compensation for

25   providing a benefit to the estate should not be entitled to

Page 154

1    that -- to the value of his worth.

2         THE COURT:  Okay.

3      (Pause)

4         MR. FREUND:  Sorry.  Too many notebooks.

5         MR. TEELE:  Your Honor, for the record, again, for

6    the IAM National Pension Fund.  I'm going to try to keep my

7    remarks simple and short.  And I only have two points to

8    make for Your Honor.  But before I do that, I just want to

9    point out that the IAM NPF is what's colloquially known as

10   the being in the green zone.  It is, according to the annual

11   funding notices and other information, 106.3 percent funded

12   as of last year.  It was overfunded at 108 percent the year

13   prior.  And in '09, 2009 plan year it was 98.4 percent

14   funded.

15        For the record, that 2009 plan year was the only

16   plan year since 1986 that employers have been assessed

17   withdrawal liability from this fund.

18        So we -- we agree that only the post-petition

19   contribution should be afforded administrative expense

20   status.  The debtors agree with that.  We agree that the

21   administrative expense claims should be paid.  The debtors

22   agree with that.  We've quantified the amount of the post-

23   petition contributions within a range of $2,000.  The

24   debtors agree with us, so we don't think that there are --

25   that there is really a material dispute.

Page 155

1           THE COURT:  And that -- and that's based on what,

2    on hours worked?

3           MR. TEELE:  That's based on hours worked and it --

4    we attached to the declaration in support of --

5           THE COURT:  And how does that -- how does that tie

6    into the collective bargaining agreement?

7           MR. TEELE:  It's -- it's baked right into the

8    collective bargaining agreement.  It's part of the CBA.

9           THE COURT:  How?

10          MR. TEELE:  Your Honor, I don't have the

11   collective bargaining agreement in front of me, but it is

12   incorporated into the -- the trust agreement is incorporated

13   into the collective bargaining agreement --

14          THE COURT:  No.  But --

15          MR. TEELE:  -- as part of the overall compensation

16   for the employees.

17          THE COURT:  Does the collective bargaining

18   agreement, for example, say that there -- or put forth a

19   schedule for employees and the contribution per employee per

20   hour?

21          MR. TEELE:  The end -- I would have to check the

22   collective bargaining agreement, but the -- Your Honor, but

23   the answer is --

24          THE COURT:  Or is it just --

25          MR. TEELE:  -- I believe it does.

Page 156

1        THE COURT:  Or, alternatively, is it just a way to

2   measure the contribution?

3        MR. TEELE:  No, Your Honor.  I believe it's the

4   former.  I believe there is a schedule, but I would have to

5   check the collective bargaining agreement to be sure.

6        THE COURT:  Okay.

7        MR. TEELE:  And we do have attached to --

8        THE COURT:  But that's a question for all of the

9   -- all of the -- all movants.

10       MR. TEELE:  We do have attached to the declaration

11  of Mr. Martucci (ph) in support of our motion each of the

12  remittance reports which show the pay periods that the

13  contributions are attributable to.  The pay that is

14  attributable for that period, and it multiplies -- it does

15  the math by the contribution level, which is, I believe,

16  $3.55 per worker per hour.

17       There is no real dispute over that.  The debtors,

18  in the declaration of Ms. Reed, set forth their analysis

19  and what they think the post-petition contributions are.

20  They say what they think the prepetition contributions are.

21  We're not going to dispute that because, like I said, we're

22  within $2,000.  So we don't think that there is a material

23  dispute over the administrative portion, the post-petition

24  portion of the IAM's claim.

25       THE COURT:  Well, but they -- the debtors say that

Page 157

1    there is a portion of that, what you call post-petition

2    portion, that's really for prepetition obligations.

3              MR. TEELE:  Well, Your Honor, we're overfunded, so

4    none of that -- none of that -- none of those contributions

5    are going to go to pay prepetition --

6              THE COURT:  Do the -- do the debtors --

7              MR. TEELE:  -- underfunding.

8              THE COURT:  -- dispute with that?

9              MS. LENNOX:  We do dispute that on a fair market

10   value basis.  That was the declaration that I referenced --

11             THE COURT:  Okay.

12             MS. LENNOX:  -- for Your Honor.

13             THE COURT:  All right.

14             MR. TEELE:  And the actuarial basis is the

15   standard methodology that these plans used to calculate the

16   value of their assets and their -- and their liabilities.

17             But that brings me to my second point.  Even --

18   even though we don't think there is any material dispute, we

19   don't think it's -- that there is any reasonable basis to

20   argue that the National Pension Plan is underfunded or has

21   been underfunded in any year except 2009.

22             You know, one of the arguments that the debtors

23   raise in their objection, and which Ms. Lennox raised today,

24   although she didn't make it a central theme, is the desire

25   of the debtors to take a -- take a step back and do some

Page 158

1  diligence with the different unions and plans.  And try to

2  come to either a consensual position with respect to what

3  might be owed or have a hearing later on this -- after some

4  further briefing.

5         So the IAM National Pension Fund, if everybody

6  else is going to agree to adjourn -- for lack of a better

7  word -- adjourn their hearing, we would be amenable to doing

8  that simply so that we can complete some discussions that

9  have been going on among the parties.  We think it could be

10  useful.  But to the extent we're going to go forward today

11  --

12         THE COURT:  But you're -- you're saying that that

13  should be a mutual agreement.  It can't be forced on people.

14  And I -- and I agree with that.

15         MR. TEELE:  Yeah.  I -- I -- that is what I'm

16  saying, Your Honor.  We think if everybody agrees, then we

17  -- we would jump into that pool --

18         THE COURT:  Okay.

19         MR. TEELE:  -- as well.  But to the extent we're

20  going to go forward today, at least with respect to the IAM

21  National Pension Fund, there really can't be any material

22  dispute over the amount that's due post-petition, over the

23  fact that none of that amount is due to underfunding or

24  would be allocated to the prepetition period and the fact

25  that we are within, you know, $2,000 of the claim amount,

Page 159

1   which for purposes of resolving our motion today, we would

2   accept the debtors' calculation which is lower than ours.

3        So those -- those are the two points that I would

4   like to raise, Your Honor.

5        THE COURT:  Okay.

6        MS. NASTASI:  Your Honor, this is Ancela Nastasi.

7   I represent the B&C fund and I apologize for interrupting.

8   I just wanted to clarify one point.

9        With respect to the B&C fund's willingness to

10  reinstate Hostess for purposes of accepting the post-

11  petition contribution amounts that are due, and subject to

12  verifying with the plan trustees, the B&C fund would be

13  prepared to reinstate Hostess on that basis.

14       THE COURT:  On -- on what basis?

15       MS. NASTASI:  On the basis of admitting them or

16  reinstating them for purposes of accepting the post-petition

17  amounts due.

18       THE COURT:  Without -- without paying the

19  prepetition amounts due?

20       MS. NASTASI:  Yes.  That's correct.  And, again,

21  they would have to verify that with the plan trustees, but

22  I've just spoken to my client at the fund and that is

23  correct.

24       THE COURT:  Doesn't that -- well, okay.  I -- I

25  appreciate that.  I -- I'm just wondering whether that

Page 160

1   creates legal issues. I don't know.

2        MS. NASTASI:  I think what the goal would be, Your

3   Honor, is to reinstate Hostess for the brief period that

4   would require -- or, you know, that would relate to them

5   paying the post-petition amounts due and then, assuming

6   there would be no further payments, terminate them

7   thereafter again.  So reinstate for purposes of accepting

8   those payments and then terminating.

9        And I believe under the plan documents they are

10  entitled to do that.

11       THE COURT:  Okay.

12       Okay.  Thank you.

13       Okay.  I'm -- Mr. Freud covered a lot of these

14  issues and pretty thoroughly, but I'm happy to hear from

15  other movants as well.

16       MR. MAZUR:  Good afternoon, Your Honor.  The law

17  firm of Weinberg, Roger & Rosenfeld, by Jordan Mazur for the

18  IUOE Stationary Engineers Local 39 Pension fund and the

19  Stationary Engineers Local 39 Annuity fund.

20       THE COURT:  Okay.

21       MR. MAZUR:  And I want to take up the annuity fund

22  first because I think it's going to be very brief.

23       The debtors, in their papers, page 4, footnote 4

24  said, "Contributions qualify administrative claims for the

25  two annuity funds."  I think that's basically the end of the

Page 161

1    discussion.  Those -- there's another annuity fund.  I'm not

2    sure if they're here or not, but those funds are defined

3    contribution funds and I don't think there's any material

4    dispute.  There was a question about the amounts, for the

5    purposes of this -- resolving this motion.  We accept the

6    declaration of Ms. Reed as to the amount of the annuity

7    fund.  But, I mean, I think, basically, there -- there's an

8    understanding about that piece of --

9              THE COURT:  Is that -- is that right, Ms. Lennox?

10             MS. LENNOX:  Yes, Your Honor.

11             THE COURT:  Okay.  So the annuity funds' motion

12   would be granted as -- as modified to reflect the amount --

13             MS. LENNOX:  Well, we still are talking about

14   timing of the payment, Your Honor.  We do --

15             THE COURT:  Okay.

16             MS. LENNOX:  -- suggest that that should be when

17   we resolve the IUOE 1113.  So while we agree with the amount

18   and status, we do think that the payment should be --

19             THE COURT:  Okay.

20             MS. LENNOX:  -- delayed.

21             THE COURT:  All right.

22             MR. MAZUR:  And to the extent that I'm going to

23   address that, I'll just address it when I talk about the

24   pension fund.

25             So turning to the pension fund, and I do think

Page 162

1    that Mr. Freund covered a lot of the issues and to the

2    extent that it -- that it's relevant for us, you know, we --

3    we agree with Mr. -- with what Mr. Freund said.

4            But there's a couple of particularly critical

5    points that I want to highlight.  The debtors agree that

6    post-petition accruals result -- should result in

7    administrative priority and then they repeatedly talk about

8    but for prepetition services that's not the case and these

9    are prepetition services for this reason or that reason.

10   And, frankly, it's just not true.  Okay.

11           What we have is a collective bargaining agreement

12   that the debtors agreed to prepetition.  They want the

13   debtors to.  But the employer agreed to -- to make

14   contributions. You raised the question.  You said it's a

15   question to all of us, the local 39 fund specifically sets

16   out a schedule much like what Mr. Freund talked about, $2.46

17   an hour.  I think the local 39 number is around 3.50 an

18   hour, and a certain amount of that goes to the pension fund,

19   a certain amount of it goes to the annuity fund is how it

20   works.

21           And that amount was agreed to by all parties as

22   part of an overall compensation package.  There was a

23   statement made in Ms. Lennox presentation where she

24   specifically said we're not taking money out of paychecks.

25           Respectfully, we disagree with that statement and

Page 163

1    I happen to know, because I've been involved in the IUOE

2    negotiations that for both local 39 and the central pension

3    fund, there are instances, actually, where workers voted to

4    forego their raises to put that money into their pensions.

5    It is absolutely an element of compensation.  It is

6    absolutely something that comes directly from the worker's

7    compensation, and it is absolutely something that is earned

8    every single day that an operating engineer steps -- walks

9    into a Hostess plant.

10            In this case we've heard, for some reason, that

11    the debtors feel comfortable with the fact that they've --

12    they've really been forthright that they want to get out of

13    the contract.  The fact is they're not out of the contracts.

14    They may or may not get out of the contracts in the future,

15    but they've engaged in -- in quite a bit of self-help here

16    while they're still in the contracts.  They're obligated to

17    the IUOE local 39 contracts and they're obligated to make

18    the contributions contained therein.  They have just haven't

19    made them.

20            And part of the explanation for that is they want

21    to get out of the contracts.  That kind of logic doesn't

22    really match up.  But it -- it should.  I mean, I agree that

23    it certainly betrays the intention.  And for the papers to

24    then suggest that we expect a consensual resolution is also

25    disingenuous as it relates to the pension fund because the

Page 164

1    pension fund is not at the bargaining table.  And the union

2    has no power to sit at the bargaining table and say, as to

3    all that money you owe the pension fund, forget about it.

4    It's not up to the union.  In -- in our particular case a

5    union trustee is involved the negotiations, but it's not up

6    to him --

7              THE COURT:  Well, then may -- let -- can we

8    explore that for a second?

9              MR. TEELE:  Sure.

10             THE COURT:  I think this is dramatically different

11   than Mr. Freund's argument.  I'm not -- his argument, which

12   carries some real weight, is that these are wages.  This is

13   -- this is money like any other wages that's earned under

14   the CBA for each hour that you work and, therefore, for each

15   hour that you work post-petition it's an administrative

16   claim.

17             And it seems to me that the union could, in fact,

18   modify their CBA to that effect.  If it's the plan making

19   the argument that we have this claim, it may well be

20   something -- well, it's not wages, right?  It's a claim --

21   it's a funding obligation that the plan has owed to him and

22   that may be for pre or post-petition amounts.  Aren't there

23   -- isn't there a distinction between those two?

24             MR. TEELE:  Well, I think that the --

25             THE COURT:  So it doesn't work the other way.  For

12-22052-rdd   Doc 1133   Filed 06/15/12   Entered 06/15/12 21:42:53   Main Document
Pg 98 of 142

Page 165

1    example, if Mr. Freund said the plan can't amend the CBA --

2              MR. TEELE:  And -- and we would agree with that

3    and Your Honor is absolutely right that the union can chance

4    the obligation going forward.

5              THE COURT:  Right.

6              MR. TEELE:  But that's not the same as saying as

7    to the January obligations, don't worry about them.  That's

8    not -- that's -- that's not something that is in the

9    capacity of the union because those hours have already been

10   worked.  They've already been reported, and unlike the B&C

11   situation with the termination, we do have pension credits

12   accruing and we do have a fund that has --

13             THE COURT:  Well, but --

14             MR. TEELE:  -- a fiduciary obligation.

15             THE COURT:  -- withdraw liability accrues, too,

16   and the Courts have been very clear that just the fact that

17   it's accruing post-petition doesn't mean that it's given a

18   post-petition status.

19             So, again, I -- I'm more sympathetic to the

20   argument that the union makes than that the plans are

21   making.  I think the distinction the debtors are drawing is

22   vis-à-vis the plan may have greater weight than vis-à-vis

23   the union.

24             MR. TEELE:  And is -- is Your Honor suggesting

25   that on the basis of the arguments about the underfunding

VERITEXT REPORTING COMPANY
212-267-6868          www.veritext.com          516-608-2400

Page 166

1    issues --

2            THE COURT:  Yes.

3            MR. TEELE:  -- that have been discussed?

4            THE COURT:  Yeah.

5            MR. TEELE:  All right.  Then I like -- I would

6    like to address that issue.

7            THE COURT:  Okay.

8            MR. TEELE:  First of all, while we didn't

9    specifically make an objection when it was asked if Ms.

10   Lennox's declaration can be put into evidence, I -- I would

11   like to say as to relevance that it is 2010 Form 5500's,

12   first of all.

13           Second of all, it has nothing to do with the

14   contribution amount.  The contribution amount is set in

15   bargaining and that's what it is.  If at some point Hostess

16   is terminated by the local 39 and they have withdrawal

17   liability, then I'm confident that we will all argue over

18   when that was accrued, but that is not the argument that

19   we're having hear today.

20           If at some point the investments that local 39's

21   fund is in do so well that Hostess can someday make lower

22   contributions, well, then that, too, could happen because

23   that is not -- also not where we are here today.  Where we

24   are here today is irrespective of funding status and as our

25   papers point out in both 2011 and 2012 the certification is

Page 167

1   green zone status for the local 39 fund, the obligation is

2   fixed based on what has been bargained for.  It's not fixed

3   based on what the market did in 2009.  It's not fixed on

4   anything other than this is the amount owed based on the

5   hour worked.  It is a contractual obligation that is based

6   on that, not based on the underfunding.

7          THE COURT:  But contractual obligation to whom?

8          MR. TEELE:  It is a contractual obligation that

9   the debtors have to -- well, as has been explained, the

10  parties of the contract are the union and the debtor, and

11  the trust fund, and its true in the local 39 case as well,

12  is a third party beneficiary of the collective bargaining

13  agreement.

14         But the critical point that I think is just -- is

15  glossed over in the debtors' papers is that this is a fixed

16  obligation for every hour worked.  It is -- let's posit a

17  not entirely difficult to conceive of situation where, as

18  was the case from 2004 on, the debtor was in bankruptcy for

19  more than one year.  The funding statuses of the funds will

20  go up and down.  The contribution amounts will only change

21  based on what is bargained for.  They won't change because

22  suddenly there's a different amount.  I'm sorry.  There's --

23  the funding is different or something like that.  Right.

24  They will change based on what is bargained for.

25         Now the funds may -- may come to the debtor and

Page 168

1    say we desperately need this or that or go to the union and

2    the union would come to the debtor, as the case may be.  But

3    that's not the same thing.  And the example that Your Honor

4    offered to Ms. Lennox quite -- quite a while ago at this

5    point, I felt was -- was particularly -- particularly

6    valuable to understanding this.  When you describe an

7    employee who sets aside a certain amount and maybe making

8    that and maybe it's making up for bad investments.  That's

9    actually what you say.  Maybe some of that money she's

10   putting aside, the $200 a year, is making up for a bad

11   investment from a previous year, but why is that not still

12   the $200 that she earned with her wage.

13           It's the same thing here.  The debtor -- in -- in

14   her argument Ms. Lennox also brought up, well, there's

15   administrative costs to the funds.  There's all these other

16   things, but all we're basing it on is what the contribution

17   is being used for.  That's not what the contractual

18   obligation is.  The local 39 CBA does not say, you're going

19   to give us this much and here's exactly what we're going to

20   do with is.  It says, you're going to pay this much into the

21   local 39 fund.  One of the benefits, we would submit, that

22   the debtors get from being in the local 39 fund is it's

23   administered a certain way, and that cost is shared over a

24   whole bunch of different employers, right?

25           There is, of course, an administrative cost, just

Page 169

1    like if the debtors were running a single employer claim

2    there would be an administrative cost to that.  That doesn't

3    mean that's not part of what is owed based on the hour

4    worked.  In the same way, if what the fund winds up using

5    the money for is something that the debtors don't like or

6    don't agree with, that doesn't mean that it wasn't earned

7    based on the hour worked of the post-petition period for the

8    amounts that we are claiming.

9        We have, as everybody here I'm sure has, made a

10    pre-petition claim in our proofs of claim.  We did not make

11    that claim here because we understand that that's -- that

12    hour worked was for then, even though in the prepetition

13    context the fund may take that money and use it to cure a

14    bad year that happens in 2013.  We're not going to then come

15    back to Your Honor and say, well, that was a -- that was a

16    post-petition expense that happened.  No, because that's

17    when the hour worked occurred.

18        There was -- excuse me.  There was a discussion

19    about frozen plans.  Again, we are not a frozen plan.  Your

20    Honor said it -- it might be that that is like McFarland's

21    and -- in talking about withdrawal liability.  Frozen plans

22    may or may not be like withdrawal liability.  I'm not here

23    to argue about frozen plans.  But it stands in direct

24    contrast to what we have here because what we have here is

25    an active ongoing obligation.  It is an active ongoing

Page 170

1    accrual, and it is a contribution that is based on something

2    that was agreed upon for hours worked.

3             Ms. Lennox's argument that, oh, we're only looking

4    at what benefit we're conferring is just simply not true.

5    It is not the business of Hostess to determine what happens

6    for the benefit later on.  That is a -- I mean, it's a

7    different kind of plan.  It's not what we have here.

8             THE COURT:  Okay.  Thanks.

9             MR. WOLF:  Your Honor, if I may?

10            THE COURT:  Sure.

11            MR. WOLF:  My name is William Wolf.  I represent

12   the RWDSU and industry pension fund, and I'll keep my

13   remarks brief because I join in the arguments that were made

14   by Mr. Freund and the previous speaker.

15            I just wanted to make a -- just a few points about

16   the RWDSU pension fund.  One is that the amount of what is

17   post-petition and what is prepetition has been agreed upon

18   with Hostess for January, February, March based on the Reed

19   declaration.

20            In addition, we request an additional $50,000 for

21   April post-petition contributions for a total of 203,000,

22   roughly in contributions to cover from January 11th through

23   April 30th, 2012.  So on the first level there's no dispute

24   between what's prepetition and what's post-petition.

25            THE COURT:  Is that right?  I thought you did

1   dispute everything.

2            MR. WOLF:  We did --

3            MS. LENNOX:  I think he's talking about the pro

4   ratio.

5            THE COURT:  Oh, okay.  Fine.

6            MS. LENNOX:  The simple math.

7            THE COURT:  All right.  Fine.

8            MR. WOLF:  Yeah.

9            THE COURT:  All right.

10           MR. WOLF:  Then to the more difficult issues,

11   which is whether the benefit -- whether the benefit

12   contributions owed for the period post-January 11th are

13   post-petition contributions and should be an administrative

14   expense.  I just wanted to make only a few points and it's

15   -- it's based in part upon what people have said earlier.

16           If you start with the premise that bankruptcy law

17   controls here, we're not talking very much about law under

18   ERISA or labor law.  And we look at the cases that were

19   cited by debtor in support of its theory, and as Ms. Lennox

20   stated it's a somewhat novel theory.  In those -- those

21   cases themselves dealt with the issue of what was

22   prepetition and what was post-petition.

23           And, in fact, in the Finley Kumble case, the Court

24   noted when it was describing what was an administrative

25   expense -- what part of the minimum funding obligation was

Page 172

1    an administrative expense and what was not, it noted that

2    the employees that remained after the petition for

3    bankruptcy filed, then that would be an -- then payments for

4    their pension contributions would be an administrative

5    expense.

6           And the Finley Kumble court, as well as this Court

7    and ACE Elevator as well as the Cinner Hauserman court,

8    which I think is the Tenth Circuit, went through basically

9    the same analysis.  These are three other cases cited by

10   debtor.  And they went with straight bankruptcy law, and in

11   each one of those cases there were employees that stayed on

12   after the bankruptcy and continued to work.  And the post-

13   petition employee benefit contributions that were found to

14   be an administrative expense sprung directly from the work

15   of those employees who stayed on post-petition.

16          And that's what we're talking about here with the

17   employees of Hostess that are participants in the RWDSU

18   pension fund.  Every single one of them, route sales

19   drivers, factory workers, they stayed on to benefit the

20   debtors' estate.  And I'm not going to tread over ground

21   that was discussed already, but the pension contribution is

22   clearly part of the wage package.  These people worked, and

23   I think the statement from Finley Cumble, it talks about,

24   what is the consideration underlying the claim.  The

25   consideration underlying the claim for my client is post-

Page 173

1    petition labor.

2            And, yes, we have a schedule of payments.  You

3    work a certain number of hours per week, then Hostess owes

4    contributions to the pension fund as well as owing wages.

5    So, yes.  We have that in our collective bargaining

6    agreement.  It's absolutely compensation.

7            And then we go back to, what's the consideration.

8    There's no post-petition contribution due if somebody

9    doesn't work.  The consideration is the labor of the route

10   sales driver or of the factor workers, and that's what it

11   comes down to and I think that's why -- and Mr. Freund

12   touched on this briefly -- why it's never been litigated

13   before because it's taken for granted, as it should be, that

14   when an employee works for a debtor to keep that debtor in

15   business for the benefit of all the creditors, there's no

16   reason to litigate something that -- you know, their

17   compensation that comes directly as a result of their work.

18           Hostess, in opposition, they cite -- of course

19   they didn't cite any cases and they've conceded that -- that

20   deal directly with multi-employer plans.  As a matter of

21   fact, most of the cases they cited had to do with what's

22   called a minimum funding obligation under --

23           THE COURT:  Let me ask -- let me ask you a

24   hypothetical.

25           MR. WOLF:  Sure.

Page 174

1          THE COURT:  Let's assume that in the first

2    bankruptcy that Hostess had --

3          MR. WOLF:  Uh-huh.

4          THE COURT:  -- it gave a note to the union, your

5    union, of a million dollars, and the CBA was amended to say

6    that the hourly wages for your union's members would be

7    increased by X dollars per hour and that amount would go to

8    pay the note.  Would the X dollar per hour increase that

9    arose post-petition be a pre or post-petition obligation?

10          MR. WOLF:  You mean in this bankruptcy?

11          THE COURT:  Yeah.

12          MR. WOLF:  If --

13          THE COURT:  In a subsequent bankruptcy.

14          MR. WOLF:  If the CBA said you're paying for

15    prepetition dollars, it's -- it's a tough call.

16          THE COURT:  Okay.

17          MR. WOLF:  But we don't have that situation here.

18    The only reason that Hostess owes a contribution for the

19    work of, you know, Jane Jones, is because they did that

20    work.  And I -- you know, I don't mean to --

21          THE COURT:  Well, I mean, the union workers who

22    were -- in my hypothetical they did they work, too.

23          MR. WOLF:  Excuse me.

24          THE COURT:  In -- in my hypothetical, the union

25    workers did the work, too, post-petition.  It's just that a

Page 175

1   portion of --

2          MR. WOLF:  They -- but they weren't post-petition

3   --

4          THE COURT:  -- portion of their wages were going

5   to pay down this prepetition note.

6          MR. WOLF:  So they were in -- so they were

7   planning in advance to have dollars taken out of their

8   pocket to pay -- to pay off this note.

9          THE COURT:  I mean, obviously -- I mean, so I

10  think the debtor is saying, look, there's a -- there's an

11  inherent or contingent or incipient underfunding claim for

12  most of these pension plans.

13         MR. WOLF:  Yeah.  My plan's a green plan.  But --

14         THE COURT:  Well, all right.  But --

15         MR. WOLF:  Yeah.

16         THE COURT:  I -- I understand that.

17         MR. WOLF:  Yeah.

18         THE COURT:  And they're saying, well, a portion of

19  -- a portion of the wages are going to pay that -- that

20  withdrawal claim, that contingent incipient withdrawal

21  claim.

22         MR. WOLF:  Well, that's -- but that's contrary to

23  the findings of the Finley Kumble court, the Cinner

24  Hauserman court and the other cases cited.  It's --

25         THE COURT:  The argument wasn't made --

Page 176

1        MR. WOLF:  Well --

2        THE COURT:  The argument wasn't made to them.

3        MR. WOLF:  Yeah.  It was not made -- well, no.

4    No.  No.  It was made to them with respect to in Finley  the

5    38 employees who continued.

6        THE COURT:  He just -- he just said that.  He --

7        MR. WOLF:  Well, what about in Cinner Hauserman --

8        THE COURT:  No one argued --

9        MR. WOLF:  -- I think there was 77 employees.

10        THE COURT:  But no one argued that this was -- no

11    one made Ms. Lennox's argument.

12        MR. WOLF:  And I would -- and I would also go back

13    to what was said earlier; that -- I mean, it's interesting

14    --

15        THE COURT:  By the way, the guy making that

16    argument, although Togut did the argument, was me.  So I

17    know that very well.

18        (Laughter)

19        THE COURT:  I didn't think --

20        MR. WOLF:  Okay.

21        THE COURT:  But --

22        MR. WOLF:  But --

23        THE COURT:  -- that doesn't mean that I --

24        MR. WOLF:  -- as -- as to the argument --

25        THE COURT:  -- I shouldn't have thought of it.

Page 177

1          MR. WOLF:  Excuse me.

2          THE COURT:  That doesn't mean I shouldn't have

3     thought of it.

4          MR. WOLF:  But as to the argument that Ms. Lennox

5     makes, it's -- it also goes back to -- and one of the other

6     speakers raised it, albeit briefly.  It's immaterial what

7     the pension fund in -- is using the dollars for.

8          THE COURT:  No.  I understand that.  I mean, it --

9          MR. WOLF:  I know.  You made that argument

10    initially right off.

11         THE COURT:  I think we're going over ground on

12    that and that point's been made very clearly and --

13         MR. WOLF:  Oh, good.

14         THE COURT:  -- very well.

15         MR. WOLF:  Good.  Good.  But --

16         THE COURT:  And, similarly, the point that this is

17    what people are working for now has been made.  So I get

18    that --

19         MR. WOLF:  Yeah.

20         THE COURT:  -- that argument.

21         MR. WOLF:  But, also, just to tie it back to the

22    citation to District Judge Sweet in Finley Kumble that you

23    look at the time when the acts giving rise to the alleged

24    liability were performed.  I mean, there's no liability here

25    that's -- in Finley Kumble they cite District Judge Sweet

Page 178

1    from one of the Shadagay (ph) cases, I think.

2            THE COURT:  Oh, oh, okay.

3            MR. WOLF:  Yeah.

4            THE COURT:  Because it's Conrad that wrote the

5    opinion, but --

6            MR. WOLF:  Yeah.  But he --

7            THE COURT:  -- he cited Sweet.

8            MR. WOLF:  -- but he's citing Judge Sweet.

9            THE COURT:  Okay.  I got it.  Right.

10           MR. WOLF:  Yeah.

11           And that's -- I mean, I don't want to waste the

12   Court's time in treading -- in going over ground that's gone

13   on over previously.  But I think we have to take a long hard

14   look at the way courts approach these things.  And as I

15   said, it's interesting.  I credit Jones Day for thinking of

16   it, and for -- in an objection doing it all in six

17   paragraphs.  But it -- it shouldn't turn everything on its

18   head.

19           THE COURT:  All right.

20           MR. WOLF:  I mean, in our papers we talked about

21   the problems that will happen if all of a sudden part of

22   somebody's wages may be subject to scrutiny some day after

23   because of what the party that receives the wages, similar

24   to the hypothetical you opened our argument with, does with

25   it.

Page 179

1          I don't have anything further to add at this

2     point.

3          THE COURT:  Okay.

4          MR. WOLF:  Did you have any other questions of me?

5          THE COURT:  No, thanks.

6          MR. WOLF:  Thank you, Your Honor.

7          MR. TENENBAUM:  Good afternoon, Your Honor.  My

8     name is Marc Tenenbaum.  I represent the Bakery and Sales

9     Drivers local union number 33, industry pension fund, the

10    Mid-Atlantic Regional Counsel of Carpenters Annuity Fund.

11         THE COURT:  The first fund is not Mr. Freund's

12    fund.  It's a different fund, right?

13         MR. TENENBAUM:  It's a different fund.  It's

14    drivers --

15         THE COURT:  Yeah.  Okay.

16         MR. TENENBAUM:  -- and the --

17         THE COURT:  All right.

18         MR. TENENBAUM:  -- participants are represented by

19    the IBT.

20         THE COURT:  Okay.

21         MR. TENENBAUM:  The second fund is an annuity fund

22    and as I understand it there is no dispute that that is an

23    administrative expense.

24         THE COURT:  That -- that's my understanding.

25         MR. TENENBAUM:  And there's no dispute about the

Page 180

1   amounts on that one.

2          And for the pension fund I agree with what the

3   previous speakers have said who have represented pension

4   funds in this case.  I do -- and I will say that the

5   collective bargaining agreement does specify that there will

6   be contributions of $179.32 per employee per week to the

7   pension fund.

8          And if we could just go back to the basic

9   principle of what you need to have an administrative

10  expense, Second Circuit said in Bethlehem Steel that "There

11  must be consideration supporting the claimant's right to

12  payment that was both supplied to and beneficial to the

13  debtor-in-possession's operation of the business."  And

14  that's what we're talking about here.  We're talking about

15  contributions for work performed post-petition.  That's the

16  consideration.

17         And what the -- and it's obviously beneficial to

18  the estate.  It was -- it was -- the employees were induced

19  to work by the promise of wages and contributions to the

20  pension fund, among other things.  And the -- and what the

21  pension fund does with the money after it gets it is really

22  immaterial.  The pension fund is a third party beneficiary

23  of the collective bargaining agreement between the employer

24  and the union, and that provides for a contribution -- an

25  hourly contribution for each hour worked post-petition.

Page 181

1           And this is the -- my client is the pension fund

2    that Ms. Lennox highlighted as an example of a frozen plan,

3    and that just means that the -- there are no benefits being

4    accrued to the -- to the participants.  But that doesn't

5    mean the pension fund isn't entitled to payment post-

6    petition as an administrative expense for work performed

7    post-petition.

8           THE COURT:  But what is the money going to pay?

9           MR. TENENBAUM:  I'll answer the question.  I think

10   the answer is legally irrelevant, but the answer to the

11   question is that it's going to pay -- well, the pension fund

12   will -- will pay benefits to people, including benefits that

13   they earned --

14          THE COURT:  Pre-petition.

15          MR. TENENBAUM:  -- pre-petition.

16          THE COURT:  And -- and that -- I guess that's the

17   rub here, and it may be what I need some additional briefing

18   on.  I mean, McFarland's says flat out that this -- and,

19   albeit it was a withdrawal liability, but it's not entitled

20   -- it accrued post-petition.  It's not a part of the

21   administrative status because it is made to guarantee

22   pension benefits already earned by those employees covered

23   by employment.

24          MR. TENENBAUM:  But the -- but the right --

25          THE COURT:  And you're saying they provided the

Page 182

1    service.

2           MR. TENENBAUM:  But in McFarland's --

3           THE COURT:  And I -- I understand that.  I guess -

4    -

5           MR. TENENBAUM:  I'm sorry.

6           THE COURT:  I guess -- and I -- and you're saying,

7    well, but the employees earned it when they provided the

8    service.  But the -- did the plan earn it when it provided

9    the service?

10          MR. TENENBAUM:  The plan earned the contribution

11   -- to use that terminology, the plan earned the contribution

12   post-petition when the employees provided the service post-

13   petition.  It may even be different employees.  There may be

14   -- to take an example you gave two or three hours ago, there

15   may be a Mr. Smith who was hired by Hostess post-petition

16   and contributions are being made for work he's performing,

17   being made to the plan or should be made to the plan, and

18   he's not going to get any benefit from it.  But that's the

19   nature of multi-employer plans.  There is no direct tie

20   between the contribution and the benefit.

21          THE COURT:  Okay.

22          MR. TENENBAUM:  And the withdrawal liability

23   example, I think, is totally different because the

24   substantive law there that created the claim, and all claims

25   are -- claims in bankruptcy are -- are determined by non-

Page 183

1    bankruptcy law.  It's just the treatment of it that's

2    determined by bankruptcy law.  The substantive law, the

3    claim is -- is Section 4201 of ERISA, require -- which

4    prescribes withdrawal liability.

5            That's very different -- here the -- here the

6    substantive law is basically the collective bargaining

7    agreement.

8            THE COURT:  Well, the collective bargaining

9    agreement also provides that there will -- that the debtor

10   will satisfy its withdrawal liability, right?  Isn't there a

11   provision that --

12           MR. TENENBAUM:  I don't -- I don't believe there

13   is such a provision --

14           THE COURT:  -- that -- that incorporates --

15           MR. TENENBAUM:  -- Your Honor.

16           THE COURT:  No.  Doesn't -- doesn't the CBA

17   incorporate the trust agreement which includes the

18   withdrawal liability claim?

19           MR. TENENBAUM:  Yes, Your Honor, but the

20   withdrawal liability claim stands on its own, even if there

21   were no such incorporation by reference.  Even if the

22   collective -- even if there was no mention of --

23           THE COURT:  Well, I mean, you could say --

24           MR. TENENBAUM:  -- withdrawal liability.  It's a

25   statutory obligation --

Page 184

1          THE COURT:  But you --

2          MR. TENENBAUM:   -- imposed by congress --

3          THE COURT:  But you could say that the union

4   workers are working as part of their compensation.  That

5   there would be no withdrawal liability, right?  That's part

6   of their contract, too.  It's not paid on an hourly basis,

7   but they're working for it post-petition because it's part

8   of the collective bargaining agreement claim that there not

9   be withdrawal liability.

10          MR. TENENBAUM:  I'm not -- I don't think I agree

11  with that, Your Honor.  I think the -- what the collective

12  bargaining agreement prescribes is that there shall be

13  contributions to the fund.

14          THE COURT:  So the --

15          MR. TENENBAUM:  And --

16          THE COURT:   -- the obligation of --

17          MR. TENENBAUM:  I mean, the --

18          THE COURT:   -- of Hostess to the fund -- I mean,

19  I'm sorry -- to the CBA doesn't include -- it's -- it's not

20  -- it's preventing withdrawal liability?  That's not part of

21  the debt owed under the CBA?

22          MR. TENENBAUM:  The withdrawal liability is not

23  really a debt owed under the CBA.  It's possible that some

24  -- it may be that there's -- that there's a provision in

25  there that incorporates the trust agreement and the trust

Page 185

1   agreement provides for withdrawal liability.  But if -- but

2   people put all sorts of things in collective bargaining

3   agreements that say we'll comply with the law.  They put in

4   the collective bargaining agreement that we don't --

5               THE COURT:  Well, that's what they're working for.

6               MR. TENENBAUM:  -- they right in collective

7   bargain -- in the collective bargaining agreement that we

8   won't discriminate based on race.  Well, they would -- they

9   would have that obligation whether they put that in the

10  collective bargaining agreement or not.  Withdrawal

11  liability is a statutory claim, basically, just like the

12  minimum funding contributions and single employer plans, but

13  not any multi-employer plans.

14              I think everything else I could say would be

15  repetitive of what the other unions have said.

16              Thank you, Your Honor.

17              THE COURT:  Okay.

18              MR. WOLF:  Your Honor -- Your Honor, if I may,

19  just on the withdrawal liability issue.  If you look at

20  McFarland's and the Marcal Paper, which are the two leading

21  cases as to whether withdrawal liability is prepetition,

22  post-petition and, therefore, an administrative expense, the

23  courts in both those cases looked specifically -- they

24  divided it by when the labor was performed.

25              And, also, as to withdrawal liability and as to

Page 186

1    the minimum funding obligation that I was discussed earlier,

2    they're both look -- they're both based on look back.  When

3    you say withdrawal liability accrues post-petition,

4    withdrawal liability is also based upon contribution history

5    and -- and things along that line.  And the Marcal Paper

6    decision by the Third Circuit, which also -- which cited

7    McFarland's, spends -- has an analysis that coordinates

8    perfectly with what I was saying earlier about Cinner

9    Hauserman and about Finley Kumble in they go back to where

10   the obligation sprung from.

11          That's all I wanted to add.

12          THE COURT:  Okay.

13          MR. WOLF:  Thank you, Your Honor.

14          MR. KROL:  Your Honor, if I may.  Jeffrey Krol

15   appearing on behalf of the Automobile Mechanics local 701

16   pension fund.

17          THE COURT:  Yes.

18          MR. KROL:  Your Honor, I would just like to point

19   out a couple of issues that I've -- that I've heard here

20   today, specifically in the McFarland case that -- the

21   McFarland case that everyone keeps citing to.  It states

22   that this consideration was not furnished for the benefit of

23   the debtor-in-possession or in the continuation of

24   McFarland's business after it went into bankruptcy.

25   Therefore it is not a prepetition -- or predating the filing

Page 187

1    of a Chapter 11 petition and that, therefore, it cannot

2    qualify as an administrative expense.

3           What the Court and I think everyone else here is

4    appearing to miss is that every time that a contribution is

5    made to the pension fund, it's going to either increase or

6    decrease the possibility of what that participant is going

7    to receive.

8           So what the participants is going to receive when

9    he retires is based off of the amount of contributions that

10   are contributed.  So if there are left contributions being

11   contributed on his behalf post-petition, he is going to

12   suffer to the negative by not being able to have a full

13   credit of pension in the future.

14          And that's all I would like to add.

15          THE COURT:  Okay.

16          THE COURT REPORTER:  Judge, who was that?

17          THE COURT:  Could you just state your name again

18   for the record?

19          MR. KROL:  Jeffrey Krol appearing on behalf of the

20   Automobile Mechanics.

21          THE COURT:  Okay.  Thank you.

22          MR. BENZIJA:  Your Honor, Walter Benzija on behalf

23   of Central Pension Fund.

24          I just wanted to confirm that the CBAs do provide

25   for an hourly rate per hour worked as the calculation of the

Page 188

1    monthly contribution fund.

2            Also, Your Honor, that the fund status is a green

3    fund.  That should and ought to mean something in this

4    context, even if it were relevant, which we don't believe it

5    is, that this question of underfunding we've all been

6    focusing on.  As we've said before and as other speakers

7    have indicated, this claim arose from actual hours worked

8    during the post-petition period, but the fact that it is a

9    green fund should matter.  There are consequences to not

10   being a green fund, which -- which are regulated by statute

11   as to allocations and specific repayments that aren't

12   applicable to funds in that status.

13           And that also goes to the issue overall of a

14   single employer plan versus a MEP in that single employer

15   plans are required to be completely funded.  There is no

16   such specific requirement with respect to multi-employer

17   plans, although there are consequences to being funded below

18   a certain percentage.

19           I submit, therefore, Your Honor, that because of

20   the green status, it ought to effectively deal with the

21   issue of -- of whether there's any allocation to be made for

22   hours worked, contributions earned post-petition.

23           And by the way, Your Honor, just to -- to make the

24   citation, 2 U.S.C. 1145 of the ERISA statute does provide

25   and does obligate employers to continue to make

Page 189

1    contributions to multi-employer funds to the extent

2    contractually obligated, in this case, under the CBA, unless

3    it would be contrary to applicable law.

4           Here, the prepetition amounts certainly would be

5    the post-petition amounts are due and owing, both under

6    ERISA and we submit under the Bankruptcy Code.

7           Thank you, Your Honor.

8           THE COURT:  All right.

9           Okay.  You -- you have anything in response?

10          MS. LENNOX:  I -- I do, Your Honor, very briefly

11   on a couple of points mostly raised by Mr. Freund, but maybe

12   a couple by the others.

13          Actually, Your Honor, I was going to ask if we

14   could take a five-minute break because --

15          THE COURT:  Yes.  That's fine.  I'll --

16          MS. LENNOX:  -- I need a break.

17          THE COURT:  -- be back at -- at 2:30.

18          MS. LENNOX:  Thank you, Your Honor.

19          THE COURT:  Okay.

20      (Recess taken at 2:19 p.m.)

21          THE COURT:  Please be seated.

22          Okay.  We're back on the record in Hostess Brands.

23          MS. LENNOX:  Yes.  Thank you, Your Honor, for your

24   indulgence there.

25          I think I just have three things that folks

Page 190

1        brought up that I would like respond to.

2               First, I just want to clarify because there was a

3        colloquy, I think, you had with Mr. Freund about the trust

4        agreement being part of CBA and then what's required for

5        contributions as a result of that.

6               The trust agreement is incorporated into the

7        collective bargaining agreements by -- by reference,

8        pursuant to the terms of the collective bargaining

9        agreements themselves.  In fact, we -- we actually have some

10       of those agreements in evidence through Mr. Carlotta's (ph)

11       declaration.  If you look at the pension sections of those,

12       it specifically incorporates it in there.

13              Also, in Exhibit A that we filed to our objection,

14       we -- and we pulled these provisions from the various BCT

15       collective bargaining agreements.  Most of them have the

16       phrase in there that says, "This clause" -- meaning that the

17       employer agrees to the contribute to the fund.  "This clause

18       encompasses the sole and total agreement between the

19       employer and the union with respect to pensions or

20       retirement."

21              So that -- you know, what the trust agreement says

22       and what the collective bargaining agreement says you have

23       to contribute and when you have to contribute is the sole

24       agreement between the BCT and the debtors with respect to

25       pension obligations, which takes you back to what does the

Page 191

1    trust agreement say, and we have gone through that before,

2    Your Honor.  That says we don't have to contribute anymore.

3              That kind of clause was upheld -- was -- was

4    actually interpreted in the Ralph's Grocery case which is a

5    Fourth Circuit case from 1997 that actually the objectors'

6    cite in their papers, I think the BCT cites it in its paper.

7    And it references a clause like that and it's -- they call

8    it a standard clause and the standard clause say it

9    encompasses "the sole and total agreement between the

10   company and the union."

11             And that standard clause in that case was

12   basically rendered null.  The Court -- the Fourth Circuit

13   found that it rendered null another provision of the

14   collective bargaining agreement that purported to exclude

15   contributions to be made to the pension fund based on

16   severance pay.

17             So the employer was trying to say, well, look,

18   this is severance.  I don't have to contribute to the fund

19   based on that.  That's not hours worked.  That's severance.

20   And there was a clause in the collective bargaining

21   agreement that supported that argument.  The Fourth Circuit

22   found that because there was this standard clause that this

23   was a sole and total agreement you had to go back and look

24   and see what the trust agreement said.  And so we've been

25   through, Your Honor, and I'm not going to repeat here what

Page 192

1    the trust agreement says.

2            Secondly, I want to -- I want to address as a

3    preliminary matter an argument about how these contributions

4    are wages because they're not.  And that will lead into the

5    final point that I want to make.

6            Everybody keeps saying this is wages.  It's not

7    true.  Pensions are not wages.  Healthcare is not wages.  If

8    they were, we wouldn't need two sections of the code for

9    priority claims:  One for wages and one for benefits.

10   Pensions are benefits.

11           I do agree that offering a pension is part of an

12   economic package that an employer will offer to an employee

13   that has several components:  Wages, commissions, benefits,

14   healthcare, that sort of thing, and a pension.  Providing a

15   pension is the economic package.  But providing a pension

16   says, I'm going to provide a pension.  It doesn't say, and

17   I'm going to make these specific contributions to that

18   pension.

19           The whole concept of this is wages.  This is

20   benefits.  It goes to the obligation of the employer to

21   provide one in the first place because the contribution

22   funding levels change, and they change based on collective

23   bargaining changes as -- as they bargain.  They change based

24   on federal law.  We had mentioned that the Pension

25   Protection Act now imposes outside of a collective

Page 193

1    bargaining agreement a surcharge for critical funds that the

2    employer is required to contribute.

3              And so I think that --

4              THE COURT:  But -- but these --

5              MS. LENNOX:  -- that's a bit of a --

6              THE COURT:  -- these contributions don't change,

7    right?  They're specifically provided for in the CBAs?

8              MS. LENNOX:  Well, maybe they don't change for

9    three years or -- or as one of the plan funds indicated,

10   well, if they really need underfunding they can go to the

11   union and ask the union to reopen bargaining with the

12   employer because they need more money.  This is all subject

13   to bargaining.  It changes.  Now they may choose not to

14   change as part of bargaining, but they can.  And -- and it

15   can change every time the contracts open for bargaining.

16             So the benefit that we provide is providing the

17   pension, and those pensions aren't going away.  We are not

18   withholding money from employees' paychecks to make the

19   contributions.  That's not how it works.  I understand the

20   argument that they're trying to make, but I think it is not

21   precise in the way that they've made it.

22             And that leads to the final point that I want to

23   talk about.  Mr. Freund repeats -- repeated this.  It's in

24   his papers, and several of the other fund movants repeated

25   this, and they repeat the concept that post-petition

Page 194

1   contributions that we make is for accruing benefits for that

2   year.

3            And Mr. Freund took great pains to say, but, you

4   know, we're not a frozen fund so, you know, that -- that

5   difference there doesn't apply to us.  If that was a general

6   statement, if pension contributions that you had to make for

7   the current year is for the benefits that accrued that year,

8   then that can't be a general statement because it doesn't

9   apply at all to frozen funds.

10           It also doesn't apply to Mr. Freund's fund because

11  our employees are not accruing benefits this year in the BCT

12  fund.  The fund is not frozen, but we're not accruing

13  benefits.  The November 25th letter from the fund to our

14  employees said you stopped accruing benefits in December of

15  2011.  So the post-petition contributions can't be for the

16  benefits that our employees are supposed to be accruing this

17  year because they aren't accruing any.

18           And even if that were a true statement, even if

19  the concept that a post-petition contribution equates to the

20  benefits accrued that year, even if that were true, then

21  what is the point of calculating the normal costs and why is

22  the normal cost different and lower in most cases, if not

23  all, than the contributions that the fund receives for the

24  year.  There's -- there's a disconnect.

25           And, in fact, Mr. Tenenbaum actually disagreed

Page 195

1    with all of this.  I think his statement was there's no

2    direct tie between contributions and the benefits accrued.

3    I think he's right.  What he said was what the collective

4    bargaining agreement says is that you're going to make a

5    contribution to the fund.  And, in fact, counsel for the

6    central fund basically said he -- he said that his agreement

7    said that their collective bargaining agreement provides for

8    an hourly rate as a calculation for the contribution.  It is

9    a funding mechanism.  It is --

10              THE COURT:  It is what?

11              MS. LENNOX:  It is a funding mechanism.  It's a

12   calculate -- to your point, Your Honor, you asked, you know,

13   is it a direct benefit or is it -- let me use your exact

14   words here, at least as I wrote them down -- is it a measure

15   of contribution.  I think Mr. -- I think what counsel for

16   the central fund confirmed that it is a measure of the

17   contribution.

18              Counsel for the central fund also pointed out at

19   the end that there's a provision of ERISA that requires

20   pension contributions to be made on a -- requires pension

21   contributions to be made to a fund.  Well, there's also a

22   simpler provision of ERISA that requires minimum funding

23   contributions to be made to a fund.  But that doesn't mean

24   that they get made in full.  They get pro-rated.

25              In fact, Your Honor, as a general matter, there's

Page 196

1   no other way to make up the funding deficiency in the plans,

2   whether they're civil employer plans or multi-employer

3   plans.  There's no way to make up a funding deficiency other

4   than two things can happen:  One, you can get fantastic

5   improvement on your investments.  Their value could go up.

6   And the only other way to do it is through increase your --

7   increasing your funding, increasing your contributions.  And

8   that's why the contribution rates are set the way they were,

9   or should be set the way they were.

10          And if they drop too low and are in critical

11  status, that's why congress and the Pension Protection Act

12  in 2006 says, we're going to make you make additional

13  contributions because it's the only way to satisfy an

14  underfunding.  And so I think the overall theme that

15  contributions are necessarily tied to the benefits being

16  accrued at the time doesn't hold water.

17          Thank you.

18          MR. FREUND:  Your Honor, we've been on for a long

19  time, but since Ms. Lennox talked about us particularly, I

20  thought I could -- you would indulge me for a moment.

21          THE COURT:  Okay.

22          MR. FREUND:  A couple of random -- sort of random

23  points to respond to, a couple of Ms. Lennox's random

24  points.

25          So one of the cases that she referred to is Ralph

Page 197

1    -- referred to was Ralph's Grocery Store.  That happened to

2    be my firm's case, so I know something about it.  And rather

3    than try to characterize it, I want to just read a passage

4    to you from -- from that opinion.  The Court said the

5    following:

6         "The primary difficulty with this argument is that

7    the promise that the severance pay -- the funds' severance

8    pay policy is in conflict with the collective bargaining

9    agreement" -- and here's the important reference -- "but the

10   meaning of the collective bargaining agreement is the very

11   issue in this case.

12        "As previously explained, the controlling language

13   in the collective bargaining agreement is found in the

14   standard clause and, as we have seen, that language is

15   consistent with the funds' severance pay policy.  The

16   controlling language is not the fund documents.  The

17   controlling language is the collective bargaining agreement

18   and the collective bargaining agreement requires a

19   contribution of $2.46 per hour."

20        So whatever -- whatever else one might say,

21   Ralph's Grocery Store stands for the very simple and

22   straightforward proposition that it is the bargain of the

23   parties -- the union on the one side and the company on the

24   other side -- that controls the -- that controls the

25   obligation.

Page 198

1           Related to that is Ms. Lennox's point about what

2    -- what the -- what the benefit is -- what the contribution

3    is tied to.  I said this in my opening remarks and others

4    have said this as well, but it bears repeating in light of

5    Ms. Lennox's observations.  If -- if John -- if Mr. Jones,

6    in my example, does not work an hour post-petition and we

7    have a contribution made on his behalf he will not get a

8    pension credit.  He will not get an additional pension

9    credit because he didn't -- he either did not work or did

10   not have that contribution made on his behalf.

11           When that contribution is made on his behalf, he

12   gets a pension credit for -- he gets an hour's worth of

13   pension credit which goes to the calculation of his pension,

14   nobody else's.  It goes to the -- for the calculation of his

15   pension.

16           And so the hour work -- the hour of work that he

17   performed for the debtor post-petition for which the debtor

18   is obligated to pay $2.46 in the example we used, provides

19   Mr. Jones with an hour's worth of pension credit which goes

20   to his -- his or her accrual of pension credits during the

21   course of that year.

22           And then -- and then turning to Ms. Lennox's

23   observations about the fact that the fund terminated Hostess

24   and, therefore, Mr. Jones is not accruing any pension

25   benefit, aside from the fund's observations earlier in -- in

Page 199

1    this case as to what a position it would take, I think it

2    would be useful again for me to quote, if I can, from a

3    bankruptcy court decision that we cited, but didn't quote

4    extensively in our brief.  It's the Mr. Movies' case.  The

5    Bankruptcy Court in Mr. Movies said the following:

6            "The doctrine of impossibility applies only in

7    cases where an impossibility, whatever it may be, was not

8    self-created."  Citing to the restatement.  "Debtor argues

9    that once the Chapter 11 case was filed, it could not make

10   any payment to a prepetition creditor or a prepetition claim

11   outside the plan.  That is correct.  But it is not an excuse

12   because the wound is self-inflicted.  The debtor voluntarily

13   filed a bankruptcy petition which created the very

14   disability of which it now complains."

15           And that's cited at page 186 of that opinion.

16           There's no escaping the reality that what Hostess

17   is trying to do here with respect to my client, the union,

18   is to rest on its decision to cease making payments to the

19   fund, suffer the termination, and -- and then rely on the

20   fact that it is -- that it is in Chapter 11 for the

21   proposition that it has no obligation.

22           And then, finally, and I think this is -- I don't

23   want to say it's tangential, but, you know, in the sense it

24   makes the point.  I know our claim for the union and I think

25   it is the case with respect to the other funds, although the

Page 200

1  other funds may be in a somewhat different situation if

2  they're -- if they're green, our claim does not include in

3  it any surcharges that may or -- or any rehabilitation plan

4  costs that may be adopted at some point in the future by the

5  B&C fund trustees in connection with the Pension Protection

6  Act.

7          I would understand an argument -- I would

8  understand -- I -- I might push back against it, but I would

9  understand an argument to be made that -- that might be made

10  that either statutory surcharges that are imposed on a

11  pension fund and actually, ultimately, on an employer by

12  reason of the funds having gone into -- into the red zone, I

13  would understand an argument that -- that that's shouldn't

14  be treated as an administrative claim.

15          I would understand an argument that if a fund

16  adopted a rehabilitation plan rather than simply have the

17  statutory surcharge be imposed and that that rehabilitation

18  plan required additional employer contributions, I would

19  understand an argument that that might not be an

20  administrative claim.  But that's not -- that's not our

21  claim and I don't believe that's the claim of any of the

22  funds that have moved before this Court.

23          THE COURT:  Okay.

24          MR. FREUND:  Thanks.

25          THE COURT:  All right.  I'm going to give you my

Page 201

1   ruling on June 19th, which is the next omnibus day.  And

2   that will give all the parties, if they want, the

3   opportunity to submit an additional brief by June 15th.

4           What I would be interested in reading is a roadmap

5   within the documents of the origin or basis for the claim

6   and/or why, on the debtors' part, they believe that those

7   documents mean that the claim is really not entitled to

8   prepetition -- not entitled to post-petition status.

9           That may call into play -- and I would find this

10  useful, too -- discussions about the debtors' argument about

11  normal costs and the distinction that the bakers' union

12  draws in a couple of paragraphs between single employer

13  plans and multi-employer plans, and whether, in fact, that

14  distinction is -- is real or not in the context of, again,

15  whether the consideration here is for pre or post-petition

16  obligations.

17          If there is anything more to be said on frozen

18  plans and on -- you know, like particular plans and also on

19  the bakers' plans' suggestion that the debtor could be

20  readmitted and then booted out again, I would like to know

21  about that; booted out after it made the post-petition

22  claims.

23          You don't have to submit anything more if you

24  don't want to, and I would contemplate simultaneous

25  submissions.

Page 202

1          Part of why I'm asking for this is that a fairly

2    large amount of the debtors' argument and the response

3    really came up in just a few paragraphs of one of the

4    movants response, which is the bakers' response, and I want

5    to give you all a chance, beyond what you've said to me

6    today, to tie your arguments into the documents.

7          The issue here, I think, is -- it's important to

8    keep in mind -- and I think you all have -- is a narrow

9    bankruptcy law issue, which is what is the priority of this

10   claim and -- and nothing beyond that.  There's clearly a

11   claim.  The issue is whether its priority should be under

12   the applicable case law.

13         So that's -- that's where we are.  I -- I also

14   cannot help but recognize that at some level, although I

15   appreciate all the work that people have put into it, this

16   may well be a completely academic exercise and I strongly

17   encourage the parties, if they have a choice between

18   bargaining over their future relationship with the debtors,

19   which I trust will include in some way, shape or form,

20   pension plans, if they have a choice between doing that and

21   fighting on this issue, they do the former and not the

22   latter.

23         That's not to say that I need to fix the amount of

24   claims and the priority of the claims, and I -- I do that

25   and I must do that and there's no reason to put that off

1    because one side wants it puts off, because that obviously

2    increases the leverage too much or puts too much leverage on

3    the other side.

4             But on the other hand, the record that I have

5    before me in the case generally is that either the parties

6    will reach an agreement on the fundamentals of a plan which

7    includes the treatment of the various emails, including the

8    pension obligations, or fixing the administrative claim here

9    would be a -- well, let's put it this way.  There won't be

10   that much of a distinction between bankruptcy dollars and

11   hundred cent dollars, notwithstanding the legal distinction.

12            So I strongly urge you all to try to resolve these

13   issues.

14            I am not suggesting, however, that the unions give

15   in on this claim issue by any means in those negotiations,

16   you know, as a legal matter.  So I'll see you all the 19th,

17   if not on the 5th.

18            Did you want to discuss that at all or are you

19   just going to tell us later whether -- if we're having the

20   5th or not?

21            MS. LENNOX:  There -- there's one -- currently,

22   there's one matter that's scheduled for the 5th, Your Honor,

23   and that's the other union's motion for the 1113.  We have

24   ten other unions.  We actually reached out to them last

25   night to ask to adjourn it to the 19th because --

Page 204

1              THE COURT:  Okay.

2              MS. LENNOX:  -- I think people are waiting to see

3     what, if anything, comes of our discussions with the IBT

4     after Your Honor's ruling.

5              THE COURT:  You mean the ruling from earlier this

6     month?

7              MS. LENNOX:  From earlier this month.

8              THE COURT:  Okay.

9              MS. LENNOX:  Yeah.

10             THE COURT:  All right.  I -- you know, I know it's

11    kind of -- for bankruptcy judges to say that the parties

12    should continue to negotiate in these context.  I'm

13    obviously not as close to it as you all are.  I think that

14    the -- it's clear from looking at your faces you've been

15    working hard on this.  But there are times in a case when

16    the judge really feels that it's time to, you know, make

17    something happen and I have a very strong sense that you all

18    are at that point.

19             Maybe I -- maybe I'm missing something, but I

20    think that by now the parties really should have gotten a

21    handle on the debtors' business as much as they can, the

22    debtors' costs, what needs to get paid, what it would like

23    to get paid but it can't get paid, and it's really time, if

24    anybody is on the fence, to get off the fence and -- and,

25    you know, make a deal, if you can.  I -- I'm usually right

Page 205

1    in that and I think most judges are.

2            So I'm really telling you this is not just going

3    through the motions here.  I really think it's -- it's time

4    for you all to make a deal and concluding -- and I know the

5    teamsters don't have their main group here, but they -- they

6    have people here that -- and I -- there's no reason to delay

7    and every good reason to -- to make your best deal at this

8    point, whether you're a secured lender, whether you're the

9    creditors' committee, or whether you're one of the unions.

10           MS. LENNOX:  Thank you, Your Honor.

11           THE COURT:  Okay.  Thank you.

12       (Whereupon, these proceedings were concluded at 3:00

13   p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 206

1                        E X H I B I T S

2

| PARTY | NO | DESCRIPTION | ID. | EVID. |
|-------|----|-------------|-----|-------|
| Debtor | 1 | Declaration of Lori | | |
| | | Reed | -- | 99 |
| | 2 | Declaration and Form | | |
| | | 5500's | -- | 104 |

Page 207

1                            I N D E X

2

3                              RULINGS

4                                             Page      Line

5   Fourth Omnibus Motion of Debtors          13        20

6

7   Fifth Omnibus Motion of Debtors           14        10

8

9   Motion of Debtors Authorizing the

10  Payment of Director Fees                   15        20

11

12  Motion for Limited Relief from

13  Automatic Stay - Sen Deckard              16        22

14

15  Notion of No Objection Regarding

16  Motion to Approve Settlement Agreement

17  with Sugar Foods Corporation              18        22

18

19  Motion of Comerica Bank for Relief from

20  the Automatic Stay                        18        24

21

22  Debtors Motion to Establish Alternative

23  Dispute Resolution Procedures for

24  Personal Injury Claims                    80        14

25

Page 208

1    Motion to Life Stay - Mr. speck                    89          6

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 209

1                    C E R T I F I C A T I O N

2

3       I, Dawn South and Sherri L. Breach, certify that the

4       foregoing transcript is a true and accurate record of the

5       proceedings.

6

7       **Dawn South**     Digitally signed by Dawn South
                            DN: cn=Dawn South, o=Veritext,
8                           ou, email=digital@veritext.com,
                            c=US
9                           Date: 2012.06.01 16:14:09 -04'00'

10      AAERT Certified Electronic Transcriber CET**D-408

11

12      Also transcribed by:

13

14      **Sherri Breach**   Digitally signed by Sherri Breach
                             DN: cn=Sherri Breach, o=Veritext, ou,
15                           email=digital@veritext.com, c=US
                             Date: 2012.06.01 16:14:31 -04'00'

16      Sherri L. Breach

17      AAERT Certified Electronic Reporter & Transcriber

18      CERT*D-397

19

20      Veritext

21      200 Old Country Road

22      Suite 580

23      Mineola, NY 11501

24

25      Date:   June 1, 2012