```
 1                   UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3      - - - - - - - - - - x

 4      In re:                             Chapter 11

 5      HOSTESS BRANDS, INC.,              Case: 12-22052 (RDD)

 6

 7           Debtors.

 8      - - - - - - - - - - x

 9         MODIFIED BENCH RULING ON THE MOTION OF THE BAKERY,
             CONFECTIONARY, TOBACCO WORKERS AND GRAIN MILLERS
10       INTERNATIONAL UNION TO DISMISS FOR LACK OF SUBJECT MATTER
                                JURISDICTION
11
```

**12    HON. ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:**

13            I have before me the motion of the Bakery,

14   Confectionary, Tobacco Workers and Grain Millers

15   International Union -- or the Bakers' Union -- to dismiss

16   the 1113/1114 motion of the debtor for lack of subject

17   matter jurisdiction.

18            The motion is premised upon the Bakers' Union's

19   view of the plain language of Section 1113 of the Bankruptcy

20   Code, which is the sole source to permit the rejection of a

21   collective bargaining agreement by the bankruptcy court.

22            The statute provides, in relevant part in Section

23   1113(a), that "The debtor in possession may assume or reject

24   a collective bargaining agreement only in accordance with

25   the provisions of this section."  Sections (b) through (d) -

1   - or subsections (b) through (d) of Section 1113, then set

2   forth the criteria and process for a debtor in possession's

3   rejection of a collective bargaining agreement.

4          And then Section 1113(f) provides that "no

5   provision of this title shall be construed to permit a

6   trustee" -- which is defined in Section 1113(a) as also

7   including a debtor in possession -- "to unilaterally

8   terminate or alter any provisions of a collective bargaining

9   agreement prior to compliance with the provisions of this

10  section."

11         In each instance of the sections that I've quoted

12  the statute refers to a "collective bargaining agreement."

13  The Bakers' union asserts that now that its identified

14  collective bargaining agreements have expired, they are not

15  viewed under the law as "agreements," but, rather, they are

16  viewed as setting forth terms that remain, in part, in

17  effect until the parties, in good faith, bargain to impasse,

18  at which point those terms are no longer in effect under the

19  NLRA, subject, of course, to either party's right to seek a

20  determination from the NLRB, and then, ultimately, through

21  the court process, that the other side had not bargained in

22  good faith to impasse.

23         The Bakers' union contends -- and I agree with it

24  -- that, technically speaking, that regime, that post-

25  expiration regime is not one in which the collective

```
 1    bargaining agreement itself governs, but, rather, that the

 2    NLRB governs in a way that leaves key provisions, but not

 3    all of the provisions, of the collective bargaining

 4    agreement in effect under the law.

 5              The debtors contend that in drafting Section

 6    1113(a) through (d) and 1113(f) Congress meant more than

 7    simply that collective bargaining agreement as a contract,

 8    but also any of the debtor's obligations under that

 9    agreement, including obligations to perform according to the

10    terms of the provisions of such agreement that are required

11    to be performed under the NLRA until good faith bargaining

12    to impasse.

13              Both sides have argued their positions effectively

14    and, frankly, there is considerable merit to each position.

15    The case law in this area is far from controlling.  Both

16    sides have cited decisions that favor their respective

17    positions.  The debtors rely, as far as decisions on point,

18    primarily upon In re Karykeion Inc., 435 B.R. 663 (Bankr.,

19    C.D. Cal. 2010).

20              In that decision Bankruptcy Judge Tighe agrees

21    with the debtor's view that the interpretation that the

22    Bakers' Union would impose on the statute would

23    impermissibly leave a debtor at the mercy of a non-

24    bankruptcy court-supervised - - and, necessarily, under the

25    statute -- rapid bargaining and decision-making process,
```

```
 1   instead subjecting them to the uncertainties of what Judge

 2   Tighe refers to as "the more formal bargaining process"

 3   under the NLRA, as informed by the risk of after-the-fact

 4   sanction under Sections 8(a) and 8(d) of the NLRA.

 5            The Karykeion opinion concludes that Congress must

 6   not have meant to subject a debtor to that process when, in

 7   essence, the key provisions of the collective bargaining

 8   agreement are still in effect post-expiration.  In support

 9   of that view, Judge Tighe cites, as do the debtors, Section

10   1113(e) of the Bankruptcy Code which states, "If, during a

11   period when the collective bargaining agreement continues in

12   effect and if essential to the continuation of the debtor's

13   business, or in order to avoid irreparable damage to the

14   estate, the court, after notice and a hearing, may authorize

15   the trustee to implement interim changes in the terms,

16   conditions, wages and benefits or work rules provided by a

17   collective bargaining agreement.  Any hearing under this

18   paragraph shall be scheduled in accordance with the needs of

19   the trustee.  The implementation of such interim changes

20   shall not render the application for rejection moot."

21            Judge Tighe points out that the phrase "when the

22   bargaining agreement continues in effect" in Section 1113(e)

23   could easily be read to contemplate that the terms of the

24   agreement remain in effect or terms of the agreement as

25   opposed to the agreement remain in effect, which arguably is
```

1   a fair layman's summary of what happens after the expiration

2   of a collective bargaining agreement.

3           That view is buttressed by the fact that

4   Subsection 1113(e) refers to alterations only in respect of

5   conditions waived as benefits or work rules which, at least

6   based on my understanding, would be the types of provisions

7   that would be viewed as carrying on after expiration until

8   good faith bargaining to impasse.

9           The other decision relied upon by the debtor

10  dealing with a similar fact pattern is In re Ormet Corp.,

11  316 B.R. 662 (Bankr. S.D. Ohio 2004), in which the court

12  concluded, where the 1113 process started, as it did here,

13  with agreements still in effect and the agreements

14  subsequently expired before the process ended, "The debtors

15  should not be penalized for their diligent efforts over the

16  course of several months to make a proposal based on the

17  most complete and reliable information available, and to

18  provide the parties with all necessary information to

19  evaluate that proposal.  The statute requires far less.  The

20  debtors also should not have to risk being charged with an

21  unfair labor practice by declaring an impasse and

22  unilaterally making changes to the terms and conditions of

23  the parties' agreements without this Court approval." 316

24  B.R. at 665.

25          Both of those decisions assume without any real

1  evidence that there would, in fact, be a material difference

2  in the time within which a debtor could get comfort that the

3  proposed new terms for a collective bargaining agreement

4  could, in fact, be enforced without the risk of sanction.

5      They also assume, without any real evidence, that

6  the uncertainty of a subsequent NLRB determination and an

7  inevitable litigation -- which would probably end up with a

8  litigation at the federal court level under Section 8(a) or

9  8(d) of the NLRA -- would so chill the debtor's

10 reorganization efforts and, in particular, the debtor's

11 efforts to raise exit financing or close a transaction

12 necessary to preserve the debtor's going concern value that

13 Congress would have meant when it referred to "a collective

14 bargaining agreement" in Sections 1113(a) through (d) and

15 (f) that it includes the collective bargaining agreement [in

16 effect] after its expiration.

17     It is not clear to me that, in fact, that would be

18 the case, however.  Obviously, Congress imposed a rapid

19 bargaining process which, if the parties -- or one party --

20 does not pursue in good faith and which otherwise satisfies

21 the requirements of Section 1113 will lead to a court order

22 permitting the rejection of the collective bargaining

23 agreement.  And, intuitively, I feel that the bargain to

24 impasse process outside of the 1113 process, under the NLRA,

25 could well be more lengthy or create more risk of

1    uncertainty for prospective investors or acquirers of the

2    debtors as a going concern.  But it is at this level only an

3    intuition. The debtor has not offered evidence on this

4    issue.  It is a fact issue that for example, may lead to a

5    different result as between the NLRA and the RLA.

6             What is clear to me is that Congress created a sui

7    generis provision in Section 1113.  As noted by the Second

8    Circuit in In re Northwest Airlines Corp., 483 F.3d. 160 (2d

9    Cir. 2007), the purpose of Section 1113 is different from

10   the statutory construct of Section 365 of the Bankruptcy

11   Code.  It is a self-contained provision.  Thus, as

12   interpreted by the Second Circuit in the Northwest Airlines

13   case, it provides for the abrogation of a collective

14   bargaining agreement, if the court grants the debtor's

15   motion, which if it's not on a consensual basis means that

16   the union does not have a breach claim, given that there is

17   no provision of Section 1113 that provides for such a claim

18   and Sections 365 and 502(g) govern only rejections of

19   current contracts under Section 365.

20            The debtor's "policy and purpose" argument,

21   therefore, I believe is a stretch here.  Clearly, there is a

22   unique purpose to Section 1113, and that unique purpose is

23   intended to provide for expedited, good faith bargaining

24   and, ultimately, a determination by the court, if that

25   doesn't occur. But I do not necessarily read in the statute

```
 1    a purpose extending it beyond the collective bargaining

 2    agreement itself to discreet provisions of the agreement

 3    that would remain, under the law, although not under the

 4    agreement itself, in effect post-expiration.

 5              In fact, I view the language in Section 1113(e) to

 6    create a distinction between provisions that continue in

 7    effect and the agreement as a whole.  In construing the

 8    statute, it would appear to me to be more reasonable to view

 9    Section 1113(e) as an exception to Section 1113's other

10    provisions that generally focus on the contract itself and

11    not on term that would be in effect, except for instances,

12    as set forth in 1113(e), where, if it is essential to the

13    continuation of the debtor's business, or in order to avoid

14    irreparable damage to the estate, the court may authorize,

15    on an interim basis, the implementation of interim changes

16    to terms, conditions, waives, benefits or work rules.

17              There are two cases, including one from this

18    district, that come very close to taking that view.  (Of

19    course, one can distinguish each of them, as I'll point out

20    in a moment.)

21              But in both In re Chas. P. Young Company, 111 B.R.

22    410 (Bankr. S.D.N.Y. 1990) and In re D.O. & W. Coal Company,

23    93 B.R. 454 (W.D. Va. 1988), the court concluded that orders

24    under 1113(e) could continue to apply after the expiration

25    of the collective bargaining agreement.  Now in each of
```

1   those cases the court had already entered the order, so one

2   could distinguish those cases from the present facts in

3   saying that the court was continuing to implement an order

4   that the parties had relied upon.  But I believe the rulings

5   go beyond that, particularly Judge Blackshear's ruling in

6   the Chas. P. Young case. I do so particularly because in

7   that case he recognized, consistent with pre-Section 1113

8   case law (but of course this was after the event under

9   Section 1113) that "rejection of the collective bargaining

10  agreement pursuant to Section 1113(b) and (c) is a moot

11  issue if the agreement expires by its own terms and before

12  the bankruptcy court has a hearing on rejection."

13          He was not alone in reaching that conclusion.  It

14  was also reached after the enactment of Section 1113, albeit

15  in dicta, by the Ninth Circuit Bankruptcy Appellate Panel in

16  In re San Rafael Banking Company, 219 B.R. 860 (BAP 9th Cir.

17  1998). And it is stated by the editors of <u>Colliers</u>, albeit

18  that they rely upon some pre-Section 1113 authority as well,

19  that this is the majority view. 7 Collier on Bankruptcy

20  ¶1113.02[1][d](16th ed. 2011).

21          But my conclusion here is not a matter of toting

22  up the cases that take the Bakers' union's view of the

23  matter here and comparing them against the number of cases

24  that take the debtor's view.

25          My conclusion instead is based first on the plain

```
 1    language of Section 1113 as a whole and the distinction

 2    between 1113(e) and 1113(a) through (d) and (f); and,

 3    secondly, my view that, given the importance of Section 1113

 4    and its visibility and the visibility of the issues it

 5    relates to, I believe that Congress should be viewed as

 6    going only as far as the plain language takes it in this

 7    section, and that I should not presume to extend the

 8    language in the way that the debtor asks to do to further a

 9    policy concern, particularly where, again, the facts

10    allegedly supporting that policy argument are, I believe, on

11    this record no more than convincing at a merely intuitive

12    level.

13                I believe if I were to extend the language of

14    "collective bargaining agreement" to "collective bargaining

15    agreement in effect" or "collective bargaining agreement as

16    it covers the relations between the parties," I would be

17    basing that conclusion on, first, a policy that is not well-

18    articulated or found in the statute itself.  Secondly, I'm

19    of a view that as a factual matter I do not believe it has

20    been established that the post-expiration regime would so

21    interfere with whatever the congressional policy is behind

22    Section 1113 as to the negate, Congress's policy.  This

23    result might be different if the CBAs were governed by the

24    RLA.  *See* 7 Collier on Bankruptcy at ¶ 1113.07 [1][d].  And,

25    finally, I believe it would stretch the statute's language
```

1    too far.

2            As noted during oral argument, only certain

3    provisions of the collective bargaining agreement remain in

4    effect by operation of the NLRA.  So it appears to me that,

5    absent consent, the agreement could not be <u>assumed</u>, since it

6    can only be assumed in toto, again, unless the parties agree

7    to amend it, and it is logical that an agreement that cannot

8    be assumed under Section 1113(a) (which uses the phrase

9    "assume or reject"), also cannot be rejected under Sections

10   1113(a) and (c),

11           Given the expiration of the agreement, I believe

12   that 1113 instead leaves the parties (except, I believe,

13   under 1113(e)) under the fallback provisions of otherwise

14   applicable law, including here, the NLRA.

15           Courts have found at times that that fallback

16   regime may assist the debtor in relieving the debtor of

17   certain claims.  See, for example, In re CF&I Fabricators,

18   163 B.R. 858.  appeal dismissed, 169 B.R. 984 (Bankr. D.

19   Utah 1993), but I don't believe Congress intended in this

20   provision, and certainly not consistent with the plain

21   language of the provision, to impose the rejection process

22   on parties to an already expired agreement.

23           As the debtors have noted, and as the Second

24   Circuit has noted in the Northwest case, except for its

25   expedited time frame, the requirements of Section 1113(a)

```
 1   through (d) contemplate bargaining in good faith to impasse

 2   along with additional requirements going to the

 3   reorganization and the equities. Those requirements, at

 4   least the bargaining in good faith to impasse, I believe are

 5   in complete overlap with the NLRA process.  I find it hard

 6   to believe that, as a legal matter, the NLRB and any

 7   reviewing court would not take into account the context in

 8   which the debtors and the Bakers' locals find themselves,

 9   including the effect of uncertainty and the need for a quick

10   resolution in order to obtain exit financing for an

11   acquirer's agreement to preserve the debtors as a going

12   concern as opposed to having a liquidation.

13            And for that reason, again, it is hard for me to

14   find such a clear dichotomy between the process that the

15   union says must apply here and what the debtor contends

16   Congress intended to apply under Section 1113 to require

17   that 1113 would apply even when an agreement has expired.

18            So, for those reasons, I will grant the Bakers'

19   unions' motion and, Mr. Freund, you can submit an order

20   consistent with that ruling.

21

22   **Dated:** White Plains, New York
             June 22, 2012
23

24                                      /s/Robert D. Drain
                                        **UNITED STATES BANKRUPTCY JUDGE**
25
```