**<u>EXHIBIT A</u>**

**<u>PURCHASE AGREEMENT</u>**

12-22052-rdd Doc 2254-10 Filed 04/09/13 Entered 04/09/13 16:58:55 Exhibit Pg 246 of 135

EXECUTION VERSION

## ASSETS PURCHASE AGREEMENT

### Among

**Hostess Brands, Inc.**

**Interstate Brands Corporation,**

**IBC Sales Corporation,**

**United States Bakery**

**and**

**Mountain States Bakeries LLC**

**Dated as of January 28, 2013**

# TABLE OF CONTENTS

**Page**

I.   DEFINITIONS ..................................................................................... 1

    1.1   Certain Definitions ...................................................................... 1

    1.2   Other Definitional and Interpretive Matters ............................... 9

II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ................ 10

    2.1   Purchase and Sale of Assets ...................................................... 10

    2.2   Excluded Assets ........................................................................ 11

    2.3   Assumption of Liabilities .......................................................... 12

    2.4   Excluded Liabilities .................................................................. 12

    2.5   Cure Amounts ........................................................................... 14

    2.6   Non-Assignment of Assets ........................................................ 14

    2.7   Further Conveyances and Assumptions ..................................... 14

III. CONSIDERATION ................................................................................ 15

    3.1   Consideration ............................................................................ 15

    3.2   Purchase Price Deposit ............................................................. 15

    3.3   Payment of Purchase Price ........................................................ 15

    3.4   Apportionments ........................................................................ 15

IV. CLOSING AND TERMINATION ............................................................... 16

    4.1   Closing Date ............................................................................. 16

    4.2   Deliveries by Sellers ................................................................. 16

    4.3   Deliveries by Purchaser ............................................................ 17

    4.4   Termination of Agreement ......................................................... 17

    4.5   Procedure Upon Termination ..................................................... 18

    4.6   Effect of Termination ................................................................ 18

V.  REPRESENTATIONS AND WARRANTIES OF SELLERS ................................ 18

    5.1   Organization and Good Standing ............................................... 18

    5.2   Authorization of Agreement ...................................................... 19

    5.3   Conflicts; Consents of Third Parties .......................................... 19

    5.4   Real Property ............................................................................ 20

    5.5   Title to Purchased Assets .......................................................... 20

    5.6   Intellectual Property .................................................................. 20

| | | |
|---|---|---|
| 5.7 | Validity of Purchased Contracts | 21 |
| 5.8 | Litigation | 22 |
| 5.9 | Environmental Matters | 22 |
| 5.10 | Equipment | 22 |
| 5.11 | Financial Advisors | 22 |
| 5.12 | No Other Representations or Warranties; Schedules | 22 |
| **VI.** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | **23** |
| 6.1 | Organization and Good Standing | 23 |
| 6.2 | Authorization of Agreement | 23 |
| 6.3 | Conflicts; Consents of Third Parties | 24 |
| 6.4 | Litigation | 24 |
| 6.5 | Financial Advisors | 24 |
| 6.6 | Financial Capability | 24 |
| 6.7 | Condition of the Business | 25 |
| **VII.** | **BANKRUPTCY COURT MATTERS** | **25** |
| 7.1 | Competing Transaction | 25 |
| 7.2 | Break-Up Fee | 25 |
| 7.3 | Bankruptcy Court Filings | 26 |
| **VIII.** | **COVENANTS** | **26** |
| 8.1 | Access to Information | 26 |
| 8.2 | Actions Pending the Closing | 27 |
| 8.3 | Consents | 28 |
| 8.4 | Further Assurances | 28 |
| 8.5 | Publicity | 28 |
| 8.6 | Supplementation and Amendment of Schedules | 28 |
| 8.7 | Parent Guarantee | 29 |
| 8.8 | Names and Marks | 29 |
| 8.9 | Recipes | 30 |
| 8.10 | Copyrights and Trade Secrets | 31 |
| 8.11 | Confidentiality | 31 |
| 8.12 | Plant Closings | 32 |
| 8.13 | Employee Matters | 32 |
| **IX.** | **CONDITIONS TO CLOSING** | **32** |

9.1    Conditions Precedent to Obligations of Parent and Purchaser ............................ 32

9.2    Conditions Precedent to Obligations of Sellers .................................................. 33

9.3    Conditions Precedent to Obligations of Parent, Purchaser and Sellers .............. 33

9.4    Frustration of Closing Conditions....................................................................... 33

X.    TAXES......................................................................................................................... 34

10.1    Transfer Taxes .................................................................................................... 34

10.2    Purchase Price Allocation .................................................................................. 34

10.3    Certain Periodic Non-Income Taxes.................................................................. 35

10.4    Cooperation and Audits ...................................................................................... 35

XI.    MISCELLANEOUS ..................................................................................................... 36

11.1    No Survival of Representations and Warranties ................................................. 36

11.2    Expenses ............................................................................................................. 36

11.3    Injunctive Relief.................................................................................................. 36

11.4    Submission to Jurisdiction; Consent to Service of Process ................................ 36

11.5    Waiver of Right to Trial by Jury......................................................................... 37

11.6    Entire Agreement; Amendments and Waivers ................................................... 37

11.7    Governing Law .................................................................................................... 37

11.8    Notices ................................................................................................................ 37

11.9    Severability ......................................................................................................... 38

11.10    Assignment ......................................................................................................... 38

11.11    Non-Recourse ..................................................................................................... 39

11.12    Counterparts........................................................................................................ 39

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of the date set forth on the signature page hereto, among the entity identified on the signature page hereto as "Parent", the entity identified on the signature page as "Purchaser", a wholly owned subsidiary of Parent, Hostess Brands, Inc. (the "Company") and each of the Company's subsidiaries listed on the signature page (together with the Company, each a "Seller" and, collectively, the "Sellers").

## RECITALS:

A.      Sellers are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on January 11, 2012 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), where the Sellers' bankruptcy cases are jointly administered under Case No. 12-22052 (RDD) (collectively, the "Bankruptcy Case").

B.      Sellers are engaged in the business of manufacturing, marketing, selling and distributing bread and cake products.

C.      Sellers' businesses include the business (the "Business") of manufacturing, marketing, selling and distributing bread products under the Purchased Trademarks (the "Branded Products") and operating the Plants, Depots and Retail Thrift Stores.

D.      Subject to the terms and conditions set forth herein, Purchaser has agreed to purchase, and Sellers have agreed to sell, the Purchased Assets in accordance with sections 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, the parties hereby agree as follows:

## I.      DEFINITIONS

1.1      Certain Definitions.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this Section 1.1 or in other Sections of this Agreement identified in Section 1.2:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Bidding Procedures Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A.

"Business Day" means any day of the year on which banking institutions in New York City are open to the public for conducting business.

"CBA" means any collective bargaining agreement that is or was applicable to any Employee.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Depots" means the Business's depots, warehouses and other facilities identified on Schedule 5.4, including all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof owned by Sellers.

"Disputed Payable" means the unresolved account between the Company and Parent set forth on Schedule 3.1(c).

"Documents" means all files, documents, books, records, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, instruments, papers, reports, manuals, tapes, microfilms, hard drives, databases, compilations of information, photographs, letters, budgets, forecasts, supplier lists, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (including sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials located at the facilities at the Owned Real Property and exclusively related to the Business or the Purchased Assets, whether or not in electronic form, but excluding Documents exclusively related to the Excluded Assets and/or Employees.

"Employee Benefit Plans" means (i) all "employee benefit plans", as defined in Section 3(3) of ERISA, (ii) all employment, consulting or other individual compensation Contracts, and (iii) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, retiree healthcare, retiree life insurance, scholarship programs, plans or arrangements as to which any Seller Entity contributes, has an obligation to contribute, or has any liability, contingent or otherwise, with respect to the Employees.

"Employees" means all current and former employees of the Seller Entities.

"Environmental Law" means Law relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §§ 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901, et seq.), the Clean Water Act (33 U.S.C. §§ 1251, et seq.), the Clean Air Act (42 U.S.C. §§ 7401, et seq.) the Toxic Substances Control Act (15 U.S.C. §§ 2601, at seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136, et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651, et seq.) and all related regulations.

2

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the prior or ongoing ownership or operation of the Business, including Liabilities related to:  (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials or waste; (ii) the Release of Hazardous Materials or waste; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Laws with respect to the Business; and (v) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)–(iv) of this definition.

"Equipment" means all equipment (including ovens and related equipment and supplies), spare parts, machinery, fixtures, furniture, furnishings, in-store displays, trays, on-site vehicles and forklifts, leasehold improvements and other tangible personal property owned by Sellers and located at the Plants, the Depots or the Retail Thrift Stores at the Closing.

"Escrow Agent" means U.S. Bank National Association.

"Escrow Agreement" means an Escrow Agreement, substantially in the form of Exhibit B.

"Excluded Employee Liabilities" means any and all Liabilities of the Sellers of the types referred to or described in Section 8.13.

"Excluded Matter" means the effect of: (i) any change in the United States or foreign economies or financial markets in general; (ii) any change that generally affects the businesses in which Sellers generally compete; (iii) any change arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway as of the date hereof; (iv) any change in applicable Laws or accounting rules; (v) any actions taken or proposed to be taken by Purchaser or any of its Affiliates; (vi) any effect resulting from the public announcement of this Agreement, compliance with the terms of this Agreement or the consummation of the transactions contemplated by this Agreement; (vii) any effect resulting from the filing of the Bankruptcy Case, including Sellers' inability to pay certain obligations as a result of the filing of the Bankruptcy Case; (viii) any effect from the matters set forth in the Winddown Order; and (ix) any matter disclosed on any of the Schedules or in any filings by Sellers with the Bankruptcy Court prior to the date of this Agreement; provided, however, that with respect to clauses (i), (ii) and (iv), such effects do not disproportionately adversely affect the Business, taken as a whole, as compared to other companies operating in the industries in which Sellers operated.

"Final Order" means an Order that (i) is in full force and effect, (ii) is not stayed, (iii) has not been modified, reversed or amended and (iv) as to which the time to appeal from, to seek review, rehearing, reconsideration or amendment of or to petition for certiorari of has expired without any such pending appeal, application or petition.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the specified period and the immediately prior comparable period.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Material" means any substance, material or waste that is regulated by any Governmental Body, including petroleum and its by-products, asbestos, and any material or substance that is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste," "toxic substance" or otherwise regulated under any provision of Environmental Law.

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all worldwide intellectual property and rights, title and interests arising from or in respect of the following: all (i) trademarks, service marks, certification marks, collective marks, trade names, business names, slogans, acronyms, forms of advertisement, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, designs, devices, signs, symbols, design rights including product design, configuration and packaging rights, internet domain names, user names, screen names, internet and mobile account names, icons, symbols or designations, corporate names, and general intangibles of a like nature and other indicia of identity, origin or quality, whether registered, unregistered or arising by Law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing (collectively, "Trademarks"); (ii) published and unpublished works of authorship in any medium, whether copyrightable or not, whether in final form or not, in all media now known or hereafter created, including writings, graphics, artworks, photographs, compositions, sound recordings, motion pictures and audiovisual works, databases and other compilations of information, computer software, mobile and internet applications and content, source code, object code, algorithms, and other similar materials, all packaging, advertising and promotional materials related to the products, and all copyrights and moral rights therein and thereto, and registrations and applications therefor, and

all issuances, renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); and (iii) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, strategy, marketing data, marketing studies, advertisements, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, recipes, drawings, prototypes, models, designs, discoveries, technology, research and development and customer information and lists (collectively, "Trade Secrets"), together with all rights of action for past, present and future infringement of any of the foregoing Intellectual Property.

"Intellectual Property License" means (i) any Contract that contains any grant by any Seller to any other Person of any right to use, publish, perform or exploit any of the Purchased Intellectual Property, and (ii) any Contract (other than a Contract concerning the licensing of generally commercially available software, including "shrink-wrap" and "click-wrap" licenses) that contains any grant by any other Person to any Seller of any right to use, publish, perform or exploit any Intellectual Property of such other Person concerning or relating to the Purchased Intellectual Property.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" means the actual knowledge of those officers of Sellers identified on Schedule 1.1(a).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability, loss, claim (including "claim" as defined in the Bankruptcy Code), damage, expense, fine, cost, royalty, deficiency or obligation (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether direct or indirect, known or unknown, disclosed or undisclosed, matured or unmatured, determined or undeterminable, on or off balance sheet, fixed, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and including all attorney and other professional fees and other costs and expenses relating to the foregoing.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which a Seller Entity is required to make, or within the past three years has been required to make, contributions on behalf of, or for the benefit of, Employees.

5

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business as of the date of this Agreement.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body as of the Closing Date.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance which have been made available to Purchaser; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) any other imperfections in title, charges, easements, restrictions, licenses and encumbrances that do not materially affect the value or use of the affected asset; (vii) Liens for Taxes that constitute Assumed Liabilities; and (viii) Liens that will be released by the Sale Order; provided that, in the case of each of clauses (i) through (vi), none of such items secures any Indebtedness.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Plants" means the Business's bakeries located on the real property identified on Schedule 5.4, including all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof owned by Sellers.

"Purchased Intellectual Property" means all of the following: (i) the Recipes owned by Sellers and listed on Schedule 1.1(b) (collectively, the "Purchased Recipes"); (ii) the Trademarks owned by Sellers and listed on Schedule 1.1(c), and any variation of or Trademarks formative of any of the foregoing that are owned by Sellers and used in the Business (collectively, the "Purchased Trademarks"); (iii) all Copyrights and Trade Secrets (other than Recipes) owned by Sellers and used exclusively in connection with the operation or conduct of the Business; and (iv) all rights of action for past, present and future infringements of any of the foregoing.

"Purchaser Material Adverse Effect" means a material adverse effect on the ability of Parent or Purchaser to consummate the transactions contemplated by this Agreement or perform its respective obligations under this Agreement.

"Recipes" means the formulas and recipes used in the Business in connection with the production of Branded Products, including all Intellectual Property rights therein.

"Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material so it does

not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) correct a condition of noncompliance with Environmental Laws.

"Retail Thrift Stores" means the Business's retail thrift stores and other facilities located on the real property identified on Schedule 5.4, including all facilities, improvements, fixtures and other appurtenances thereto and rights in respect thereof owned by Sellers.

"Retained Recipes" means all Recipes owned by Sellers that are not Purchased Recipes.

"Retained Trademarks" means all Trademarks owned by Sellers that are not Purchased Trademarks and any variation of or Trademarks formative of any of the foregoing.

"Sale Hearing" means the hearing before the Bankruptcy Court held pursuant to the Bidding Procedures Order to determine the highest or best bid for the Purchased Assets.

"Sale Order" means the order (or orders) of the Bankruptcy Court which is not subject to a stay pending appeal, in form and substance reasonably acceptable to Purchaser and Sellers, approving this Agreement and all of the terms and conditions hereof and approving and authorizing Sellers to consummate the transactions contemplated hereby pursuant to sections 363 and 365 of the Bankruptcy Code and providing, among other things, substantially as follows:  (i) the Purchased Assets sold to Purchaser pursuant to this Agreement will be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and other than Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court will retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 11.4 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against, and are not subject to rejection or avoidance by, Sellers or any chapter 7 or chapter 11 trustee of Sellers.

"Seller Entities" means Sellers, all controlled Affiliates of Sellers and all predecessors of the foregoing.

"Seller Material Adverse Effect" means any event or occurrence (regardless of whether such event or occurrence constitutes a breach of any representation, warranty or covenant of Sellers hereunder) which has had or would reasonably be expected to have, individually or when considered together with any other events or occurrences, (i) a material adverse effect on or a material adverse change in or to the Purchased Assets, considered as a whole, or (ii) a material adverse change in or to the ability of Sellers to consummate the transactions contemplated by this Agreement or perform their obligations under this Agreement, other than in the case of clause (i) an effect or change resulting from an Excluded Matter.

"Tax Authority" means any Governmental Body or employee thereof charged with the administration of any Law relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes; (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code, or by contract, indemnity or otherwise; and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Vehicles" means all cars, vans, trucks and other vehicles identified on Schedule 1.1(d).

"Winddown Order" means the Final Order, Pursuant to Sections 105, 363, 365 and 503(c) of the Bankruptcy Code: (A) Approving (I) A Plan to Wind Down the Debtors' Businesses, (II) The Sale of Certain Assets, (III) Going-Out-Of-Business Sales at the Debtors' Retail Stores, (IV) The Debtors' Non-Consensual Use of Cash Collateral and Modifications to Final DIP Order, (V) An Employee Retention Plan, (VI) Protections for Certain Employees Implementing the Winddown of the Debtors' Businesses, (VII) The Use of Certain Third Party Contractors and (VIII) Procedures for the Expedited Rejection of Contracts and Leases; and (B) Authorizing the Debtors to Take any and all Actions Necessary to Implement the Winddown [Docket 1871].

Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| ABL Agreement | **Error! Reference source not found.** |
| Agreement | Preamble |
| Allocation Notice of Objection | 10.2(a) |
| Alternative Sale Break-Up Fee Percentage | **Error! Reference source not found.** |
| Assumed Liabilities | 2.3 |
| Auction Date | 7.1 |
| Avoidance Actions | 2.2(e) |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Branded Products | Recitals |
| Break-Up Fee | **Error! Reference source not found.** |
| Business | Recitals |
| Cash Amount | 3.1(a) |

| | |
|---|---|
| Chapter 11 Deposits | 2.2(f) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Company | Preamble |
| Competing Transaction | 7.1 |
| Deposit Amount | 3.2 |
| Deposits | 2.1(b)(i) |
| Environmental Reports | 4.2(c) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Existing Stock | 8.8(b) |
| Final Allocation Statement | 10.2(a) |
| Necessary Consent | 2.6 |
| Owned Real Property | 5.4(a) |
| Parent | Preamble |
| Periodic Non-Income Taxes | 10.3(a) |
| Petition Date | Recitals |
| Post-Closing Straddle Period | 10.3(b) |
| Pre-Closing Straddle Period | 10.3(b) |
| Proposed Allocation Statement | 10.2(a) |
| Purchased Assets | 2.1(b) |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Seller or Sellers | Preamble |
| Straddle Period | 10.3(b) |
| Termination Date | 4.4(a) |
| Transfer Taxes | 10.1 |
| WARN Act | 2.4(f) |

1.2     <u>Other Definitional and Interpretive Matters</u>.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

<u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.

<u>Dollars</u>.  Any reference in this Agreement to $ will mean U.S. dollars.

<u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

<u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

9

Gender and Number. Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

Headings. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)      The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## II.      PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1      Purchase and Sale of Assets.

(a)      On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from Sellers, and Sellers will sell, transfer, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens (other than those created by Purchaser and other than Permitted Exceptions) and Excluded Liabilities.

(b)      The term "Purchased Assets" means the following properties, assets and rights of Sellers (other than the Excluded Assets) existing as of the Closing:

(i)      all deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers made in connection with the Business exclusively, in each case to the extent utilizable by Purchaser as of or after the Closing ("Deposits"), other than Chapter 11 Deposits;

(ii)      all rights of Sellers with respect to the Owned Real Property together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

(iii)      the Equipment;

(iv)      the Vehicles;

     (v)     the Purchased Intellectual Property;

     (vi)     the Documents;

     (vii)     all Permits used by Sellers exclusively in the Business, to the extent assignable;

     (viii)     all warranties, guarantees and similar rights related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets; and

     (ix)     other than Intellectual Property that is not Purchased Intellectual Property, all goodwill and other intangible assets exclusively associated with the Business, including customer and supplier lists exclusively related to the Business.

     2.2     <u>Excluded Assets</u>.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers will retain all right, title and interest to, in and under the Excluded Assets.  The term "<u>Excluded Assets</u>" means assets of any Seller other than Purchased Assets, including:

     (a)     all cash and cash equivalents;

     (b)     all accounts receivable;

     (c)     any shares of capital stock or other equity interest of any Seller or any of their subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any such subsidiaries;

     (d)     any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain, including Tax Returns, financial statements and corporate or other entity filings; <u>provided</u>, <u>however</u>, that Purchaser will have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets;

     (e)     all avoidance actions or similar causes of action arising under sections 544 through 553 of the Bankruptcy Code, including any proceeds thereof (collectively, the "<u>Avoidance Actions</u>");

     (f)     all postpetition adequate assurance deposits provided to utilities and any deposits provided to suppliers or service providers to Sellers on a prepetition or postpetition basis (collectively, the "<u>Chapter 11 Deposits</u>");

     (g)     all Retained Recipes;

     (h)     all Retained Trademarks;

(i)    any assets of Sellers designated by Purchaser as Excluded Assets on Schedule 2.2(i) hereof;

(j)    subject to Section 2.6, any Permit that requires the consent of a third party to be assumed and assigned hereunder as to which, by the Closing Date, such consent has not been obtained;

(k)    refunds, credits and rebates of Taxes for any period or portion thereof prior to or ending on the Closing Date;

(l)    all Employee Benefit Plans and all trust funds and Contracts related thereto; and

(m)    all rights in or to assets leased by Sellers except to the extent the Liabilities under the associated lease are assumed by Purchaser and such lease is assigned to Purchaser.

2.3    Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the following Liabilities existing as of the Closing Date (collectively, the "Assumed Liabilities"):

(a)    subject to Section 10.1, 50% of any Transfer Taxes; and

(b)    all Liabilities that Purchaser has agreed to assume, pay or discharge pursuant to this Agreement.

2.4    Excluded Liabilities.  Purchaser will not assume and will be deemed not to have assumed, and Sellers will remain liable with respect to, the Excluded Liabilities. "Excluded Liabilities" means any and all Liabilities of Sellers arising out of, relating to or otherwise in respect of the Business, the Employees or the Purchased Assets prior to the Closing Date, and all other Liabilities of any Seller Entity, other than the Assumed Liabilities. Without limiting the foregoing, Purchaser will not be obligated to assume, does not assume and hereby disclaims all of the Excluded Liabilities, including all of the following Liabilities of any Seller Entity (each of which will constitute an Excluded Liability hereunder):

(a)    all Liabilities for accrued expenses and accounts payable incurred prior to the Closing Date, except to the extent that the same expressly constitute Assumed Liabilities pursuant to Section 2.3;

(b)    all Liabilities arising out of any of the Excluded Assets;

(c)    all Environmental Liabilities and Obligations, and all other Liabilities relating to any Laws in connection with any environmental, health or safety matters based on facts arising or existing during Sellers' operation of the Business prior to the Closing Date; provided, that nothing in this Agreement will (i) release, nullify or enjoin the enforcement of any liability to a Governmental Body under Environmental Laws (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the

owner, lessor, lessee, or operator of the property after the Closing Date or (ii) in any way (A) diminish the obligation of any entity to comply with Environmental Laws, or (B) diminish the obligations of Sellers to comply with Environmental Laws consistent with their rights and obligations as debtors-in-possession under the Bankruptcy Code;

(d)     all Liabilities relating to any claims for infringement, dilution, misappropriation or any other violation of the rights of any third parties or caused by use of the Purchased Intellectual Property arising from Sellers' operation of the Business prior to the Closing Date;

(e)     except as otherwise expressly provided in this Agreement with respect to Transfer Taxes and Periodic Non-Income Taxes, all Liabilities for any Taxes of any Seller;

(f)     all Liabilities in respect of Employees, including Liabilities that arise from or relate to their employment with any Seller Entity and, if applicable, their termination of employment from any Seller Entity, whether such Liabilities arise under the Worker Adjustment and Retraining Notification Act (the "WARN Act"), the CBAs, the Employee Benefit Plans or the Multiemployer Plans (including, but not limited to, for unpaid contributions or withdrawal Liability in connection with any of the forgoing plans whether such Liability arises before or after the Closing), or otherwise and including any Liabilities to Employees arising from the effect of the sale of the Purchased Assets, and all other Excluded Employee Liabilities;

(g)     all Liabilities arising as a result of any Legal Proceedings initiated at any time, to the extent related to the Business or the Purchased Assets on or prior to the Closing Date, including any actions for breach of contract, product liability or any tort actions;

(h)     all Liabilities arising under any Indebtedness of Sellers and any obligations or Liabilities to equityholders;

(i)     all Liabilities with respect to any costs and expenses (including all legal, accounting, financial advisory, valuation, investment banking and other third party advisory or consulting fees and expenses) incurred by or on behalf of any Seller or any Affiliates of a Seller in connection with the Bankruptcy Case or the transactions contemplated by this Agreement;

(j)     all Liabilities existing prior to the filing of the Bankruptcy Case that are subject to compromise under the Bankruptcy Case;

(k)     to the extent not otherwise expressly assumed herein, all Liabilities incurred subsequent to the filing of the Bankruptcy Case and prior to the Closing;

(l)     all Liabilities relating to any theories of law or equity involving successors or transferees; and

(m)     all Liabilities relating to the failure to comply with any bulk sales Laws.

2.5     [Intentionally Omitted]

2.6     Non-Assignment of Assets.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder and (b) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request; provided, however, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchaser would not in fact receive all such rights, such Seller and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Seller, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which such Seller would enforce for the benefit of Purchaser with Purchaser assuming such Seller's obligations and any and all rights of such Seller against a third party thereto.

2.7     Further Conveyances and Assumptions.  From time to time following the Closing, Sellers and Purchaser will, and will cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby; provided, however, that nothing in this Section 2.7 will require Purchaser or any of its Affiliates to assume any Liabilities other than the Assumed Liabilities.

### III.     CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Purchased Assets (the "Purchase Price") will be:

(a)     $29.25 million in cash, less an amount equal to the lesser of (i) $400,000 and (ii) the net sales proceeds received by Sellers or their Affiliates from the sale of the depot property located at 1505 East  Main Avenue, Bismarck, North Dakota (such amount, the "Cash Amount");

(b)     the assumption of the Assumed Liabilities; and

(c)     payment of the amount with respect to the Disputed Payable set forth on Schedule 3.1(c).

3.2     Purchase Price Deposit.  No later than two Business Days following the entry of the Bidding Procedures Order, pursuant to the terms of the Escrow Agreement, Purchaser will deposit with the Escrow Agent the sum of $1.5 million (the "Deposit Amount"), which will be released by the Escrow Agent and delivered to either Purchaser or the Company in accordance with the provisions of the Escrow Agreement.  Pursuant to the Escrow Agreement, the Deposit Amount (together with all accrued investment income thereon) will be distributed as follows:

(a)     if the Closing occurs, the Deposit Amount and all accrued investment income thereon will be delivered to the Company and applied towards the amount payable by Purchaser under Section 3.3 hereof;

(b)     if this Agreement is terminated by Sellers pursuant to Section 4.4(f), the Deposit Amount, together with all accrued investment income thereon, will be delivered to the Company; and

(c)     if this Agreement is terminated for any reason other than by Sellers pursuant to Section 4.4(f), the Deposit Amount, together with all accrued investment income thereon, will be returned to Purchaser.

3.3     Payment of Purchase Price.  On the Closing Date, (i) Purchaser will, and Parent will cause Purchaser to, pay the Cash Amount (less the Deposit Amount) to the Company in immediately available funds to an account designated by the Company, and (ii) Purchaser and the Company will cause the Deposit Amount and all accrued investment income thereon to be paid to the Company as provided in Section 3.2(a) above.

3.4     Apportionments.

(a)     To the extent the following ordinary course costs and expenses (and credits therefor to the extent paid prior to the Closing Date) of the Business relate to Owned Real Property, in each case for a period that begins prior to the Closing Date and ends after the Closing Date, such expenses (and credits) are to be apportioned between Sellers, on the one hand, and Purchaser, on the other hand, as of midnight on the Closing Date:

(i)     annual utility assessments, water meter charges, and sewer rents, if any, on the basis of the year for which assessed; and

(ii)     charges and fees payable for telephone services, water, heat, steam, electric power, gas and other utilities, at the price charged by the suppliers, including any taxes thereon and based upon applicable meter readings, where available, made on or immediately prior to or immediately after the Closing Date.

(b)     If, after apportioning the foregoing expenses, a party has borne more than its allocable share of such expenses, the other parties will promptly make the appropriate compensating payment(s) to such party.

## IV. CLOSING AND TERMINATION

4.1 <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 9.1</u>, <u>9.2</u> and <u>9.3</u> hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "<u>Closing</u>") will take place at the offices of Jones Day located at 222 East 41st Street, New York, New York (or at such other place as the parties may designate in writing) at 10:00 a.m. (New York City time) on the date that is two Business Days following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing is held is referred to in this Agreement as the "<u>Closing Date</u>."

4.2 <u>Deliveries by Sellers</u>. At the Closing, Sellers will deliver to Purchaser:

(a) one or more duly executed bills of sale in a form to be agreed upon by the parties hereto;

(b) one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto and duly executed assignments of the U.S. Trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office;

(c) duly executed special or limited warranty deeds conveying title to the Owned Real Property to Purchaser in recordable form;

(d) with respect to each of the Depots and Retail Thrift Stores, a Phase I environmental site assessment meeting the requirements of the American Society for Testing and Materials, prepared within 60 days prior to the Closing Date by a licensed third-party professional experienced in environmental matters (collectively, the "<u>Environmental Reports</u>");

(e) all such affidavits, certificates and other instruments as may be required by a nationally recognized title company for purposes of issuing title insurance policies to Purchaser, with the standard, pre-printed exceptions (other than with respect to survey matters) deleted;

(f) the officer's certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>;

(g) affidavits executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code; and

(h) all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary or appropriate in Purchaser's reasonable discretion to convey the Purchased Assets to Purchaser and vest title therein to Purchaser.

4.3    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will, and Parent will cause Purchaser to, deliver:

(a)    to the Company, on behalf of the Sellers, the consideration specified in <u>Section 3.4</u> hereof;

(b)    to the Company, on behalf of Sellers, one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto;

(c)    to the Company, on behalf of Sellers, the officer's certificate required to be delivered pursuant to <u>Sections 9.2(a)</u> and <u>9.2(b)</u>; and

(d)    to the Company, a rejection notice, if elected by Purchaser in its discretion, identifying any Depots or Retail Thrift Stores identified on <u>Schedule 5.4</u> that it elects not to purchase, without affecting the Purchase Price, based on the results of any Environmental Reports.

(e)    to the Company, on behalf of Sellers, such other documents, instruments and certificates as Sellers may reasonably request.

4.4    <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser or Seller, if the Closing has not occurred by the close of business on May 30, 2013 (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that if the Closing has not occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or a Seller, then the breaching party may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>;

(b)    by mutual written consent of Sellers and Purchaser;

(c)    by Purchaser, if any condition to the obligations of Purchaser set forth in <u>Sections 9.1</u> and <u>9.3</u> has become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)    by Sellers, if any condition to the obligations of Sellers set forth in <u>Sections 9.2</u> and <u>9.3</u> has become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(e)    by Purchaser, if Sellers breach any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in <u>Sections 9.1</u> or <u>9.3</u> and such breach has not been cured by the earlier of (i) 20 Business Days after the giving of written notice by Purchaser to Sellers of such breach and (ii) the Termination Date;

(f)     by Sellers, if Purchaser breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would result in a failure of a condition set forth in Sections 9.2 or 9.3 and such breach has not been cured by the earlier of (i) 20 Business Days after the giving of written notice by Sellers to Purchaser of such breach and (ii) the Termination Date;

(g)     by Sellers or Purchaser if there is in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto will promptly appeal any adverse determination that is appealable and pursue such appeal with reasonable diligence;

(h)     automatically, if Sellers consummate a Competing Transaction, subject to Purchaser's right to payment of the Break-Up Fee in accordance with the provisions of Section **Error! Reference source not found.**; or

(i)     by Purchaser or Sellers if the Bidding Procedures Order is not entered by February 28, 2013.

4.5     Procedure Upon Termination.  In the event of termination pursuant to Section 4.4 hereof, written notice thereof will forthwith be given to the other party or parties, and this Agreement will terminate, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchaser or Sellers.  If this Agreement is terminated as provided herein, upon request, each party will redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination will be without liability to Parent, Purchaser or Sellers; provided, however, that the provisions of this Section 4.6, Section **Error! Reference source not found.** and Article XI (other than Section 11.3) hereof and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1 hereof, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 4.6 will be deemed to release any party from liability for any breach of its obligations under this Agreement.

## V.     REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby jointly and severally represents and warrants to Parent and Purchaser that:

5.1     Organization and Good Standing.  Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

5.2     Authorization of Agreement.  Subject to entry of the Bidding Procedures Order and the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and each other

agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and the entry of the Bidding Procedures Order and the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

     5.3     <u>Conflicts; Consents of Third Parties</u>.

     (a)     Except as set forth on <u>Schedule 5.3(a)</u>, the execution and delivery by each Seller of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the transactions contemplated hereby and thereby and compliance by such Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of such Seller; (ii) subject to entry of the Bidding Procedures Order and the Sale Order, any Contract or Permit to which such Seller is a party or by which any of the properties or assets of such Seller are bound; (iii) subject to entry of the Bidding Procedures Order and the Sale Order, any Order of any Governmental Body applicable to such Seller or any of the properties or assets of such Seller as of the date hereof; or (iv) subject to entry of the Bidding Procedures Order and the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

     (b)     Except as set forth on <u>Schedule 5.3(b)</u> and except to the extent not required if the Bidding Procedures Order and the Sale Order are entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Sellers in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Sellers of any other action contemplated hereby or thereby, except for (i) the entry of the Bidding Procedures Order and the Sale Order, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect to the Business.

     5.4     <u>Real Property</u>.

     (a)     <u>Schedule 5.4</u> sets forth the legal descriptions of the land on which the Plants, Depots and Retail Thrift Stores are located (collectively, the "<u>Owned Real Property</u>").

Sellers have good and marketable fee title to the Owned Real Property, free and clear of all Liens (except for Permitted Exceptions). Except as set forth on Schedule 5.4, none of the Owned Real Property is subject to any leases or tenancies or other rights of occupancy. To the Knowledge of Sellers, no Seller has received notice that any of the improvements comprising the Owned Real Property or the business conducted by Sellers thereon is in violation of any use or occupancy restriction, limitation, easement, condition or covenant of record, other than with respect to such violations as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect. To the Knowledge of Sellers, there are no physical defects in the buildings located at any of the Owned Real Property which would interfere with the use and operation of the Owned Real Property as currently used and operated, other than with respect to such defects as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

(b)     Except as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect: (i) there is no pending or, to the Knowledge of Sellers, threatened condemnation proceeding, administrative action or judicial proceeding of any type relating to the Owned Real Property or other matters affecting adversely the current use, occupancy or value of the Owned Real Property; (ii) the Owned Real Property does not serve any adjoining property for any purpose inconsistent with the use of the Owned Real Property, and, to the Knowledge of Sellers, the Owned Real Property is not located within any flood plain or subject to any similar type of restriction for which any permits or licenses necessary to the use thereof have not been obtained; and (iii) neither the current use of the Owned Real Property nor the operation of the Business violates any instrument of record or agreement affecting the Owned Real Property or any applicable legal requirements.

5.5     Title to Purchased Assets. Sellers own the Purchased Assets, and, subject to the entry of the Sale Order, at the Closing, Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.6     Intellectual Property.

(a)     Schedule 5.6(a) sets forth a list of all material registrations and material applications for registration of Purchased Intellectual Property.

(b)     Schedule 5.6(b) sets forth a complete list of all written Intellectual Property Licenses that are material to the operation of any of the Plants, Depots, Retail Thrift Stores or the Business, regardless of whether such Intellectual Property Licenses involve payments by or to a Seller or an Affiliate of any Seller.

(c)     Except as set forth on Schedule 5.6(c):

(i)     A Seller owns all Intellectual Property listed on Schedule 5.6(a) and has valid rights in and to, including all rights to use, reproduce, publish, distribute, perform, display and create derivative works of, as applicable, all such Purchased Intellectual Property as such Intellectual Property is used in the

Ordinary Course of Business, in each case, free and clear of all Liens (other than Permitted Exceptions) and Intellectual Property Licenses.

(ii)     The Purchased Intellectual Property is not the subject of any ownership, validity, use or enforceability challenge or claim received by Sellers in writing or, to the Knowledge of Sellers, any outstanding Order restricting the use by Sellers thereof or adversely affecting any of the rights of Sellers thereto, except as would not, individually or in the aggregate, be material.

(iii)     To the Knowledge of Sellers, in the operation of the Business as conducted on the date hereof (A) no Seller is violating, and since the Petition Date, has violated, any Intellectual Property rights of any other Person and (B) there are no Legal Proceedings, pending or threatened, concerning any claim that Sellers have infringed, diluted, misappropriated or otherwise violated any Intellectual Property rights of any other Person, in each case, except as would not, individually or in the aggregate, have or reasonably be expected to have, a Seller Material Adverse Effect.

5.7     [Intentionally Omitted]

5.8     Litigation.  Except as set forth on Schedule 5.8 and except for Legal Proceedings that do not have and could not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, as of the date hereof, there are no Legal Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller that involve or relate to any of the transactions contemplated by this Agreement, that affect any of the Purchased Assets or the Business or that could reasonably be expected to adversely affect Purchaser's ability to conduct the Business after the Closing or the ownership or use by Purchaser of the Purchased Assets in the operation of the Business after the Closing.

5.9     Environmental Matters.  Except as set forth on Schedule 5.9 and except for facts, circumstances or conditions that would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect, (a) with respect to the Plants, Depots and Retail Thrift Stores, none of Sellers is the subject of any outstanding Order of any Governmental Body nor have Sellers received any written notice, complaint or inquiry from such entities respecting (i) Environmental Laws or (ii) a Remedial Action, (b) there is no investigation, action or proceeding pending, or, to the Knowledge of Sellers, threatened that could reasonably be expected to result in Sellers incurring any material liability pursuant to any applicable Environmental Law in connection with the Plants, Depots and Retail Thrift Stores, (c) Sellers have not caused or allowed the Release of Hazardous Materials at, on or under the Owned Real Property, and (d) Sellers maintain and have complied with all Permits that are required under or pursuant to Environmental Laws for the operation of the Plants, Depots and Retail Thrift Stores. Sellers have delivered or made available to Purchaser copies of all reports, assessments or tests with respect to compliance of the Owned Real Property with any Environmental Laws or the presence of Hazardous Material that are in the Sellers' possession. custody or control, including but not limited to the following records:  (i) final reports concerning the removal of underground storage tanks from the Owned Real Property and Remedial Actions, if any, conducted to address Releases from the underground storage tanks at issue; (ii) correspondence from Government

Bodies informing Sellers that no further action is required to address Releases that have been the subject of Remedial Action conducted by or on behalf of Sellers; (iii) the most recent final Phase I Environmental Site Assessment reports for the Plants, Depots and Retail Thrift Stores; and (iv) inventories of asbestos and asbestos-containing materials, if any, for the Plants, Depots and Retail Thrift Stores. This <u>Section 5.9</u> represents the sole and exclusive representation and warranty of Sellers regarding environmental matters.

5.10    <u>Equipment and Vehicles</u>.  Sellers have exclusive possession and control of all Equipment and Vehicles material to the operation of the Business.  All Equipment is usable and operable, subject only to ordinary wear and tear.

5.11    <u>Financial Advisors</u>.  Except for Perella Weinberg Partners LP, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Parent or Purchaser in respect thereof.

5.12    <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of Sellers' or their Affiliates respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection or advice that may have been or may be provided to Parent or Purchaser by any director, officer, employee, agent, consultant or representative of Sellers or any of their Affiliates).  Sellers make no representations or warranties to Parent or Purchaser regarding the probable success or profitability of the Business.  The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Seller Material Adverse Effect.

## VI.    REPRESENTATIONS AND WARRANTIES OF PURCHASER

Parent and Purchaser hereby jointly and severally represent and warrant to Sellers that:

6.1    <u>Organization and Good Standing</u>.  Each of Parent and Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its incorporation.

6.2    <u>Authorization of Agreement</u>.  Each of Parent and Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and each other agreement,

document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Parent or Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each of Parent and Purchaser. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Parent and Purchaser is a party has been duly and validly executed and delivered by Parent and Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Parent and Purchaser is a party constitutes legal, valid and binding obligations of each of Parent and Purchaser enforceable against each such entity in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    The execution and delivery by Parent and Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Parent and Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Parent and Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Parent and Purchaser; (ii) any Contract or Permit to which Parent or Purchaser is a party or by which any of the properties or assets of Parent or Purchaser are bound; (iii) any Order of any Governmental Body applicable to Parent or Purchaser or any of the properties or assets of Parent or Purchaser as of the date hereof; or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Parent or Purchaser in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Parent or Purchaser is a party, the compliance by Parent or Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Parent or Purchaser of any other action contemplated hereby or thereby, except for the entry of the Bidding Procedures Order and the Sale Order and such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.4    <u>Litigation</u>.  There are no Legal Proceedings pending or, to the knowledge of each of Parent and Purchaser, threatened against Parent or Purchaser, or to which Parent or Purchaser

is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect. Neither Parent nor Purchaser is subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have, individually or in the aggregate, a Purchaser Material Adverse Effect.

6.5     Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Parent or Purchaser in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6     Financial Capability. Purchaser will have, and Parent will cause Purchaser to have, at the Closing sufficient funds available to pay the Cash Amount and any expenses incurred by Parent and Purchaser in connection with the transactions contemplated by this Agreement. For the avoidance of doubt, Purchaser's and Parent's obligations to complete the transactions contemplated hereby are not dependent upon or conditioned on receipt of financing.

6.7     Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Each of Parent and Purchaser acknowledges that it has conducted to its satisfaction its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, each of Parent and Purchaser has relied on the results of its own independent investigation.

## VII.    BANKRUPTCY COURT MATTERS

7.1     Competing Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids. From and after the date hereof until the date that the auction contemplated by the Bidding Procedures Order is declared closed by Sellers (the "Auction Date"), Sellers are permitted to cause their respective representatives and Affiliates to initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Parent, Purchaser and their Affiliates, agents and representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all, or a material portion of, the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a Chapter 11 plan) the consummation of which would be substantially inconsistent with the transactions herein contemplated (a "Competing Transaction").

7.2     Break-Up Fee. In the event that (a) this Agreement terminates pursuant to Section 4.4(e) by Purchaser or pursuant to Section 4.4(h), and (b) a Competing Transaction is consummated, then Sellers will pay to Purchaser in cash an amount (the "Break-Up Fee") equal to the Cash Amount multiplied by 3.0%. The Break-Up Fee shall be paid in cash concurrently

with the consummation (which, in the case of a plan of reorganization or liquidation, shall be the effectiveness) of the first Competing Transaction to occur simultaneously with or following the termination of this Agreement, and shall be paid from the first proceeds of such Competing Transaction and from each succeeding Competing Transaction prior to payment of any other claims including claims secured by the assets that are the subject of the Competing Transaction (other than claims arising under the Credit Agreement, dated as of February 3, 2009, among Interstate Bakeries Corporation and certain of its affiliates and General Electric Capital Corporation (as amended, the "ABL Agreement")) until the Break-Up Fee is paid in full. The Break-Up Fee will constitute, pursuant to sections 364 and 503 of the Bankruptcy Code, a super priority administrative expense claim in each Seller's bankruptcy estate with priority over any and all administrative expense claims other than claims arising under the ABL Agreement. Any Break-Up Fee payable pursuant to this Agreement will be allowed and paid, without any further Bankruptcy Court approval or Order. Notwithstanding anything to the contrary contained herein, upon timely payment of the Break-Up Fee to Purchaser in accordance with this Section 7.2, Sellers and their respective representatives and Affiliates, on the one hand, and Purchaser and its respective representatives and Affiliates, on the other hand, will be deemed to have fully released and discharged each other from any Liability resulting from the termination of this Agreement and none of Sellers, Parent, Purchaser or their respective representatives or Affiliates will have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses. Sellers will not qualify any bid to participate in the auction contemplated by the Bidding Procedures Order that does not include at a minimum a cash consideration sufficient to repay both any amounts outstanding under the ABL Agreement and the Break-Up Fee.

7.3    Bankruptcy Court Filings. Sellers will file with the Bankruptcy Court a motion seeking entry of the Bidding Procedures Order and the Sale Order. Sellers will attach to such motion and propose the entry of the Bidding Procedures Order and the Sale Order. Subject to Section 7.1, Sellers will thereafter pursue diligently the entry of the Bidding Procedures Order and the Sale Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event that the entry of the Bidding Procedures Order or the Sale Order is appealed or a stay pending appeal is sought, Sellers will oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, or a motion for rehearing, reargument, reconsideration or revocation). Sellers will provide Purchaser at least 24 hours' notice in advance of filing with the Bankruptcy Court or any appellate court any motion, brief, notice, proposed order, amendment, supplement or other pleading that Sellers propose to file in the Bankruptcy Court relating to the transactions contemplated by this Agreement. Sellers will give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order and Purchaser will have the right to attend and seek to be heard at any such hearings.

## VIII.  COVENANTS

8.1    <u>Access to Information</u>.  Prior to the Closing Date, Purchaser will be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination will be conducted upon reasonable advance notice and under reasonable circumstances and will be subject to restrictions under applicable Law.  Sellers will direct and use their reasonable best efforts to cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives will cooperate with Sellers and their representatives.  Notwithstanding anything herein to the contrary, no such investigation or examination will be permitted to the extent that it would require Sellers to disclose information that is competitively sensitive or subject to attorney-client privilege.  No investigation by Purchaser prior to or after the date of this Agreement will affect or be deemed to modify any of the representations, warranties, covenants or agreements of Sellers contained in this Agreement.  Sellers will promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other judicial or administrative proceeding related to the Business, the Purchased Assets and the transactions contemplated by this Agreement as Purchaser may reasonably request.

8.2    <u>Actions Pending the Closing</u>.

(a)    Except (1) as required by applicable Law or by Order of the Bankruptcy Court, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date, Sellers will:

(i)    maintain the Purchased Assets in their current condition, ordinary wear and tear excepted;

(ii)    take reasonable actions to defend and protect the Purchased Assets from infringement or usurpation; and

(iii)    comply with applicable Law, including Environmental Law, other than with respect to the failure of such compliance as would not reasonably be expected to have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)    Except (1) as required by applicable Law or by Order of the Bankruptcy Court, (2) as otherwise contemplated by this Agreement, or (3) with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date, Sellers will not in connection with the Business:

(i)    subject any of the Purchased Assets to any Lien (except for Permitted Exceptions);

    (ii)    assign, license, transfer, convey, lease or otherwise dispose of any of the Purchased Assets (except for the purpose of disposing of obsolete assets);

    (iii)    enter into any Contract for the sale of any Owned Real Property; or

    (iv)    agree to do anything prohibited by this <u>Section 8.2(b)</u>.

(c)    Sellers will promptly notify Purchaser of:

    (i)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the transactions contemplated by this Agreement; and

    (ii)    the commencement of any material Legal Proceedings relating to the Business or the Purchased Assets; provided, however, that the delivery of any notice pursuant to this <u>Section 8.2(c)</u> will not (A) limit or otherwise affect any remedies available to Purchaser, or (B) be deemed to amend or supplement any Schedule or prevent or cure any misrepresentations or breach of warranty.

8.3    <u>Consents</u>.  Sellers will use their commercially reasonable efforts, and Purchaser will, and Parent will cause Purchaser to, cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including, without limitation, the consents and approvals referred to in <u>Section 5.3(b)</u> hereof; <u>provided</u>, <u>however</u>, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or proceedings to obtain any such consent or approval.

8.4    <u>Further Assurances</u>.  Subject to the other provisions of this Agreement, each of Parent, Purchaser and each Seller will use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.5    <u>Publicity</u>.  The initial press release concerning this Agreement and the transactions contemplated hereby will be in substantially the form previously agreed by the parties.  None of the parties hereto will issue any press release concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Parent or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, <u>provided</u>, <u>however</u>, that the party intending to make such release uses its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.  After the Closing, the parties may issue public announcements regarding the transactions contemplated hereby so long as such announcements, in the case of announcements made by Sellers, do not disclose the specific terms or conditions of this Agreement except where such terms and conditions have already been disclosed as required by Law, applicable stock exchange regulation or in filings that any Seller has made in the Bankruptcy Court; provided, however, that the issuing party will use

its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.6    <u>Supplementation and Amendment of Schedules</u>.  Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent on its face.  From time to time prior to the Closing, Sellers will have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement.  No such supplement or amendment will have any effect on the satisfaction of the condition to closing set forth in <u>Section 9.1(a)</u>.

8.7    <u>Parent Guarantee</u>.  Parent hereby guarantees the full and timely performance of all of Purchaser's agreements and covenants made in this Agreement and each other document executed and delivered by or on behalf of Parent or Purchaser to Sellers at Closing with respect to the transactions contemplated by this Agreement.

8.8    <u>Names and Marks</u>.

(a)    Purchaser hereby acknowledges that all right, title and interest in and to the Retained Trademarks are owned exclusively by Sellers, and that, except as expressly provided below, any and all right to use the Retained Trademarks shall terminate as of the Closing and shall immediately revert to Sellers, along with any and all goodwill associated therewith.  Purchaser further acknowledges that it has no rights, and is not acquiring any rights, to use the Retained Trademarks, except as provided herein.

(b)    Purchaser will, for a period of 60 days after the date of the Closing, be entitled to use, solely in connection with the operation of the Business as operated immediately prior to Closing, all of the existing stocks of signs, letterheads, branding, invoice stock, packaging, advertisements and promotional materials, inventory and other tangible materials included in the Purchased Assets, including the Vehicles ("<u>Existing Stock</u>") containing the Retained Trademarks, after which date Purchaser will remove or obliterate all Retained Trademarks from such Existing Stock or cease using such Existing Stock.

(c)    Purchaser will  ensure that all use of the Retained Trademarks as provided in this <u>Section 8.8</u> shall be only with respect to goods and services of a level of quality equal to or greater than the quality of goods and services with respect to which the Retained Trademarks were used in the Business prior to the Closing.  Any and all goodwill generated by the use of the Retained Trademarks under this <u>Section 8.8</u> shall inure solely to the benefit of Sellers.  In no event shall Purchaser use the Retained Trademarks in any manner that may damage or tarnish the reputation of Sellers or the goodwill associated with the Retained Trademarks.

(d)     Purchaser agrees that no Seller shall have any responsibility for claims by third parties arising out of, or relating to, the use by Purchaser of any Retained Trademarks after the Closing.  Purchaser will indemnify and hold harmless Sellers from any and all claims that may arise out of the use thereof by Purchaser in accordance with the terms and conditions of this Section 8.8, other than such claims that the Retained Trademarks infringe the Intellectual Property rights of any third party.  In addition to any and all other available remedies, Purchaser shall indemnify and hold harmless Sellers from any and all claims that may arise out of the use of the Retained Trademarks in violation of or outside the scope permitted by this Section 8.8.  Notwithstanding anything in this Agreement to the contrary, Purchaser hereby acknowledges that Sellers, in addition to any other remedies available to them for any breach or threatened breach of this Section 8.8, shall be entitled to a preliminary injunction, temporary restraining order or other equivalent relief restraining Purchaser and any of its Affiliates from any such breach or threatened breach.

(e)     The provisions of this Section 8.8 will survive the Closing.

8.9     Recipes.

(b)     No right or license is granted to Purchaser by implication or otherwise with respect to any Retained Recipes, including, but not limited to, the right to use any Retained Recipes.  Purchaser acknowledges and agrees that all right, title and interest in and to the Retained Recipes are owned exclusively by the Sellers or their Affiliates and, except as specifically set forth herein, nothing in this Agreement grants Purchaser or any of its Affiliates, by implication or otherwise, any license or right to use any Retained Recipes, whether in connection with the Business, the products or services of the Business or otherwise.  Purchaser will immediately destroy or purge any copies of any Retained Recipes to which Purchaser may otherwise access, whether in connection with the Purchased Assets, the transactions contemplated by this Agreement or otherwise.

(c)     Purchaser acknowledges and agrees that the remedies at law for any breach of this Section 8.9 are inadequate and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms.  Accordingly, Purchaser acknowledges and agrees that upon any breach by it of the terms and conditions of this Section 8.9, Sellers and their Affiliates will be entitled to immediate injunctive relief and may obtain any order restraining any threatened or future breach from any court of competent jurisdiction.

(d)     The provisions of this Section 8.9 shall survive the Closing.

8.10     Copyrights and Trade Secrets.

(a)     Effective upon, and only upon, the Closing, and subject to the terms and conditions of this Agreement, Sellers, on behalf of themselves and their Affiliates, hereby grant to Purchaser a non-exclusive, non-transferable (other than to Affiliates of Purchaser or in connection with the sale of all or substantially all of the Purchased Intellectual Property), fully paid-up, perpetual, license (without the right to grant sublicenses, other than to Affiliates of Purchaser) to use the Copyrights and Trade Secrets (other than Recipes) owned by Sellers that, prior to the Closing, were used in connection with the operation of the Business and that are not

included in the Purchased Assets, in each case solely in connection with manufacturing, marketing, selling and distributing Branded Products in the United States. Purchaser may not use or otherwise exploit any such Copyrights or Trade Secrets for any other business purposes.

      (b)    Except as expressly set forth in this <u>Section 8.10</u>, no other right or license is granted to Purchaser by implication or otherwise with respect to any of Sellers' Copyrights or Trade Secrets.

      (c)    The provisions of this <u>Section 8.10</u> shall survive the Closing.

    8.11   <u>Confidentiality</u>. Purchaser acknowledges that Confidential Information (as defined in the Confidentiality Agreement) has been, and in the future will be, provided to it in connection with this Agreement, including under <u>Section 8.1</u>, and is subject to the terms of the confidentiality agreement between Parent and Purchaser, dated December 5, 2012 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Purchaser acknowledges and understands that this Agreement may be publicly filed in the Bankruptcy Court and further made available by Sellers to prospective bidders and that such disclosure will not be deemed to violate any confidentiality obligations owing to Purchaser, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Effective upon, and only upon, the Closing, the Confidentiality Agreement will terminate. Sellers acknowledge that from and after the Closing, all non-public information relating to the Business, including the Purchased Assets and the Assumed Liabilities, will be valuable and proprietary to Purchaser and its Affiliates. Sellers agree that, from and after the Closing, no Seller will, and Sellers will cause their Subsidiaries not to, disclose to any Person any non-public information relating to Purchaser and its Affiliates, or the Business, including the Purchased Assets, and the Assumed Liabilities, except as required by Law or as otherwise becomes available in the public domain other than through any action by any Seller in violation of its obligations under this <u>Section 8.10</u>. Each party acknowledges and agrees that the remedies at law for any breach of this <u>Section 8.10</u> are inadequate and that the damages resulting from any such breach are not readily susceptible to being measured in monetary terms. Accordingly, each party acknowledges and agrees that upon any breach by it of the terms and conditions of this <u>Section 8.10</u>, the other party will be entitled to seek immediate injunctive relief and to seek an Order restraining any threatened or future breach from any court of competent jurisdiction. The provisions of this <u>Section 8.10</u> will survive the Closing.

    8.12   <u>Plant Closings</u>. Sellers have ceased production at the Plants and, prior to the Closing Date, will clean and sanitize such Plants and the Purchased Assets located there in accordance with accepted industry practices and will ready such Plants and Purchased Assets for ongoing maintenance and preservation without production until the Closing. Sellers will keep and turn over to Purchaser updated equipment maintenance records and other documentation of the cleaning and other work performed customary for such activities.

    8.13   <u>Employee Matters</u>. Sellers have terminated the employment of all Employees of the Business located at the Plants, Depots and Retail Thrift Stores, other than any such Employees necessary for purposes of providing the cleaning and other Plant-closing activities provided for in <u>Section 8.12</u>. Sellers shall terminate the employment of such other Employees of the Business prior to the Closing. Sellers will retain and be solely responsible for all Liabilities

that relate to any Employee's employment with any Seller Entity and, if applicable, their termination of employment from any Seller Entity, including all such Liability arising under the WARN Act, any CBAs, the Employee Benefit Plans, the Multiemployer Plans or otherwise and including any such Liabilities to Employees arising from the effect on Employees of the sale of the Purchased Assets. Without limiting the generality of the foregoing, Purchaser will have no Liability whatsoever under the WARN Act based on actions taken at or before the Closing, any CBA, the Employee Benefit Plans or the Multiemployer Plans (including for unpaid contributions or withdrawal Liability in connection with any of the forgoing whether such Liability arises before or after the Closing), nor will Purchaser become a participating employer in, or make contributions to, any such Employee Benefit Plans or the Multiemployer Plans. Purchaser will have no obligation to employ or to consider employing any Employee on or after the Closing. If any Employees are hired by Purchaser, Purchaser will not be obligated to provide any particular level of compensation or benefits to such Employees except as Purchaser may otherwise agree.

## IX. CONDITIONS TO CLOSING

9.1    <u>Conditions Precedent to Obligations of Parent and Purchaser</u>.  The obligation of Parent and Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Sellers contained in this Agreement that are not qualified by materiality or Seller Material Adverse Effect shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Sellers contained in this Agreement that are qualified by materiality or Seller Material Adverse Effect shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and Purchaser shall have received a certificate signed by an authorized officer of the Company, dated the Closing Date, to the foregoing effect; and

(b)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in <u>Section 4.2</u>.

9.2    <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Parent and Purchaser contained in this Agreement that are not qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all material respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and the representations and warranties of Parent and Purchaser contained in this Agreement that are qualified by materiality or Purchaser Material Adverse Effect shall be true and correct in all respects on and

as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date and Sellers shall have received a certificate signed by an authorized officer of each of Parent and Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Parent or Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Parent and Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered, or Parent shall have caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>.

9.3     <u>Conditions Precedent to Obligations of Parent, Purchaser and Sellers</u>.  The respective obligations of Parent, Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order; and

(c)     the Bankruptcy Court shall have entered the Sale Order and the effectiveness of such Sale Order shall not have been stayed.

9.4     <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## X.     TAXES

10.1     <u>Transfer Taxes</u>.  All documentary, stamp, transfer, motor vehicle registration, sales, use, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "<u>Transfer Taxes</u>") will be borne 50% by Purchaser and 50% by Sellers, regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes, except that all motor vehicle registration, transfer or other similar Taxes (and all recording or filing fees) will be borne 100% by Purchaser.  Sellers and Purchaser will consult and cooperate in timely preparing and making all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes and will cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for or exemptions from such Transfer Taxes, including preparing exemption certificates and other instruments as are applicable to claim available exemptions from the payment of Transfer Taxes under applicable

Law and executing and delivering such affidavits and forms as are reasonably requested by the other party. Notwithstanding anything contained in this Agreement to the contrary, any Transfer Taxes arising from Purchaser's failure to provide to Sellers valid completed exemption certificates and other instruments, to obtain any documentation or to complete any registration necessary to qualify for any exemption from the imposition of, or refund or reduction of, Transfer Taxes will be borne 100% by Purchaser.

10.2    Purchase Price Allocation.

(a)    As promptly as practicable after the Closing Date, but no later than 90 days thereafter, Purchaser will prepare and deliver to Sellers an allocation schedule setting forth the amounts to be allocated among Sellers and among the Purchased Assets of each Seller, pursuant to (and to the extent necessary to comply with) Section 1060 of the Code and the applicable regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law) (the "Proposed Allocation Statement"). Sellers will have 20 Business Days following delivery of the Proposed Allocation Statement during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Statement, setting forth in reasonable detail the basis of their objections. If Sellers fail to deliver an Allocation Notice of Objection in accordance with this Section 10.2(a), the Proposed Allocation Schedule will be conclusive and binding on all parties and will become the "Final Allocation Statement". If Sellers submit an Allocation Notice of Objection, then for 20 Business Days after the date Purchaser receives the Allocation Notice of Objection, Purchaser and Sellers will use their commercially reasonable efforts to agree on the allocations. Failing such agreement within 20 Business Days of such notice, the unresolved allocations will be submitted to an independent, internationally-recognized accounting firm mutually agreeable to Purchaser and Sellers, which firm will be instructed to determine its best estimate of the allocation schedule based on its determination of the unresolved allocations and provide a written description of the basis for its determination within 45 Business Days after submission, such written determination to be final, binding and conclusive. The fees and expenses of such accounting firm will be apportioned among Sellers and Purchaser equally.

(b)    Sellers and Purchaser and their respective Affiliates will report, act, and file Tax Returns (including, but not limited to IRS Form 8594) in all respects and for all purposes consistent with such allocation as determined pursuant to this Section 10.2. Neither Sellers nor Purchaser will take any position (whether in audits, Tax Returns, or otherwise) that is inconsistent with such allocation unless required to do so by applicable Law.

10.3    Certain Periodic Non-Income Taxes.

(a)    With respect to any real or personal property or other periodic Taxes not based on income or receipts ("Periodic Non-Income Taxes") that are assessed on, or in respect of, the Purchased Assets and attributable to any period that begins after the Closing Date, if any Seller pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to Purchaser of proof of such payment, Purchaser will pay to such Seller the amount of such Periodic Non-Income Taxes paid by Seller. With respect to any Periodic Non-Income Taxes that are assessed on, or in respect of, the Purchased Assets and attributable to any period that ends on or prior to the Closing Date, if Purchaser pays such Periodic Non-Income Taxes, as promptly as

practicable after delivery to the applicable Seller of proof of such payment, such Seller will pay to Purchaser the amount of such Periodic Non-Income Taxes paid by Purchaser, but only to the extent such amount was not taken into account to determine any amount otherwise payable to such Seller under any other provision of this Agreement.

(b)     With respect to any Periodic Non-Income Taxes that are assessed on, or in respect of, the Purchased Assets and attributable to any period which includes but does not end on the Closing Date (a "Straddle Period"): (i) if any Seller pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to Purchaser of proof of such payment, Purchaser will pay to such Seller the amount of such Periodic Non-Income Taxes paid by such Seller that are attributable to the portion of such Straddle Period beginning after the Closing Date (the "Post-Closing Straddle Period"); and (ii) if Purchaser pays such Periodic Non-Income Taxes, as promptly as practicable after delivery to the applicable Seller of proof of such payment, such Seller will pay to Purchaser the amount of such Periodic Non-Income Taxes paid by Purchaser that are attributable to the portion of such Straddle Period up to and including the Closing Date (the "Pre-Closing Straddle Period"), but only to the extent such amount was not taken into account to determine any amount otherwise payable to such Seller under any other provision of this Agreement. For purposes of this Section 10.3(b), the amount of Periodic Non-Income Taxes attributable to a Pre-Closing Straddle Period will be based upon the ratio of the number of days in the Pre-Closing Straddle Period to the total number of days in the Straddle Period, and the amount of Periodic Non-Income Taxes attributable to a Post-Closing Straddle Period will be based upon the ratio of the number of days in the Post-Closing Straddle Period to the total number of days in the Straddle Period.

(c)     The party that has the primary obligation to do so under applicable Law shall timely pay to the applicable Governmental Body any Periodic Non-Income Taxes covered by this Section 10.3

10.4     Cooperation and Audits.  Purchaser, its Affiliates and Sellers will cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) and will make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

## XI.     MISCELLANEOUS

11.1     No Survival of Representations and Warranties.  The parties hereto agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the parties will have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder, and each party hereto will be liable to the other after the Closing for any breach thereof.

11.2     Expenses.  Each of Sellers, Parent and Purchaser will bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other

agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby.

11.3    Injunctive Relief.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto will be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 11.3 will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

11.4    Submission to Jurisdiction; Consent to Service of Process.  (a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as indicated in Section 11.8 hereof; provided, however, that if the Bankruptcy Cases have been closed pursuant to Section 350 of the Bankruptcy Code, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.8, provided, however, that such service will not be effective until the actual receipt thereof by the party being served.

11.5    Waiver of Right to Trial by Jury.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

11.6    Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, will

be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.7    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

11.8    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, to:

> Hostess Brands, Inc.
> 12 East Armour Boulevard
> Kansas City, MO 64111
> Facsimile:      (816) 502-4138
> Attention:      Jolyn Sebree

With a copy (which will not constitute notice) to:

> Jones Day
> 222 East 41st Street
> New York, NY 10017
> Facsimile:  (212) 755-7306
> Attention:      Robert A. Profusek
>                       John K. Kane

If to Purchaser or Parent, to:

> United States Bakery
> 315 NE 10th Avenue
> Portland, OR 97232
> Facsimile:      (503) 731-5680
> Attention:      Marc Albers

With copies (which will not constitute notice) to:

36

> Tonkon Torp LLP
> 888 SW 5th Avenue, Suite 1600
> Portland, OR 97204
> Facsimile:      (503) 972-3706
> Attention:     Ronald L. Greenman

11.9      Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.10      Assignment.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, Parent or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents will be void, provided, however, that (a) Parent or Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more wholly-owned subsidiaries formed by it prior to the Closing and (b) Sellers may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court.  No assignment of any obligations hereunder will relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Sellers, Parent and Purchaser will also apply to any such assignee unless the context otherwise requires.

11.11      Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Sellers, Parent or Purchaser will have any liability for any obligations or liabilities of Sellers, Parent or Purchaser under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

11.12      Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.  A signature delivered by facsimile or other electronic means is as effective as delivery of an original signature.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of January __, 2013.

PARENT:

UNITED STATES BAKERY

By: _____
      Marc Albers, President


PURCHASER:

MOUNTAIN STATES BAKERIES LLC

By: _____
      Marc Albers, President


COMPANY:

HOSTESS BRANDS, INC.

By: _____
      Name:  Gregory F. Rayburn
      Title:  Chief Executive Officer


OTHER SELLERS:

INTERSTATE BRANDS CORPORATION

By: _____
      Name:  Gregory F. Rayburn
      Title:  Chief Executive Officer and President

IBC SALES CORPORATION

By: _____
      Name:  Gregory F. Rayburn
      Title:  Chief Executive Officer and President

000632/00244/4274265v1

NYI-4498305v3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of January 28, 2013.

PARENT:

UNITED STATES BAKERY

By: _____
    Marc Albers, President


PURCHASER:

MOUNTAIN STATES BAKERIES LLC

By: _____
    Marc Albers, President


COMPANY:

HOSTESS BRANDS, INC.

By: _____
    Name: Gregory F. Rayburn
    Title: Chief Executive Officer


OTHER SELLERS

INTERSTATE BRANDS CORPORATION

By: _____
    Name: Gregory F. Rayburn
    Title: Chief Executive Officer and President


IBC SALES CORPORATION

By: _____
    Name: Gregory F. Rayburn
    Title: Chief Executive Officer and President

**EXHIBIT A**

**EXHIBIT B**

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** (this **"Escrow Agreement"**), dated as of _____, 2013, is by and among U.S. Bank National Association, as escrow agent (the **"Escrow Agent"**), Mountain States Bakeries LLC (the **"Purchaser"**), and Hostess Brands, Inc. (the **"Company"**). Capitalized terms used in this Escrow Agreement, but not defined herein, are used in this Escrow Agreement as defined in the Asset Purchase Agreement (the **"Purchase Agreement"**), dated January 28, 2013, by and among the Purchaser, United States Bakery, the Company and each of the Company's subsidiaries listed on the signature page thereto (together with the Company, each a "**Seller**" and, collectively, the "**Sellers**").

## RECITALS

**WHEREAS**, the Sellers are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on January 11, 2012 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") Case No. 12-22052 (RDD) (the "**Bankruptcy Case**"); and

**WHEREAS**, concurrently with the execution and delivery of this Escrow Agreement, Parent, the Purchaser and the Company have entered into the Purchase Agreement, which provides for the Purchaser to deposit the sum of $1.5 million (the **"Deposit Amount"**) into an escrow account with the Escrow Agent after entry of a bidding procedures order in the Bankruptcy Case (the "**Bidding Procedures Order**");

**NOW THEREFORE**, in consideration of the mutual promises and subject to the terms and conditions contained herein, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Appointment of Escrow Agent**. The Purchaser and the Company hereby appoint and designate the Escrow Agent as the escrow agent for the purposes set forth in this Escrow Agreement, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth in this Escrow Agreement. Notwithstanding the references in this Escrow Agreement to the Purchase Agreement, the Purchaser and the Company acknowledge that the Escrow Agent is not a party to the Purchase Agreement for any purpose or responsible for its interpretation or enforcement and is not charged with any knowledge of the contents thereof.

2.     **Deposit in Escrow**. No later than two Business Days following the entry of the Bidding Procedures Order, and in accordance with Section 3.2 of the Purchase Agreement, the Purchaser will deposit the Deposit Amount by wire transfer of immediately available funds with the Escrow Agent to be held in an account (the "**Deposit Account**") and disposed of as provided in this Escrow Agreement. The Deposit Amount held by the Escrow Agent in the Deposit Account hereunder, including any interest, dividends or gains earned thereon and any other earnings in respect thereof, are hereinafter called the **"Deposit Funds."** The Deposit Funds will be held in trust and will not be subject to lien or attachment of any creditor of any party hereto and will be used solely for the purposes and subject to the conditions set forth herein. The Deposit Funds shall be invested in the interest-bearing funds set forth on Exhibit A. All earnings

on the Deposit Funds shall become part of the Deposit Funds to be held and distributed in accordance with the terms and conditions of this Escrow Agreement. The Escrow Agent shall have no liability for any loss arising from or related to any such investment other than in accordance with Section 6 of this Escrow Agreement.

**3.** **Release of Deposit Funds**.

(a) If the Purchase Agreement is terminated by the Sellers pursuant to Section 4.4(f) thereof, the Purchaser and the Company shall deliver to the Escrow Agent a joint written instruction signed by the Purchaser and the Company directing the Escrow Agent to deliver the Deposit Funds to the Company on the next Business Day.

(b) If the Purchase Agreement is terminated for any reason other than by the Sellers pursuant to Section 4.4(f) thereof, the Purchaser and the Company shall deliver to the Escrow Agent a joint written instruction signed by the Purchaser and the Company directing the Escrow Agent to deliver the Deposit Funds to the Purchaser on the next Business Day.

(c) If the Closing occurs, the Purchaser and the Company shall deliver to the Escrow Agent a joint written instruction signed by the Purchaser and the Company directing the Escrow Agent to deliver the Deposit Funds to the Company on the Closing Date (provided such request is received prior to 10:00AM Eastern Time on the Closing Date otherwise on the next Business Day).

(d) Notwithstanding the foregoing or anything else to contrary herein, the Escrow Agent shall release funds from the Deposit Account at any time or from time to time as directed in any joint written instruction signed by the Purchaser and the Company, but no sooner than the next Business Day following receipt of the joint written instruction.

**4.** **Escrow Agent Compensation**. The Escrow Agent is to be compensated in accordance with the fee schedule attached to this Escrow Agreement as Exhibit D for the performance of its duties under this Escrow Agreement (the **"Escrow Fees"**). The Escrow Fees and expenses shall be paid severally and jointly by the Purchaser and the Company simultaneously with the deposit with the Escrow Agent of the Deposit Amount. In case of any disagreement or dispute arising under the provisions of this Escrow Agreement, the Escrow Agent shall be entitled to be paid additional reasonable compensation for its extraordinary services hereunder and shall be entitled to prompt reimbursement for all reasonable costs and expenses incurred by reason of such disagreement or dispute, including, but not limited to, all reasonable attorneys' fees. The Purchaser and the Company severally and jointly (provided that solely as between the Company and the Purchaser they agree that one-half shall be borne by Purchaser and the other half by the Company) promise to pay the aforementioned compensation.

**5.** **Duties of Escrow Agent**. The Escrow Agent shall treat the Deposit Account with such degree of care as it treats its own similar property. It is agreed that the duties and obligations of the Escrow Agent are only such as are herein specifically provided and no other. The Escrow Agent's duties are as a bailee only, and the Escrow Agent shall incur no liability whatsoever, except for its willful misconduct or omission, bad faith or gross negligence. The Escrow Agent may consult with counsel of its choice and shall not be liable for any action taken,

suffered or omitted to be taken by it in good faith in accordance with the advice of such counsel. The Escrow Agent shall not be bound in any way by any of the terms of the Purchase Agreement or any other agreement to which the Purchaser and the Company are parties, whether or not the Escrow Agent has knowledge thereof, and the Escrow Agent shall not in any way be required to determine whether or not the Purchase Agreement or any other agreement has been complied with by the Purchaser, the Company or any other party thereto. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands which, in its opinion, are in conflict with any of the provisions of this Escrow Agreement, it shall be entitled to refrain from taking any action other than to keep safely all property held in escrow until it shall be directed otherwise pursuant to a joint written notice from the Purchaser and the Company. This Escrow Agreement shall not create any fiduciary duty of the Escrow Agent to the Purchaser or the Company nor disqualify the Escrow Agent from representing any of such parties in any way (other than in connection with this Escrow Agreement).

**6.** **Liability of Escrow Agent**.

(a) The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement. The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's willful misconduct or omission, bad faith or gross negligence was the cause of any loss to the Purchaser or the Company. Escrow Agent's sole responsibility shall be for the safekeeping, investment and disbursement of the Deposit Funds in accordance with the terms of this Escrow Agreement. Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the Person purporting to sign the same. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Agent shall not be responsible or liable in any manner for the performance by any party of their respective obligations under the Purchase Agreement nor shall Escrow Agent be responsible or liable in any manner for the failure of Purchaser or the Company to honor any of the provisions of this Escrow Agreement or the Purchase Agreement. Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. The Purchaser and the Company, severally and jointly (provided that solely as between the Company and the Purchaser they agree that one-half shall be borne by Purchaser and the other half by the

Company), shall promptly pay, upon demand, the reasonable fees and expenses of any such counsel.

(b)     The Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by the Bankruptcy Court with respect to the Deposit Funds without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Deposit Funds is at any time attached, garnished or levied upon under any order by the Bankruptcy Court, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any such order, or in case any order, judgment or decree shall be made or entered by the Bankruptcy Court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other Person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

## 7.     **Indemnification of Escrow Agent**.

(a)     From and at all times after the date of this Escrow Agreement, the Purchaser and the Company, severally and jointly (one-half to be borne by the Purchaser and the other half to be borne by the Company), shall, to the fullest extent permitted by law, defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "**Escrow Agent Indemnified Parties**") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Escrow Agent Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any Person, including without limitation the Purchaser or the Company, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any Person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement or any transactions contemplated herein, whether or not any such Escrow Agent Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that no Escrow Agent Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted from the willful misconduct or omission, bad faith or gross negligence of any Escrow Agent Indemnified Party. Each Escrow Agent Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Purchaser and the Company severally and jointly (one-half to be borne by the Purchaser and the other half to be borne by the Company). The obligations of the Purchaser and the Company under this Section 7 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

(b)     The parties agree that no payment for indemnification hereunder of any amounts to Escrow Agent shall impair, limit, modify, or affect, as between the Purchaser and the Company, the respective rights and obligations of the Purchaser, on the one hand, and the Company, on the other hand, under the Purchase Agreement or this Escrow Agreement.

**8.      Risk to Escrow Agent**.  None of the provisions of this Escrow Agreement shall require the Escrow Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

**9.      Investigation by Escrow Agent**.  The Escrow Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, entitlement order, approval or other paper or document.

**10.     Automatic Succession; Resignation and Removal of Escrow Agent**.

(a)     Any company into which the Escrow Agent may be merged or with which it may be consolidated or any company to whom the Escrow Agent may transfer a substantial amount of its global escrow business, will be the successor to the Escrow Agent without the execution or filing of any paper or further act on the part of any parties, notwithstanding anything in this Escrow Agreement to the contrary.

(b)     The Escrow Agent may resign as escrow agent at any time with or without cause by giving written notice to the Purchaser and the Company, and such resignation shall be effective thirty (30) calendar days following the date such notice is given.  In addition, the Purchaser and the Company jointly may remove the Escrow Agent as escrow agent at any time with or without cause by an instrument executed by the Purchaser and the Company (which may be executed in counterparts) and given to the Escrow Agent; such instrument must designate the effective date of such removal.  If any such resignation or removal occurs, a successor escrow agent will be appointed by the Purchaser and the Company.  Any such successor escrow agent shall deliver to the Purchaser and the Company a written instrument accepting such appointment and upon such delivery it will succeed to all of the rights and duties of the Escrow Agent under this Escrow Agreement and will be entitled to receive the Deposit Funds.

(c)     If the Purchaser and the Company are unable to agree upon a successor escrow agent or have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following the date of the notice of resignation or removal, the then acting escrow agent shall petition the Bankruptcy Court for the appointment of a successor escrow agent or other appropriate relief, and any such resulting appointment will be binding upon all of the parties to this Escrow Agreement.

(d)     Upon acknowledgment by any successor escrow agent of the receipt of the Deposit Funds, the then replaced escrow agent will be fully relieved of all duties, responsibilities and obligations under this Escrow Agreement except with respect to actions previously taken or omitted by such replaced escrow agent.

11.     **Disputes**.

(a)     In the event of a dispute under this Escrow Agreement, the Escrow Agent may hold the Deposit Funds and await settlement or other resolution of any dispute in accordance with Section 11(b) of this Escrow Agreement.

(b)     If the Purchaser and the Company are unable to resolve any dispute under this Escrow Agreement within fifteen (15) days, such dispute shall be submitted to and resolved by the Bankruptcy Court.  Notice of the Bankruptcy Court's decision shall be provided to the Escrow Agent in writing.  The Escrow Agent is under no duty whatsoever to institute or defend any such proceedings.  Prior to the settlement of any such dispute, the Escrow Agent is authorized and directed to retain in its possession, without liability to anyone, that portion of the Deposit Funds that is the subject of such dispute.

12.     **Notices**.  All notices and other communications required or permitted hereunder shall be in writing, or set forth in a PDF attached to an e-mail, and shall be deemed to have been duly given when delivered in person or sent by e-mail or one Business Day after having been dispatched by a nationally recognized overnight courier service to the appropriate party at the address specified below:

(a)     If to the Purchaser:           United States Bakery
                                        315 NE 10th Avenue
                                        Portland, OR 97232
                                        Facsimile: (503) 731-5680
                                        Attention:
                                        E-mail:

With a copy (which shall not constitute notice to Purchaser):

                                        Tonkon Torp LLP
                                        888 SW 5th Avenue, Suite 1600
                                        Portland, OR 97204
                                        Facsimile: (503) 972-3706
                                        Attention:  Ronald L. Greenman
                                        E-mail: ron.greenman@tonkon.com

(b)     If to the Company:            Hostess Brands, Inc.
                                        12 East Armour Boulevard
                                        Kansas City, MO 64111
                                        Attention:  Jolyn Sebree
                                        E-mail:  jolyn.sebree@hostessbrands.com

With a copy (which shall not constitute notice to the Company):

                                        Jones Day
                                        222 East 41st Street
                                        New York, NY 10017

Attention:  John K. Kane
E-mail:  jkkane@jonesday.com

(c)     If to the Escrow Agent:     U.S. Bank National Association
461 Fifth Avenue, 14th Floor
New York, NY, 10017
Phone:(212)951-6996
Cell:(347)451-4121
Fax: 212-951-8543, 8544, 8545
Email: hazrat.haniff@usbank.com
Attention:  Hazrat Ray Haniff
Trust Officer

With a copy (which shall not constitute notice to Escrow Agent) to:

Moritt Hock & Hamroff LLP
400 Garden City Plaza
Garden City, NY  11530
Facsimile:  (516) 873-2010
Email:  bgarver@moritthock.com
Attention:  Brett P. Garver, Esq.

or at such other address as any of the parties to this Escrow Agreement may hereafter designate by written notice to the other parties.

**13.**    **Binding Effect**.  This Escrow Agreement is binding and inures to the benefit of the parties and their respective successors and assigns.

**14.**    **Assignment**.  This Escrow Agreement may not be assigned or transferred except upon a written agreement executed by each of the parties to this Escrow Agreement; provided, however, that (a) the Purchaser may assign this Escrow Agreement to one or more wholly-owned subsidiaries formed by it prior to the Closing and (b) the Company may assign this Escrow Agreement to a successor entity (including a liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court provided that in either case the Assignor shall remain liable hereunder, and the successor party shall comply with Escrow Agents request for identifying information.

**15.**    **Third Party Beneficiaries**.  Nothing in this Escrow Agreement is intended or will be construed to confer on any Person other than the parties or their permitted successors and assigns any rights or benefits under this Escrow Agreement.

**16.**    **Headings**.  The headings in this Escrow Agreement are intended solely for the convenience of reference and will be given no effect in the construction or interpretation of this Escrow Agreement.

17. **Exhibits**. The Exhibits and other attachments hereto will be deemed to be a part of this Escrow Agreement.

18. **Counterparts**. This Escrow Agreement may be executed in multiple counterparts, each of which will be deemed an original, and all of which together will constitute one and the same document.

19. **Governing Law**. This Escrow Agreement must be governed by and construed under the laws of the State of New York, without regard to conflict of laws principles, and, to the extent applicable, the Bankruptcy Code. In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree that the Bankruptcy Court shall have the sole and exclusive jurisdiction over any such proceeding. If such court lacks federal subject matter jurisdiction, the parties agree that the Supreme Court of the State of New York for New York County shall have sole and exclusive jurisdiction. Any of these courts shall be proper venue for any such lawsuit or judicial proceeding and the parties hereto waive any objection to such venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

20. **Amendment**. No amendment of this Escrow Agreement is binding unless made in a written instrument that specifically refers to this Escrow Agreement and is signed by the Purchaser, the Company and the Escrow Agent.

21. **Entire Agreement**. This Escrow Agreement (and as between Purchaser and the Company only, the Purchase Agreement) contains the entire understanding among the parties and supersedes any prior understanding and agreements between them, in each case respecting the subject matter hereof. There are no representations, agreements or understandings, oral or written, between or among the parties to this Escrow Agreement relating to the subject matter of this Escrow Agreement that are not fully expressed in this Escrow Agreement.

22. **Disclosure**. The parties hereto hereby agree not to use the name of U.S. BANK NATIONAL ASSOCIATION to imply an association with the transaction other than that of a legal escrow agent.

23. **Brokerage Confirmations**. The parties acknowledge that to the extent regulations of the Comptroller of Currency or other applicable regulatory entity grant a right to receive brokerage confirmations of security transactions of the escrow, the parties waive receipt of such confirmations, to the extent permitted by law. The Escrow Agent shall furnish a statement of security transactions on its regular monthly reports.

24. **Identifying Information**. The Company and Purchaser acknowledge that a portion of the identifying information set forth on Schedule A is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"). To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust, or other legal entity, we ask for documentation to verify its formation and existence as a legal

entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

*[Remainder of this Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first above written.

**U.S. BANK NATIONAL ASSOCIATION**

By: _____

Name: _____

Title: _____

**MOUNTAIN STATES BAKERY**

By: _____

Name: _____

Title: _____

**HOSTESS BRANDS, INC.**

By: _____

Name: _____

Title: _____

## EXHIBIT A

### Investment of Deposit Funds

[Escrow Agent is hereby directed to deposit and invest funds in the U.S. Bank Money Market Savings Account.  The Purchaser and the Company acknowledge that the U.S. Bank Money Market Account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank.  Selection of this investment includes authorization to place funds on deposit with U.S. Bank.  Interest rates currently offered on the accounts are determined at U.S. Bank's discretion and may be tiered by customer deposit amount.  The owner of the accounts is U.S. Bank as Agent for its trust customers.  U.S. Bank's trust department performs all account deposits and withdrawals.  Each customer's deposit is insured by the Federal Deposit Insurance Corporation as determined under FDIC Regulations, up to applicable FDIC limits (which may be lower that the amount of the customer's deposits).  Any and all interest earned on the Deposit Fund after the deposit shall be added to the Deposit Fund and shall become a part thereof.  Escrow Agent shall thereafter hold, maintain and utilize the Deposit Fund pursuant to the terms and conditions of this Escrow Agreement.  The Purchaser and the Company shall provide Escrow Agent with a W-9 or original W-8 IRS tax form prior to the disbursement of interest and Escrow Agent will file the appropriate 1099 or other required forms pursuant to Federal and State laws.  A statement of citizenship will be provided if requested by Escrow Agent.  Escrow Agent shall not be responsible for maximizing the yield on the Deposit Fund.  Escrow Agent shall not be liable for losses, penalties or charges incurred upon any sale or purchase of any such investment.]

## EXHIBIT B

**Notification to Escrow Agent**

_____, 2013

_____
_____
_____
Attention:  _____

**BY EMAIL**

Ladies and Gentlemen:

        Pursuant to Section 4 of the Escrow Agreement dated _____, 2013, by and among U.S. Bank National Association (the "Escrow Agent"), [Purchaser] (the "Purchaser"), and [Company] (the "Company"), and the Asset Purchase Agreement dated _____, 2013, by and among [Parent], the Purchaser, the Company and each of the Company's subsidiaries listed on the signature page thereto (the "Purchase Agreement") we hereby notify you that the Closing Date is to occur on _____, 2013.

        All capitalized terms used herein and not otherwise defined herein have the respective meanings ascribed to them in the Purchase Agreement.

Very Truly Yours,

[Purchaser]

By: _____
Name: _____
Title: _____

[Company]

By: _____
Name: _____
Title: _____

## <u>EXHIBIT C</u>

**Deposit Notice**

_____, 2012

_____
_____
_____
Attention: _____

_____
_____
_____
Attention: _____

**BY EMAIL**

Ladies and Gentlemen:

     Pursuant to Section 4 of the Escrow Agreement dated _____, 2013, by and among U.S. Bank National Association, [Purchaser] (the "Purchaser") and [Company] (the "Escrow Agreement"), we hereby notify you that we have received from the Purchaser funds in the amount of U.S.$_____, and such funds are being held in the Deposit Account (as defined in the Escrow Agreement) until released pursuant to the terms set forth in the Escrow Agreement.

Very truly yours,

U.S. Bank National Association

_____
By: _____
Title: _____

## **EXHIBIT D**

**Escrow Agent's Fee Schedule**

Attached

EXECUTION VERSION

# DISCLOSURE SCHEDULES
# TO THE
# ASSET PURCHASE AGREEMENT
# AMONG
# HOSTESS BRANDS, INC.,
# INTERSTATE BRANDS CORPORATION,
# IBC SALES CORPORATION,
# UNITED STATES BAKERY
# AND
# MOUNTAIN STATES BAKERIES LLC

This set of Disclosure Schedules (these "Schedules") was prepared by Sellers in connection with the execution of the Asset Purchase Agreement, dated as of January 28, 2013 (the "Agreement"), among Hostess Brands, Inc. (the "Company"), Interstate Brands Corporation, IBC Sales Corporation, United States Bakery and Mountain States Bakeries LLC. Any capitalized terms used in the Schedules but not otherwise defined herein will be defined as set forth in the Agreement.

The Schedules are qualified in their entirety by reference to specific provisions of the Agreement and are not intended to constitute, and will not be construed as constituting, representations, warranties or covenants of Sellers or any of their respective Affiliates except as and to the extent provided in the Agreement. Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of the Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent.

Disclosure in these Schedules of any allegations with respect to any alleged failure to perform, or breach or default of a contractual or other duty or obligation, or breach or violation of any Law or Order will not be deemed an admission to any third party that such in fact exists or has in fact occurred. Headings have been inserted on the sections and within such sections of these Schedules for convenience of reference only and will not change the express description of such sections as set forth in the Agreement. The numbering of sections of these Schedules reflects the corresponding section in the Agreement.

The information contained herein is strictly confidential and is in all events subject to the confidentiality provisions contained in the Agreement. Sellers and their Affiliates expressly do not waive any attorney-client privilege associated with any matter disclosed in these Schedules or any protection afforded by the work-product doctrine with respect to any matter disclosed in these Schedules.

**Table of Contents**

| Description | Page |
|---|---|
| Schedule 1.1(a) - Knowledge of Sellers | 3 |
| Schedule 1.1(b) - Purchased Recipes | 4 |
| Schedule 1.1(c) - Purchased Trademarks | 6 |
| Schedule 1.1(d) - Vehicles | 8 |
| Schedule 2.2(i) - Excluded Assets | 9 |
| Schedule 3.1(c) - Disputed Payable | 10 |
| Schedule 5.3(a) - Conflicts | 11 |
| Schedule 5.3(b) - Consent of Third Parties | 12 |
| Schedule 5.4 - Owned Real Property | 13 |
| Schedule 5.6(a) - Purchased Intellectual Property | 14 |
| Schedule 5.6(b) - Intellectual Property Licenses | 15 |
| Schedule 5.6(c) - Intellectual Property Exceptions | 16 |
| Schedule 5.8 - Litigation | 17 |
| Schedule 5.9 - Environmental Matters | 18 |

**Exhibits**

Exhibit 1.1(d) – Vehicles
Exhibit 5.4(i) – Plants
Exhibit 5.4(ii) – Depots

**Schedule 1.1(a)**
**Knowledge of Sellers**

John Stewart
Rich Seban
Jolyn Sebree, Esq.

## Schedule 1.1(b)
## Purchased Recipes

| Pkg Desc | Net Wt Oz | UPC |
|----------|-----------|-----|
| SWEETHEART WHITE 20 OZ PLYBG | 20 | 4130009133 |
| SWEETHEART SAND 24 OZ PLYBG | 24 | 4130009153 |
| SWEETHEART WHITE T/T 24 OZ PLYBG | 24 | 4130009195 |
| SWEETHEART WHEAT SAND 24 OZ PLYBG | 24 | 4130009203 |
| SWEETHEART WHEAT,100 24 OZ PLYBG | 24 | 4130009218 |
| SWEETHEART WHEAT CR RL 12 PK 12 OZ PLYBG | 12 | 4130009238 |
| SWEETHEART BUN 12 PK PLYBG | | 4130009546 |
| SWEETHEART SAND TWIN PLYBG | 48 | 4130009565 |
| SWEETHEART BUN HAMS 8 PK 12 OZ PLYBG | 12 | 4130009622 |
| SWEETHEART BUN HOTS 8 PK 12 OZ PLYBG | 12 | 4130009626 |
| SWEETHEART BUN 12 PK 22 OZ PLYBG | 22 | 4130009636 |
| SWEETHEART BUN SES 8 PK 22 OZ PLYBG | 22 | 4130009639 |
| SWEETHEART BUN HOTS 16 PK 24 OZ PLYBG | 24 | 4130009645 |
| SWEETHEART RL KAISER 8 PK 19 OZ PLYBG | 19 | 4130009687 |
| SWEETHEART WHEAT BUN 8 PK 19 OZ PLYBG | 19 | 4130009704 |
| SWEETHEART B&S 12 PK 12 OZ PLYBG | 12 | 4130009711 |
| SWEETHEART DINRL O/F 12 OZ PLYBG | 12 | 4130009755 |
| EDDYS SAND GIANT 24 OZ PLYBG | 24 | 4130037153 |
| EDDYS BMILK 24 OZ PLYBG | 24 | 4130037160 |
| EDDYS WHEAT,CR 24 OZ PLYBG | 24 | 4130037204 |
| EDDYS BUN SEED 8 PK 18 OZ PLYBG | 18 | 4130037641 |
| EDDYS WHEAT CR BUN 8 PK 19 OZ PLYBG | 19 | 4130037687 |
| EDDYS S/D BUN 6 PK 20 OZ PLYBG | 20 | 4130037696 |
| EDDYS BUN BMILK 8 PK 19 OZ PLYBG | 19 | 4130037702 |
| EDDYS WHEAT CR BUN DELI 6 PK 15 OZ PLYBG | 15 | 4130037763 |
| STANDISH FARMS WHEAT,100 24 OZ PLYBG | 24 | 4130041218 |
| STANDISH FARMS WHEAT HNY 24 OZ PLYBG | 24 | 4130041243 |
| STANDISH FARMS HNY WHOLE GRN 24 OZ PLYBG | 24 | 4130041252 |
| STANDISH FARMS 7 GRN 24 OZ PLYBG | 24 | 4130041262 |
| STANDISH FARMS WHEAT CR S/T 20 OZ PLYBG | 20 | 4130041300 |
| STANDISH FARMS RYE,DELI 24 OZ PLYBG | 24 | 4130041307 |
| STANDISH FARMS S/D 24 OZ PLYBG | 24 | 4130041430 |

| Pkg Desc | Net Wt Oz | UPC |
|---|---|---|
| STANDISH FARMS GRN,HONEY,WHL PLYBG | 24 | 4130041545 |
| EDDYS WHITE FARM STYLE 24 OZ PLYBG | 24 | 4130042115 |
| SWEETHEART BUN STEAK 6 PK 16 OZ PLYBG | 16 | 4130070679 |
| GRANDMA EMILIES WHITE O/F 24 OZ PLYBG | 24 | 4500060563 |
| GRANDMA EMILIE'S MULTGRN 24 OZ PLYBG | 24 | 4500060564 |
| AK PRID WHITE SAND 24 OZ PLYBG | 24 | 6546101001 |
| AK PRID WHEAT 24 OZ PLYBG | 24 | 6546101003 |
| AK PRID BMILK 24 OZ PLYBG | 24 | 6546101019 |
| AK PRID S/D 24 OZ PLYBG | 24 | 6546101021 |
| AK PRID WHEATBERRY 24 OZ PLYBG | 24 | 6546101023 |
| AK PRID MULTGRN 24 OZ PLYBG | 24 | 6546101025 |
| AK PRID WHEAT,100,S/G 24 OZ PLYBG | 24 | 6546101027 |
| AK PRID HNY OAT 24 OZ PLYBG | 24 | 6546101031 |
| AK PRID BUN FR RL 12 PK 32 OZ PLYBG | 32 | 6546101032 |
| AK OWN BUN HAMS 4.5" 12 PK 29 OZ PLYBG | 29 | 6546101049 |
| AK PRID BUN 16 PK 24 OZ PLYBG | 24 | 6546101360 |
| AK PRID BUN 8 PK 12 OZ PLYBG | 12 | 6546101360 |
| AK PRID BUN 8 PK 12 OZ PLYBG | 12 | 6546101370 |

## Schedule 1.1(c)
## Purchased Trademarks

## Trademarks

### (a) U.S. Registrations

| Mark | Reg. No. | Reg. Date |
|------|----------|-----------|
| EDDY'S (STYLIZED) *Eddy's* | 1343051 | 18-Jun-1985 |
| GRANDMA EMILIE'S | 1753356 | 16-Feb-1993 |
| GRANDMA EMILIE'S AND DESIGN | 1776686 | 15-Jun-1993 |
| SWEETHEART | 801976 | 11-Jan-1966 |
| SWEETHEART & DESIGN *Sweetheart* | 900873 | 13-Oct-1970 |
| STANDISH FARMS | 1198991 | 22-Jun-1982 |

### (b) Unregistered Names and Marks

GRANDMA EMILIE'S
GRANDMA EMILIE'S AND DESIGN



### (c) Internet Domain Names

sweetheartbakeryoutlets.biz
sweetheartbakeryoutlets.com
sweetheartbakeryoutlets.info
sweetheartbakeryoutlets.net
sweetheartbakeryoutlets.org
sweetheartbakeryoutlets.us
sweetheartbreads.biz
sweetheartbreads.com
sweetheartbreads.info
sweetheartbreads.net
sweetheartbreads.org
sweetheartbreads.us

NYI-4497556v4

6

eddysbakeryoutlets.biz
eddysbakeryoutlets.com
eddysbakeryoutlets.info
eddysbakeryoutlets.net
eddysbakeryoutlets.org
eddysbakeryoutlets.us
eddysbreads.biz
eddysbreads.com
eddysbreads.info
eddysbreads.net
eddysbreads.org
eddysbreads.us

# Schedule 1.1(d)
# Vehicles

Each Vehicle listed on <u>Exhibit 1.1(d)</u>.

**Schedule 2.2(i)**
**Excluded Assets**

None.

### Schedule 3.1(c)
### Disputed Payable

The aggregate amount, as reflected on the below chart, of the Disputed Payable that reflects all amounts in dispute attributable to the prior distribution by Purchaser of Hostess cakes in certain geographic markets in the Northwest is the sum of $1,353,351.03

The parties have agreed to settle the disputed amount by Purchaser paying the sum of $750,000 at the time for the payment due for the Purchased Assets.

EXHIBIT A

| Vendor No. | Posting Date | Document Type | USB Doc # | USB Tracking # | Original Amount |
|---|---|---|---|---|---|
| V11295 | 12/6/2011 | Credit Memo | PC006127 | CNTRT-2010 | 14,261.00 |
| V11295 | 12/7/2011 | Credit Memo | PC006141 | CNTRT-2011 | 705,311.00 |
| V11295 | 8/20/2011 | Credit Memo | PC004759 | CTRT-ADJ | 554,909.78 |
| V11295 | 8/22/2011 | Credit Memo | PC004836 | AP08/22/11 | 78,869.25 |

**1,353,351.03**

10

## Schedule 5.3(a)
## Conflicts

1. All Permits.
2. Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of January 12, 2012, among Hostess Brands, Inc. and Interstate Brands Corporation, as borrowers, certain of Hostess Brands, Inc.'s subsidiaries, as guarantors, the DIP lenders from time to time party thereto and Silver Point Finance, LLC, as DIP Agent, as amended, supplemented or otherwise modified.
3. The Consulting and Marketing Services Agreement For Real Property and Other Assets, dated as of December 7, 2012, among Hilco Industrial, LLC, Hilco IP Services, LLC d/b/a Hilco Streambank, and Hilco Real Estate, LLC, and Hostess Brands, Inc., on behalf of itself and its affiliate debtors and debtors in possession, as amended, supplemented or otherwise modified.
4. Order (docket no. 1985) of the United States Bankruptcy Court for the Southern District of New York that was entered on December 21, 2012 , (i) authorizing Debtors to (a) retain and employ Hilco as exclusive consulting and marketing agents and (b) obtain related postpetition financing and (ii) granting certain related relief.
5. Final Order (docket number 1871) of the United States Bankruptcy Court for the Souther District of New York that was entered on November 30, 2012,  pursuant to Sections 105, 363, 365 and 503(c) of the Bankruptcy Code:  (a) approving (i) a plan to wind down the Debtors' businesses, (ii) the sale of certain assets, (iii) going-out-of-business sales at the Debtors' retail stores, (iv) the Debtors' use of cash collateral and modifications to Final DIP Order, (v) an Employee Retention Plan, (vi) a Management Incentive Plan, (vii) protections for certain employees implementing the winddown of the Debtors' businesses, (viii) the use of certain third party contractors and (ix) procedures for the expedited rejection of contracts and leases; and (b) authorizing the Debtors to take any and all actions necessary to implement the winddown.
6. Final Order (docket number 254) of the United States Bankruptcy Court for the Southern District of New York that was entered on February 3, 2012, (i) authorizing Debtors to (a) obtain post-petition financing pursuant to 11 U.S.C Sections 105, 361, 362, and 364 and (b) Utilize Cash Collateral Pursuant to 11 U.S.C. Section 363, and (ii) granting adequate protection to pre-petition secured parties.

.

**Schedule 5.3(b)**
**Consent of Third Parties**

See Schedule 5.3(a).

## Schedule 5.4
## Owned Real Property

(i)

**Plants**

| ADDRESS | CITY | STATE | FACILITY USE | LEGAL DESC. |
|---|---|---|---|---|
| 2248 Spenard Road | Anchorage | Alaska | Plant | 1.1.E-1 |
| 5150 Midland Road | Billings | Montana | Plant | 1.1.E-2 |
| 734 East 400 South | Salt Lake City | Utah | Plant | 1.1.E-3 |
| 434 Aurora Avenue North | Seattle | Washington | Plant | 1.1.E-4 |

**Depots and Retail Thrift Stores**

| ADDRESS | CITY | STATE | FACILITY USE | LEGAL DESC. |
|---|---|---|---|---|
| 1670 Highway 30 North | Heyburn | Idaho | Store/Depot | 1.1.A-1 |
| 365 East Anderson | Idaho Falls | Idaho | Store/Depot/Garage | 1.1.A-2 |
| 1111 Washington Street | Montpelier | Idaho | Depot | 1.1.A-3 |
| 3100 Pole Line Road | Pocatello | Idaho | Store/Depot | 1.1.A-4 |
| 548 Washington Street | Twin Falls | Idaho | Store/Depot/Garage | 1.1.A-5 |
| Madison Avenue 59 BLG | Billings | Montana | Storage | 1.1.A-6 |
| 1700 East Main Avenue | Bismarck | North Dakota | Store | 1.1.A-7 |
| 7522 South State Street | Midvale | Utah | Store | 1.1.A-8 |
| 1180 West Center Street | Provo | Utah | Store/Depot/Garage | 1.1.A-9 |
| 5923 South 350 West | Salt Lake City (Murray) | Utah | Depot/Garage | 1.1.A-10 |
| 708 West North Temple | Salt Lake City | Utah | Store/Depot/Garage | 1.1.A-11 |
| 162 South 100 West | Logan | Utah | Store/Depot | 1.1.A-12 |
| 430 East Casino Road | Everett | Washington | Store/Depot | 1.1.A-13 |
| 10014 Pacific Avenue | Tacoma | Washington | Store/Depot | 1.1.A-14 |

*Legal descriptions of Plants and Depots are set forth on Exhibit 5.4(i) and Exhibit Exhibit 5.4(ii).*

(ii)

The Owned Real Property is subject to the following leases and tenancies:  None.

Violations:

  Depots:

| ADDRESS | CITY | STATE | DATE | SENT BY | SUMMARY OF VIOLATION |
|---|---|---|---|---|---|
| 1180 West Center Street | Provo | Utah | 9/18/12 | City of Provo Community Development | Notice that weeds around property need to be cut |

13

## Schedule 5.6(a)
## Purchased Intellectual Property

See Schedule 1.1(c)(a).

**Schedule 5.6(b)**
**Intellectual Property Licenses**

1.      License Agreement dated November 29, 2001, between Interstate West Brands Corporation, ABC Distributors, Alaska Best Consolidators, LTD and Alaska Pride Baking Company, LLC.

**Schedule 5.6(c)**
**Intellectual Property Exceptions**

(i)

None.

(ii)

1.     The labeling, advertising, promotion, offering for sale, sale and distribution of bread, bread products, rolls and muffins is subject to the following Order:  In the Matter of Interstate Bakeries Corporation, Docket No. C-4042 (Decision and Order of the U.S. Federal Trade Commission dated April 16, 2002).

 (iii)

None.

(iv)

None.

## Schedule 5.8
## Litigation

1.  All litigation being conducted in the Bankruptcy Case.

2.  *Municipality of Anchorage v. Interstate Brands Corporation.* In 2012, Interstate Brands Corporation entered into a stipulated order in which it admitted allowing the outdoor storage of commercial trucks and heavy equipment, a violation of Anchorage Municipal Code 21.40.180.

## Schedule 5.9
## Environmental Matters

1. The Plant in Anchorage, Alaska had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on August 8, 1997.  Remedial Action was undertaken; a No Further Action letter was issued on March 16, 2003.
2. The Depot in Heyburn, Idaho had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on August 8, 1997.  Remedial Action was undertaken; a No Further Action letter was issued on March 16, 2003.
3. The Depot in Idaho Falls, Idaho had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on January 12, 1993 and April 15, 1993.  Remedial Action was undertaken; a No Further Action Letter was not required because soil sampling results did not exceed state action levels.
4. The Depot in Pocatello, Idaho had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on March 1, 1989.  Remedial Action was undertaken; a No Further Action letter was issued on April 21, 1993.
5. The Depot in Twin Falls, Idaho had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on February 1, 1991.  Remedial Action was undertaken; a No Further Action letter was not required because sampling results did not exceed state action levels.
6. The Plant in Billings, Montana had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on February 10, 1993.  Remedial Action was undertaken; a No Further Action letter was issued on May 21, 1993.  Above ground storage tank(s) were removed on July 1, 2012.  Remedial Action was undertaken; sampling results did not exceed state action levels.
7. The Depot in Logan, Utah had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on December 1, 1992.  Remedial Action was undertaken; a No Further Action letter was issued on July 10, 1995.
8. The Depot in Provo, Utah had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed on September 19, 1990, August 20, 1997, and April 1, 1998.  Remedial Action was undertaken; No Further Action letters were issued on November 19, 1997 and July 12, 2005.
9. The Plant at 734 E. 400 South, Salt Lake City, Utah had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s).  The equipment was removed in 1968; April 30, 1990; July 18, 1995; October 20, 1995; October 5, 1998; and April 15, 2008.  Remedial Action was undertaken; No Further Action letters were issued on August 18, 1992; November 19, 1998; July 19, 2005; and September 18, 2008.

10. The Depot at 5923 South 350 West, Salt Lake City, Utah (aka Murray, Utah) had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s). The equipment was removed on May 16, 1990 and April 29, 1991. Remedial Action was undertaken; a No Further Action letter was issued on March 5, 1998.

11. The Depot at 708 West North Temple, Salt Lake City, Utah had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s). The equipment was removed in 1992. Remedial Action was undertaken; a No Further Action letter was issued on December 2, 1996.

12. The Depot in Everett, Washington had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s). The equipment was removed in 1990. Remedial Action was undertaken; a No Further Action letter was not required because sampling results did not exceed state action levels.

13. The Plant in Seattle, Washington had a Release or threatened Release of Hazardous Materials due to former underground storage tank(s). The equipment was removed on August 8, 1997. Remedial Action was undertaken; a No Further Action letter was issued on March 16, 2003.

**<u>Exhibit 1.1(d)</u>**
**Vehicles**


Attached.

| Plant asset is assigned to | Assigned Plant Name | Assigned Plant State | Location Asset is Physically stored at | Bu | Bus Ctr Class | Asset | Sfin | Class | Asset description | Inventory number | Serial number | Status | Manufacturer of asset | Type name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664425 | | OVERTHEKAT | ROUTE TRUCK | 375 | 4UZAAPDT23CH53709 | Present | FREIGHTLINER | 2001 M2TS |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664426 | | OVERTHEKAT | ROUTE TRUCK | 383 | 4UZAAPDT23CH53704 | Present | FREIGHTLINER | 2001 M2TS |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664443 | | OVERTHEKAT | ROUTE TRUCK | 383 | 4UZAAPDT23CH53768 | Present | FREIGHTLINER | 2001 M2TS |
| 30 | ANCHORAGE | AK | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660879 | | OVERTHEKAT | ROUTE TRUCK | 384 | 4UZAAPDT23CH51778 | Present | FREIGHTLINER | 2001 M2TS |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660879 | | OVERTHEKAT | TRACTOR | 429 | 1FUYCSEB81H009572 | Present | FREIGHTLINER | 2000 CENTRY |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 668863 | | OVERTHEKAT | TRACTOR | 782 | 1FUYCSEB31H009570 | Present | FREIGHTLINER | 2000 CENTRY |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664485 | | OVERTHEKAT | TRAILER | 783 | 1GRAA06261W080270 | Present | TRAILMOBILE | 2000 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664484 | | OVERTHEKAT | TRAILER | 864 | 1GRAA06281W080271 | Present | TRAILMOBILE | 2000 DRY VAN |
| 30 | ANCHORAGE | AK | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664482 | | OVERTHEKAT | TRAILER | 865 | 1GRAA06221W090555 | Present | TRAILMOBILE | 2000 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660790 | | OVERTHEKAT | TRAILER | 790 | 1GRAA1113YJ009573 | Present | TRAILMOBILE | 2001 VNLV6AT |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660840 | | OVERTHEKAT | TRACTOR | 837 | 1FUJA6AV03LK90821 | Present | VOLVO | 2001 VNL64T |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660847 | | OVERTHEKAT | TRACTOR | 1653 | JALC4B14347006504 | Present | ISUZU | 2001 INFINI |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660841 | | OVERTHEKAT | ROUTE TRUCK | 1701 | JALC4B14347006527 | Present | ISUZU | 2001 NPR HD |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663557 | | OVERTHEKAT | ROUTE TRUCK | 1721 | 1GDH6611BV10500533 | Present | CHEVROLET | 2001 W 4500 |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660886 | | OVERTHEKAT | ROUTE TRUCK | 1773 | 1GDJ6H1BK1J500534 | Present | GMC | 2001 W 4500 |
| 39 | LAKEWOOD | WA | 8000 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7339001 VEHR TER | 664726 | | OVERTHEKAT | ROUTE TRUCK | 1772 | 4UZAAFDCX1CJ66224 | Present | FREIGHTLINER | 2001 MT45 |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 660889 | | OVERTHEKAT | TRAILER | 1908 | 1PT011AH9195009594 | Present | TRAILMOBILE | 2001 01 TRA |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663556 | | OVERTHEKAT | TRAILER | 1910 | 1PT011AH319S009595 | Present | TRAILMOBILE | 2001 01 TRA |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664227 | | OVERTHEKAT | TRAILER | 1916 | 1PT011AH519S009596 | Present | TRAILMOBILE | 2001 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663559 | | OVERTHEKAT | TRAILER | 1917 | 1PT011AH919S009600 | Present | TRAILMOBILE | 2001 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663560 | | OVERTHEKAT | TRAILER | 1918 | 1PT011AH119S009601 | Present | TRAILMOBILE | 2001 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663561 | | OVERTHEKAT | TRAILER | 1923 | 1PT011AH919S009703 | Present | TRAILMOBILE | 2001 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663562 | | OVERTHEKAT | TRAILER | 1924 | 1PT011AH119S009704 | Present | TRAILMOBILE | 2001 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663563 | | OVERTHEKAT | TRAILER | 1925 | 1PT011AH319S009705 | Present | TRAILMOBILE | 2001 DRY VAN |
| 39 | LAKEWOOD | WA | 8000 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7339001 VEHR TER | 664710 | | OVERTHEKAT | TRAILER | 2265 | 4V4NK9HH34N236828 | Present | VOLVO | 2002 CONV |
| 39 | LAKEWOOD | WA | 8000 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7339001 VEHR TER | 664710 | | OVERTHEKAT | TRACTOR | 2766 | 4V4NK9JH04N236829 | Present | VOLVO | 2002 CONV |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663555 | | OVERTHEKAT | TRAILER | 2815 | 1UYVS25381U655164 | Present | TRAILMOBILE | 2002 ST |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 663554 | | OVERTHEKAT | TRAILER | 2815 | 1UYVS25351U655153 | Present | TRAILMOBILE | 2002 ST |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664643 | | OVERTHEKAT | TRAILER | 3112 | 1PT011AH2905194 | Present | TRAILMOBILE | 2002 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664644 | | OVERTHEKAT | TRAILER | 3102 | 1PT011AH2905166 | Present | TRAILMOBILE | 2003 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664642 | | OVERTHEKAT | TRAILER | 3010 | 4V4NK9GH53N420617 | Present | VOLVO | 2003 VN VVX |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664741 | | OVERTHEKAT | TRACTOR | 3776 | 4V4NK9GH83N420612 | Present | VOLVO | 2003 VN VVX |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664739 | | OVERTHEKAT | TRACTOR | 3710 | 4V4NK9GH3N426421 | Present | VOLVO | 2003 VN VVX |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664740 | | OVERTHEKAT | TRACTOR | 3778 | 1FUJA6AVX3LK90821 | Present | FREIGHTLINER | 2003 VN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664188 | | OVERTHEKAT | TRAILER | 3813 | 1UYVS25361U643020 | Present | WABASH | 2003 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664331 | | OVERTHEKAT | TRAILER | 3812 | 1JJV482W03L843030 | Present | WABASH | 2003 DRY VAN |
| 30 | ANCHORAGE | AK | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664719 | | OVERTHEKAT | TRAILER | 3822 | 1JJV482W73L843787 | Present | WABASH | 2003 DRY VAN |
| 30 | ANCHORAGE | AK | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664714 | | OVERTHEKAT | TRAILER | 3822 | 1JJV482W53L843384 | Present | WABASH | 2003 DRY VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664721 | | OVERTHEKAT | ROUTE TRUCK | 3825 | 1HTMMAAM43H569683 | Present | INTERNATIONAL | 2003 ISUZU |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664720 | | OVERTHEKAT | ROUTE TRUCK | 3826 | 1HTMMAAM43H569674 | Present | INTERNATIONAL | 2003 ISUZU |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 664718 | | OVERTHEKAT | TRAILER | 3828 | 1JJV532W03L843655 | Present | WABASH | 2003 TRAVREM |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005143 | | OVERTHEKAT | ROUTE TRUCK | 4144 | 6GJAN9WHC4M54618 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005142 | | OVERTHEKAT | ROUTE TRUCK | 4101 | 6GJAN9WHC4M54619 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005154 | | OVERTHEKAT | ROUTE TRUCK | 4102 | 6GJAN9WHC4M54638 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005159 | | OVERTHEKAT | ROUTE TRUCK | 4103 | 6GJAN9WHC4M54641 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005138 | | OVERTHEKAT | ROUTE TRUCK | 4141 | 6GJAN9WHC4M54857 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005131 | | OVERTHEKAT | ROUTE TRUCK | 4142 | 6GJAN9WHC4M54859 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005132 | | OVERTHEKAT | ROUTE TRUCK | 4143 | 6GJAN9WHC4M54860 | Present | FREIGHTLINER | 2004 WALK N VAN |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005133 | | OVERTHEKAT | ROUTE TRUCK | 4501 | JALC4B14X47006487 | Present | ISUZU | 2004 W 4500 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VEHR TER | 2005135 | | OVERTHEKAT | ROUTE TRUCK | 4504 | JALC4B14247006492 | Present | ISUZU | 2004 W 4500 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VEHR TER | 2005145 | | OVERTHEKAT | ROUTE TRUCK | 4502 | JALC4B14X47006547 | Present | ISUZU | 2004 W 4500 |
| 32 | OGDEN | UT | 2301 GRANT AVENUE, OGDEN, UT 84401 32398 | West | 7332001 VEHR TER | 2005140 | | OVERTHEKAT | ROUTE TRUCK | 4508 | JALC4B14X47006583 | Present | ISUZU | 2004 W 4500 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VEHR TER | 2005136 | | OVERTHEKAT | ROUTE TRUCK | 4514 | JALC4B14X47006581 | Present | ISUZU | 2004 W 4500 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VEHR TER | 2005137 | | OVERTHEKAT | ROUTE TRUCK | 4608 | 1HTMMAAM94H565665 | Present | INTERNATIONAL | 2004 DRY VAN |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VEHR TER | 2005139 | | OVERTHEKAT | ROUTE TRUCK | 4609 | 1HTMMAAM04H565666 | Present | INTERNATIONAL | 2004 DRY VAN |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VEHR TER | 2005130 | | OVERTHEKAT | ROUTE TRUCK | 4615 | 1HTMMAAM74H565664 | Present | INTERNATIONAL | 2004 2K TK TRK |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | | 2005140 | | | | 4616 | | Present | | 2004 2K TK TRK |

| | City | State | Address | | Code | No. | Type | No. | VIN | Status | Make | Year/Model |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 2005424 | OTHER/TRAILS | 4720 | 4V4NC9TG2N5N1835 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005425 | TRACTOR | 4721 | 4V4NC9TG4N5N1836 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005426 | TRACTOR | 4722 | 4V4NC9TG6N5N1837 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005427 | TRACTOR | 4723 | 4V4NC9TG8N5N1838 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005428 | TRACTOR | 4745 | 4V4NC9TGXN5N1823 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005429 | TRACTOR | 4755 | 4V4NC9TG6N5N1824 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005430 | TRACTOR | 4756 | 4V4NC9TG4N5N1823 | Present | VOLVO | 2004 SEMI TRACT |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005491 | TRACTOR | 4815 | 1UYVS2487W793793 | Present | WABASH NATIONAL | 2004 TRAILER |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005492 | TRAILER | 4816 | 1UYVS2489W793798 | Present | WABASH NATIONAL | 2004 TRAILER |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005499 | TRAILER | 4817 | 1UYVS2485W793799 | Present | WABASH NATIONAL | 2004 TRAILER |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005500 | TRAILER | 4818 | 1UYVS2485W38X3797 | Present | WABASH NATIONAL | 2004 TRAILER |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005501 | TRAILER | 4819 | 1UYVS2487W38X3798 | Present | WABASH NATIONAL | 2004 TRAILER |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005310 | CONVERTER DOLLY | 4824 | 1UYVS2489W38X3799 | Present | SILVER EAGLE | 2004 CAJON |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005311 | CONVERTER DOLLY | 4905 | 1U1KGT21X4M089411 | Present | SILVER EAGLE | 2004 CAJON |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005312 | CONVERTER DOLLY | 4906 | 1GGGHT0OYS14M090 | Present | SILVER EAGLE | 2004 CAJON |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 2005313 | TRAILER | 4823 | 1U1KGT2184M089093 | Present | SILVER EAGLE | 2004 CAJON |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 2005144 | TRAILER | 4909 | 1U1KGT2154M089094 | Present | SILVER EAGLE | 2004 CAJON |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 2005501 | TRACTOR | 7601 | 4CDMAHD2X4M1204714 | Present | KENWORTH | 2006 4200 |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 663578 | TRACTOR | 7602 | 4CDMAHD2N4M120647 | Present | KENWORTH | 2006 4200 |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 663577 | TRACTOR | 7604 | 1HTWMAAM7HJ177466 | Present | INTERNATIONAL HARVESTER | 2006 4200 |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 663576 | TRACTOR | 23524 | 1HTWMAAM7HJ177467 | Present | INTERNATIONAL HARVESTER | 2006 4200 |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 663555 | TRACTOR | 23575 | 1HTWDAAR5CJ652456 | Present | INTERNATIONAL | 1990 MT120 |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 732000 VEH/TRACT | 664448 | TRACTOR | 23673 | 1HTWPAZR7XH712426 | Present | INTERNATIONAL TRUCKING | 2007 42000 |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 664449 | TRAILER | 7612 | 1GRAA7026J0502 | Present | GMC | 2007 42000 |
| 32 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 664450 | TRAILER | 8802 | 1GDA47OY54J8090 | Present | GMC | 1986 P30 |
| 30 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 664156 | TRAILER | 23697 | 1GDAA72K4M089414 | Present | GMC | 2006 UPLANDER |
| 30 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 664728 | ROUTE TRUCK | 23698 | 1JGGA48E94J026 | Present | OSHKOSH | 2008 M110 |
| 30 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 670916 | CONVERTER DOLLY | 30045 | 1X8CFAD2684N120642 | Present | OSHKOSH | 2004 M110 |
| 80 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 664165 | ROUTE TRUCK | 23700 | 1X8CFAD2684N120647 | Present | OSHKOSH | 1991 M120 |
| 80 | OGDEN | UT | 2245 GRANT AVENUE, OGDEN, UT 84401 | West | 733000 VEH/TRAILS | 664166 | ROUTE TRUCK | 30052 | 1G5C2532115M089102 | Present | OSHKOSH | 1984 DOLLY |
| 39 | LAKEWOOD | WA | 8000 DAMMEO STREET SW, LAKEWOOD, WA 98498 | West | 733000 VEH/TRAILS | 664167 | TRACTOR | 7603 | 1M2P270M60025901 | Present | FREIGHTLINER | 1991 J1294 |
| 39 | LAKEWOOD | WA | 8000 DAMMEO STREET SW, LAKEWOOD, WA 98498 | West | 732000 VEH/TRACT | 666082 | TRACTOR | 40736 | 1M2P270MX0025911 | Present | FREIGHTLINER | 1985 |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 666881 | TRACTOR | 40035 | 1GRAA7022L6000 | Present | GREAT DANE | 1990 DOLLY |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 664164 | TRACTOR | 40075 | 1GRAA7024L0702 | Present | GREAT DANE | 1990 DOLLY |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 733000 VEH/TRAILS | 664593 | TRAILER | 30074 | 1GRAA70221L6 | Present | GREAT DANE | 1996 DOLLY |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 733000 VEH/TRAILS | 664596 | TRAILER | 30513 | 1GRFB11335M0104660 | Present | GREAT DANE | 1990 DOLLY |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 733000 VEH/TRAILS | 664172 | TRAILER | 82818 | 1GRFAB0064795M02 | Present | GREAT DANE | 1991 MT12 |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 733000 VEH/TRAILS | 664171 | DOLLY | 30875 | 1XKFA09XM5J90691 | Present | KENWORTH | 1988 VAN |
| 39 | LAKEWOOD | WA | 8000 DAMMEO STREET SW, LAKEWOOD, WA 98498 | West | 733000 VEH/TRAILS | 663552 | DOLLY | 61115 | 1GRAA96299M0711 | Present | GREAT DANE | 1981 TRAILER |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 733000 VEH/TRAILS | 664170 | DOLLY | 82134 | 1GRAA96239M0711 | Present | GREAT DANE | 1988 215S |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 733000 VEH/TRAILS | 664596 | TRACTOR | 61206 | 1GRAA96290M0711 | Present | GREAT DANE | 1994 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 732000 VEH/TRACT | 664697 | TRACTOR | 61277 | 1GRAA96289M02601 | Present | GREAT DANE | 1994 731 TR |
| 39 | LAKEWOOD | WA | 8000 DAMMEO STREET SW, LAKEWOOD, WA 98498 | West | 732000 VEH/TRACT | 664827 | TRACTOR | 61417 | 1GGAAD8Q12045XS1 | Present | GREAT DANE | 1994 731 TR |
| 39 | LAKEWOOD | WA | 8000 DAMMEO STREET SW, LAKEWOOD, WA 98498 | West | 732000 VEH/TRACT | 663565 | TRACTOR | 61418 | 1GRAA922N0810 | Present | GREAT DANE | 1972 DOLLY |
| 39 | LAKEWOOD | WA | 8000 DAMMEO STREET SW, LAKEWOOD, WA 98498 | West | 732000 VEH/TRACT | 664680 | TRACTOR | 61472 | 5ABO6045055 | Present | BROWN | 1972 DOLLY |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 732000 VEH/TRACT | 664691 | TRACTOR | 72800 | 5AB06045057414 | Present | FRUEHAUF | 1979 SUPER II |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663567 | TRAILER | 72897 | PHP3418283 | Present | FRUEHAUF | 1979 SUPER II |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663567 | TRAILER | 79906 | PHP3418283 | Present | FRUEHAUF | 1982 I-BAR |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663568 | TRAILER | 81122 | 1DTVGVW2XA73874X4 | Present | THERMOKING | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663569 | TRAILER | 82517 | 1G9AA7022L0664 | Present | OSHKOSH | 1991 MT12 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663580 | TRAILER | 82812 | 4CDMAHD2N4M120644 | Present | OSHKOSH | 1982 I-BAR2 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663582 | TRAILER | 82523 | 1HGX6D8L0M05691 | Present | OSHKOSH | 1982 I-BAR2 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663586 | TRAILER | 85460 | 1FGE19791683636 | Present | FORD | 1985 E350 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 733000 VEH/TRAILS | 663586 | FLATBED TRUCK | 85902 | 1FGE37Y77683636 | Present | FORD | 1986 FLATBED |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663588 | 0 | VEHTRALS | TRAILER | 86816 | 1PT021AH8G9002395 | Present | TRAILMOBILE | 1986 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663589 | 0 | VEHTRALS | TRAILER | 86819 | 1PT021AH7G9006694 | Present | TRAILMOBILE | 1986 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663590 | 0 | VEHTRALS | TRAILER | 86820 | 1PT021AH9G9006695 | Present | TRAILMOBILE | 1986 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663592 | 0 | VEHRTETR | ROUTE TRUCK | 87302 | 1FCJE39H1HHA40052 | Present | FORD | 1987 E350 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663595 | 0 | VEHRTETR | ROUTE TRUCK | 87306 | 1FCJE39H9HHA40056 | Present | FORD | 1987 E350 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663596 | 0 | VEHTRALS | TRAILER | 87851 | 1PT071JE9H9006771 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663597 | 0 | VEHTRALS | TRAILER | 87852 | 1PT071JE0H9006772 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7217001 | VEHTRALS | 660748 | 0 | VEHTRALS | TRAILER | 87853 | 1PT071JE2H9006773 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 2006236 | 0 | VEHTRALS | TRAILER | 87854 | 1PT071JE4H9006774 | Present | TRAILMOBILE | 1987 27X96 PUP |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663598 | 0 | VEHTRALS | TRAILER | 87855 | 1PT071JE6H9006775 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663599 | 0 | VEHTRALS | TRAILER | 87856 | 1PT071JE8H9006776 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 664733 | 0 | VEHTRALS | TRAILER | 87857 | 1PT071JEXH9006777 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663600 | 0 | VEHTRALS | TRAILER | 87858 | 1PT071JE1H9006778 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663601 | 0 | VEHTRALS | TRAILER | 87859 | 1PT071JE3H9006779 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663602 | 0 | VEHTRALS | TRAILER | 87860 | 1PT071JEXH9006780 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663603 | 0 | VEHTRALS | TRAILER | 87861 | 1PT071JE1H9006781 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663604 | 0 | VEHTRALS | TRAILER | 87866 | 1PT071JE0H9006786 | Present | TRAILMOBILE | 1987 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663606 | 0 | VEHTRALS | DOLLY | 87903 | 1PT0Y10G4H9006791 | Present | TRAILMOBILE | 1987 DOLLY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663607 | 0 | VEHTRALS | DOLLY | 87905 | 1PT0Y10G8H9006793 | Present | TRAILMOBILE | 1987 DOLLY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663608 | 0 | VEHTRALS | DOLLY | 87906 | 1PT0Y10GXH9006794 | Present | TRAILMOBILE | 1987 DOLLY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663610 | 0 | VEHTRALS | DOLLY | 87908 | 1PT0Y10G3H9006796 | Present | TRAILMOBILE | 1987 DOLLY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663612 | 0 | VEHRTETR | ROUTE TRUCK | 88096 | 1GDHP32J8J3501610 | Present | GMC | 1988 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663614 | 0 | VEHRTETR | ROUTE TRUCK | 88098 | 1GDHP32J3J3501613 | Present | GMC | 1988 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663617 | 0 | VEHRTETR | ROUTE TRUCK | 88101 | 1GDHP32J0J3501620 | Present | GMC | 1988 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663618 | 0 | VEHRTETR | ROUTE TRUCK | 88102 | 1GDHP32J2J3501618 | Present | GMC | 1988 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663620 | 0 | VEHTRALS | TRAILER | 88872 | 1PT01AAH9J9003872 | Present | TRAILMOBILE | 1988 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663623 | 0 | VEHTRALS | TRAILER | 89816 | 1H2V05327KE014801 | Present | FRUEHAUF | 1989 FB91 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663624 | 0 | VEHTRALS | TRAILER | 89817 | 1H2V05329KE014802 | Present | FRUEHAUF | 1989 FB91 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663625 | 0 | VEHTRALS | TRAILER | 89820 | 1H2V04827KE014901 | Present | FRUEHAUF | 1988 FB91 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663626 | 0 | VEHTRALS | TRAILER | 89821 | 1H2V04829KE014902 | Present | FRUEHAUF | 1988 FB91 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 2006237 | 0 | VEHTRALS | TRAILER | 89887 | 1PT01AAH7L9001766 | Present | TRAILMOBILE | 1990 48' |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663627 | 0 | VEHTRALS | TRAILER | 89895 | 1PT01AAH3L9001862 | Present | TRAILMOBILE | 1990 01AA1RAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663629 | 0 | VEHTRALS | TRAILER | 89897 | 1PT01AAH7L9001864 | Present | TRAILMOBILE | 1990 01AA1RAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663630 | 0 | VEHTRALS | TRAILER | 89898 | 1PT01AAH9L9001865 | Present | TRAILMOBILE | 1990 01AA1RAY |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664693 | 0 | VEHRTETR | ROUTE TRUCK | 90111 | 1GCDM15Z3NB196661 | Present | CHEVROLET | 1992 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664694 | 0 | VEHRTETR | ROUTE TRUCK | 90112 | 1GCDM15Z5NB197584 | Present | CHEVROLET | 1992 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664690 | 0 | VEHRTETR | ROUTE TRUCK | 90201 | 1GCCM15Z7MB122606 | Present | CHEVROLET | 1991 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664685 | 0 | VEHRTETR | ROUTE TRUCK | 90202 | 1GCCM15E0JB197138 | Present | CHEVROLET | 1988 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664691 | 0 | VEHRTETR | ROUTE TRUCK | 90203 | 1GCDM15Z2MB170003 | Present | CHEVROLET | 1991 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664718 | 0 | VEHRTETR | ROUTE TRUCK | 90377 | 1GCCM15E8HB141572 | Present | CHEVROLET | 1987 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664716 | 0 | VEHRTETR | ROUTE TRUCK | 90379 | 1GCCM15E4LB179681 | Present | CHEVEROLET | 1990 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664717 | 0 | VEHRTETR | ROUTE TRUCK | 90380 | 1GCCM15Z8MB135462 | Present | CHEVROLET | 1991 ASTRO VAN |
| 30 | ANCHORAGE | AK | 2248 SPENARD ROAD, ANCHORAGE, AK 99503 | West | 7330001 | VEHRTETR | 664182 | 0 | VEHRTETR | ROUTE TRUCK | 90400 | 1GCDM15Z9MB169253 | Present | CHEVROLET | 1991 MINI VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664738 | 0 | VEHRTETR | ROUTE TRUCK | 90418 | 1GCCM15Z9MB154392 | Present | CHEVROLET | 1991 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664739 | 0 | VEHRTETR | ROUTE TRUCK | 90419 | 1GCDM15Z4MB167345 | Present | CHEVROLET | 1991 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664741 | 0 | VEHRTETR | ROUTE TRUCK | 90421 | 1GCDM15Z6MB167900 | Present | CHEVROLET | 1991 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664743 | 0 | VEHRTETR | ROUTE TRUCK | 90422 | 1GCDM15Z5NB190263 | Present | CHEVROLET | 1992 ASTRO VAN |
| 39 | LAKEWOOD | WA | 8500 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 7339001 | VEHRTETR | 664742 | 0 | VEHRTETR | ROUTE TRUCK | 90423 | 1GCDM15Z8NB191200 | Present | CHEVROLET | 1991 ASTRO VAN |
| 32 | OGDEN | UT | 2557 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | VEHRTETR | 664356 | 0 | VEHRTETR | ROUTE TRUCK | 90547 | 1GCCM15E6KB219547 | Present | CHEVROLET | 1990 ASTRO VAN |
| 32 | OGDEN | UT | 2557 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | VEHRTETR | 664438 | 0 | VEHRTETR | ROUTE TRUCK | 90548 | 1GCCM15E2LB179422 | Present | CHEVROLET | 1990 ASTRO VAN |
| 32 | OGDEN | UT | 2557 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | VEHRTETR | 664445 | 0 | VEHRTETR | ROUTE TRUCK | 90549 | 1GCDM15ZXMB166703 | Present | CHEVROLET | 1991 ASTRO VAN |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663631 | 0 | VEHRTETR | ROUTE TRUCK | 91040 | 1GDHP32J1M3500710 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 2006209 | 0 | VEHRTETR | ROUTE TRUCK | 91041 | 1GDHP32J3M3500711 | Present | GMC | 1994 P-30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663632 | 0 | VEHRTETR | ROUTE TRUCK | 91042 | 1GDHP32J9M3500714 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663635 | 0 | VEHRTETR | SERVICE TRUCK | 91320 | 1GDHP32JXM3501807 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663636 | 0 | VEHRTETR | ROUTE TRUCK | 91321 | 1GDHP32J5M3501746 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663638 | 0 | VEHRTETR | ROUTE TRUCK | 91323 | 1GDHP32J6M3501965 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663639 | 0 | VEHRTETR | ROUTE TRUCK | 91324 | 1GDHP32J7M3501893 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663640 | 0 | VEHRTETR | ROUTE TRUCK | 91325 | 1GDHP32J0M3501802 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663643 | 0 | VEHRTETR | ROUTE TRUCK | 91328 | 1GDHP32J8M3501868 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663644 | 0 | VEHRTETR | ROUTE TRUCK | 91329 | 1GDHP32JXM3501743 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663645 | 0 | VEHRTETR | ROUTE TRUCK | 91330 | 1GDHP32J9M3501796 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663647 | 0 | VEHRTETR | ROUTE TRUCK | 91332 | 1GDHP32J1M3501937 | Present | GMC | 1991 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663562 | 0 | VEHTRALS | TRAILER | 91839 | 1PT01AAH4M9001872 | Present | TRAILMOBILE | 1991 01AA1VAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663648 | 0 | VEHTRALS | TRAILER | 91879 | 1PT01AAH1M9008231 | Present | TRAILMOBILE | 1991 01AA1VAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663649 | 0 | VEHTRALS | TRAILER | 91880 | 1PT01AAH3M9008232 | Present | TRAILMOBILE | 1991 01AA1VAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663650 | 0 | VEHTRALS | TRAILER | 91881 | 1PT01AAH5M9008233 | Present | TRAILMOBILE | 1991 01AA1VAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663651 | 0 | VEHTRALS | TRAILER | 91882 | 1PT01AAH7M9008234 | Present | TRAILMOBILE | 1991 01AA1VAY |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663652 | 0 | VEHRTETR | SERVICE TRUCK | 92027 | 1GDHP32J8N3501399 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663654 | 0 | VEHRTETR | SERVICE TRUCK | 92031 | 1GDHP32J4N3501447 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663655 | 0 | VEHRTETR | ROUTE TRUCK | 92032 | 1GDHP32J8N3501449 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663656 | 0 | VEHRTETR | ROUTE TRUCK | 92034 | 1GDHP32J9N3501461 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663657 | 0 | VEHRTETR | ROUTE TRUCK | 92035 | 1GDHP32J2N3501480 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663658 | 0 | VEHRTETR | ROUTE TRUCK | 92036 | 1GDHP32J7N3501412 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663659 | 0 | VEHRTETR | ROUTE TRUCK | 92037 | 1GDHP32J9N3501511 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663660 | 0 | VEHRTETR | SERVICE TRUCK | 92038 | 1GDHP32J6N3501529 | Present | GMC | 1992 P30 |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663661 | 0 | VEHTRALS | TRAILER | 92888 | 1PT01AAH8P9000843 | Present | TRAILMOBILE | 1992 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHTRALS | 663662 | 0 | VEHTRALS | TRAILER | 92889 | 1PT01AAHXP9000844 | Present | TRAILMOBILE | 1992 TRAILER |
| 17 | BILLINGS | MT | 5150 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7317001 | VEHRTETR | 663664 | 0 | VEHRTETR | ROUTE TRUCK | 93022 | 1GDHP32J8P3501874 | Present | GMC | 1993 P30 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664577 | OVEHTR/LS | 97827 | 11WS3272XL390936 | Present | 1997 DRY VAN |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 663718 | OVEHTR/TR | 97880 | 11WS7191XL390919 | Present | 1997 D SADDLMC |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTRALS | 663733 | OVEHTRALS | 97892 | 11VS1275N139095L | Present | 1997 D SADDLMC |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTRTR | 664734 | OVEHTR/TR | 97900 | | Present | GMC |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664722 | OVEHTR/TR | 97901 | 1CFEEAWVCS18491 | Present | 1997 PICKUP |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 663726 | OVEHTR/TR | 98004 | | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 663727 | OVEHTR/TR | 98005 | 4U2A2NT2XKCA2806 | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 663728 | OVEHTR/TR | 98007 | 4U2AIM72XKCA2879 | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 663729 | OVEHTR/TR | 98008 | | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 663730 | OVEHTR/TR | 98010 | 4U2AIM72XKCA8310 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTRALS | 663747 | OVEHTRALS | 98011 | 4U2AIX72XKCA8320 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 664590 | OVEHTR/TR | 98013 | 4U2A700XDCA3114 | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664591 | OVEHTR/TR | 98016 | 4U2A700A2CA8114 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTRTR | 664593 | OVEHTR/TR | 98017 | 4U2AIM72XKCA8314 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664595 | OVEHTR/TR | 98018 | 4U2AIM72XKCA8299 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 663738 | OVEHTR/TR | 98019 | 4U2A2NT2XKCA8313 | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 663739 | OVEHTR/TR | 98020 | 4U2AIM72XKCA8307 | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 663741 | OVEHTR/TR | 98021 | 4U2AIM72XKCA8331 | Present | FREIGHTLINER |
| 17 | BILLINGS | MT | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 663742 | OVEHTR/TR | 98035 | 4U2A2NT2XKCA8309 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 663743 | OVEHTR/TR | 98036 | 4U2A2NT2XKCA8308 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 663744 | OVEHTR/TR | 98039 | 4U2AIN72XKCA8319 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTRALS | 663745 | OVEHTR/TR | 98042 | 4U2A2NT2XKCA8278 | Present | FREIGHTLINER |
| 39 | LAKEWOOD | WA | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 663746 | OVEHTR/TR | 98026 | 4U2AIM72XKCA8180 | Present | FREIGHTLINER |
| 39 | LAKEWOOD | WA | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 664247 | OVEHTR/TR | 98030 | 1PTGLU0XWPD95975 | Present | 1998 DRY VAN |
| 39 | LAKEWOOD | WA | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 664781 | OVEHTR/TR | 98033 | 4U2AIM72XKCA8167 | Present | FREIGHTLINER |
| 39 | LAKEWOOD | WA | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7330001 VOHTR/TR | 664782 | OVEHTR/TR | 98359 | 4U2AIM72XKCA8164 | Present | FREIGHTLINER |
| 39 | LAKEWOOD | WA | 2257 MIDLAND ROAD, BILLINGS, MT 59101 | West | 7332001 VOHTR/TR | 664783 | OVEHTR/TR | 98367 | 4U2A7D0A2CA8114 | Present | FREIGHTLINER |
| 39 | LAKEWOOD | WA | 2298 SPYHARE ROAD, ANCHORAGE, AK 99507 | West | 7332001 VOHTR/TR | 664787 | OVEHTR/TR | 98366 | 4U2AIM72XKCA8166 | Present | FREIGHTLINER |
| 30 | ANCHORAGE | AK | 2298 SPYHARE ROAD, ANCHORAGE, AK 99507 | West | 7330001 VOHTR/TR | 664781 | OVEHTR/TR | 98399 | 4U2A7D0A2CA8111 | Present | FREIGHTLINER |
| 30 | ANCHORAGE | AK | 2298 SPYHARE ROAD, ANCHORAGE, AK 99507 | West | 7332001 VOHTR/TR | 664782 | OVEHTR/TR | 98400 | 4U2AIM72XKCA8154 | Present | FREIGHTLINER |
| 30 | ANCHORAGE | AK | 2298 SPYHARE ROAD, ANCHORAGE, AK 99507 | West | 7332001 VOHTR/TR | 664802 | OVEHTR/TR | 98401 | 4U2A2N72XKCA8312 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 664798 | OVEHTR/TR | 98402 | 4U2AIM72XKCA8315 | Present | FREIGHTLINER |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664797 | OVEHTR/TR | 98403 | 4U2AIM72XKCA8279 | Present | FREIGHTLINER |
| 39 | LAKEWOOD | WA | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664793 | OVEHTR/TR | 98857 | 1PTGLLUXWPD95975 | TRAILMOBILE | TRAILMOBILE |
| 39 | LAKEWOOD | WA | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664611 | OVEHTR/TR | 98895 | | Present | TRAILMOBILE |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTRALS | 664617 | TRAILER | 99177 | | Present | TRAILER |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664615 | OVEHTR/TR | 99180 | 4U2A7D0XKCA82... | Present | 1998 MT35 |
| 17 | BILLINGS | MT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 664638 | OVEHTR/TR | 99181 | 4U2A7D0XKCA82... | Present | 1999 MT35 |
| 32 | OGDEN | UT | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 664802 | OVEHTR/TR | 99182 | 4U2A7D0XKCA82... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | 2257 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664626 | OVEHTR/TR | 99183 | 4U2A7D0XKCA82... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7332001 VOHTR/TR | 664624 | OVEHTR/TR | 99188 | 4U2A7D0XKCA82... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7330001 VOHTR/TR | 664605 | OVEHTR/TR | 99169 | 4U2AIM72XKCA8... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7332001 VOHTR/TR | 664602 | OVEHTR/TR | 99172 | 4U2A7D0XKCA82... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7330001 VOHTR/TR | 664806 | OVEHTR/TR | 99173 | 4U2AIM72XKCA8... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7330001 VOHTR/TR | 664609 | OVEHTR/TR | 99174 | 4U2AIM72XKCA8... | Present | 2000 MT35 |
| 39 | LAKEWOOD | WA | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7332001 VOHTR/TR | 664608 | OVEHTR/TR | 99175 | 4U2AIM72XKCA8... | Present | 2000 MT35 |
| 17 | BILLINGS | MT | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7330001 VOHTR/TR | 664601 | OVEHTR/TR | 99176 | 4U2AIN72XKCA8... | Present | 2000 MT35 |
| 17 | BILLINGS | MT | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7332001 VOHTR/TR | 664599 | OVEHTR/TR | 99018 | 4U2AIM72XKCA8... | Present | 1999 LITUMAST |
| 17 | BILLINGS | MT | ROXO GAMMACO STREET 136, LAKEWOOD, WA 98498 | West | 7332001 VOHTR/TR | 664792 | OVEHTR/TR | 98393 | 4U2A7D96XKCA8... | Present | 1999 MT35 |
| 32 | OGDEN | UT | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664782 | OVEHTR/TR | 98359 | 4U2A7D96XKCA8... | Present | 1999 LITUMAST |
| 32 | OGDEN | UT | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664781 | ROUTE TRUCK | 99020 | 4U2A7D96XKCA8... | Present | 1999 MT35 |
| 32 | OGDEN | UT | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664783 | ROUTE TRUCK | 99023 | 4U2A7D96XKCA8... | Present | 1999 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664780 | ROUTE TRUCK | 99026 | 4U2A7D96XKCA8... | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664778 | ROUTE TRUCK | 98013 | 4U2A7D96XKCA8... | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664777 | ROUTE TRUCK | 98042 | 4U2A7D96XKCA8... | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664459 | ROUTE TRUCK | 98044 | 4U2A7D96XKCA8... | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664738 | ROUTE TRUCK | 98016 | 4U2A7D96XKCA8... | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664742 | ROUTE TRUCK | 98017 | 2001 MT35 | Present | 2001 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7330001 VOHTR/TR | 664741 | ROUTE TRUCK | 98018 | | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664730 | ROUTE TRUCK | 98019 | | Present | 1998 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664739 | ROUTE TRUCK | 98020 | | Present | 1999 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664735 | ROUTE TRUCK | 98021 | | Present | 1999 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664737 | ROUTE TRUCK | 98035 | | Present | 1999 MT35 |
| 39 | LAKEWOOD | WA | 2251 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 VOHTR/TR | 664734 | ROUTE TRUCK | 98036 | | Present | 1999 MT35 |

| # | City | State | Address | Dir | Code | No. | Type | No. | VIN | Status | Make | Year/Model |
|---|------|-------|---------|-----|------|-----|------|-----|-----|--------|------|------------|
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664809 | OVERHTER | 99195 | 4U2AJNT2XYC82612 | Present | FREIGHTLINER | 1999 MT55 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664818 | OVERHTER | 99197 | 4U2AJNT2XYC82638 | Present | FREIGHTLINER | 2000 MT55 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664812 | OVERHTER | 99199 | 4U2AJNT2YC82647 | Present | FREIGHTLINER | 2000 MT55 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664813 | OVERHTER | 99190 | 4U2AJNT2YC82649 | Present | FREIGHTLINER | 2000 MT55 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664814 | OVERHTER | 99200 | 4U2AJNT2XYC82649 | Present | FREIGHTLINER | 1999 MT55 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664191 | OVERHTER | 99202 | 4U2AJNT2XYC82648 | Present | FREIGHTLINER | 1999 MT55 |
| 39 | ANCHORAGE | AK | 12M GRANT ANIMAL, ANCHORAGE, AK 99501 | West | 73300(X) VGHRTER | 664837 | OVERHTER | 99203 | 4U2AJNT2XYC82653 | Present | FREIGHTLINER | 2000 MT55 |
| 30 | ANCHORAGE | AK | 12M GRANT ANIMAL, ANCHORAGE, AK 99501 | West | 73300(X) VGHRTER | 664190 | OVERHTER | 99204 | 4U2AJNT2XYC82654 | Present | FREIGHTLINER | 2000 MT55 |
| 30 | ANCHORAGE | AK | 12M GRANT ANIMAL, ANCHORAGE, AK 99501 | West | 73300(X) VGHRTER | 664188 | OVERHTER | 99208 | 4U2AJNT2XYC82657 | Present | FREIGHTLINER | 2000 MT55 |
| 39 | ANCHORAGE | AK | 12M GRANT ANIMAL, ANCHORAGE, AK 99501 | West | 73300(X) VGHRTER | 664189 | OVERHTER | 99206 | 4U2AJNT2XYC82658 | Present | FREIGHTLINER | 2000 MT55 |
| 39 | ANCHORAGE | AK | 12M GRANT ANIMAL, ANCHORAGE, AK 99501 | West | 73300(X) VGHRTER | 664187 | OVERHTER | 99210 | 4U2AJNT2XYC82653 | Present | FREIGHTLINER | 2000 MT55 |
| 30 | ANCHORAGE | AK | 12M GRANT ANIMAL, ANCHORAGE, AK 99501 | West | 73300(X) VGHRTER | 664820 | OVERHTER | 99217 | 1FUY9MDB1JLAA8613 | Present | FREIGHTLINER | 1999 F1B |
| 17 | BILLINGS | MT | 3510 MIDLAND ROAD, BILLINGS, MT 59101 | West | 73170(X) VGHTSAL5 | 664191 | OVERHTACT | 99222 | 4UZAAFRVC82679 | Present | FREIGHTLINER | 1999 F1B |
| 17 | BILLINGS | MT | 3510 MIDLAND ROAD, BILLINGS, MT 59101 | West | 73170(X) VGHTSAL5 | 660751 | OVERHTACT | 99216 | 1FUY9MDB1JLAA8618 | Present | FREIGHTLINER | 1999 F1B |
| 17 | BILLINGS | MT | 3510 MIDLAND ROAD, BILLINGS, MT 59101 | West | 73170(X) VGHTSAL5 | 660753 | OVERHTACT | 99217 | 1FUY9MDB1JLAA8612 | Present | FREIGHTLINER | 1999 F1B |
| 17 | BILLINGS | MT | 3510 MIDLAND ROAD, BILLINGS, MT 59101 | West | 73170(X) VGHTSAL5 | 664900 | OVERHTACT | 99728 | 4VHKCPKH1HA24337 | Present | VOLVO | 2003 VNL64T |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664899 | OVERHTACT | 99729 | 1FUY9BDV1JLAA8619 | Present | FREIGHTLINER | 1999 COF/SLP |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 660901 | OVERHTACT | 99741 | 1FUY9BDV1JLAA8621 | Present | FREIGHTLINER | 1999 COF/SLP |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 660902 | OVERHTACT | 99743 | 1FUY9BDV1JLAA8622 | Present | FREIGHTLINER | 1999 COF/SLP |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664655 | OVERHTACT | 99742 | 1FUY9BDV1JLAA8645 | Present | FREIGHTLINER | 1999 CL120 |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664656 | OVERHTACT | 99741 | 1FUY9BDV1JLAA8799 | Present | FREIGHTLINER | 1999 CL120 |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664421 | OVERHTACT | 99744 | 1FUYDDYB1YDH06228 | Present | FREIGHTLINER | 1999 CL120 |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664470 | OVERHTACT | 99870 | 1FVXJJBJ07HDB4208 | Present | FORD | 1998 E350 |
| 30 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73170(X) VGHTSAL5 | 664451 | OVERHTACT | 99875 | 1FUJGBDV79LW93240 | Present | FORD | 1997 E350 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 660768 | OVERHTER | 99974 | 1FVHT039893A66048 | Present | FORD | 1999 E350 |
| 39 | LAKEWOOD | WA | 8005 DURANGO STREET SW, LAKEWOOD, WA 98498 | West | 73300(X) VGHRTER | 664121 | TRAILER | 24854 | 1FTDL1HSKK00557 | Present | TRAILMOBILE | 1997 E350 |
| 28 | Henderson | NN | 2050 GRANT ANIMAL, OGDEN, UT 84401 | West | 73330(X) VGHTSAL5 | 670000 | TRAILER | 942 | 1G9AAA02NH096020 | recent | TRAILMOBILE | 1987 TRAILER |
| 70 | LA HOSTESS | CA | 3510 MIDLAND ROAD, BILLINGS, MT 59101 | West | 73170(X) VGHTSAL5 | 664921 | TRAILER | 13919 | 1PTLS1HK30001134 | Present | UTILITY | 2001 DRY VAN |
| 70 | LA HOSTESS | CA | 3510 MIDLAND ROAD, BILLINGS, MT 59101 | West | 73170(X) VGHTSAL5 | 60867A | TRAILER | 28858 | 1PTLS1HKX0001173 | Present | TRAILMOBILE | 2001 DRY VAN |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664415 | TRACTOR | 3728 | 1UYVS2536WU265310 | Present | UTILITY | 2000 V530C |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664413 | TRACTOR | 3766 | 1UYVS25396U265320 | Present | VOLVO | 2003 VNL64T |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664677 | TRACTOR | 40769 | 1FUJGBDV79LW93240 | Present | FREIGHTLINER | 1999 DROM BOX |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664416 | TRACTOR | 40770 | 1FUJGBDV79LW93244 | Present | FREIGHTLINER | 1993 DROM BOX |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664819 | TRACTOR | 40723 | 1FUJGBDV79LW93244 | Present | FREIGHTLINER | 1993 DROM BOX |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 604877 | TRACTOR | 40778 | 1FUJGBDV89LW93240 | Present | FREIGHTLINER | 1992 DROM BOX |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 604888 | TRACTOR | 40792 | 1FUJGBDV09LW93240 | Present | FREIGHTLINER | 1992 DROM BOX |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 660961 | TRACTOR | 40916 | 1FVNF88BRFKA5312 | Present | FREIGHTLINER | 1994 DROM BOX |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 660964 | TRACTOR | 4034 | 1FVNH8BBR1AA5312 | Present | FREIGHTLINER | 1994 FL70 |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 660965 | TRACTOR | 4033 | 1FVHF8BBR1AA5313 | Present | FREIGHTLINER | 1991 FL70 |
| 22 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 660372 | TRACTOR | 46022 | 1FVHR8BBR1AA5313 | Present | FREIGHTLINER | 1991 FL70 |
| 22 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664902 | TRACTOR | 46023 | 1G9AAA02NH020701 | Present | FREIGHTLINER | 1991 FL70 |
| 22 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 5188 | TRAILER | 5188 | 1G9AAA02NH027901 | recent | GREAT DANE | 1988 FL70 |
| 22 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 60595 | TRAILER | 60595 | 1G9AAA02NH020701 | recent | GREAT DANE | 1998 FL70 |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664387 | TRAILER | 60595 | 1G9AAA82NH010701 | recent | GREAT DANE | 1992 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664646 | TRAILER | 61143 | 1G9AAA82NH017061 | recent | GREAT DANE | 1992 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664504 | TRAILER | 61141 | 1G9AAA82NH011061 | recent | GREAT DANE | 1992 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664467 | TRAILER | 61143 | 1G9AAA02H817001 | recent | GREAT DANE | 1992 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664404 | TRAILER | 61127 | 1G9AAA82H817001 | recent | GREAT DANE | 1992 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664453 | TRAILER | 61128 | 1G9AAA12H818048 | recent | GREAT DANE | 1986 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664851 | TRAILER | 61135 | 1G9AAA82H010701 | recent | GREAT DANE | 1986 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 60823 | TRAILER | 61136 | 1G9AAA02H010701 | recent | GREAT DANE | 1993 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 60188 | TRAILER | 60902 | 1G9AAA02H020703 | recent | GREAT DANE | 1993 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 60873 | TRAILER | 60139 | 1G9AAA02H020701 | recent | GREAT DANE | 1992 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664846 | TRAILER | 60135 | 1G9AAA02H020701 | recent | GREAT DANE | 1986 711TRB |
| 32 | DODGEN | UT | 2057 GRANT ANIMAL, OGDEN, UT 84405 | West | 73230(X) VGHTTSAL5 | 664388 | TRAILER | 61145 | 1G9AAA02H026901 | recent | GREAT DANE | 1982 SST |
| Henderson | | NV | 2050 GRANT ANIMAL, OGDEN, UT 84401 | West | 73330(X) VGHTSAL5 | 665900 | TRAILER | 62266 | 1G9AA02925920703 | Present | GREAT DANE | 1983 VAN |

| | City | ST | Address | | | Code | | Type | | VIN | Status | Make | Model/Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664437 | TRAILER | 61267 | 1GRAA81298J017551 | Present | GREAT DANE | 1995 7111P68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664427 | TRAILER | 61449 | 1GRAA06260B023902 | Present | GREAT DANE | 1995 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664448 | TRAILER | 61450 | 1GRAA06250B023901 | Present | GREAT DANE | 1995 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664462 | TRAILER | 61451 | 1GRAA53208B023403 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664452 | TRAILER | 61452 | 1GRAA53208B023402 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664453 | TRAILER | 61453 | 1GRAA53208B023401 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664454 | TRAILER | 61454 | 1GRAA53208B024801 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664465 | TRAILER | 61456 | 1GRAA06250B024803 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664465 | TRAILER | 61462 | 1GRAA06250B034601 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664450 | TRAILER | 61463 | 1GRAA06292B034011 | Present | GREAT DANE | 1995 7111R68 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 660852 | TRAILER | 70068 | 1HTSGYAR0YH142779 | Present | INTERNATIONAL HARVESTER | 1999 STRAIGHT |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668050 | QVEHTRACT | 70097 | 2NKWH7X55WM702751 | Present | KENWORTH | 1999 BOBTAIL |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668089 | QVEHTRACT | 81852 | 4DRAHFK1XDA912401 | Present | OSHKOSH | 1991 INDUT TK |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668085 | QVEHTRACT | 81892 | 1ZRAAY2BXRG012401 | Present | OSHKOSH | 1991 INDUT TK |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664465 | QVEHTRACT | 81893 | 17ML112JZ6LW026626 | Present | FORD | 1986 E350 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664480 | TRACTOR | 86735 | 1FUYCZYB6VH400957 | Present | FREIGHTLINER | 1986 MED CONV |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664488 | TRACTOR | 86738 | 1FUYCZYB6VH400958 | Present | FREIGHTLINER | 1986 MED CONV |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 660087 | TRACTOR | 86739 | 1FUYCZYB6VH400774 | Present | FREIGHTLINER | 1986 MED CONV |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668500 | TRACTOR | 86797 | 1FUYCZYB6VH400763 | Present | FREIGHTLINER | 1986 MED CONV |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668491 | TRAILER | 87895 | 1GRAA9245T132132 | Present | GREAT DANE | 1996 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668493 | TRAILER | 87894 | 1GRAA9241T132132 | Present | GREAT DANE | 1996 |
| 32 | OGDEN | UT | 7841 OPDYKE, SR Lake City, UT 84101 | West | 7332001 | QVEHTRAILS | 664545 | QVEHTRACT | 90240 | 5DWIST9233CDTL7728 | Present | CHEVROLET | 1980 ASTRO VAN |
| 32 | OGDEN | UT | 7841 OPDYKE, SR Lake City, UT 84101 | West | 7332001 | QVEHTRAILS | 664531 | QVEHTRACT | 90707 | 1GCHG35K931723234 | Present | CHEVROLET | 1980 ASTRO VAN |
| 70 | LA HOSTESS | CA | 2844 GETH AVE, San Lake City, CA 84701 | West | 7332001 | QVEHTRAILS | 568258 | TRAILER | 91882 | 1JJV482A8YL060852 | Present | TRAILMOBILE | 1991 53' |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664502 | TRAILER | 91883 | 1JJV482A8YL060853 | Present | TRAILMOBILE | 1991 53' |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664505 | TRAILER | 91884 | 1JJV482A8YL060854 | Present | TRAILMOBILE | 1991 53' |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664508 | TRAILER | 91885 | 1JJV482A8YL060855 | Present | TRAILMOBILE | 1991 53' |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664510 | TRAILER | 92887 | 1JJV482A8YL562924 | Present | TRAILMOBILE | 1991 53' |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668860 | TRAILER | 95708 | 1JJV482A8YL562924 | Present | TRAILMOBILE | 1995 FLC |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668089 | TRACTOR | 95224 | 4XYVB06P72N685888 | Present | FREIGHTLINER | 1995 FLC |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 668890 | TRAILER | 96298 | 4XYVB06P72N685888 | Present | FREIGHTLINER | 1995 FLC |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664546 | QVEHTRACT | 96801 | 4XMKIC2E2T2J1590 | Present | VOLVO | 1996 CDX |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664548 | QVEHTRACT | 97410 | 4U2AN47Z1VC934398 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664547 | QVEHTRACT | 97411 | 4U2AN47Z1VC934398 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664550 | QVEHTRACT | 97412 | 4U2AN47Z1VC934399 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664551 | QVEHTRACT | 97414 | 4U2AN47ZXVC934397 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664553 | QVEHTRACT | 97415 | 4U2AN47Z9VC934385 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 609215 | QVEHTRACT | 97416 | 4U2AN47Z7VC934391 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 609215 | ROUTE TRUCK | 97439 | 4U2AN47Z7VC934291 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 609517 | ROUTE TRUCK | 97435 | 4U2AN47Z6VC801290 | Present | FREIGHTLINER | 1997 MT55 |
| 32 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRAILS | 664374 | ROUTE TRUCK | 97721 | 3J1BPGP5W6M297213 | Present | FREIGHTLINER | 1994 COL/SP |
| 70 | OGDEN | UT | 2844 L. OPDYKE, SR Lake City, UT 84101 | West | 7332001 | QVEHTRAILS | 660887 | TRACTOR | 98713 | 1FUYDDYBXVH062124 | Present | FREIGHTLINER | 1998 COL/SP |
| 39 | OGDEN | UT | 2501 GRANT AVENUE, OGDEN, UT 84401-3198 | West | 7332001 | QVEHTRACT | 674191 | QVEHTRACT | 3716 | 4XHN42A0HJ042223 | Present | VOLVO | 2001 VN64T |
| 39 | LAKEWOOD | WA | 8300 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7239001 | QVEHTRACT | 674193 | QVEHTRACT | 3717 | 4XHN42A0HJ042124 | Present | VOLVO | 2001 VN64T |
| 39 | LAKEWOOD | WA | 8300 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7239001 | QVEHTRACT | 660914 | QVEHTRACT | 3718 | 4XHN42A0HJ042125 | Present | VOLVO | 2001 VN64T |
| 39 | LAKEWOOD | WA | 8300 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7239001 | QVEHTRACT | 20112 | QVEHTRACT | 20712 | 4V4ND21M6YN406096 | Present | VOLVO | 2000 VN64T |
| 39 | LAKEWOOD | WA | 8300 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7239001 | QVEHTRACT | 669916 | QVEHTRACT | 20716 | 4V4ND21M7YN406065 | Present | VOLVO | 2000 VN64T |
| 39 | LAKEWOOD | WA | 8300 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7239001 | QVEHTRACT | 669915 | QVEHTRACT | 20731 | 4V4ND21M3YN470665 | Present | VOLVO | 2000 VN64T |
| 39 | LAKEWOOD | WA | 8300 DURANGO STREET, LAKEWOOD, WA 98498 | West | 7239001 | QVEHTRACT | 660915 | QVEHTRACT | 70072 | 1HTSDYVR6LH214778 | Present | INTERNATIONAL HARVESTER | 1961 4900 |

**Exhibit 5.4(i)**
**Plants**

Attached.

**Exhibit 5.4(i)**
**Plants**

| ADDRESS | CITY | STATE | FACILITY USE | LEGAL DESC. |
|---------|------|-------|--------------|-------------|
| 2248 Spenard Road | Anchorage | Alaska | Plant | 1.1.E-1 |
| 5150 Midland Road | Billings | Montana | Plant | 1.1.E-2 |
| 734 East 400 South | Salt Lake City | Utah | Plant | 1.1.E-3 |
| 434 Aurora Avenue North | Seattle | Washington | Plant | 1.1.E-4 |

**1.1.E-1**

*2248 Spenard Road, Anchorage, Alaska*

Real property in the City of Anchorage, County of Anchorage, State of Alaska, described as follows:

Lot 1A, Block 5, Rornig Park Subdivision, according to the official plat thereof, filed under Plat Number 71-38, Records of the Anchorage Recording District, Third Judicial District, State of Alaska.

## 1.1.E-2

*5150 Midland Road, Billings, Montana*

Real property in the City of Billings, County of Yellowstone, State of Montana, described as follows:

Parcel A:

The Southwest Quarter of the Southwest Quarter of the Northeast Quarter (SW¼SW¼NE¼) of Section 17, Township 1 South, Range 26 East, MPM, Yellowstone County, Montana, excepting therefrom, however, all that portion of the said Southwest Quarter of the Southwest Quarter of the Northeast Quarter (SW¼SW¼NE¼) as is contained by "Midland Road" on the North of said real property; and, excepting therefrom, all of Certificate of Survey No. 1430, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 966083, more particularly described as follows:

Lots 1 and 2, Block 1, of Pinyon Subdivision, in the City of Billings, Yellowstone County, Montana, according to the official plat on file in the office of the Clerk and Recorder of said County, under Document #1030147.

Parcel B:

The East one hundred thirty-nine feet (139') of Lot eighteen (18) of Willis Subdivision, situated in the Southeast one-quarter (SE¼) of Northwest one-quarter (NW¼), Section ten (10), Township one (1) South, Range twenty-six (26) East, M.P.M, according to the plat thereof, more particularly described as follows:

Lot 18C, of Amended Plat of Lot 18, Willis Subdivision, in the City of Billings, Yellowstone County, Montana, according to the official plat on file in the office of the Clerk and Recorder of said County, under Document #540481.

## 1.1.E-3

*734 East 400 South, Salt Lake City, Utah*

Real property in the City of Salt Lake City, County of Salt Lake, State of Utah, described as follows:

PARCEL 1:

BEGINNING AT THE NORTHWEST CORNER OF LOT 4, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE SOUTH 48 FEET; THENCE EAST 10 RODS; THENCE NORTH 48 FEET; THENCE WEST 10 RODS TO THE PLACE OF BEGINNING.

PARCEL 2:

COMMENCING AT A POINT THAT IS NORTH 4.5 FEET AND EAST 102.00 FEET FROM THE NORTHWEST CORNER OF LOT 4, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION; THENCE EAST 63.00 FEET TO THE EAST LINE OF SAID LOT 4; THENCE SOUTH 4.5 FEET ALONG THE EAST LINE OF SAID LOT 4; THENCE WEST 63.00 FEET; THENCE NORTH 4.5 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL 3:

BEGINNING 48 FEET SOUTH OF THE NORTHWEST CORNER OF LOT 4, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY IN THE CITY OF SALT LAKE AND RUNNING THENCE SOUTH 34.5 FEET; THENCE EAST 10 RODS; THENCE NORTH 34.5 FEET; THENCE WEST 10 RODS TO THE PLACE OF BEGINNING.

PARCEL 4:

COMMENCING 5 RODS SOUTH OF THE NORTHWEST CORNER OF LOT 4, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE EAST 10 RODS; THENCE SOUTH 3 RODS;

THENCE WEST 10 RODS; THENCE NORTH 3 RODS TO THE PLACE OF BEGINNING.

PARCEL 5:

BEGINNING 8 RODS SOUTH OF THE NORTHWEST CORNER OF LOT 4, BLOCK 31; PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE SOUTH 34.5 FEET; THENCE EAST 5 RODS; THENCE NORTH 1.5 FEET; THENCE EAST 5 FEET; THENCE SOUTH 10 FEET; THENCE EAST 77.5 FEET; THENCE NORTH 43 FEET; THENCE WEST 10 RODS TO THE POINT OF BEGINNING.

PARCEL 6:

BEGINNING AT THE NORTHWEST CORNER OF LOT 6, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE SOUTH 130 FEET; THENCE EAST 2.5 RODS; THENCE NORTH 130 FEET; THENCE WEST 2.5 RODS TO THE PLACE OF BEGINNING.

PARCEL 7:

COMMENCING AT THE NORTHEAST CORNER OF LOT 6 AND RUNNING THENCE EAST 7.5 RODS; THENCE SOUTH 10 RODS; THENCE WEST 2.5 RODS; THENCE SOUTH 12.5 RODS; THENCE EAST 10 RODS; THENCE NORTH 22.5 RODS TO THE PLACE OF BEGINNING.

ALSO:

BEGINNING AT A POINT 130 FEET SOUTH FROM THE NORTHWEST CORNER OF LOT 6, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE SOUTH 35 FEET; THENCE EAST 2.5 RODS; THENCE NORTH 35 FEET; THENCE WEST 2.5 RODS TO THE PLACE OF BEGINNING.

PARCEL 8:

COMMENCING AT THE SOUTHWEST CORNER OF LOT 3, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE EAST 60 FEET; THENCE NORTH 140 FEET; THENCE WEST 60 FEET; THENCE SOUTH 140 FEET TO THE PLACE OF BEGINNING.

PARCEL 9:

BEGINNING AT A POINT ON THE SOUTH LINE OF LOT 3, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, WHICH IS AS 85 FEET WEST OF THE SOUTHEAST CORNER OF SAID LOT, AND RUNNING THENCE NORTH 130 FEET; THENCE EAST 22.5 FEET; THENCE NORTHEASTERLY 22 FEET, MORE OR LESS, TO A POINT WHICH IS 140 FEET NORTH AND 42.5 FEET WEST OF THE SOUTHEAST CORNER OF SAID LOT 3; THENCE EAST 42.5 FEET; THENCE NORTH 128.75 FEET; THENCE WEST 80 FEET; THENCE NORTH 20 FEET; THENCE WEST 46.5 FEET, MORE OR LESS, TO THE NORTHEAST CORNER OF THE LAND HERETOFORE CONVEYED BY THE GRANTOR TO THE PALACE MEAT CO., THENCE SOUTH 148.75 FEET TO A POINT WHICH IS 140 FEET NORTH AND 126.5 FEET WEST OF THE SOUTHEAST CORNER OF SAID LOT 3; THENCE EAST 22.5 FEET; THENCE SOUTH 140 FEET TO THE SOUTH LINE OF SAID LOT; THENCE 20 FEET TO THE PLACE OF BEGINNING.

ALSO:

THE STRIP OF LAND ADJOINING SAID TRACT ABOVE DESCRIBED ON THE EAST AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF LOT 3, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE WEST 85 FEET; THENCE NORTH 139 FEET; THENCE EAST 22.5 FEET TO A POINT 62.5 FEET WEST AND 130 FEET NORTH OF THE POINT OF BEGINNING; THENCE NORTHEASTERLY 22.5 FEET, MORE OR LESS, TO A POINT 42.5 FEET WEST AND 140 FEET NORTH OF THE POINT OF BEGINNING; THENCE EAST 42.5 FEET; THENCE SOUTH 140 FEET TO THE POINT OF BEGINNING.

ALSO:

BEGINNING AT A POINT 268.75 FEET NORTH OF THE SOUTHEAST CORNER OF SAID LOT 3, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE WEST 80 FEET; THENCE NORTH 20 FEET; THENCE EAST 80 FEET; THENCE SOUTH 20 FEET TO THE POINT OF BEGINNING.

ALSO:

COMMENCING AT THE SOUTHEAST CORNER OF LOT 3, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE EAST 3 FEET, MORE OR LESS, TO A POINT 140 FEET NORTH OF THE POINT OF BEGINNING; THENCE SOUTH 140 FEET TO THE POINT OF BEGINNING.

ALSO;

BEGINNING AT A POINT NORTH 140 FEET AND WEST 126.5 FEET FROM THE SOUTHEAST CORNER OF LOT 3, BLOCK 31, PLAT "B", SALT LAKE CITY SURVEY, AND RUNNING THENCE NORTH 148.75 FEET; THENCE WEST 38.5 FEET, MORE OR LESS, TO FENCE LINE; THENCE SOUTH ALONG FENCE LINE 128.75 FEET, MORE OR LESS, TO THE SOUTH AND OF SAID FENCE LINE; THENCE WEST 2 FEET, MORE OR LESS, TO A POINT DUE NORTH OF A POINT 38.5 FEET WEST OF THE POINT OF BEGINNING; THENCE SOUTH 20 FEET, MORE OR LESS, TO A POINT 38.5 FEET WEST OF THE POINT OF BEGINNING; THENCE EAST 38.5 FEET TO THE POINT OF BEGINNING.

PARCEL 10:

BEGINNING AT SOUTHEAST CORNER OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, IN THE CITY OF SALT LAKE, COUNTY OF SALT LAKE, STATE OF UTAH, AND RUNNING THENCE WEST 100.02 FEET; THENCE NORTH 165 FEET; THENCE EAST 100.02 FEET; THENCE SOUTH 165 FEET TO THE POINT OF BEGINNING.

PARCEL A:

BEGINNING AT A POINT ON THE SOUTH LINE OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, IN THE CITY OF SALT LAKE, COUNTY OF SALT LAKE, STATE OF UTAH, DISTANCE THEREON 100.02 FEET WEST OF THE SOUTHEAST CORNER OF SAID LOT 1; THENCE WEST 110.48 FEET; THENCE NORTH 165 FEET; THENCE EAST 110.48 FEET; THENCE SOUTH 165 FEET TO THE POINT OF BEGINNING.

PARCEL B:

ALL OF THE SOUTH HALF OF LOT 8, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY.

PARCEL C:

BEGINNING AT A POINT 36.0 FEET EAST OF THE SOUTHWEST CORNER OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY AND RUNNING THENCE EAST 83.50 FEET; THENCE NORTH 165.0 FEET; THENCE WEST 83.50 FEET; THENCE SOUTH 165.0 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPTING FROM PARCELS A AND C THAT PORTION DEEDED TO THE STATE ROAD COMMISSION OF UTAH AS DISCLOSED BY THAT CERTAIN QUITCLAIM DEED RECORDED MARCH 20, 1963 AS ENTRY NO. 1906985 IN BOOK 2029 AT PAGE 360 OF OFFICIAL RECORDS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

A TRACT OF LAND SITUATED IN LOTS 1 AND 8, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT 33.0 FEET WEST FROM THE SOUTHEAST CORNER OF SAID LOT 1;

THENCE EAST 33.0 FEET; THENCE NORTH 247.5 FEET ALONG THE EAST LINE OF SAID LOTS 1 AND 8 TO A POINT ON THE NORTH LINE OF THE SOUTH HALF OF SAID LOT 8; THENCE WEST 14.0 FEET ALONG SAID NORTH LINE; THENCE SOUTHERLY ALONG A STRAIGHT LINE TO THE POINT OF BEGINNING.

ALSO LESS AND EXCEPTING FROM PARCEL 4 AND PORTION OF PARCEL 3, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTH LINE OF NORTH TEMPLE STREET, SAID POINT BEING SOUTH 89°58'38" EAST 36.00 FEET FROM THE SOUTHWEST CORNER OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, AND RUNNING THENCE NORTH 00°00'56" WEST 165.04 FEET; THENCE SOUTH 89°58'50" WEST 36.00 FEET; THENCE NORTH 00°00'56" WEST 82.53 FEET; THENCE NORTH 89°59'03" EAST 122.20 FEET; THENCE SOUTH 00°00'12" WEST ALONG THE EAST SIDE OF AN EXISTING CURB WALL AND CURB WALL LINE EXTENDED 247.56 FEET TO THE NORTH LINE OF NORTH TEMPLE STREET; THENCE NORTH 89°58'38" WEST ALONG SAID NORTH LINE 86.11 FEET TO THE POINT OF BEGINNING.

**1.1.E-4**

*434 Aurora Avenue North, Seattle, Washington*

Real property in the City of Seattle, County of King, State of Washington, described as follows:

LOTS 1, 2, 3, 9, 10, 11 AND 12 IN BLOCK 75 OF D.T. DENNY'S HOME ADDITION TO THE CITY OF SEATTLE, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 3 OF PLATS PAGE 115, RECORDS OF KING COUNTY, WASHINGTON;

TOGETHER WITH THAT PORTION OF VACATED ALLEY ADJOINING TO THE LOTS; EXCEPT THAT PORTION OF STREET PURPOSES.

**<u>Exhibit 5.4(ii)</u>**
**Depots**


Attached.

**Exhibit 5.4(ii)**
**Depots**

| ADDRESS | CITY | STATE | FACILITY USE | LEGAL DESC. |
|---------|------|-------|--------------|-------------|
| 1670 Highway 30 North | Heyburn | Idaho | Store/Depot | 1.1.A-1 |
| 365 East Anderson | Idaho Falls | Idaho | Store/Depot/Garage | 1.1.A-2 |
| 1111 Washington Street | Montpelier | Idaho | Depot | 1.1.A-3 |
| 3100 Pole Line Road | Pocatello | Idaho | Store/Depot | 1.1.A-4 |
| 548 Washington Street | Twin Falls | Idaho | Store/Depot/Garage | 1.1.A-5 |
| Madison Avenue 59 BLG | Billings | Montana | Storage | 1.1.A-6 |
| 1700 East Main Avenue | Bismarck | North Dakota | Store | 1.1.A-7 |
| 7522 South State Street | Midvale | Utah | Store | 1.1.A-8 |
| 1180 West Center Street | Provo | Utah | Store/Depot/Garage | 1.1.A-9 |
| 5923 South 350 West | Salt Lake City (Murray) | Utah | Depot/Garage | 1.1.A-10 |
| 708 West North Temple | Salt Lake City | Utah | Store/Depot/Garage | 1.1.A-11 |
| 162 South 100 West | Logan | Utah | Store/Depot | 1.1.A-12 |
| 430 East Casino Road | Everett | Washington | Store/Depot | 1.1.A-13 |
| 10014 Pacific Avenue | Tacoma | Washington | Store/Depot | 1.1.A-14 |

## 1.1.A-1
*1670 Highway 30 North, Heyburn, Idaho*

The North 150 feet of Block 185 and the North 150 feet of Block 186 of the Original Townsite of Heyburn, Minidoka County, Idaho, according to the official plat thereof, now on file in the office of the County Recorder, Minidoka County, Idaho.

TOGETHER WITH that portion of vacated "F" Street situated between Blocks 185 and 186 of the Heyburn Townsite, Minidoka County, Idaho, described as follows:

Beginning at the Northwest corner of Block 186; thence South 150 feet; thence West across said vacated "F" Street to the East line of Block 185; thence North along said East line to the Northeast corner of Block 185; thence East to the POINT OF BEGINNING.

**1.1.A-2**

*365 East Anderson, Idaho Falls, Idaho*

Real property in the City of Idaho Falls, County of Bonneville, State of Idaho, described as follows:

Beginning at a point that is North 89 degrees 16 minutes 03 seconds East 64.00 feet along the section line from the Southwest corner of the Southeast Quarter of the Southeast Quarter of Section 7, Township 2 North, Range 38, East of the Boise Meridian, Bonneville County, Idaho and running thence North 0 degrees 19 minutes 42 seconds West 118.00 feet; thence South 89 degrees 16 minutes 03 seconds West 64.00 feet to a North-South fence line; thence North 0 degrees 19 minutes 42 seconds West 541.00 feet along said fence line to an East-West fence line; thence South 89 degrees 43 minutes 17 seconds East 340.03 feet to a North-South fence line; thence South 0 degrees 19 minutes 42 seconds East 359.00 feet along said fence line; thence South 89 degrees 16 minutes 03 seconds West 68.00 feet; thence South 0 degrees 19 minutes 42 seconds East 294.00 feet to the South line of said Section 7; thence South 89 degrees 16 minutes 03 seconds West 208.00 feet to the point of beginning.

Less and Excepting Therefrom: Beginning at the Southeast corner of Section 7, Township 2 North, Range 38, East of the Boise Meridian, Bonneville County, Idaho, and running thence South 89 degrees 16 minutes 03 seconds West a distance of 1053.57 feet; thence North 0 degrees 43 minutes 57 seconds West a distance of 8.33 feet to the true point of beginning and running thence South 89 degrees 16 minutes 03 seconds West a distance of 208.00 feet; thence North 0 degrees 19 minutes 42 seconds West a distance of 4.95 feet; thence South 88 degrees 42 minutes 50 seconds East a distance of 52.37 feet to the point of curve of 1958.00 foot radius curve (concave to the North whose 155.66 foot chord bears South 89 degrees 36 minutes 48 seconds East); thence along said curve a distance of 155.66 feet; thence South 0 degrees 19 minutes 42 seconds East a distance of 0.06 feet to the true point of beginning.

APN: RPA00008079307A

## 1.1.A-3

*1111 Washington Street, Montpelier, Idaho*

Commencing at the Northwest Corner of Block 16 of BURGOYNE'S ADDITION to the City of Montpelier, Bear Lake County, Idaho, (the point where the South line of Washington Street intersects the East line of 12th Avenue); running thence East 128.3 feet along the said South line of Washington Street; thence South 59 feet; thence West 105.3 feet, more or less, to the East line of 12th Avenue; thence North 21°24' West 63.4 feet, more or less, to the Point of Beginning.

**1.1.A-4**

*3100 Pole Line Road, Pocatello, Idaho*

**LOTS 24, 25, AND 26, NORTH POCATELLO BUSINESS CENTER, BANNOCK COUNTY, IDAHO, AS THE SAME APPEARS ON THE OFFICIAL PLAT THEREOF, RECORDED JANUARY 6, 1948 AS INSTRUMENT NO. 257206.**

**1.1.A-5**

*548 Washington Street, Twin Falls, Idaho*

LOT 6 IN BLOCK 3 OF TERRACE PARK PLACE, ACCORDING TO THE PLAT THEREOF ON FILE IN THE OFFICE OF THE COUNTY RECORDER, TWIN FALLS COUNTY, IDAHO, IN BOOK 2 OF PLATS, PAGE 12.

EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PARCEL:

A PARCEL OF LAND FOR PUBLIC RIGHT-OF-WAY LOCATED IN LOT 6 OF BLOCK 3 OF TERRACE PARK PLACE IN THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 10 SOUTH, RANGE 17 EAST, BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO, MORE SPECIFICALLY DESCRIBED AS FOLLOWS, TO-WIT:

BEGINNING AT THE SOUTHWEST CORNER OF SAID LOT 6;
THENCE NORTH 07°05'56" WEST (FORMERLY NORTH 01°39' WEST) ALONG THE WESTERLY BOUNDARY OF SAID LOT 6 A DISTANCE OF 7.02 FEET TO A POINT;
THENCE NORTH 87°29'51" EAST A DISTANCE OF 100.56 FEET TO A POINT;
THENCE SOUTH 02°30'09" EAST A DISTANCE OF 7.00 FEET TO A POINT;
THENCE SOUTH 87°29'51" WEST (FORMERLY NORTH 86°45' WEST) ALONG THE SOUTHERLY BOUNDARY OF SAID LOT 6 A DISTANCE OF 100.00 FEET TO THE POINT OF BEGINNING.

AND EXCEPT:

A PARCEL OF LAND FOR PUBLIC RIGHT-OF-WAY LOCATED IN LOT 6 OF BLOCK 3 OF

TERRACE PARK PLACE IN THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 10 SOUTH, RANGE 17 EAST, BOISE MERIDIAN, TWIN FALLS COUNTY, IDAHO, MORE SPECIFICALLY DESCRIBED AS FOLLOWS, TO-WIT:

BEGINNING AT THE SOUTHEAST CORNER OF SAID LOT 6;
THENCE SOUTH 87°29'51" WEST (FORMERLY NORTH 86°45' WEST) ALONG THE SOUTHERLY BOUNDARY OF SAID LOT 6, SAID LINE BEING THE EAST/WEST ¼ SECTION LINE OF SAID SECTION 17, A DISTANCE OF 119.53 FEET TO A POINT;
THENCE NORTH 86°01'53" EAST A DISTANCE OF 59.15 FEET TO A POINT;
THENCE NORTHEASTERLY ALONG A CURVE TO THE LEFT, A DISTANCE OF 59.38 FEET, SAID CURVE HAVING A RADIUS OF 92.50 FEET, A CENTRAL ANGLE OF 36°46'59', AND A LONG CHORD OF 58.37 FEET BEARING NORTH 67°38'23" EAST TO A POINT;
THENCE NORTHEASTERLY ALONG A CURVE TO THE LEFT, A DISTANCE OF 4.94 FEET, SAID CURVE HAVING A RADIUS OF 22.50 FEET, A CENTRAL ANGLE OF 12°34'32", AND A LONG CHORD OF 4.93 FEET BEARING NORTH 42°57'38" EAST TO A POINT IN THE EASTERLY BOUNDARY OF SAID LOT 6;
THENCE SOUTH 07°05'56" EAST (FORMERLY SOUTH 01°39'EAST) ALONG THE EASTERLY BOUNDARY OF SAID LOT 6 A DISTANCE OF 24.88 FEET TO A POINT IN THE WESTERLY BOUNDARY OF WASHINGTON STREET AND THE POINT OF BEGINNING.

### 1.1.A-6

*Madison Avenue, Billings, Montana*

Real property in the City of Billings, County of Yellowstone, State of Montana, described as follows:

Parcel A:

The Southwest Quarter of the Southwest Quarter of the Northeast Quarter (SW¼SW¼NE¼) of Section 17, Township 1 South, Range 26 East, MPM, Yellowstone County, Montana, excepting therefrom, however, all that portion of the said Southwest Quarter of the Southwest Quarter of the Northeast Quarter (SW¼SW¼NE¼) as is contained by "Midland Road" on the North of said real property; and, excepting therefrom, all of Certificate of Survey No. 1430, according to the official plat thereof on file and of record in the office of the Clerk and Recorder of said County, under Document No. 966083, more particularly described as follows:

Lots 1 and 2, Block 1, of Pinyon Subdivision, in the City of Billings, Yellowstone County, Montana, according to the official plat on file in the office of the Clerk and Recorder of said County, under Document #1030147.

Parcel B:

The East one hundred thirty-nine feet (139') of Lot eighteen (18) of Willis Subdivision, situated in the Southeast one-quarter (SE¼) of Northwest one-quarter (NW¼), Section ten (10), Township one (1) South, Range twenty-six (26) East, M.P.M, according to the plat thereof, more particularly described as follows:

Lot 18C, of Amended Plat of Lot 18, Willis Subdivision, in the City of Billings, Yellowstone County, Montana, according to the official plat on file in the office of the Clerk and Recorder of said County, under Document #540481.

## 1.1.A-7

*1700 East Main Avenue, Bismarck, North Dakota*

Lots Thirteen (13) through Eighteen (18), together with the adjoining vacated alley, Block Nine (9), Governor Pierce Addition, to the City of Bismarck, Burleigh County, North Dakota, all of which lies within the following described traverse:

Beginning at the southwest corner of said Block 9; thence North 00 Deg., 04 Min., 35 Sec. West, along the west line of said Block 9, a distance of 150.00 feet to the southwest corner of Lot 19, said Block 9; thence South 89 Deg., 59 Min., 53 Sec., East, along the south line (and said line extended easterly) of said Lot 19, a distance of 149.96 feet; thence South 00 Deg., 02 Min., 31 Sec., East, along the East line (and said line extended Northerly) of said Lot 13, a distance of 150.00 feet to the South line of said Block 9; thence North 89 Deg., 59 Min., 51 Sec., West, along the South line of said Block 9, a distance of 149.87 feet to the Point of Beginning; including Grantor's interest, if any, in streets and alleyways (whether vacated or not) contained within such traverse. This tract of land is now known as Tract 10 .

## 1.1.A-8

*7522 South State Street, Midvale , Utah*

Real property in the City of Midvale, County of Salt Lake, State of Utah, described as follows:

BEGINNING AT A POINT WHICH IS SOUTH 0°00'05" WEST 693.74 FEET ALONG THE SECTION LINE AND EAST 131.44 FEET FROM THE WEST QUARTER CORNER OF SECTION 30, TOWNSHIP 2 SOUTH, RANGE 1 EAST, SALT LAKE BASE AND MERIDIAN, SAID POINT MORE SPECIFICALLY DESCRIBED AS BEING NORTH 89°24'35" WEST 46.30 FEET AND SOUTH 0°35'25" WEST 41.25 FEET FROM A MONUMENT IN THE INTERSECTION OF STATE STREET AND 7500 SOUTH STREET; AND RUNNING THENCE WEST 150.00 FEET; THENCE SOUTH 0°35'25" WEST 150.00 FEET; THENCE EAST 150.00 FEET TO THE WEST LINE OF STATE STREET; THENCE ALONG SAID WEST LINE NORTH 0°35'25" EAST 150.00 FEET TO THE POINT OF BEGINNING.

## 1.1.A-9

*1180 West Center Street, Provo, Utah*

Real property in the City of Provo, County of Utah, State of Utah, described as follows:

PARCEL 1:

COMMENCING ON NORTH LINE OF CENTER STREET 1170.4 FEET WEST AND 1133.7 FEET SOUTH 3° WEST 694.6 FEET AND NORTH 89° EAST 10 FEET FROM NORTHEAST CORNER OF SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 7 SOUTH, RANGE 2 EAST, SALT LAKE BASE AND MERIDIAN; THENCE NORTH 89° EAST ALONG NORTH LINE OF CENTER STREET 138.50 FEET TO WEST LINE OF CHARLES A. SMITH PROPERTY, NORTH ALONG WEST LINE OF SMITH PROPERTY 198 FEET, EAST 13.4 FEET, NORTH 3° EAST 199.50 FEET TO SOUTH LINE OF FIRST NORTH STREET, NORTH 89° WEST ALONG SOUTH LINE OF SAID FIRST NORTH STREET 141.50 FEET, SOUTH 3° WEST 397.50 FEET TO BEGINNING.

EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PROPERTY:

A TRACT OF LAND FOR HIGHWAY KNOWN AS PROJECT NO. 15-6 SITUATED IN THE SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 7 SOUTH, RANGE 2 EAST, SALT LAKE BASE AND MERIDIAN. THE BOUNDARIES OF SAID TRACT OF LAND ARE DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE GRANTORS LAND WHICH POINT IS 1170.4 FEET WEST, 1133.7 FEET SOUTH 694.6 FEET SOUTH 3°00' WEST AND 10 FEET NORTH 89°00' EAST FROM THE NORTHEAST CORNER OF SAID SOUTHEAST QUARTER; THENCE NORTH 89°00' EAST 138.50 FEET ALONG THE SOUTH BOUNDARY LINE OF SAID GRANTORS LAND; THENCE NORTH 24 FEET ALONG THE EAST BOUNDARY LINE OF SAID GRANTORS LAND; THENCE WESTERLY 139 FEET, MORE OR LESS, TO THE WEST BOUNDARY LINE OF SAID GRANTORS LAND AT A POINT 28 FEET NORTH 3°00' EAST FROM THE POINT OF BEGINNING; THENCE SOUTH 3°00' WEST 28 FEET ALONG SAID WEST BOUNDARY LINE TO THE POINT OF BEGINNING AS SHOWN ON THE OFFICIAL MAP OF SAID PROJECT ON FILE IN THE OFFICE OF

-10-

THE STATE ROAD COMMISSION OF UTAH.

PARCEL 2:

A PARCEL OF LAND SITUATED IN THE SOUTHEAST QUARTER OF SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 7 SOUTH, RANGE 2 EAST, SALT LAKE BASE AND MERIDIAN, THE BOUNDARIES OF WHICH ARE DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF THE GRANTORS LAND, WHICH POINT IS 1019.9 FEET WEST, 1136.6 FEET SOUTH, AND SOUTH 3° WEST 292 FEET FROM THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 2; THENCE SOUTH 3° WEST 175.6 FEET; THENCE WEST 20.5 FEET; THENCE SOUTH 174 FEET, MORE OR LESS, TO THE NORTHERLY RIGHT OF WAY LINE OF HIGHWAY KNOWN AS PROJECT NO. 15-6; THENCE EAST 50 FEET, MORE OR LESS, TO THE EAST BOUNDARY LINE OF SAID GRANTORS LAND; THENCE NORTH 7°57' EAST 177.3 FEET, MORE OR LESS; THENCE NORTH 8°37' EAST 182 FEET, MORE OR LESS, ALONG SAID EAST BOUNDARY LINE TO THE NORTHEAST CORNER OF SAID GRANTORS LAND; THENCE WEST 72 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PROPERTY:

A TRACT OF LAND FOR HIGHWAY KNOWN AS PROJECT NO. 15-6 SITUATED IN THE SOUTHEAST QUARTER OF SECTION 2, TOWNSHIP 7 SOUTH, RANGE 2 EAST, SALT LAKE BASE AND MERIDIAN. THE BOUNDARIES OF SAID TRACT OF LAND ARE DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF THE GRANTORS LAND WHICH POINT IS 10.58 CHAINS SOUTH, 13.08 CHAINS WEST AND 16.80 CHAINS SOUTH 7°57' WEST FROM THE NORTHEAST CORNER OF SAID SOUTHEAST QUARTER; THENCE WEST 49.5 FEET ALONG THE SOUTH BOUNDARY LINE OF SAID GRANTORS LAND; THENCE NORTH 24 FEET ALONG THE WEST BOUNDARY LINE OF SAID GRANTORS LAND; THENCE EASTERLY 50 FEET, MORE OR LESS TO THE EAST BOUNDARY LINE OF SAID GRANTORS LAND AT A POINT 24 FEET NORTH 7°57' EAST FROM THE POINT OF BEGINNING THENCE SOUTH 7°57' WEST 24 FEET ALONG SAID EAST BOUNDARY LINE TO THE POINT OF BEGINNING AS SHOWN ON THE OFFICIAL MAP OF SAID PROJECT ON FILE IN THE OFFICE OF THE STATE ROAD COMMISSION OF UTAH.

-11-

## 1.1.A-10

*5923 South 350 West, Salt Lake City (Murray), Utah*

Real property in the City of Murray, County of Salt Lake, State of Utah, described as follows:

BEGINNING AT A POINT WHICH IS NORTH 529.98 FEET AND SOUTH 89°36' EAST 313.50 FEET AND NORTH 0°30' EAST 240.25 FEET AND SOUTH 89°36'15" EAST 70.875 FEET AND NORTH 0°30' EAST 1.0 FEET AND SOUTH 89°36'15" EAST 227.425 FEET AND NORTH 0°30' EAST 574.189 FEET FROM THE SOUTH QUARTER CORNER OF SECTION 13, TOWNSHIP 2 SOUTH, RANGE 1 WEST, SALT LAKE BASE AND MERIDIAN AND RUNNING THENCE NORTH 89°54' WEST 227.42 (BY SURVEY 227.432 FEET) FEET; THENCE SOUTH 0°30' WEST 269 FEET; THENCE SOUTH 89°54' EAST 227.42 (BY SURVEY 227.432 FEET) FEET; THENCE NORTH 0°30' EAST 269 FEET TO THE POINT OF BEGINNING.

## 1.1.A-11
### *708 West North Temple, Salt Lake City, Utah*

Real property in the City of Salt Lake City, County of Salt Lake, State of Utah, described as follows:

PARCEL 1:

BEGINNING AT SOUTHEAST CORNER OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, IN THE CITY OF SALT LAKE, COUNTY OF SALT LAKE, STATE OF UTAH, AND RUNNING THENCE WEST 100.02 FEET; THENCE NORTH 165 FEET; THENCE EAST 100.02 FEET; THENCE SOUTH 165 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

BEGINNING AT A POINT ON THE SOUTH LINE OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, IN THE CITY OF SALT LAKE, COUNTY OF SALT LAKE, STATE OF UTAH, DISTANCE THEREON 100.02 FEET WEST OF THE SOUTHEAST CORNER OF SAID LOT 1; THENCE WEST 110.48 FEET; THENCE NORTH 165 FEET; THENCE EAST 110.48 FEET; THENCE SOUTH 165 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

ALL OF THE SOUTH HALF OF LOT 8, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY.

PARCEL 4:

BEGINNING AT A POINT 36.0 FEET EAST OF THE SOUTHWEST CORNER OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY AND RUNNING THENCE EAST 83.50 FEET; THENCE NORTH 165.0 FEET; THENCE WEST 83.50 FEET; THENCE SOUTH 165.0 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPTING FROM PARCELS 1 AND 3 THAT PORTION DEEDED TO THE STATE ROAD COMMISSION OF UTAH AS DISCLOSED BY THAT CERTAIN QUITCLAIM DEED RECORDED MARCH 20, 1963 AS ENTRY NO. 1906985 IN BOOK 2029 AT PAGE 360 OF OFFICIAL RECORDS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

A TRACT OF LAND SITUATED IN LOTS 1 AND 8, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT 33.0 FEET WEST FROM THE SOUTHEAST CORNER OF SAID LOT 1; THENCE EAST 33.0 FEET; THENCE NORTH 247.5 FEET ALONG THE EAST LINE OF SAID LOTS 1 AND 8 TO A POINT ON THE NORTH LINE OF THE SOUTH HALF OF SAID LOT 8; THENCE WEST 14.0 FEET ALONG SAID NORTH LINE; THENCE SOUTHERLY ALONG A STRAIGHT LINE TO THE POINT OF BEGINNING.

ALSO LESS AND EXCEPTING FROM PARCEL 4 AND PORTION OF PARCEL 3, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTH LINE OF NORTH TEMPLE STREET, SAID POINT BEING SOUTH 89°58'38" EAST 36.00 FEET FROM THE SOUTHWEST CORNER OF LOT 1, BLOCK 62, PLAT "C", SALT LAKE CITY SURVEY, AND RUNNING THENCE NORTH 00°00'56" WEST 165.04 FEET; THENCE SOUTH 89°58'50" WEST 36.00 FEET; THENCE NORTH 00°00'56" WEST 82.53 FEET; THENCE NORTH 89°59'03" EAST 122.20 FEET; THENCE SOUTH 00°00'12" WEST ALONG THE EAST SIDE OF AN EXISTING CURB WALL AND CURB WALL LINE EXTENDED 247.56 FEET TO THE NORTH LINE OF NORTH TEMPLE STREET; THENCE NORTH 89°58'38" WEST ALONG SAID NORTH LINE 86.11 FEET TO THE POINT OF BEGINNING.

## 1.1.A-12

*162 South 100 West, Logan, Utah*

Real property in the City of Logan, County of Cache, State of Utah, described as follows:

PARCEL 1:

BEGINNING AT A POINT 230.76 FEET NORTH OF THE SOUTHWEST CORNER OF BLOCK 5, PLAT "D" LOGAN CITY SURVEY, AND RUNNING THENCE NORTH 11 FEET; THENCE EAST 188 FEET; THENCE SOUTH 11 FEET; THENCE WEST 188 FEET TO BEGINNING, AND BEING SITUATE IN THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 11 NORTH, RANGE 1 EAST OF THE SALT LAKE BASE AND MERIDIAN.

PARCEL 2:

BEGINNING AT A POINT 9 RODS NORTH OF A POINT 36 RODS WEST OF THE SOUTHEAST CORNER OF BLOCK 5, PLAT "D" OF THE LOGAN CITY SURVEY; THENCE NORTH 4.44 RODS; THENCE EAST 12 RODS; THENCE SOUTH 4.44 RODS; THENCE WEST 12 RODS TO THE POINT OF BEGINNING.

ALSO: BEGINNING AT A POINT IN THE WEST LINE OF BLOCK 5, PLAT "D" LOGAN CITY SURVEY, 221.76 FEET NORTH OF THE SOUTHWEST CORNER OF SAID BLOCK 5; THENCE EAST AND PARALLEL WITH THE SOUTH LINE OF SAID BLOCK S, 198 FEET; THENCE NORTH 4 FEET ; THENCE WEST 198 FEET TO A POINT IN THE WEST LINE OF SAID BLOCK 5; THENCE SOUTH IN THE WEST LINE OF SAID BLOCK 5, 4 FEET TO THE PLACE OF BEGINNING, AND SITUATED IN THE NORTHEAST QUARTER OF SECTION 4, TOWNSHIP 11 NORTH, RANGE 1 EAST OF THE SALT LAKE BASE AND MERIDIAN.

ALSO: BEGINNING AT A POINT IN THE SOUTH PROPERTY LINE OF THE GRANTORS PROPERTY AND NORTH PROPERTY LINE OF GRANTEE'S PROPERTY, WHICH POINT IS 225.76 FEET NORTH OF SAID SOUTHWEST CORNER OF BLOCK 5, PLAT "D" LOGAN CITY SURVEY, AND RUNNING

### 1.1.A-13

*430 East Casino Road, Everett , Washington*

Real property in the City of Everett, County of Snohomish, State of Washington, described as follows:

PORTION OF GOVERNMENT LOT 1, SECTION 18, TOWNSHIP 28 NORTH, RANGE 5 EAST, W.M., IN SNOHOMISH COUNTY, WASHINGTON, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHWEST CORNER OF SAID SECTION;

THENCE SOUTH 0°49'20" EAST ALONG WEST LINE OF SECTION FOR 30 FEET;

THENCE NORTH 89°51'00" EAST PARALLEL WITH NORTH LINE OF SAID SECTION 500.20 FEET TO THE TRUE POINT OF BEGINNING;

THENCE SOUTH 0°49'20" EAST PARALLEL WITH WEST LINE OF SAID SECTION FOR 203.41 FEET;

THENCE SOUTH 23°37'14" EAST 109.38 FEET TO NORTHERLY MARGIN OF HOLLY DRIVE;

THENCE ANGLE TO LEFT 109°31'25" TO BECOME TANGENT TO CURVE;

THENCE ALONG SAID NORTHERLY MARGIN OF HOLLY DRIVE ON CURVE TO RIGHT RADIUS 2894.90 FEET, CONSTITUTING AN ANGLE OF 4°10'26" FOR 208.71 FEET;

THENCE NORTH 0°54'00" WEST 168.93 FEET TO SOUTH LINE OF CASINO ROAD;

THENCE SOUTH 89°51'00" WEST ALONG SOUTH LINE OF CASINO ROAD FOR 199.63 FEET TO TRUE POINT OF BEGINNING.

**1.1.A-14**

*10014 Pacific Avenue, Tacoma , Washington*

Real property in the City of Tacoma, County of Pierce, State of Washington, described as follows:

LOT 23 OF FERN HILL GARDENS, ACCORDING TO PLAT RECORDED IN VOLUME 4 OF PLATS AT PAGE 14, IN PIERCE COUNTY, WASHINGTON.

EXCEPT THE EAST 20 FEET FOR STATE HIGHWAY.

TOGETHER WITH the benefits, and subject to the burdens, of that certain Easement and Restrictive Covenant recorded April 2, 1987, Recorded as Document No. 8704020290.