JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball
Lisa Laukitis

- and -

JONES DAY
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Ryan T. Routh

Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
|  |  |
| --- | --- |
| In re | : Chapter 11 |
| | : |
| Old HB, Inc. | : Case No. 12-22052 (RDD) |
| (f/k/a Hostess Brands, Inc.), *et al.*,[1] | : |
| | : (Jointly Administered) |
| Debtors. | : |
| | : |

-------------------------------------------------------------x

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION
## FOR AN ORDER (I) AUTHORIZING THE SALE OF THEIR REMAINING
## ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
## ENCUMBRANCES TO TWO ENTITIES CREATED FOR THE BENEFIT OF THE
## DEBTORS' SECURED CREDITORS AND (II) GRANTING RELATED RELIEF

---

[1]  The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Old HB, Inc. (f/k/a Hostess Brands, Inc.) (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

Old HB, Inc. (f/k/a Hostess Brands, Inc.) and its five domestic direct and indirect subsidiaries, as debtors and debtors in possession (collectively, "<u>Old HB</u>" or the "<u>Debtors</u>"), respectfully represent as follows:

## <u>BACKGROUND</u>

1.      On January 11, 2012 (the "<u>Petition Date</u>"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors' chapter 11 cases have been consolidated and are being administered jointly for procedural purposes only.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On January 18, 2012, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors Committee</u>").

3.      On February 3, 2012, the Court entered the Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364 and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection to Pre-Petition Secured Parties [Docket No. 254] (the "<u>Final DIP Order</u>") approving, on a final basis, the Debtors' entry into that certain Debtor-in-Possession Credit, Guaranty and Security Agreement.

4.      On November 16, 2012, the Debtors filed a motion seeking authority to wind down their businesses and various related relief [Docket No. 1710] (the "<u>Winddown</u>

Motion"). After hearings on November 19, 2012, November 21, 2012 and November 29, 2012, the Court entered a final order approving the Winddown Motion on November 30, 2012 [Docket No. 1871] (the "Winddown Order").

## JURISDICTION

5. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

6. The Debtors have entered into an Asset Purchase Agreement (including all exhibits, schedules and ancillary agreements related thereto, the "Purchase Agreement") with Ostess, LLC and Ostess Services LLC (the "Purchasers"), dated as of September 25, 2015, which contemplates a set of related transactions (collectively, the "Sale Transaction") for the private sale and transfer of certain assets (collectively, the "Remaining Assets") free and clear of liens, claims, interests and encumbrances.[2]

7. By this Motion, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Rules (the "Local Bankruptcy Rules") for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and General Order M-383 of the Bankruptcy Court ("General Order M-383"), the Debtors hereby seek the entry of an order authorizing the private sale and transfer of the Remaining Assets free and clear of liens, claims, interests and other encumbrances. In support of the relief requested herein, the

---

[2] A copy of the Purchase Agreement is attached hereto as Exhibit A. The terms of the Purchase Agreement shall control over the summary of the Purchase Agreement contained in this Motion.

Debtors submit the Declaration of David Rush (the "Rush Declaration") attached hereto as

Exhibit B.

## FACTS RELEVANT TO THIS MOTION

### *Previous Sales Transactions*

8.      At the outset of these bankruptcy cases, the Debtors stated their intention of pursuing a stand-alone chapter 11 reorganization, while at the same time expressing a willingness to consider value-maximizing alternatives.  Beginning in the spring of 2012, the Debtors' investment banker, Perella Weinberg Partners ("PWP"), engaged in the process of soliciting investments to fund a stand-alone chapter 11 reorganization plan or alternative investment or sale proposals and held discussions with various entities regarding such proposals.  See Rush Declaration at ¶ 9.

9.      Following the shutdown of the Debtors' operations in November 2012, PWP undertook a significantly expanded effort to market the Debtors' assets for sale.  After reviewing initial indications of interest, the Debtors determined to market and sell groups of their assets in order to maximize value (the "Brand Sale Process").  Ultimately, the Debtors were able to sell the majority of their businesses through the Brand Sale Process pursuant to five separate agreements approved by this Court on March 20, 2013 and April 9, 2013 [Docket Nos. 2455, 2457, 2459, 2510 and 2514].  These five transactions closed at various times in calendar year 2013 and netted approximately $855 million in proceeds for the Debtors.  Id. at ¶ 10.

10.     The Debtors then undertook additional efforts to market the assets that were not sold in the Brand Sale Process.  The Debtors retained Hilco Real Estate, LLC and certain of its affiliates ("Hilco") to assist with this process.  Hilco initiated an extensive campaign to market the assets that were not sold through the Brand Sale Process.  Ultimately, the Debtors

sold real property, machinery, equipment and fleet assets in 140 locations in 34 states pursuant to a purchase agreement that was approved by this Court on August 21, 2013 [Docket No. 2794], and which provided approximately $61 million in sale proceeds. As part of the liquidation process, the Debtors also entered into a number of other, smaller purchase and sale transactions involving the sales of vehicles, trailers, rail cars, intellectual property and stand-alone real estate assets, many of which were assisted by Hilco. Id. at ¶ 11.

11.     As a result of these sale processes, by the end of 2013, all of the Debtors' real property, personal property and intellectual property assets of any material value had been sold. As such, beginning in late 2013 and into 2014, the Debtors focused substantial efforts on liquidating their intangible assets. Various lawsuits and administrative proceedings were commenced by the Debtors in this Court and in other courts seeking recoveries from state governments, insurance companies, customers and other parties in interest. These actions have resulted in the direct recovery of millions of dollars for the benefit of the Debtors' estates. Presently, the Debtors have no pending matters in which they are actively prosecuting an action for the return of collateral or liquidation of other intangible assets. Certain of the Debtors' intangible assets, however, are residual interests or reversionary rights that will take years to mature before they can be liquidated into cash. Id. at ¶ 12.

### *Status of Debt Repayment and Payment of Liens*

12.     As this Court is aware, with the sale proceeds from the sale processes described above, the Debtors have paid down a significant amount of their secured debt. Pursuant to the Stipulation and Agreed Order by and Among the Debtors, the DIP Agent and the Pre-Petition Agents Modifying the Final Orders in Certain Respects [Docket No. 2521] (the "Paydown Stipulation") and the Winddown Order, in early 2013 the Debtors repaid their

debtor-in-possession financing facility, repaid a $30 million loan supplied by Hilco and repaid their pre-petition credit agreement for which General Electric Capital Corporation served as administrative and collateral agent.  In addition, the First Lien Term Loan Pre-Petition Indebtedness (as such term is defined in the Paydown Stipulation) was repaid in full by the Debtors through a series of payments made in April and July 2013.  In addition, the Third Lien Term Loans (as such term is defined in the Paydown Stipulation) were also repaid by the Debtors in July 2013.  Id. at ¶ 13.

13.     Accordingly, since the commencement of the winddown and liquidation of the Debtors' estates in November 2012, the Debtors have paid all funded secured debt obligations other than those associated with (a) $85.8 million of 5% Secured Convertible PIK-Election Series A Notes due 2019; (b) $85.8 million of 5% Secured Convertible PIK-Election Series B Notes due 2019; and (c) $30.0 million of 10% Secured Convertible PIK-Election Series C Notes, due 2019 (collectively, the "2019 Notes").  The 2019 Notes were issued pursuant to the Indenture, dated as of February 3, 2009, among:  (x) Old HB, as issuer; (y) certain others of the Debtors, as guarantors; and (z) The Bank of New York Mellon Trust Company, N.A., as trustee and collateral trustee (in such capacity, the "2019 Notes Trustee").  The 2019 Notes represent debt secured by all of the assets of the Debtors.  While $74.2 million has been paid to the 2019 Notes Trustee to date,[3] at least $156.6 million in principal amount remains outstanding under the 2019 Notes.  If interest had continued to accrue on the 2019 Notes after the Petition Date,

---

[3]     On August 20, 2013, a payment of $8.2 million, including accrued prepetition interest, was made with respect to a partial repayment of the 2019 Notes. Subsequently, on September 23, 2013 and October 18, 2013, additional payments, including prepetition interest, of $45.0 million and $3.5 million, respectively, were made on the 2019 Notes.  On February 6, 2014, an additional payment of $5.0 million, including prepetition interest, was made on the 2019 Notes and, on December 18, 2014, an additional payment of $12.5 million was made on the 2019 Notes.

approximately $57.2 million in such interest would have accrued through September 1, 2015. Id. at ¶ 14.

14.     In addition, the Debtors have worked diligently to identify liens against the Debtors' estates and believe that all claims that give rise to statutory liens, including mechanics liens, possessory liens and property tax liens have been paid (or soon will be paid) in full, with no further amounts outstanding. Indeed, most mechanics liens and materialman's liens would have arisen prior to the winddown process while the Debtors were still operating. Accordingly, proofs of claim or administrative claim request forms for such claims would have been filed either by the April 24, 2012 prepetition bar date or by the bar date for payment of administrative claims that arose prior to January 31, 2013. The Debtors reviewed such claims and either (a) paid the claims or (b) such claims were disallowed by an order of this Court. None remain outstanding. Id. at ¶ 15.

15.     Accordingly, at this time, the 2019 Notes Trustee has the senior lien on the Remaining Assets. Pursuant to the Final DIP Order, the Court has found that the 2019 Notes Trustee's claims are secured by the assets of the Debtors, and the 2019 Notes Trustee was granted adequate protection liens in the Debtors' postpetition collateral.[4] The Court has found, in the Final DIP Order, that the liens and obligations that constitute the 2019 Notes are not "subject to avoidance, recharacterization, recovery or subordination." Final DIP Order at ¶ 6(e). The

---

[4]     See Final DIP Order at ¶ 6(d)(iii) ("To secure the Fourth Lien Pre-Petition Indebtedness, the Credit Parties and the Pre-Petition Fourth Lien Trustee entered into that certain security agreement, dated February 3, 2009, pursuant to which the Credit Parties granted to the Pre-Petition Fourth Lien Trustee, for the benefit of such Trustee and the Pre-Petition Fourth Lien Parties, security interests in all or substantially all of the Pre-Petition Collateral…"); ¶ 15(a) ("As adequate protection of the interests of the Pre-Petition Fourth Lien Trustee and the Pre-Petition Fourth Lien Parties in the Pre-Petition Collateral for their Diminution Claims . . . the Pre-Petition Fourth Lien Trustee was, by the Interim Order, and hereby is confirmed to be granted, for itself and for the benefit of the Pre-Petition Fourth Lien Parties, valid, perfected and silent subordinated replacement security interests in, and liens on, the Post-Petition Collateral….").

time for any party in interest in these cases to challenge the findings in the Final DIP Order has expired.

***The Remaining Assets***

16. While substantially all of the Debtors' tangible and intangible assets have been sold in the aforementioned sale processes, none of the purchasers chose to purchase the Remaining Assets, which consist largely of intangible assets, including the rights to recover funds against certain third-parties through litigation or after the passage of time. The Debtors have been working diligently to resolve the matters that can be appropriately and efficiently resolved within their chapter 11 cases. That said, parties-in-interest in the Debtors' chapter 11 cases have expressed reservations with the Debtors remaining in chapter 11 for an extended period of time. After consultation with certain of their creditor constituencies, in late 2014 the Debtors commenced extended discussions regarding the process of transferring their remaining assets for the benefit of their remaining secured lenders (the holders of the 2019 Notes), dismissing these chapter 11 cases and dissolving their corporate existence. See Rush Declaration at ¶ 16.

17. Accordingly, the Debtors have entered into the Purchase Agreement with the Purchasers, which are two entities that have been created for the benefit of holders of the 2019 Notes. The Remaining Assets proposed to be sold pursuant to the Sale Transaction comprise nearly all of the Debtors' remaining assets that have not been the subject of an approved sale motion before the Court and include all of the Debtors' remaining cash. One of the Purchaser entities will take possession of various of the Debtors' documents and the other Purchaser entities will take possession of the other Remaining Assets. The Sale Transaction contemplates the sale and transfer, free and clear of liens, claims, interests and encumbrances of

all of the Debtors' assets of any kind or nature, other than certain limited excluded assets. The identity of the Remaining Assets is disclosed in the Purchase Agreement and the schedules thereto in greater detail. Most of the Remaining Assets are litigation rights, refund rights, reversionary rights, intangible assets and rights to pursue refunds and accounts receivable. The Remaining Assets are not assets that could be utilized in a bakery business or of a type traditionally bought and sold. Id. at ¶ 17.

### *Value of Remaining Assets*

18.     The Debtors have conclusively determined that the value of the Remaining Assets is insufficient to pay the amount that remains outstanding under the 2019 Notes. In particular, the Debtors believe that the $156.6 million in principal amount that remains outstanding under the 2019 Notes exceeds any reasonable estimation of the value of the Remaining Assets, including:

- the approximately $15.8 million in cash held by the Debtors' estates (as of September 1, 2015);[5]

- the remaining value in revisionary rights in the $5 million Protected Persons Trust Agreement by and among the Debtors and The Private Trust Company, N.A.;

- the utility deposits, tax refunds, accounts receivable and other related rights; and

- the rights against insurers or governmental entities with respect to the letter of credit proceeds, bond proceeds or cash deposits from governmental entities or insurance companies with respect to the Debtors' workers' compensation obligations.

Id. at ¶ 18.

---

[5]     Expenses incurred by the Debtors between now and the closing of the sale, and certain cash to be retained by the Debtors after closing, will mean that less than this amount of cash will be transferred to the Purchaser.

19.    While the Debtors believe there exists material value in these assets, it is unlikely, taken as a whole, that the Remaining Assets are worth more than $50 million and it is inconceivable that such assets could be worth more than $75 million.  Accordingly, the Debtors believe it appropriate for the Purchaser to receive the value of all of the Remaining Assets.  The Purchase Agreement involves a credit bid by the 2019 Notes Trustee of the entire $156.6 million in principal amount of 2019 Notes.  As such, the Sale Transaction will effectuate the exercise of remedies by the 2019 Notes Trustee, and provide for the transfer of the Remaining Assets to the Purchasers for the benefit of the holders of the 2019 Notes.  Id. at ¶ 19.

20.    After the transfer of the Remaining Assets to the Purchasers, there will be no further assets of the Debtors to administer within chapter 11.  With no assets, there will be no prospect of payment of unsecured claims, whether general unsecured, priority or administrative claims (unless such claims are claims incurred in connection with the winddown that are payable pursuant to the Winddown Order).  Without the ability to pay outstanding administrative claims, the Debtors will be unable to confirm a plan in these chapter 11 cases.  Id. at ¶ 20.

## PRINCIPAL TERMS OF THE PURCHASE AGREEMENT

21.    The Purchase Agreement provides, in summary, as follows:[6]

- **Purchased Assets:**  All of the Debtors' remaining cash and the sale and transfer, free and clear of liens, claims, interests and encumbrances of all of the Debtors' assets of any kind or nature, other than certain limited excluded assets, as set forth in section 2.2 of the Purchase Agreement.  See Purchase Agreement § 2.1.

---

[6] This summary of the Purchase Agreement is intended only to assist the Court and parties in interest in understanding the key aspects thereof and is qualified in its entirety by reference to the Purchase Agreement, as the same may be modified or amended pursuant to any order approving the Sale (any such order, the "Sale Order") or otherwise.  In the event of any inconsistency between this description and the Purchase Agreement, the terms of the Purchase Agreement shall govern.  Capitalized terms used in this summary and not otherwise defined herein have the meanings given to such terms in the Purchase Agreement.

- **Transfer of Reversionary Rights Under Protected Persons Trust Agreement:** Debtor Old HB, Inc.'s estate presently possess the right to the return of certain funds upon the termination of the trust created by the Protected Persons Trust Agreement dated as of December 12, 2012.  Old HB, Inc. is transferring this right to Purchase Ostess, LLC pursuant to the Purchase Agreement.  See Purchase Agreement § 2.1.

- **Purchase Price:**  The aggregate consideration for the Purchased Assets will be (a) the discharge of the entire outstanding indebtedness (including $156.6 million in principal amount) owed to the 2019 Notes Trustee under the applicable indenture and (b) the assumption of Assumed Liabilities.  See Purchase Agreement §§ 3.1, 3.2.

- **Preservation of Documents and Cooperation:**  In connection with the execution of the Purchase Agreement, Purchaser Ostess Services LLC is purchasing WC/AL Claims Documents.  Ostess Services LLC shall be required to retain WC/AL Claims Documents that relate to unresolved WC/AL Claims but may destroy other WC/AL Claims Documents after December 31, 2015.  Ostess Services shall retain the WC/AL Claims Documents relevant to a particular Unresolved WC/AL Claim until either (i) such claim is closed by ACE American or its affiliate, ESIS, Inc., in its claims management database or (ii) Purchasers otherwise determine that the claim has been finally resolved (including by settlement, final judgment, court order, the expiration of an applicable statute of limitation or other indication that the applicable claimant no longer desires to pursue the claim in question).  Ostess and Ostess Services have agreed to cooperate with ACE American in the defense of Unresolved WC/AL Claims that are subject to coverage under insurance policies between one or more of the Sellers and ACE American by making the WC/AL Claims Documents available to ACE American for inspection and copying.  Prior to destruction of any WC/AL Claims Documents permitted under this paragraph 8.8, Ostess Services will give ACE American an opportunity to collect or copy any WC/AL Claims Documents to be destroyed at ACE American's sole cost and expense.  To the extent that Ostess Services incurs any cost or expense under this section 8.8(a), Ostess agrees to pay such cost or expense on its behalf.  See Purchase Agreement § 8.8(a).

- **Assumption and Assignment of Purchased Contracts:**  The Purchase Agreement provides, pursuant to section 365 of the Bankruptcy Code, that the Debtors will assume the contracts set forth on Schedule 2.1(b)(x) of the Purchase Agreement (the "Purchased Contracts") and assign such Purchased Contracts to the Purchaser.   The cure amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts will be paid by Purchaser (to the extent not paid by the Debtors prior to closing).  See Purchase Agreement § 2.5.

22.    For the reasons described herein, the Debtors believe that the terms of the Purchase Agreement are fair and reasonable.  Further, under the circumstances, the Debtors respectfully submit that their entry into the Purchase Agreement and the consummation of the Sale Transaction is in the best interests of the Debtors' estates and represents the sound exercise of the Debtors' business judgment.

## EXTRAORDINARY PROVISIONS UNDER THE GUIDELINES

23.    The following items in the Purchase Agreement and the Sale Order may be considered Extraordinary Provisions under the "Guidelines for the Conduct of Asset Sales" promulgated pursuant to General Order M-383:

- Private Sale.  As described above, the Purchase Agreement and Sale Order contemplate a private sale of the Remaining Assets.  As described elsewhere in this Motion, the Debtors believe that a private sale is appropriate under the circumstances and maximizes the value of the Remaining Assets.

- No Deposit.  The Purchase Agreement does not require the Purchaser to provide a deposit.  The Debtors believe that this is appropriate given the nature of the consideration to be provided by the Purchasers (credit bid) and the nature of the Remaining Assets.

- Record Retention. The Debtors are selling certain of their remaining records and Documents, including electronic systems, relevant to Unresolved WC/AL Claims.  The Debtors submit that this is appropriate in light of the fact that they expect to terminate all of their contractors and their corporate existence after the closing of the Sale Transaction.  As set forth above, provision has been made in the Purchase Agreement for certain parties to have access to the Debtors' Documents in appropriate circumstances.

- Successor Liability.  The proposed form of Sale Order contains certain findings and operative provisions to ensure that the Remaining Assets are sold free and clear of claims of transferee or successor liability and enjoins parties from asserting such claims against the Purchaser or the Remaining Assets.

- Relief from Bankruptcy Rule 6004(h).  The Debtors seek a waiver of the fourteen day stay that would otherwise be imposed on the Sale Order by Bankruptcy Rule 6004(h).

## NOTICE OF THE PROPOSED SALE

24.     On September 23, 2015, the Court entered its Order Approving (A) Form and Manner of Notice of (I) the Sale and Transfer of the Remaining Assets of the Debtors to Certain Entities Created For the Benefit of All Holders of Debtors' Fourth Lien Debt; (II) Debtors' Request to Transfer or Destroy Their Remaining Documents; and (III) Debtors' Motion to Dismiss Their Chapter 11 Cases and Dissolve Their Corporate Existence; and (B) the Release and Exculpation of the Fourth Lien Trustee and Collateral Trustee in Connection Therewith Pursuant to Fed. R. Bankr. P. 9019 (the "Notice Order") [Docket No. 3678].  The Debtors will provide notice of the Sale Transaction in accordance with the Notice Order.

## BASIS FOR RELIEF REQUESTED

25.     Section 363 of the Bankruptcy Code provides, in relevant part, "that a [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and elsewhere, in applying this section, have required that a sale outside of the ordinary course of the debtor's business be based upon a good business reason.  See Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) motion must find from the evidence presented a good business reason to grant such motion); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

26.     In considering the "good business reason" for pursuing a sale outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, the debtor's business judgment is the focus of the inquiry.  See Chateaugay, 973 F.2d at 143; Lionel,

722 F.2d at 1070-71.  A showing of a legitimate business justification gives rise to a presumption that the debtor's decision was made "on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), app. dismissed, 3 F.3d 49 (2d Cir. 1993).  As courts in this district have stated, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

27.     Here, the Debtors' decision to sell the Remaining Assets to the Purchasers pursuant to the Purchase Agreement represents a sound exercise of the Debtors' business judgment as an appropriate means to bring these chapter 11 cases to their conclusion.

28.     The fact that the Remaining Assets are to be sold pursuant to a private sale does not undermine the reasonable nature of the Sale Transaction.  Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Numerous courts have endorsed the sale of assets outside the ordinary course of business by means of a private sale.  See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship), 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect sales of estate property pursuant to section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

29.     Accordingly, courts in this District have previously permitted a chapter 11 debtor to sell assets outside the ordinary course of business by private sale where the debtors

have satisfied the general standards for approval under section 363 of the Bankruptcy Code.[7]

See, e.g., In re Old Carco LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Nov. 12, 2009) (Docket No. 5937) (order approving sale of the Debtors' former Newark, Delaware assembly plant by private sale where the Debtors satisfied the requirements of section 363 of the Bankruptcy Code); In re Wellman, Inc., Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2009) (order approving the sale of one of the debtors' facilities by private sale, not subject to higher and better offers); In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Nov. 29, 2005) (order authorizing the sale of certain aircraft by private sale and stating that "no auction was necessary with respect to sale of the [a]ircraft"); In re Loral Space & Communications Ltd., Case No. 03-41710 (RDD) [Docket. No. 2393] (Bankr. S.D.N.Y. Sep. 30, 2005) (authorizing private sale of debtor's minority equity interest in third party holding company to majority equity holder free and clear of any liens, claims and encumbrances, pursuant to section 363 of the Bankruptcy Code).

30.     While the Sale Transaction is structured as a private sale pursuant to section 363 of the Bankruptcy Code, the transaction could have been structured in various other ways, such as an abandonment or a consensual motion for relief from the automatic stay followed by a foreclosure process.  As the Debtors and the 2019 Notes Trustee began to discuss options for allowing the 2019 Notes Trustee (at the direction of the holders of the 2019 Notes) to exercise its remedies to transfer ownership of the Remaining Assets for the benefit of the holders of the 2019 Notes, the Debtors, in consultation with the U.S. Trustee, determined that a sale under section 363 of the Bankruptcy Code was the most transparent option to transfer ownership.

---

[7]     Moreover, General Order M-383 promulgated by this Court likewise refuses to "express a preference for public over private sales as a means to maximize the sale price" of assets.  General Order M-383, at page 2, note 2.

A sale transatcion provided the Debtors with a means to transfer certain liabilities and going forward obligations to the Purchasers. Moreover, the holders of the 2019 Notes had indicated their preference that the Sale Transaction be consummated through a section 363 process.

31. An auction of the Remaining Assets makes little sense here. The value of the Remaining Assets is known within a reasonable range. Based upon the range, no rational buyer would pay more than the $156.6 million principal amount outstanding under the 2019 Notes Indenture. In fact, the Remaining Assets are not assets that could be utilized in a bakery business; nor are they assets of a type traditionally bought and sold. Accordingly, the Debtors did not seek to market the Remaining Assets to third parties in recent months. If a third-party purchaser was interested in the Remaining Assets, it could have expressed interest during the robust marketing processes conducted during the previous sale processes.[8]

32. Under the circumstances, the private sale of the Remaining Assets on the terms and conditions set forth in the Purchase Agreement maximizes the value of the Remaining Assets for the Debtors' estates and represents a sound exercise of the Debtors' business judgment. Accordingly, for all of the foregoing reasons, the proposed sale of the Property satisfies the standards of section 363 of the Bankruptcy Code governing sales of assets outside the ordinary course of business and should therefore be approved.

## SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

33. The Debtors request that the Remaining Assets be sold free and clear of any liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code. Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if

---

[8]    To the extent that a potential purchaser is interested in purchasing the Remaining Assets, it is welcome to approach the Purchasers to discuss the purchase of the Remaining Assets.

(a) applicable nonbankruptcy law permits the sale of such property free and clear of such interest, (b) such entity consents, (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (d) such interest is in bona fide dispute, or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  <u>See</u> 11 U.S.C. § 363(f)(1)–(5).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); <u>see also</u> <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

34.     As noted above, the Debtors believe that the holders of the 2019 Notes hold the only material liens in or security interests upon the assets of the Debtors.  The Debtors have paid the funded secured debt obligations that were senior to the 2019 Notes.  <u>See</u> Rush Declaration, at ¶¶ 13-14.  In addition, all claims that give rise to statutory liens, including mechanics liens, possessory liens and property tax liens have been paid in full, with no further amounts outstanding.  <u>Id.</u> at ¶ 15.  If, however, other currently unknown liens on the Remaining Assets do exist, each of the parties holding such liens on the Remaining Assets could be compelled to accept a monetary satisfaction of such interests pursuant to section 363(f)(5) of the Bankruptcy Code.  In addition, if a holder of a lien, claim, interest or encumbrance receives notice of this Motion and does not object within the prescribed time period, the Debtors submit that such holder may be deemed to have consented to the proposed sale pursuant to 363(f)(2) of the Bankruptcy Code.  Accordingly, the Debtors submit that the proposed sale of the Remaining

Assets free and clear of liens, claims, encumbrances and interests satisfies the statutory

prerequisites of section 363(f) of the Bankruptcy Code.

## THE PURCHASE AGREEMENT IS THE PRODUCT OF GOOD
## FAITH NEGOTIATIONS AND CONTAINS FAIR CONSIDERATION

35.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> [section 363(b) of the Bankruptcy Code] . . . does not affect the
> validity of a sale . . . to an entity that purchased . . . such property
> in good faith, whether or not such entity knew of the pendency of
> the appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals, in In re Gucci, has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct
> during the course of the sale proceedings; where there is a lack of
> such integrity, a good faith finding may not be made.  A
> purchaser's good faith is lost by 'fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor to section 363(m) of the Bankruptcy Code));

see also Bace v. Babbitt, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y.

Mar. 25, 2008) (same) (quoting Gucci, 126 F.3d at 390); In re Sasson Jeans, Inc., 90 B.R. 608,

610 (S.D.N.Y. 1988) (same) (quoting Tompkins v. Frey (In re Bel Air Assocs., Ltd.), 706 F.2d

301, 305 (10th Cir. 1983)).

36.     The Debtors submit that the Purchasers — which do not fall within any of

the express "insider" categories under section 101(31) of the Bankruptcy Code — are "good faith

purchasers" within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors and the

Purchasers have entered into the Purchase Agreement without collusion and in good faith as a

means to bring these chapter 11 cases to a responsible conclusion.  The Purchase Agreement was negotiated through an arm's length process.  There is no indication of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or any similar conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Finally, as described above, the consideration to be received by the Debtors pursuant to the Purchase Agreement is substantial, fair and reasonable.  Accordingly, the Debtors seek a finding that the Purchasers are "good faith purchasers" under section 363(m) of the Bankruptcy Code and entitled to the full protection thereof.

### A CREDIT BID IS APPROPRIATE HERE

37.    Pursuant to the Purchase Agreement, the Purchasers will cause the 2019 Notes Trustee to credit bid its claim to purchase the Remaining Assets as contemplated by section 363(k) of the Bankruptcy Code.  Section 363(k) of the Bankruptcy Code expressly grants secured creditors the right to credit bid unless the Court "orders otherwise" for cause.  11 U.S.C. § 363(k).  Here, there is no reason for this Court to order otherwise.  While some courts have found cause to disallow a secured creditor from credit bidding, such circumstances are rare and typically involve misconduct or an attempt to chill the bidding process.  No such concern exists here.  Accordingly, the Debtors seek a finding that the credit bid contemplated by the 2019 Notes Trustee is valid and proper under section 363(k) of the Bankruptcy Code.

### APPROVAL OF ASSUMPTION AND ASSIGNMENT OF PURCHASED CONTRACTS

38.    The standard for a debtor to assume and assign an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code is whether the debtor's decision is made within its sound business judgment.  See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993) (noting that

section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.").

39.     The Debtors seek authority to assume, and assign to Purchaser Ostess, LLC, the Purchased Contracts.  The assumption and assignment of the Purchased Contracts is provided for in the Purchase Agreement and is an integrated part of the transaction contemplated therein.  In light of the Debtors' winddown, the Purchased Contracts will no longer provide any benefit to the Debtors' estates.  Indeed, the Purchased Contracts only serve to burden the Debtors' estates.  Accordingly, the assumption and assignment of the Purchased Contracts is warranted, in the Debtors' business judgment, to eliminate any ongoing liabilities associated therewith and to maximize the value received from the Sale Transaction.

40.     Pursuant to section 365(b) of the Bankruptcy Code, prior to the assumption of the Purchased Contracts, the Debtors generally are required to (a) cure any outstanding defaults under the Assigned Agreements and (b) provide adequate assurance of future performance thereunder.  The exhibits to the Purchase Agreement set forth the proposed cure amounts to be paid to cure prepetition defaults under the Purchased Contracts.  Pursuant to the Purchase Agreement, (y) the Purchaser will assume all liabilities arising from and after closing pursuant to the Purchased Contract and (z) the cure amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts will be paid by the Purchaser (to the extent not paid by Sellers prior to Closing).  Accordingly, the requirements of cure of defaults and adequate assurance of

future performance set forth at section 365(b) of the Bankruptcy Code are satisfied with respect to the Purchased Contracts.

41.     Assumption and assignment of the Purchased Contracts is thus a sound and reasonable exercise of the Debtors' business judgment and should be approved.  The Debtors request that, if the non-Debtor counterparties to the Purchased Contracts fail to object to the proposed sale of the Property, such counterparties should be deemed to consent to the proposed treatment of the Purchased Contracts under section 365 of the Bankruptcy Code and this Motion. See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

## TRANSFER AND DESTRUCTION/ABANDONMENT OF DOCUMENTS

42.     As noted above, the Purchase Agreement also provides that Purchaser Ostess Services LLC is taking possession of certain of the documents of the Debtors (the "Purchased Documents").  Certain of the Purchased Documents are relevant to unresolved workers' compensation and auto liability claims, and the Purchasers have agreed to assume responsibility to cooperate with ACE American, in its capacity as insurer of the Debtors, as set forth in section 8.8 of the Purchase Agreement.  The Purchase Agreement also requires the Purchasers to keep Purchased Documents confidential as set forth in section 8.4 of the Purchase Agreement.  Other than the obligations to retain the Purchased Documents as set forth in the Purchase Agreement, the Purchaser is free to destroy such Purchased Documents after December 31, 2015.

43.     In addition, other documents are being retained by the Debtors' estates and are not being transferred to Purchaser Ostess Services LLC under the Purchase Agreement, including any employee files that do not relate to unresolved workers compensation or auto

liability claims. The Debtors seek authorization from this Court to abandon and destroy all such documents, with the cost and expense of destruction borne by the Debtors' estates. Section 554 of the Bankruptcy Code provides, in relevant part, that a debtor "may abandon any property of the estate that is burdensome to the estate or that is inconsequential value and benefit to the estate." 11 U.S.C. §554(a); see also Fedotov v. Peter T. Roach & Assocs., P.C., 354 F. Supp. 2d 471, 475 (S.D.N.Y. 2005) (noting long-standing right of trustee to abandon property burdensome to estate).

44.     Where adequate notice is given pursuant to Bankruptcy Rule 6007, "[t]he abandonment power embodied in Section 554 enables the trustee to rid the estate of burdensome or worthless assets, and so speeds the administration of the estate . . . and also protects the estate from diminution." In re Quanta Resources Com., 739 F.2d 912, 915 (3d Cir. 1984) (internal citation omitted). Indeed, such abandonment provisions "are designed to allow the trustee to relinquish assets that would be a financial drain on the estate, or relieve the trustee of the financial burden of administering inconsequential assets that would cost more than they are worth to the estate." Mele v. First Colony Ins. Co., 127 B.R. 82, 85 (D.D.C. 1991); see also Adelphi Hospital Corp. v. N.Y. State Department of Health (In re Adelphi Hospital Corp.), 579 F.2d 726, 729 (2d Cir. 1978) (affirming order authorizing debtor to abandon records that would not benefit the estate).

45.     As is the case with a debtor's decision to assume or reject executory contracts, the business judgment standard applies to a debtor's decision to abandon property that is either of inconsequential value or burdensome to the estate. See In re Slack, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("The trustee's power to abandon property is discretionary.... The Court only needs to find the trustee made: (i) a business judgment; (ii) in good faith; (iii) upon

some reasonable basis; and (iv) within the trustee's scope of authority.") (internal citations omitted); In re Moore, 110 B.R. 924, 927 (Bankr. C.D. Cal. 1990) ("[W]hen called upon to review contested applications for abandonment, a court must focus its examination upon the reasons underlying the trustee's determination and affirm a decision which reflects a business judgment made in good faith, upon a reasonable basis and within the scope of his authority under the Code.").

46.     Here, the Debtors are resolving their chapter 11 cases and will soon have no assets, officers or contractors of any kind or nature.  As such, it will make no sense for the Debtors themselves to retain any documents.  Accordingly, in the Debtors' business judgment, the Debtors seek authorization to abandon and destroy all documents that are not being transferred to Purchaser Ostess Services LLC under the Purchase Agreement.  To the extent that parties in interest believe that they have an interest in the Debtors' documents, they must contact the Debtors or object to the this Motion in order to resolve any such issues prior to the closing of the Sale Transaction.[9]

47.     Courts in this district have authorized the abandonment and destruction of documents in a variety of contexts, including situations where, as here, the Debtors are winding down their businesses.  See e.g., In re Dewey & Leboeuf LLP, Case No. 12-12321 (MG) (Bankr. S.D.N.Y April 8, 2015) (Docket No. 2287) (authorizing abandonment of debtor's electronic data center and hard copy records in wind-down process); In re MF Global Inc., Case No 11-02790 (MG) (Bankr. S.D.N.Y. Dec. 16, 2014) (Docket No. 8546) (ordering abandonment and destruction of certain paper records in conjunction with winding down of the estate); In re

---

[9]     The Debtors believe such notice is sufficient to satisfy the notice requirements of Bankruptcy Rule 6007, which allows parties to object to a debtor's proposed abandonment and be heard by the court.  See Fed. R. Bankr. P. 6007.

Metropark USA, Inc., Case No. 11-22866 (RDD) (Bankr. S.D.N.Y. July 11, 2011) (Docket No. 285) (authorizing the abandonment and destruction of documents and records when debtor was in process of winding down its operations); In re Mount Vernon Monetary Management Corp., Case No. 10-23053 (RDD) (Bankr S.D.N.Y. August 2, 2013) (Docket No. 582) (authorizing the destruction and abandonment of books, records and other documents in connection with the closing of the chapter 11 cases); In re PubliCARD Inc., Case No. 07-11517 (RDD) (Bankr S.D.N.Y. January 31, 2008) (Docket No. 86) (authorizing the destruction and abandonment of the debtors' operating documents where such documents had no bearing on future operations).

### **WAIVER OF 14-DAY STAY UNDER BANKRUPTCY RULE 6004(H)**

48.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, any order authorizing the sale of property pursuant to section 363 of the Bankruptcy Code is automatically stayed for 14 days after the entry of such order.  See Fed. R. Bankr. P. 6004(h). Pursuant to Bankruptcy Rule 6006(d), unless the court orders otherwise, any order authorizing the assignment of an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code is automatically stayed for 14 days after the entry of such order.  See Fed. R. Bankr. P. 6006(d).  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and Fed. R. Bankr. P. 6006(d).

49.     The Debtors believe that a waiver of the 14-day periods under Bankruptcy Rules 6004(h) and 6006(d) is appropriate here to permit the parties to consummate the Sale Transaction when appropriate under the terms of the Purchase Agreement, even if that time is within 14 days after the entry of the order approving the transaction (including the assumption, and assignment to the Purchaser, of the Purchased Contracts).

## NO PRIOR REQUEST

50.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court enter the Sale Order, substantially in the form attached hereto as <u>Exhibit C</u>, and grant such other and further relief as it deems just and proper.

Dated:  September 28, 2015
        New York, New York

Respectfully submitted,


/s/  Corinne Ball
Corinne Ball
Lisa Laukitis
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

and

Ryan T. Routh
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

**(Purchase Agreement)**

**ASSET PURCHASE AGREEMENT**

**among**

**Old HB, Inc.**

**Interstate Brands Corporation,**

**IBC Sales Corporation,**

**IBC Services, LLC,**

**IBC Trucking, LLC,**

**MCF Legacy, Inc.,**

**Ostess, LLC**

**and**

**Ostess Services LLC**

**Dated as of September 25, 2015**

# TABLE OF CONTENTS

**Page**

I.   DEFINITIONS.................................................................................................. 1
    1.1   Certain Definitions ................................................................................ 1
    1.2   Other Definitional and Interpretive Matters ................................. 5
II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES............. 6
    2.1   Purchase and Sale of Assets.................................................. 6
    2.2   Excluded Assets .................................................................... 8
    2.3   Assumption of Liabilities ...................................................... 8
    2.4   Excluded Liabilities ............................................................... 8
    2.5   Cure Amounts........................................................................ 8
    2.6   Further Conveyances and Assumptions ............................. 9
III. CONSIDERATION; ADJUSTMENT.......................................................... 9
    3.1   Consideration......................................................................... 9
    3.2   Payment of Purchase Price ................................................. 9
IV.  CLOSING AND TERMINATION ............................................................... 9
    4.1   Closing Date .......................................................................... 9
    4.2   Deliveries by Sellers ............................................................ 9
    4.3   Deliveries by Purchasers .................................................. 10
    4.4   Termination of Agreement ................................................. 10
    4.5   Procedure Upon Termination............................................ 11
    4.6   Effect of Termination.......................................................... 11
V.   REPRESENTATIONS AND WARRANTIES OF SELLERS............................ 12
    5.1   Organization ........................................................................ 12
    5.2   Authorization of Agreement ............................................... 12
    5.3   Consents of Third Parties .................................................. 12
    5.4   Title to Assets ..................................................................... 12
    5.5   Financial Advisors............................................................... 12
    5.6   Taxes .................................................................................... 12
    5.7   No Other Representations or Warranties; Schedules.............. 12
VI.  REPRESENTATIONS AND WARRANTIES OF PURCHASERS ..................... 13
    6.1   Organization and Good Standing........................................ 13

| | | |
|---|---|---|
| 6.2 | Authorization of Indenture Trustee | 13 |
| 6.3 | Authorization of Purchasers | 13 |
| 6.4 | Authorization of Purchasers | 14 |
| 6.5 | Conflicts; Consents of Third Parties | 14 |
| 6.6 | Financial Advisors | 14 |
| 6.7 | Condition of the Purchased Assets | 14 |
| VII. | BANKRUPTCY COURT MATTERS | 15 |
| 7.1 | Bankruptcy Court Filings | 15 |
| VIII. | COVENANTS | 15 |
| 8.1 | Consents | 15 |
| 8.2 | Efforts to Close | 15 |
| 8.3 | Supplementation and Amendment of Schedules | 15 |
| 8.4 | Confidential Records | 16 |
| 8.5 | Assumption of Liabilities | 16 |
| 8.6 | Retained Cash | 16 |
| 8.7 | Indemnity Trust | 16 |
| 8.8 | Preservation of Documents and Cooperation | 16 |
| 8.9 | Access to Assets | 17 |
| IX. | CONDITIONS TO CLOSING | 17 |
| 9.1 | Conditions Precedent to Obligations of Purchasers | 17 |
| 9.2 | Conditions Precedent to Obligations of Sellers | 18 |
| 9.3 | Conditions Precedent to Obligations of Purchasers and Sellers | 18 |
| 9.4 | Frustration of Closing Conditions | 19 |
| X. | TAXES | 19 |
| 10.1 | Transfer Taxes | 19 |
| XI. | MISCELLANEOUS | 19 |
| 11.1 | No Survival of Representations and Warranties | 19 |
| 11.2 | Injunctive Relief | 19 |
| 11.3 | Submission to Jurisdiction; Consent to Service of Process | 19 |
| 11.4 | Waiver of Right to Trial by Jury | 20 |

**TABLE OF CONTENTS**
(continued)

**Page**

11.5    Entire Agreement; Amendments and Waivers ........................................ 20

11.6    Governing Law ................................................................................ 20

11.7    Notices ........................................................................................... 20

11.8    Severability .................................................................................... 22

11.9    Assignment ..................................................................................... 22

11.10  Non-Recourse ................................................................................. 22

11.11  Representation of Sellers and their Affiliates .......................................... 22

11.12  Counterparts ................................................................................... 22

# ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of the date set forth on the signature page hereto, among Ostess, LLC, a Delaware limited liability company ("<u>Ostess</u>"), Ostess Services LLC, a Delaware limited liability company ("<u>Ostess Services</u>," and together with Ostess, each a "<u>Purchaser</u>" and together, "<u>Purchasers</u>"), Old HB, Inc. (the "<u>Company</u>") and each of the Company's subsidiaries listed on the signature page (together with the Company, each a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>").

## RECITALS:

A.     Sellers are debtors and debtors in possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on January 11, 2012 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), where the Sellers' bankruptcy cases are jointly administered under Case No. 12-22052 (RDD) (collectively, the "<u>Bankruptcy Case</u>").

B.     Subject to the terms and conditions set forth herein, Purchasers have agreed to purchase, and Sellers have agreed to sell, the Purchased Assets pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, the parties hereby agree as follows:

## I.  DEFINITIONS

1.1     <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, have the meanings specified in this <u>Section 1.1</u> or in other Sections of this Agreement identified in <u>Section 1.2</u>:

"<u>ACE American</u>" means ACE American Insurance Company, each of its Affiliates, including (but not limited to) ESIS, Inc.

"<u>ACE American Stipulation</u>" means the Stipulation and Agreed Order Providing for and Approving the Settlement of the Motion of Debtors and Debtors in Possession, Pursuant to 11 U.S.C. §§ 105, 361 and 363(c), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York, for Entry of an Order Permitting the Debtors to Use Cash Collateral of ACE American Insurance Company Nunc Pro Tunc as of November 1, 2012 (Docket No. 2110).

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies

of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Business Day</u>" means any day of the year on which banking institutions in New York City are open to the public for conducting business.

"<u>Collateral</u>" means any letter of credit or its proceeds, any pledged security account or its proceeds, any paid loss deposit funds, or any other form of security, in cash or otherwise, to secure the Sellers' obligations to pay WC/AL Claims under insurance policies or under applicable state or federal law.

"<u>Collateral Agreement</u>" shall mean any agreement between Sellers and/or their predecessors and ACE American associated with or involving Collateral, other than policies of insurance, including without limitation, the agreement between ACE American and Interstate Brands Corporation effective January 1, 2007 and any Pledge and Security Agreement(s) between ACE American and Sellers and/or their predecessors.

"<u>Contract</u>" means any contract, indenture, note, bond, lease or other agreement.

"<u>Cure Amounts</u>" means any and all amounts required, as a condition to assumption or assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"<u>Dismissal Date</u>" means the date upon which the dismissal of the Bankruptcy Case is effective.

"<u>Document Destruction Order</u>" means any Order of the Bankruptcy Court that is entered on or after the date of this Agreement that authorizes the Sellers to destroy documents.

"<u>Documents</u>" means all files, documents, books, records, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, and other similar materials remaining in the possession of the Sellers as of the Closing Date, in each case whether or not in electronic form.

"<u>Final Professional Fee Order</u>" means the Order of the Bankruptcy Court authorizing the final allowance of professional fees and expenses in Bankruptcy Case pursuant to section 327 and 330 of the Bankruptcy Code.

"<u>GAAP</u>" means generally accepted accounting principles in the United States, consistently applied throughout the specified period and the immediately prior comparable period.

"<u>Governmental Body</u>" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Indenture Trustee" means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee and collateral trustee for the fourth lien notes due in 2019 and issued under the Indenture, dated as of February 3, 2009 (as amended, supplemented, or otherwise modified).

"IRS" means the Internal Revenue Service.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" as applied to any Person means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other right of a third party in respect of an asset of such Person.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body as of the Closing Date.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Contracts" means the Contracts set forth on Schedule 2.1(b)(x).

"Purchased Documents" means (a) the WC/AL Claims Documents; (b) any Documents that will aid the Purchasers in maximizing their recovery on the Purchased Assets; and (c) those documents designated by the Debtors in writing pursuant to section 8.8(b) of this Agreement.

"Sale Order" means the order (or orders) of the Bankruptcy Court, in form and substance reasonably acceptable to Purchasers and Sellers, (i) approving this Agreement and all of the terms and conditions hereof and approving and authorizing Sellers to consummate the transactions contemplated hereby pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and (ii) authorizing Ostess or Ostess Services, at Ostess's direction, to destroy the WC/AL Claims Documents in the manner authorized by this Agreement. The form of Sale Order attached to the Sale Motion shall be

considered to be in form and substance reasonably acceptable to Purchasers and Sellers.

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes; (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Tax Code, or by contract, indemnity or otherwise; and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Unresolved WC/AL Claims" means any workers' compensation claim or auto liability claim asserted against one or more of the Sellers that, as of any particular date, is identified as open by ACE American or other adminstrator for such claim.

"Winddown Order" means the Order entered on November 30, 2012 by the Bankruptcy Court in the Sellers' Bankruptcy Case authorizing the winddown and liquidation of the Sellers' business operations, docketed at Docket No. 1871.

Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Company | Preamble |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Withdrawal and Dissolution Activities | 8.10 |
| Petition Date | Recitals |
| Purchased Assets | 2.1(b) |

NAI-524625802v20

| Term | Section |
|------|---------|
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Ostess | Preamble |
| Ostess Services | Preamble |
| Retained Cash | 2.2(a) |
| Sale Motion | 7.1 |
| Seller or Sellers | Preamble |
| Termination Date | 4.4(a) |
| Transfer Taxes | 10.1 |
| WC/AL Claims Documents | 8.8 |

1.2    <u>Other Definitional and Interpretive Matters</u>.  (a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

<u>Calculation of Time Period</u>.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.

<u>Dollars</u>.  Any reference in this Agreement to $ will mean U.S. dollars.

<u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein will be defined as set forth in this Agreement.

<u>GAAP</u>.  Terms used herein which are defined in GAAP are, unless specifically defined herein, used herein as defined in GAAP.

<u>Gender and Number</u>.  Any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa.

<u>Headings</u>.  The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "<u>Section</u>" are to the corresponding Section of this Agreement unless otherwise specified.

<u>Herein</u>.  The words such as "<u>herein</u>," "<u>hereinafter</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

NAI-524625802v20

Including. The word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## II.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  (a)  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers will purchase, acquire and accept from Sellers, and Sellers will sell, transfer, convey and deliver to Purchasers, all of Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens other than those expressly assumed by Purchasers hereunder.  All Purchased Assets shall be transferred to Ostess unless otherwise specified herein.

(b)     The term "Purchased Assets" means the following properties, assets and rights of Sellers (other than the Excluded Assets) existing as of the Closing:

(i)     any and all rights that (A) Sellers have against ACE American under the ACE American Stipulation or the Collateral Agreements between the parties, as such Collateral Agreements may have been modified by the ACE American Stipulation, to the refund or return of Collateral from ACE American, (B) Sellers have under the Final Award and Order dated July 29, 2015 in the matter captioned as In the Matter of the Arbitration Between Interstate Brands Corporation and ACE American Insurance Company and (C) are associated with the right to pursue any claims against ACE American under the Collateral Agreements for the refund or return of Collateral; nothing in this paragraph 2.1(B)(i), however, shall be construed as assigning or attempting to assign any rights under insurance policies between one or more of the Sellers and ACE American or as entitling or purporting to entitle Purchasers to insurance coverage under any such policies.

(ii)     all rights of the Sellers associated with rights to recover cash collateral posted with third parties to secure surety bonds or letters of credit, including those rights identified on Schedule 2.1(b)(ii);

(iii)     all rights of the Sellers to (a) recover letter of credit proceeds, bond proceeds, cash deposits or other amounts, in each instance posted as collateral to secure certain workers' compensation obligations of the Sellers, from Governmental Bodies; (b) seek partial or

NAI-524625802v20

complete returns of such amounts as permitted by applicable law, including those rights identified on Schedule 2.1(b)(iii);

(iv)     all rights to recover deposits posted with vendors, utility companies and all other service providers (including telecommunication service providers) and third party administrators as collateral to secure the obligations of the Sellers for payment for such services and any overpayments made to vendors, utility companies and other service providers, including those deposits and overpayments identified on Schedule 2.1(b)(iv);

(v)     all accounts receivable of any kind or nature, including those identified on Schedule 2.1(b)(v);

(vi)     all claims for Tax refunds of any kind or nature and all claims for refunds sought from vendors and service providers of the Sellers for Taxes collected from the Sellers by such vendors and service providers, including those identified on Schedule 2.1(b)(vi);

(vii)     all claims for refunds submitted to state or local governments for underground storage tank reimbursements and environmental emission reduction credits, including those claims and rights, identified on Schedule 2.1(b)(vii);

(viii)     all rights of Sellers with respect to the assets of the Sellers set forth on Schedule 2.1(b)(viii);

(ix)      all cash and cash equivalents other than the Retained Cash;

(x)     the Purchased Contracts, subject to Section 8.1;

(xi)     the personal property identified on Schedule 2.1(b)(xii).

(xii)     all rights of Sellers to reimbursement of payments made under excess insurance policies including those identified on Schedule 2.1(b)(xiii);

(xiii)     all warranties, guarantees and similar rights related to the Purchased Assets, including warranties and guarantees made by suppliers, manufacturers and contractors under the Purchased Assets;

(xiv)     all intellectual property of Sellers (the "Intellectual Property"), including without limitation, those certain trademarks and other intellectual property identified on Schedule 2.1(b)(xiv) (the "Trademarks");

(xv)     the Purchased Documents, to be transferred to Ostess Services; and

(xvi)    all other assets of the Sellers that are not Excluded Assets.

2.2    <u>Excluded Assets</u>.  Nothing herein contained will be deemed to constitute an agreement to sell, transfer, assign or convey the following assets of Sellers to Purchasers, which are "<u>Excluded Assets</u>":

(a)    an amount in cash that, as agreed to by Sellers and Purchasers in writing prior to the Closing (the "<u>Retained Cash</u>"), subject to <u>Section 8.6</u>;

(b)    any shares of capital stock or other equity interest of any Seller or any of their subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any such subsidiaries; and

(c)    assets identified as assets to be abandoned by the Sellers, which are set forth on <u>Schedule 2.2(c)</u>.

2.3    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchasers will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, only the following Liabilities existing as of the Closing Date (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities of Sellers relating to the Purchased Assets that arise on or after the Closing Date;

(b)    any cure amounts set forth on <u>Schedule 2.1(b)(x)</u> that are owed in connection with <u>Section 2.5</u>, if any;

(c)    Ostess and Ostess Services shall assume certain obligations of the Sellers as specified in section 8.8;

(d)    all Transfer Taxes, if any.

2.4    <u>Excluded Liabilities</u>.  Purchasers will not assume and will be deemed not to have assumed, and Sellers will remain liable with respect to, any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>").

2.5    <u>Cure Amounts</u>.  At Closing, and pursuant to section 365 of the Bankruptcy Code with respect to prepetition Purchased Contracts, Sellers will assume the Purchased Contracts (to the extent not previously assumed) and assign their rights and obligations under the Purchased Contracts to Purchasers, and Purchasers will assume all Assumed Liabilities arising from and after Closing associated with the Purchased Contracts.  Subject to the terms hereof, the Cure Amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts will be paid by Purchasers (to the extent not paid by Sellers prior to Closing).  In the event that the Bankruptcy Court determines that the cure amount for a particular Purchased Contract exceeds the amount set forth on

Schedule 2.1(b)(x) by more than $1,000, then prior to the entry of the Sale Order, Purchasers may advise the Sellers in writing that they are not assuming that Purchased Contract, and Sellers shall not assign such Purchased Contract to Purchasers.

2.6     Further Conveyances and Assumptions.  From time to time following the Closing, but prior to the Dismissal Date, Sellers and Purchasers will execute, acknowledge and deliver all such further conveyances, notices, assumptions, assignments, releases and other instruments, and will take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchasers and their respective successors or assigns, all of the Purchased Assets intended to be conveyed to Purchasers under this Agreement and to assure fully to each Seller and its Affiliates and their successors and assigns, the assumption of the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby.

## III.  CONSIDERATION; ADJUSTMENT

3.1     Consideration.  The aggregate consideration for the Purchased Assets (the "Purchase Price") will be:

(a)     the discharge of the entire principal amount of indebtedness owed to the Indenture Trustee, in its capacity as trustee, under that certain indenture, dated as of February 3, 2009, by and among the Company (as issuer), certain Sellers (as guarantors) and the Indenture Trustee (the "Indenture"); and

(b)     the assumption of the Assumed Liabilities.

3.2     Payment of Purchase Price.  On the Closing Date, Purchasers shall cause the Indenture Trustee to deliver to the Company a fully executed credit bid document, in the form attached as Exhibit A, reflecting the reduction of the balance due on account of the Indenture, in the amount set forth in Section 3.1(a) (the "Credit Bid").

## IV.  CLOSING AND TERMINATION

4.1     Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") will take place at the offices of Jones Day located at 222 East 41st Street, New York, New York (or at such other place as the parties may designate in writing) at 10:00 a.m. (New York City time) on the date that is five Business Days following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to by the parties hereto.  The date on which the Closing is held is referred to in this Agreement as the "Closing Date."

4.2     Deliveries by Sellers.  At the Closing, Sellers will deliver to Purchasers:

(a)     one or more duly executed bills of sale in a form to be agreed upon by the parties hereto;

(b)     affidavits executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Tax Code;

(c)     duly executed assignments of the Trademarks, in a form suitable for recording in the U.S. trademark office;

(d)     a general assignment of all other intangible assets of Sellers which are included in the Purchased Assets;

(e)     the officer's certificate required to be delivered pursuant to Section 9.1; and

(f)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchasers, as may be necessary to convey the Purchased Assets to Purchasers.

4.3     <u>Deliveries by Purchasers</u>.  At the Closing Purchasers will deliver:

(a)     the consideration specified in <u>Section 3.1</u>; and

(b)     to the Company, on behalf of Sellers, the Credit Bid;

(c)     the officer's certificate required to be delivered pursuant to <u>Section 9.2</u>; and

(d)     to the Company, on behalf of Sellers, such other documents, instruments and certificates as Sellers may reasonably request.

4.4     <u>Termination of Agreement</u>.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Sellers or Purchasers, if the Closing has not occurred by 5:00 PM New York time on November 23, 2015 (the "<u>Termination Date</u>"); <u>provided</u>, however, that if the Closing has not occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants in this Agreement by Sellers or Purchasers, then the breaching party may not terminate this Agreement pursuant to this <u>Section 4.4(a)</u>;

(b)     by mutual written consent of Sellers and Purchasers;

(c)     by Sellers or Purchasers, as applicable, if any of the conditions set forth in <u>Section 9.3</u> shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Purchasers, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party;

-10-

(d)     by Sellers or Purchasers, if there shall be in effect a final Order or other nonappealable final action of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(e)     by Purchasers, if any of the conditions to the obligations of Purchasers set forth in Section 9.1 shall have become incapable of fulfillment other than as a result of a breach by any Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived in writing by Purchasers; and

(f)     by Purchasers, if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and which breach cannot be cured or has not been cured within ten (10) Business Days after the giving of written notice by Purchasers to Sellers of such breach;

(g)     by Sellers, if any condition to the obligations of Sellers set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived in writing by Sellers; or

(h)     by Sellers, if there shall be a material breach by any Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach cannot be cured or has not been cured within ten (10) Business Days after the giving of written notice by Sellers to Purchasers.

4.5     Procedure Upon Termination.  In the event of termination pursuant to Section 4.4, written notice thereof will forthwith be given to the other party or parties, and this Agreement will terminate, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Purchasers or Sellers.  If this Agreement is terminated as provided herein, each party will redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6     Effect of Termination.  In the event that this Agreement is validly terminated as provided herein, then each of the parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination will be without liability to Purchasers or Sellers; provided, however, that the provisions of this Section 4.6 and Article XI (other than Section 11.2) and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 4.6 will be deemed to release any party from liability for any breach of its obligations under this Agreement.

## V.  REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby, jointly and severally, represents and warrants to Purchasers that:

5.1     Organization.  Each Seller is an entity duly organized and validly existing under the laws of the jurisdiction of its organization.

5.2     Authorization of Agreement.  Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, each Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and the entry of the Sale Order) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of each Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3     Consents of Third Parties.  Certain of the Purchased Contracts of the Sellers are postpetition Contracts not subject to assignment pursuant to section 365 of the Bankruptcy Code or which otherwise may prohibit assignment. With respect to such Contracts, the Sellers will, prior to Closing, seek written authorization of the counterparties to such Contracts to the assignment of such Contracts to Purchaser. To the extent that an authorization is not obtained with respect to a particular Contract, Sellers shall not be obligated to assign such Contract to Purchaser.  The Sellers do not believe that a failure to assign any particular Purchased Contract is likely to have a highly material impact on the value of the Purchased Assets taken as a whole.

5.4     Title to Assets.  To the best of Sellers' knowledge, Sellers are the owners of the Purchased Assets and, subject to the entry of the Sale Order, such Purchased Assets shall be sold free and clear of all Liens.

5.5     Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from any Purchaser in respect thereof.

5.6     Taxes.  All income Tax Returns required to have been filed by Sellers for each of the Sellers' tax years ended through December 31, 2014 have been filed.

5.7     No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V, none of Sellers nor any other Person makes any other express or implied representation or warranty with respect to

-12-

Sellers, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and each Seller disclaims any other representations or warranties, whether made by Sellers, any Affiliate of Sellers, or any of Sellers' or their Affiliates respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), each Seller (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to any Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to any Purchaser by any director, officer, employee, agent, consultant, or representative of Sellers or any of its Affiliates). Sellers make no representations or warranties to any Purchaser regarding the ability to recover any of the intangible Purchased Assets.

## VI.  REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Each Purchaser hereby represents and warrants to Sellers that:

6.1     Organization and Good Standing.  Each Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its formation.

6.2     Authorization of Indenture Trustee.  The Indenture Trustee has been provided a direction letter instructing the Indenture Trustee to (a) credit bid the Indebtedness as contemplated by this Agreement, and (b) execute and deliver each agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.  The Indenture Trustee has agreed to accept such Instruction, subject to entry by the Bankruptcy Court of an order acceptable in form and substance to the Indenture Trustee, that no longer shall be subject to appeal, reargument or reconsideration (the "Trustee Release Order"), releasing the Indenture Trustee and holding the Indenture Trustee harmless with respect to such instruction.  A proposed form of order in this regard has been filed with the Bankruptcy Court.  Upon satisfaction of the aforesaid condition regarding the Trustee Release Order, the Indenture Trustee will be deemed to have accepted the direction letter and will be authorized, and have full authority under the Indenture, to undertake the direction.  The direction letter shall only be withdrawn by the Purchaser in connection with a valid termination of this Agreement.

6.3     Authorization of Purchasers.  Each Purchaser has the requisite limited liability company power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.

-13-

6.4    Authorization of Purchasers.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which any Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of each Purchaser.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which each Purchaser is a party has been duly and validly executed and delivered by each Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which each Purchaser is a party constitutes legal, valid and binding obligations of each Purchaser enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.5    Conflicts; Consents of Third Parties.  (a)  The execution and delivery by each Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which each Purchaser is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by each Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of formation and operating agreement of any Purchaser; (ii) any Contract or Permit to which any Purchaser is a party or by which any of the properties or assets of any Purchaser are bound; (iii) any Order of any Governmental Body applicable to Purchasers or any of the properties or assets of Purchasers as of the date hereof; (iv) the Indenture or (v) any applicable Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchasers in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which any Purchaser is a party, the compliance by Purchasers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the taking by Purchasers of any other action contemplated hereby or thereby.

6.6    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchasers in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

6.7    Condition of the Purchased Assets.  Notwithstanding anything contained in this Agreement to the contrary, each Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or

-14-

implied, beyond those expressly given by Sellers in <u>Article V</u> hereof (as modified by the Schedules hereto), and each Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis.

## VII. BANKRUPTCY COURT MATTERS

7.1    <u>Bankruptcy Court Filings</u>.  By October 1, 2015, Sellers will file with the Bankruptcy Court a motion seeking entry of the Sale Order (the "<u>Sale Motion</u>") and shall seek to establish a hearing on the Sale Motion on a date prior to November 15, 2015. The Sale Motion shall seek authorization for the Sellers to complete the transactions contemplated by this Agreement through a private sale pursuant to sections 105, 363 and 365 of the Bankruptcy Code, without conducting an auction process.  Each Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchasers under this Agreement and demonstrating that each Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order is appealed, Sellers and Purchasers will use their respective reasonable efforts to defend such appeal(s).

## VIII. COVENANTS

8.1    <u>Consents</u>.  Sellers will use their commercially reasonable efforts, and Purchasers will cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals contemplated by this Agreement, including the consents and approvals referred to in <u>Section 5.3</u>; <u>provided</u>, <u>however</u>, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or proceedings to obtain any such consent or approval.  Notwithstanding the foregoing, the parties hereto acknowledge that certain of the Purchased Contracts are post-petition Contracts not subject to assignment pursuant to section  365 of the Bankruptcy Code or which otherwise may prohibit assignment by its terms.  With respect to such Contracts, the Sellers will, prior to Closing, seek written authorization of the counterparties to such Contracts to the assignment of such Contracts to Purchasers.

8.2    <u>Efforts to Close</u>.  Subject to the other provisions of this Agreement, each Purchaser and each Seller will use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

8.3    <u>Supplementation and Amendment of Schedules</u>.  Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be

deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  From time to time prior to the Closing, Sellers will have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement.  No such supplement or amendment will have any effect on the satisfaction of the condition to closing set forth in <u>Section 9.1(a)</u>.

8.4    <u>Confidential Records</u>.  Each Purchaser acknowledges that the Documents of the Sellers may include information which is confidential and/or protected  information under Contract, Law or Order, including information which may be subject to the requirements of the Health Insurance Portability and Accountability Act of 1996.  Each Purchaser agrees that it shall be bound by, and shall comply in all respects with, any such Contract, Law or Order relating to the confidentiality or protection of such information.

8.5    <u>Assumption of Liabilities</u>.  Purchasers will assume, effective as of the Closing, and will timely perform and discharge in accordance with their respective terms, the Assumed Liabilities.

8.6    <u>Retained Cash</u>.  Sellers shall be permitted to utilize the Retained Cash to pay obligations that may be paid under the terms and conditions of the Winddown Order.  Sellers may use certain Retained Cash to pre-fund certain liabilities that the Sellers expect to incur in connection with the dismissal of the Bankruptcy Cases, the filing of final tax returns and the winddown of their corporate existence.  On the Dismissal Date, Sellers shall transfer any remaining Retained Cash to Purchasers.

8.7    <u>Indemnity Trust</u>.  Purchasers shall assume all of the rights and obligations of the Sellers under the Protected Persons Trust Agreement by and among the Sellers and The Private Trust Company, N.A., as trustee, including the right to the return of assets remaining in the trust at the termination of the trust presently held by the Sellers and/or their bankruptcy estates as set forth in section 12.3 of the trust agreement.

8.8    <u>Preservation of Documents and Cooperation</u>.

(a) Ostess Services is, among other things, purchasing the Documents that that are relevant to Unresolved WC/AL Claims (the "<u>WC/AL Claims Documents</u>"), such as historical employee files for such claims.  Ostess Services shall retain all such files until at least December 31, 2015.  Thereafter, Ostess Services shall be required to retain only those WC/AL Claims Documents that relate to Unresolved WC/AL Claims.  Ostess Services shall retain the WC/AL Claims Documents relevant to a particular Unresolved WC/AL Claim until either (i) such claim is closed by ACE American or its affiliate, ESIS, Inc., in its claims management database or (ii) Purchasers otherwise determine that the claim has been finally resolved (including by settlement, final judgment, court order, the expiration of an applicable statute of limitation or other indication that the applicable claimant no longer desires to pursue the claim in question).  Ostess and Ostess Services will

-16-

cooperate with ACE American in the defense of Unresolved WC/AL Claims that are subject to coverage under insurance policies between one or more of the Sellers and ACE American by making the WC/AL Claims Documents available to ACE American for inspection and copying.  Prior to destruction of any WC/AL Claims Documents permitted under this paragraph 8.8, Ostess Services will give ACE American an opportunity to collect or copy any WC/AL Claims Documents to be destroyed at ACE American's sole cost and expense.  To the extent that Ostess Services incurs any cost or expense under this section 8.8(a), Ostess agrees to pay such cost or expense on its behalf.

(b)  In addition to WC/AL Claims Documents, Sellers may designate by written notice up to 250 boxes of Documents that Ostess Services shall agree to store until at least December 1, 2019.  Ostess Services will provide access to such stored documents during normal business hours to Jones Day, Greg Rayburn, David Rush, Laurie Reed or Tom Apel upon reasonable notice by, and at the sole cost and expense of, such party.

(c)  Sellers shall obtain authorization from the Bankruptcy Court to destroy all documents that are not WC/AL Claims Documents in connection with the Sale Order.

8.9    Access to Assets.  After the Closing, Sellers, or any professionals retained by Sellers to complete the winddown of Sellers' affairs, shall, at their sole cost and expense, have reasonable access to (a) the Documents during normal business hours upon at least one (1) day's prior notice and (b) the personal property that constitute Purchased Assets as necessary or appropriate to assist in the winddown of the Sellers' corporate affairs.

## IX.  CONDITIONS TO CLOSING

9.1    Conditions Precedent to Obligations of Purchasers.  The obligation of Purchasers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Purchasers in whole or in part (in Purchasers' sole and absolute discretion) to the extent permitted by applicable Law):

(a)    the  representations and warranties of Sellers contained in this Agreement shall be true and accurate in all respects as of the Closing Date as if made on the Closing Date (other than representations and warranties made as of a specific date, which representations and warranties shall have been true and correct as of such date), in each case without regard to any express qualifier therein as to materiality, except for such inaccuracies which are not material when taken in the aggregate, and Purchasers shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

-17-

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchasers shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud); and

(c)     Sellers have delivered, or caused to be delivered, to Purchasers, all of the items set forth in <u>Section 4.2</u>;

9.2     <u>Conditions Precedent to Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchasers contained in this Agreement shall be true and accurate in all respects as of the Closing Date as if made on the Closing Date (other than representations and warranties made as of a specific date, which representations and warranties shall have been true and correct as of such date), in each case without regard to any express qualifier therein as to materiality, except for such inaccuracies which are not material when taken in the aggregate, and Sellers shall have received a certificate signed by an authorized officer of each Purchaser, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud); and

(b)     Purchasers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of each Purchaser, dated the Closing Date, to the forgoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud).

9.3     <u>Conditions Precedent to Obligations of Purchasers and Sellers</u>.  The respective obligations of Purchasers and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchasers and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

-18-

(b)     the Bankruptcy Court shall have entered the Sale Order and the effectiveness of such Sale Order shall not have been stayed;

(c)     the Bankruptcy Court shall have entered an order providing for the dismissal of the Bankruptcy Cases upon the completion of certain identified tasks; and

(d)     Sellers and the Purchaser shall have agreed, in writing, on the amount of the Retained Cash.

9.4     <u>Frustration of Closing Conditions</u>.  No party may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## X.  TAXES

10.1     <u>Transfer Taxes</u>.  Purchasers will be responsible for all documentary, stamp, transfer, motor vehicle registration, sales, use, excise and other similar non-income Taxes and all filing and recording fees (and any penalties and interest associated with such Taxes and fees) arising from or relating to the consummation of the transactions contemplated by this Agreement (collectively, "<u>Transfer Taxes</u>"), regardless of the party on whom liability is imposed under the provisions of the Laws relating to such Transfer Taxes.  Purchasers will prepare and make all filings, Tax Returns, reports and forms as may be required to comply with the provisions of the Laws relating to such Transfer Taxes (even if any Seller is the party that is obligated by law to make such filings, Tax Returns, reports and forms).

## XI.  MISCELLANEOUS

11.1     <u>No Survival of Representations and Warranties</u>.  The parties hereto agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the parties will have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in <u>Article VIII</u> that are to be performed at or after the Closing will survive the Closing hereunder, and each party hereto will be liable to the other after the Closing for any breach thereof.

11.2     <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto will be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 11.2</u> will be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

11.3     <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy

NAI-524625802v20

Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as indicated in <u>Section 11.3</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been dismissed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

11.4    <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

11.5    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, will be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.6    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

11.7    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (i) when delivered personally by hand, or (ii) one business day following the day sent by overnight courier (with written confirmation of

receipt), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, to:

Old HB, Inc.
3101 Mercier, Suite 422
Kansas City, Missouri  64111
Attention: David Rush

And

FTI Consulting
1001 Fannin, Suite 3950
Houston, Texas  77002
Attention: David Rush

With a copy (which will not constitute notice) to:

Jones Day
901 Lakeside Avenue
Cleveland, Ohio  44114
Facsimile:  (216) 579-0212
Attention:   Ryan T. Routh

If to Purchasers, to:

Ostess, LLC and Ostess Services LLC
c/o Cole Schotz P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
Attention:  Registered Agent

And

FTI Consulting
1001 Fannin, Suite 3950
Houston, Texas  77002

-21-

With copies (which will not constitute notice) to:

Cole Schotz P.C.
25 Main Street
Hackensack, New Jersey 07601
Facsimile: (201) 678-6294
Attention: Leo V. Leyva, Esq.

11.8 <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.9 <u>Assignment</u>. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Other than section 8.8, nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Purchasers (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents will be void.

11.10 <u>Non-Recourse</u>. No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Sellers will have any liability for any obligations or liabilities of Sellers under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

11.11 <u>Representation of Sellers and their Affiliates</u>. The legal and financial advisors of each of the parties are known to the other parties. Following the Closing, such advisors may serve as advisers to any other party and their respective Affiliates in connection with any matters related to this Agreement and the transactions contemplated hereby, including any litigation, claim or obligation arising out of or relating to this Agreement or the transactions contemplated by this Agreement notwithstanding any representation by any such advisor of another party or any of its Affiliates.

11.12 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

NAI-524625802v20

[*Signature page follows*]

NAI-524625802v20

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of September 25, 2015.

PURCHASERS:

OSTESS, LLC

By: _____
    Name:
    Title:

OSTESS SERVICES LLC

By: _____
    Name:
    Title:

COMPANY:

OLD HB, INC.
(F/K/A HOSTESS BRANDS, INC.)

By: _____
    Name:
    Title:

OTHER SELLERS:

INTERSTATE BRANDS CORPORATION

By: _____
    Name:
    Title:

IBC SALES CORPORATION

By: _____
    Name:
    Title:

IBC SERVICES, LLC

By: _____
    Name:
    Title:

IBC TRUCKING, LLC

By: _____
    Name:
    Title:

MCF LEGACY, INC.

By: _____
    Name:
    Title:

**SCHEDULES
TO THE
ASSET PURCHASE AGREEMENT
AMONG
OSTESS, LLC,
OSTESS SERVICES, LLC,
OLD HB, INC.
AND
EACH OF THE SUBSIDIARIES
OF OLD HB, INC.
LISTED ON THE SIGNATURE PAGES
THERETO**

This set of Disclosure Schedules (these "Schedules") was prepared by Sellers in connection with the execution of the Asset Purchase Agreement, dated as of September 25, 2015 (the "Agreement"), among Ostess, LLC, Ostess Services LLC, Old HB, Inc. (the "Company") and each of the Company's subsidiaries listed on the signature pages thereto (together with the Company, each a "Seller" and, collectively, the "Sellers"). Any capitalized terms used in the Schedules but not otherwise defined herein will be defined as set forth in the Agreement.

The Schedules are qualified in their entirety by reference to specific provisions of the Agreement and are not intended to constitute, and will not be construed as constituting, representations, warranties or covenants of Sellers or any of their respective Affiliates except as and to the extent provided in the Agreement. Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of the Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent.

Headings have been inserted on the sections and within such sections of these Schedules for convenience of reference only and will not change the express description of such sections as set forth in the Agreement. The numbering of sections of these Schedules reflects the corresponding section in the Agreement.

## Schedule 2.1(b)
## Purchased Assets

**2.1(b)(ii) – Debt Recovery Rights**

All rights of the Sellers under the General Contract of Indemnity between Travelers Casualty and Surety Company of America, St. Paul Fire and Marine Insurance Company and Old HB, Inc. (f/k/a Hostess Brands, Inc.) dated April 10, 2012, including the return of excess collateral thereunder.

NOTICE ADDRESSES

St. Paul Travelers Bond
Attention:  Senior Vice President, Commercial Surety
One Tower Square
Hartford, Connecticut 06183

Travelers Casualty and Surety Company of America
Attn: Robert G. Lavitt, Director & Counsel, Bond & Financial Products
One Tower Square, 0000-S102A
Hartford, CT 06183

## 2.1(b)(iii) – Workers' Compensation Recovery Rights

Insurance and Claims Collateral Description

| Entity | Entity Type/Relationship | Collateral Type | CD, Bond, or LOC Number | Collateral Amount | Account or Permit Number | Total Original Collateral Amount |
|---|---|---|---|---|---|---|
| California Dept of Industrial Relations | Former Self Insured State | Certificates of Deposit | 017169953 | 7,844,559.00 | 2253 | 57,558,703.00 |
| | | | 015882357 | 2,485,433.00 | | |
| | | | 015620773 | 2,500,000.00 | | |
| | | | 004311787 | 44,728,711.00 | | |
| Connecticut Workers Compensation Commission | Former Self Insured State | Letter of Credit | 63660502 | 1,000,000.00 | | 1,500,000.00 |
| | | Bond | 105749635 | 500,000.00 | | |
| Treasurer of the State of Maine | Former Self Insured State | Bond | 105323417 | 100,000.00 | J J Nissen | 100,000.00 |
| Michigan Dept of Licensing & Regulatory Affairs, Workers Compensation Agency | Former Self Insured State | Letter of Credit | 63664925 | 1,000,000.00 | 6417 | 1,000,000.00 |
| Missouri Division of Workers Compensation | Former Self Insured State | Bond | 10367599 | 7,382,597.00 | WI00549 | 7,432,597.00 |
| | | Bond | 400EU2021 | 50,000.00 | | |
| State of New Jersey | Former Self Insured State | Bond | 103830959 | 600,000.00 | | 600,000.00 |
| North Carolina Self Insurance Security Association | Former Self Insured State | Bond | 103730395 | 500,000.00 | | 500,000.00 |
| Ohio Bureau of Workers Compensation | Former Self Insured State | Letter of Credit | 63666379 | 1,600,000.00 | 20002988 | 1,600,000.00 |

| Entity | Entity Type/Relationship | Collateral Type | CD, Bond, or LOC Number | Collateral Amount | Account or Permit Number | Total Original Collateral Amount |
|---|---|---|---|---|---|---|
| | | Bonds | 9271770 | 565,000.00 | | 925,000.00 |
| | | | 400EZ5478 | 210,000.00 | | |
| | | | 400EE461561 | 145,000.00 | | |
| | | | 1608276 | 90,000.00 | | |
| | | | 5091141-034014 | 1,910,000.00 | | |
| | | | KO1602858 | 795,000.00 | | |
| | | | 297443 | 750,000.00 | | |
| | | | 1832829-439 | 280,000.00 | | |
| | | | 1832829 | 135,000.00 | | |
| | | | 71S3612 | 135,000.00 | | |
| | | | 80368241 | 135,000.00 | | |
| State of Oklahoma | Former Self Insured State | Bond | 105749636 | 100,000.00 | 18734 | 100,000.00 |
| Commonwealth of Pennsylvania | Former Self Insured State | Letter of Credit | 63660231 | 9,000,000.00 | 6070 | 9,000,000.00 |

## 2.1(b)(iv) – Deposit Recovery Rights

Schedule 2.1(b)(iv)

**OLD HB, INC.**
**Deposits and Other Receivables**

| Company Name | Amount | Account # | Description | Contact Information | | |
|---|---|---|---|---|---|---|
| | | | | Contact Person | Address/Email | Phone # |
| **Deposits** | | | | | | |
| Gallagher Bassett | 25,000.00 | 30890606 | TPA Deposit | Kevin Wright, Sr Account Manager | Gallagher Bassett Services, Inc., 6404 International Parkway, Suite 2300, Plano, TX 75093 | |
| ESIS Services | 619,788.00 | Various | TPA Deposit for Claims Handling Fees | Elaine Allen, Sr Account Manager | ESIS Services, 7450 W. 130th St., Suite 400, Overland Park, KS 66213 | |
| ACE/ESIS | 867,519.00 | Various | Escrow Deposit-Paid Loss Deposit Funds (PLDF) | | | |
| Broadspire Services | 91,300.00 | Various | Insurer/TPA Deposit | Martin Leung, Financial Reporting Director | Broadspire Services, Inc., 1001 Summit Blvd, Atlanta, GA 30319 | |
| Cigna Health and Life Insurance Co. | Unknown | Various | Recovery from closed health insurance policies | Janice James, Client Financial Specialist | 900 Cottage Grove Road, Hartford, CT 06152 | |
| Composition and Extension Agreement and Trust Indenture for 30 Commerce Boulevard, LLC, f/k/a Cirelli Foods, Inc. | Unknown | | The Trust was established to provide recovery of amounts due creditors of Cirelli Foods, Inc. Sublease net earnings from the building are periodically issued as dividends, on a pro-rata basis, to the creditors. The last two payments received were 7/31/15 and 7/2/13. This will continue indefinitely until if and when the building is sold at which time any net proceeds from the sale less the bank mortgage will be issued as final didvidends. | Christopher W. Parker, Trustee | 900 Cummings Center, Suite 207T, Beverly, MA 01915 cparker@metaxasbrown.com | 978-232-4201 |

Total   1,603,607.00

## 2.1(b)(v) – Accounts Receivable

Schedule 2.1(b)(v)

**OLD HB, INC.**
**Accounts Receivable Lawsuits and Other - Contact Information**

| Defendant | Amount | Contact Information | | Payment Information |
|---|---|---|---|---|
| | | **Address** | **Attorney** | |
| **Accounts Receivable Lawsuits** | | | | |
| Bread Depo of New York, Inc. | 133,544.45 | 256 48th Street, Brooklyn, NY 11220 | Jeff Morgenstern, PLLC, One Old Country Road, Suite 320, Carle Place, NY 11514. 516-739-5908 | |
| RL Restaurants, LLC dba Keke's Breakfast Café | 2,525.80 | 345 West Fairbanks Ave., Winter Park, FL 32789 | Defendant is not represented by counsel | |
| L.Y.L.E. Enterprises, Inc. (Larry's Foodland) | 8,269.10 | 33151 Plymouth Road, Livonia, MI 48150 | Defendant is not represented by counsel | |
| Total Lawsuits | 144,339.35 | | | |
| **Accounts Receivable Other** | | | | |
| Fuzzy's BBQ | 4,429.00 | PO Box 10419, Wilmington, NC 28404 | Debra S. Harpe (address at left is attorney's address) | Monthly installments of $350 to UMAC supported by a signed confession of judgment from October 2014. |
| Total Other | 4,429.00 | | | |
| **Total** | 148,768.35 | | | |

## 2.1(b)(vi) – Tax Refund Claims

| Refund Claim $ | Jurisdiction | Tax Type | Contact person | Address | Claimant | ID # | Reason: |
|---|---|---|---|---|---|---|---|
| $65,934.00 | GA Columbus | City Business License | Paul Nipper pnipper@columbusga.org706.225.3095 | Columbus Consol Government P.O. Box 1397 Columbus GA 31902-1397 | Interstate Brands Corporation | FEIN 44-0296705 AC 00302901 | Refund request for overpaid tax CY2011 and CY2012 |
| $263,328.00 | Egypt | Foreign royalty withholding tax | Atirek.Ratani@ey.com; david.anderson05@ey.com | Ernst & Young 12th and Main Kansas City MO | Old HB Inc or Interstate Brands | FEIN 44-0296705 | W/H tax reduction request from 20% to 15% for CY10/11/12 |

## 2.1(b)(vii) – Tank Reimbursement Claims

Environmental Remediation Reimbursement Claims
As of 9/15/2015

| Remediation Site and Current Owner | Contact | Requested Refund Amount | Status |
|---|---|---|---|
| Kokomo, IN (Hackman Capital) | Darrell Angleton<br>Herlacher Angleton Associates<br>522 Belle Street<br>Alton, IL 62002<br>1-618-462-1132<br>dangleton@charter.net | $241,695.34 | ELTF Application submitted 6/28/2013 but was subsequently rejected. The resubmission will occur by October 1, 2015. |
| Indianapolis, IN Bakery (HBLLC) | Same as above | $178,132.44 | ELTF Application submitted 6/28/2013; however, the current owner has not proceeded with remediation activities. |
| Indianapolis 2801 Lafayette Rd. (HBLLC) | Same as above | $133,063.81 | ELTF Application submitted 6/28/2013 but was subsequently rejected. The anticipated resubmission date is late October, 2015. |

| | |
|---|---|
| **Total State Trust Fund Refunds for Hostess Remediation Sites** | **$552,891.59** |

Note:  Funding of remediation reimbursement claims come from the trust funds that have been established for each state from taxes paid by the oil companies.  Private companies can request reimbursement for past environmental remediation expenses from their respective State trust fund.  Each state sets its own rules for reimbursement.

**2.1(b)(viii) – Certain Rights**

All rights of the Sellers relating to the Settlement and Escrow Disengagement Transaction entered into in March 2010 by and among Interstate Brands Corporation, Lumbermens Mutual Casualty Company and JPMorgan Chase Bank N.A., including (but not limited to):

(1) all rights under the Confidential Settlement Agreement and Release executed on March 9, 2010, by and between Interstate Brands Corporation, on behalf of itself and the other Insureds, and Lumbermens (all as defined in such agreement); and

(2) the Escrow Agreement by and among Interstate Brands Corporation, Lumbermens Mutual Casualty Company and JPMorgan Chase Bank, N.A. (as the escrow agent) dated as of March 9, 2010 (the "Escrow Agreement")

(3) all rights to recover any Escrowed Amounts that have been distributed to Lumbermens pursuant to the Escrow Agreement (as such terms are defined in the Escrow Agreement)

All rights and obligations of the Sellers under the Protected Persons Trust Agreement by and among Old HB, Inc. (f/k/a Hostess Brands, Inc.), its subsidiaries and The Private Trust Company, N.A., as trustee, dated as of December 12, 2012, including the reversionary right to funds to be returned to the Estate of Old HB, Inc. (f/k/a Hostess Brands, Inc.) upon the termination of the trust.

NOTICE ADDRESSES for the above:

Lumbermens:

Associate General Counsel
Kemper Insurance Companies
One Kemper Drive
Long Grove, IL  60049
Attention:  Gerald C. Pluard, Jr.
Attention:  General Counsel

The Private Trust Company, N.A.

The Private Trust Company, N.A.
1422 Euclid Avenue, Suite 1130
Cleveland, OH  44115
Attention:  Philip Rosplock, Vice President

JPMorgan Chase Bank, N.A.

JPMorgan Chase Bank, N.A.
Escrow Services
4 New York Plaza, 21st Floor
New York, NY  10004
Attention:  Iona Kandarova

## UNCLAIMED PROPERTY - CLAIMS BY JURISDICTION

The following list represents claims filed on behalf of Interstate Brands Corp. (IBC) or one of its subsidiaries for uncashed checks payable to IBC or the respective subsidiary. recovery agent to handle all of the claim filings and follow-up for a fee of 15% of the actual recovery. The contact information for the third party agent is:

Michael G. Griffith
Orion Recovery Services, Inc.
10644 Alison Way
Inver Grove Heights, MN  55077
(651) 252-1613 *office*
(612) 272-2149 *cell*
(651) 344-0770 *fax*
mike@orionrecoveryservices.com

## Old HB, Inc. UCP Outstanding 9/15/15

| Client | Jurisdiction | Claim ID No. | Claim Entity Name | | Amount |
|--------|--------------|--------------|-------------------|---|--------|
| OHB | Arkansas | 763539/ | Interstate Brands | $ | 172.12 |
| OHB | Arizona | 4382300 | Interstate Brands | | Unknown |
| OHB | California | 953694239 | Interstate Brands | $ | 48,144.88 |
| OHB | Florida | C5774212 | Hostess Cake | $ | 895.81 |
| OHB | Florida | C5914091 | ITT Continental baking | $ | 1,775.46 |
| OHB | Florida | C5846975 | Interstate Brands et | $ | 6,298.72 |
| OHB | Florida | C6054163 | American Bakeries | $ | 11,636.90 |
| OHB | Illinois | 6030145 | Interstate Brands Corp | $ | 8,754.27 |
| OHB | Illinois | 6030143 | IBC etal | $ | 2,518.00 |
| OHB | Indiana | 3703919 | Wonder Bread | | Unknown |
| OHB | Iowa | 8311000189 | Continental Baking Co | $ | 64.22 |
| OHB | Iowa | 2001033156 | Continental Baking Co. | $ | 97.17 |
| OHB | Iowa | 2010101112 | Interstate Brands Co | $ | 281.54 |
| OHB | Iowa | 2004022829 | IBC | $ | 662.10 |
| OHB | Iowa | 2009019142 | Interstate Brands etal | $ | 3,933.04 |
| OHB | Maine | 7130937 | Interstate Brands etal | $ | 4,845.89 |
| OHB | Maryland | 824310 | Continental Baking | | Unknown |
| OHB | Michigan | 961393 | Old HB | $ | 12,067.49 |
| OHB | Michigan | | Interstate Brands | | Unknown |
| OHB | Missouri | 6707358 | Interstate Brands | | Unknown |
| OHB | Missouri | 6707360 | IBC Sales | | Unknown |
| OHB | Missouri | 66771710 | IBC Sales | | Unknown |
| OHB | Missouri | | Interstate brands | | Unknown |
| OHB | Nevada | 5315622 | Interstate Brands | $ | 300.43 |

| OHB | New York | 53446432 | IBC Hostess | | Unknown |
|-----|----------|----------|-------------|---|---------|
| OHB | New York | 2487874 | Interstate Baking | | Unknown |
| OHB | New York | 12019567 | Interstate Brands | | Unknown |
| OHB | New York | 58254797 | Interstate Brands | | Unknown |
| OHB | New York | 58635663 | Interstate Brands | | Unknown |
| OHB | New York | 35629653 | ITT Continental Baking | | Unknown |
| OHB | New York | 21242546 | ITT Continental Baking | | Unknown |
| OHB | New York | 33343600 | IBC Hostess | | Unknown |
| OHB | New York | 53446432 | IBC Hostess | | Unknown |
| OHB | New York | 34496157 | IBC Sales Corp | | Unknown |
| OHB | North Carolina | 6059877 | Interstate brands | | Unknown |
| OHB | Ohio | 7842597 | Interstate Brands | $ | 1,694.59 |
| OHB | Ohio | 7877620 | Interstate Brands | $ | 2,037.26 |
| OHB | Oregon | 50251472 | Interstate Brands | | Unknown |
| OHB | Pennsylvania | 79233573 | Interstate Brands | | Unknown |
| OHB | South Carolina | 1348093 | IBC Baking Co. | | Unknown |
| OHB | South Carolina | 1732537 | Holsum Baking co. | | Unknown |
| OHB | USBC - West Washington | 00-08775 | Continental Baking | $ | 150.91 |
| OHB | Virginia | 775570 | Interstate Brands | | Unknown |
| OHB | Wisconsin | 5469048 | Interstate Brands | $ | 815.29 |

**Total of Known Claims**       $   **107,366.08**

**Corporate Domains**
**Owned by Interstate Brands Corporation**
**9/14/2015**

| Corporate Domains | | |
| --- | --- | --- |
| **Domain** | **Active URL** | **Link** |
| ibcinthemix.com | No | http://www.ibcinthemix.com |
| interstatebakeries.biz | Yes | http://www.interstatebakeries.biz |
| interstatebakeries.com | Yes | http://www.interstatebakeries.com |
| interstatebakeries.info | Yes | http://www.interstatebakeries.info |
| interstatebakeries.net | Yes | http://www.interstatebakeries.net |
| interstatebakeries.org | Yes | http://www.interstatebakeries.org |
| interstatebakeries.us | Yes | http://www.interstatebakeries.us |
| interstatebakeriescorp.biz | Yes | http://www.interstatebakeriescorp.biz |
| interstatebakeriescorp.com | Yes | http://www.interstatebakeriescorp.com |
| interstatebakeriescorp.info | Yes | http://www.interstatebakeriescorp.info |
| interstatebakeriescorp.net | Yes | http://www.interstatebakeriescorp.net |
| interstatebakeriescorp.org | Yes | http://www.interstatebakeriescorp.org |
| interstatebakeriescorp.us | Yes | http://www.interstatebakeriescorp.us |
| interstatebrands.biz | Yes | http://www.interstatebrands.biz |
| interstatebrands.info | Yes | http://www.interstatebrands.info |
| interstatebrands.net | Yes | http://www.interstatebrands.net |
| interstatebrands.org | Yes | http://www.interstatebrands.org |
| interstatebrands.us | Yes | http://www.interstatebrands.us |
| interstatebrandscorp.biz | Yes | http://www.interstatebrandscorp.biz |
| interstatebrandscorp.info | Yes | http://www.interstatebrandscorp.info |
| interstatebrandscorp.net | Yes | http://www.interstatebrandscorp.net |
| interstatebrandscorp.org | Yes | http://www.interstatebrandscorp.org |
| interstatebrandscorp.us | Yes | http://www.interstatebrandscorp.us |

**Old HB, Inc.**
**Cooperatives - Other Income**

| Last Date Check Received | Name | Reference | Amount(s) Received | Ending Balance If Noted |
|---|---|---|---|---|
| 5/1/2015 | Envision<br>105 4th Ave. SW<br>Rugby ND 58368 | Interstate Brands | 241.16 | 2,192.50 |
| 4/21/2015 | Nodak Electric Cooperative<br>PO Box 13000<br>Grand Forks ND 58208<br>(701) 746-4461 | ME# 13545 | 30.05 | 219.01 |
| 4/1/2015 | Clay Electric Cooperative Inc.<br>PO Box 308<br>Keystone Heights FL<br>(352) 473-8000 | Member# 40765 (American Bakeries)<br>Member# 1290682 (Interstate Brands Corp)<br>Member# 484188 (American Bakeries)<br>Member# 1243083 (Interstate Brands Corp)<br>Member# 457494 (American Bakeries) | 25.03<br>19.78<br>29.90<br>16.15<br>27.62 | |
| 1/20/2015 | San Isabel Electric Association, Inc.<br>781 E Industrial Blvd.<br>Pueblo West, CO 81007-1592 | Capital Credit #0009929786 | 240.88 | 3,352.76 |
| 12/17/2014 | Withlacoochee River Electric Cooperative, Inc.<br>PO Box 278<br>Dade City, FL 33526-0278 | IBC #0036291<br>IBC - Merita #0168315 | 179.05<br>188.09 | |
| 10/22/2014 | Triangle Telephone Cooperative Assn.<br>PO Box 1220<br>Hevre MT<br>(800) 332-1201 | Member# 903648 | 18.13 | 3,606.42 |
| 6/4/2014 | Jones-Onslow Electric Membership Corp<br>259 Western Blvd.<br>Jacksonville NC | Member# 800110554 (Merita Bakery) | 0.88 | |
| 4/7/2014 | Blackfoot Telephone Cooperative<br>1221 N. Russell St.<br>Missoula MT 59808-1898<br>(406) 541-5000 | Member# 0073431<br>Member# 0060270<br>Member# 0018592 | 10.59<br>100.51<br>39.84 | 178.70<br>0.00<br>1,289.91 |
| 1/21/2014 | Glacier Electric Cooperative, Inc.<br>410 East Main<br>PO Box 2090<br>Cut Bank, Montana 59427<br>(406) 873-5566 | Member# 8564 | 43.20 | 1,474.58 |
| 1/21/2014 | Coast Electric Power Association<br>PO Box 2430<br>Bay St. Louis, MS 39521 | Member# 812184 | 59.54 | |

13

## 2.1(b)(x) – Purchased Contracts

### TPA Historical Services Agreements

| TPA | Contact | Period Covered | Contract Name |
|---|---|---|---|
| Natlsco/KRMS (Assumed by Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/89-90 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/90-91 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/91-92 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/92-93 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/93-94 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/94-95 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/95-96 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/96-97 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire | 07/01/97-98 | TPA Services Agreement with Interstate Brands |

| TPA | Contact | Period Covered | Contract Name |
|---|---|---|---|
| | Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | | Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 7/1/1998-99 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/99-00 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/00-01 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/01-02 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Natlsco/KRMS (Broadspire) | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | 07/01/02-06/15/03 | TPA Services Agreement with Interstate Brands Corporation - self insured account 73370900 |
| Broadspire | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | All Kemper/Natlsco insured policy years - 07/01/89 to 06/15/2003 | TPA Services Agreement with Interstate Brands Corporation -  account 73370900 - takeover of all Kemper insured policies |
| Broadspire | Tami E Stevenson, General Counsel Legal, Broadspire Services, 1001 Summit Boulevard, 10th Floor, Atlanta, GA 30319 | CA Takeover | TPA Services Agreement with Interstate Brands Corporation -  accounts 79996900 and 79997500 - takeover of all self insured CA and AZ claims |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 06/15/03-07/01/04 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account | 07/01/04-05 | TPA Services Agreement |

| TPA | Contact | Period Covered | Contract Name |
|------|---------|----------------|---------------|
| | Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | | with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/05-06 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/06-07 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/07-08 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/08-09 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/09-10 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/10-11 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/11-12 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |
| ESIS | Elaine Allen, Senior Account Executive, 7450 W 130th Street Suite 400, Overland Park, KS 66213 | 07/01/12 - 10/07/12 | TPA Services Agreement with Interstate Brands Corporation - various insurance policies and SI contracts |

Post Petition Contracts (Entered into after 1-11-12 and not Rejected as of 9/15/15)

| Title | Date | Vendor Name | Service Provided | Address | E-Mail | Proposed Pre-Petition/ Pre-Liquidation Cure Amount |
|---|---|---|---|---|---|---|
| Consulting Agreement | 12/28/2014 | Conger, Kevin | Storage Unit Records Manager<br><br>Services performed on hourly basis (as needed) | 55 SE Highway, Holt, MO | kevin.conger@yahoo.com<br>kevin.conger@interstatebrands.com | None |
| Consulting Agreement | 12/28/2014 | Garcia, Jerri | Worker's Compensation<br><br>Services performed on hourly basis (as needed) | 5327 NW Edgewood Circle, Houston Lake, MO 64151 | mariosgrannie@yahoo.com<br>jerri.garcia@interstatebrands.com | None |
| Consulting Agreement | 8/1/2014 | Reed, Laurie | Shared Svcs./Operational<br><br>Services performed on hourly basis (as needed) | 3653 W. 132nd Terrace, Leawood, KS 66209 | laurie.reed79@gmail.com<br>laurie.reed@interstatebrands.com | None |
| **Professional/Office Services** | | | | | | |
| Protected Persons Trust Agreement | 12/12/2012 | The Private Trust Company, N.A. | Protected Persons Trust Agreement | 1422 Euclid Ave., Ste.1130, Cleveland, OH 44115; (216) 771-6960 (Attn: Philip Rosplock, V.P.) | | None |
| Consulting/ Expert Testimony Agreement | 7/23/2013 | EVP Advisors | Actuarial consulting and expert testimony services - ACE | 514 W. State Street, Suite 210 Geneva, IL 60134 Attn: Charles C. Emma (636) 232-3372 | | None |
| Expert Consulting Agreement | 8/12/2013 | Milliman, Inc. | Actuarial consulting services - ACE | 71 S. Wacker Drive, 31st Floor, Chicago, IL 60606 Attn: Tony Bloemer, Principal (312) 726-0677 | | None |
| Expert Consulting Agreement | 10/15/2013 | Milliman, Inc. | Consulting services and expert witness testimony in connection with collateral negotiations w/states (NC, RI, KS) | 71 S. Wacker Drive, 31st Floor, Chicago, IL 60606 Attn: Tony Bloemer, Principal (312) 726-0677 | | None |
| Casualty Actuarial Consulting State Collateral Proposal | 10/15/2013 | Milliman, Inc. | Proposal/Engagement Letter to provide actuarial services to Old HB, Inc. (NC, RI, KS) | 71 S. Wacker Drive, 31st Floor, Chicago, IL 60606 Attn: Tony Bloemer, Principal (312) 726-0677 | | None |
| Missouri Collateral Access Agreement | 8/1/2013 | Missouri Private Sector Individual Self-Insurers Guaranty Corporation | Provides Old HB, Inc. and its subsidiaries with information concerning pending workers' compensation claims | P.O. Box 1831 Jefferson City, MO 65102 Michael G. Winter, Exec. Director (573) 634-5444 | | None |
| Consulting Services | 1/22/2015 | Risk Navigation Group, LLC | Consulting services and independent valuation and depositional and/or arbitration hearing testimony related to the ACE arbitration with IBC. | 122 Washington Street Morristown, NJ 07960 Attn: Richard Sabetta, Managing Principal (973) 285-1010 | rsabetta@risknavigation.com | None |

Post Petition Contracts (Entered into after 1-11-12 and not Rejected as of 9/15/15)

| Title | Date | Vendor Name | Service Provided | Address | E-Mail | Proposed Pre-Petition/ Pre-Liquidation Cure Amount |
|---|---|---|---|---|---|---|
| Services Agreement | 12/8/2014 | Dallas Series of Lockton Companies | Services associated with providing claims settlement and mitigation assistance for legacy ACE workers compensation insurance. In addition, services include providing support related to legacy self-insured states and placement of required coverage. The service fee was prepaid through December 2015. | Attn: Ken Baggett, ARM, Sr. Vice-President | kbaggett@lockton.com | None |
| Space License | 11/1/2015 | Dean Realty (Larry McMillin) | Lease agreement for storage Unit #548 for Ostess, LLC files will become effective 11-1-15 at a rate of $1,500/month. | 1501 W. 31st Street Kansas City, MO 64111 Attn: Larry McMillin | lmcmillin@deanrealty.com | None |

Old HB, Inc                                                                    PROPOSED ASSUMPTION

Pre-Petition Contracts (Not Rejected as of 9/15/15)

| Hostess Brands Entity | Vendor | Contact | Title | Street Address | City | State | Zip Code | Phone / Email | Type | Date | Proposed Pre-petition/ Pre-liquidation Cure Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Interstate Brands Corporation | ESIS, Inc. | Michael Lamoureaux | VP Client Services | 436 Walnut Street | Philadelphia | PA | 19106 | | Risk Management Services Agreement; ESIS Service Rate Schedule | 7/1/2007 | None |
| Interstate Brands Corporation | ESIS, Inc. | Michael Lamoureaux | VP Client Services | 425 W. Monroe, 4th Floor | Chicago | IL | 60661 | | Risk Management Services Agreement; ESIS Service Rate Schedule | N/A | None |
| Hostess Brands, Inc. | IntraLinks, Inc. | Anthony Plesner | Chief Financial Officer | 150 East 42nd Street, 8th Floor | New York | NY | 10017 | | Agreement for IntraLinks Services; IntraLinks Exchanges Order | 7/29/2011 | $281.04 |
| Interstate Brands, Inc. | Risk Sciences Group (RSG) Service Agreement | Tami Stevenson | General Counsel, Broadspire | 1001 Summit Blvd., 10th Floor | Atlanta | GA | 30319 | (404) 300-1038 | Claims Data Management Services Agreement | 1/1/1998 (Amended October, 2013) | None |
| Interstate Brands Corporation | Gerald Taylor | Gerald Taylor | Consultant | 19209 W. 98th Terrace | Lenexa | KS | 66220 | | Auto Claims (ACE policies) - Services performed on hourly basis (will be as needed) | 3/1/2007 | None |

**2.1(b)(xii) – Personal Property**

23 obsolete laptop computers

## 2.1(b)(xiii) – Reimbursement Rights Under Excess Insurance Polices

| Claim Number | Claimant Name | Carrier | Accident Date | Coverage | State | Status | Pending Final Reimbursement Request |
|---|---|---|---|---|---|---|---|
| CRT 678142040-001 | WAYNE GILBERT | CRT - Broadspire - Risktech | 06/05/1990 | WC | ME | O | 2,635.12 |
| CRT 678142036-001 | ROBICHAUD KEVIN | CRT - Broadspire - Risktech | 03/09/1995 | WC | ME | O | 6,862.21 |

# Schedule 2.1(b)(xiv)

Updated 6/12/15

**Hostess Brands Schedule of Live U.S. Trademarks**

| Dkt. No. | Mark | Design | Goods/Services | App. No. | App. Date | Reg. No. | Reg. Date | Due Date Desc. | Due Date |
|---|---|---|---|---|---|---|---|---|---|
| 25702-US | 1853 EMPEROR NORTON'S ORIGINAL SAN FRANCISCO | | CLASS 030 - SNACK FOOD PRODUCT OF TOASTED SOURDOUGH BREAD IN WAFER FORM. | 73/686752 | 28-Sep-1987 | 1490409 | 31-May-1988 | Next renewal date | 31-May-2018 |
| 25700-US | COLOMBO | | CLASS 030:  Bakery goods, namely, breads and rolls. | 73/564284 | 21-Oct-1985 | 1442338 | 09-Jun-1987 | Next renewal date | 09-Jun-2027 |
| 20627-US | COTTON'S | | CLASS 030: BAKERY GOODS | 74/013523 | 26-Dec-1989 | 1644539 | 14-May-1991 | Next renewal date | 14-May-2021 |
| 25698-US | FISHERMAN'S WHARF | | CLASS 030:  BAKERY PRODUCTS, NAMELY, ROLLS AND BREAD | 73/589811 | 24-Mar-1986 | 1420325 | 09-Dec-1986 | Next renewal date | 09-Dec-2016 |
| 13607-US | IBC & DESIGN | | CLASS 030:  BAKERY GOODS--NAMELY BREAD, CAKES, SWEET ROLLS, HAMBURGER BUNS, HOT DOG BUNS, BROWN AND SERVE ROLLS, FRIED DOUGHNUTS, FRUIT PIES, COOKIES, AND BROWNIES | 72/348781 | 16-Jan-1970 | 923556 | 09-Nov-1971 | Next renewal date | 09-Nov-2021 |
| 25709-US | PARISIAN AND DESIGN | | CLASS 030:  BAKERY GOODS, NAMELY BREAD | 74/019718 | 16-Jan-1990 | 1620234 | 30-Oct-1990 | Next renewal date | 30-Oct-2020 |
| 25704-US | TOSCANA | | CLASS 030:  Bakery goods, namely, bread, pizza and panettone. | 73/781124 | 16-Feb-1989 | 1563604 | 31-Oct-1989 | Next renewal date | 31-Oct-2019 |

# Schedule 2.2(c)

## Excluded Assets

**Hostess Brands, Inc. - Schedule of Live Foreign Trademarks**

| Our Docket No. | Country | Status | Trademark | Class | App. Date | App. No. | Reg. Date | Reg. No. | Next Renewal Due |
|---|---|---|---|---|---|---|---|---|---|
| 24417-CA | Canada | Registered | MRS. CUBBISON'S | | 30-Jun-1992 | 708208 | 23-Jul-1993 | 414928 | 23-Jul-2023 |
| 25701-CA | Canada | Registered | COLOMBO OAKLAND SAN FRANCISCO | | 25-Mar-1986 | 559613 | 24-Feb-1989 | 352014 | 24-Feb-2019 |
| 25745-JP | Japan | Registered | EMPEROR NORTON | 30 | 19-Oct-1995 | 7-106453 | 07-Nov-1997 | 4078447 | 07-Nov-2017 |

# EXHIBIT B

**(Rush Declaration)**

NAI-181953347v11

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11
                                          :
Old HB, Inc.                              :    Case No. 12-22052 (RDD)
(f/k/a Hostess Brands, Inc.), et al.,¹    :
                                          :    (Jointly Administered)
                     Debtors.             :
                                          :
-------------------------------------------------------------x
```

## DECLARATION OF DAVID RUSH IN SUPPORT OF MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR AN ORDER (I) AUTHORIZING SALE OF THEIR REMAINING ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO TWO ENTITIES CREATED FOR THE BENEFIT OF THE DEBTORS' SECURED CREDITORS AND (II) GRANTING RELATED RELIEF

---

¹ The Debtors are the following six entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Old HB, Inc. (f/k/a Hostess Brands, Inc.) (0322), IBC Sales Corporation (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and MCF Legacy, Inc. (0599).

I, David Rush, declare under penalty of perjury as follows, pursuant to the provisions of 28 U.S.C. § 1746:

1.     I am the Chief Financial Officer of Old HB, Inc. (f/k/a Hostess Brands, Inc.), one of the debtors and debtors in possession in the above-captioned bankruptcy cases (collectively, "Hostess" or the "Debtors").

2.     I submit this Declaration in support of the Motion of Debtors and Debtors in Possession, for an Order (I) Authorizing the Sale of Their Remaining Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Two Entities Created for the Benefit of the Debtors' Secured Creditors and (II) Granting Related Relief (the "Motion").

3.     Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

4.     Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of relevant documents, my opinion, my experience as a restructuring advisor or my conversations with Old HB's employees and/or advisors working at my direction. If called on to testify, I could and would testify to the facts set forth herein. I am authorized to submit this declaration on behalf of the Debtors. I am not being compensated specifically for this testimony other than payments received as a professional retained in these chapter 11 cases.

## Qualifications

5.     As Chief Financial Officer of Old HB, Inc., I work with the Debtors' management and contractors to refine Hostess' existing cash flow forecasts, related analyses and reporting. I also provide recommendations with respect to Hostess' existing cash flow practices

and methodologies. I served as Interim Treasurer of Old HB, Inc. since July 1, 2011 and assumed Chief Financial Officer responsibilities in May 2013.

6.      I am also a Senior Managing Director of the Corporate Finance/Restructuring practice at FTI Consulting, Inc. ("FTI Consulting"). I have more than 17 years of corporate recovery and financial advisory experience. I have corporate recovery and financial advisory expertise in the oil and gas, energy, financial services, retail, manufacturing, and oilfield services, among other industries. I have advised numerous clients with regard to debtor in possession financings, covenant negotiations, bankruptcy preparation, asset sales, avoidance actions and litigation support matters. I have been involved in numerous chapter 11 cases including, among others, Fremont General Corporation, Enron, Bombay Company, ASARCO, Texas Petrochemicals, Orion Refining, Link Energy, TransCom USA, Tri-Union Development, Tokheim Corporation, American Eco and Weiner's Stores.

7.      Prior to joining FTI Consulting, I was a Director with KPMG's Financial Advisory Services practice and a Manager with PricewaterhouseCoopers' Business Recovery Services practice.

8.      I have an M.B.A. from the Jones Graduate School of Management at Rice University and a B.B.A *magna cum laude* in accounting from the University of Houston. I am a certified public accountant in Texas, a certified insolvency and restructuring advisor and a certified turnaround professional.

### Previous Sales Transactions

9.      At the outset of these bankruptcy cases, the Debtors stated their intention of pursuing a stand-alone chapter 11 reorganization, while at the same time expressing a willingness to consider value-maximizing alternatives. Beginning in the spring of 2012, the

-2-

Debtors' investment banker, Perella Weinberg Partners ("PWP"), engaged in the process of soliciting investments to fund a stand-alone chapter 11 reorganization plan or alternative investment or sale proposals and held discussions with various entities regarding such proposals.

10.     Following the shutdown of the Debtors' operations in November 2012, PWP undertook a significantly expanded effort to market the Debtors' assets for sale. After reviewing initial indications of interest, the Debtors determined to market and sell groups of their assets in order to maximize value (the "Brand Sale Process"). Ultimately, the Debtors were able to sell the majority of their businesses through the Brand Sale Process pursuant to five separate agreements approved by this Court on March 20, 2013 and April 9, 2013 [Docket Nos. 2455, 2457, 2459, 2510 and 2514]. These five transactions closed at various times in calendar year 2013 and netted approximately $855 million in proceeds for the Debtors.

11.     The Debtors then undertook additional efforts to market the assets that were not sold in the Brand Sale Process. The Debtors retained Hilco Real Estate, LLC and certain of its affiliates ("Hilco") to assist with this process. Hilco initiated an extensive campaign to market the assets that were not sold through the Brand Sale Process. Ultimately, the Debtors sold real property, machinery, equipment and fleet assets in 140 locations in 34 states pursuant to a purchase agreement that was approved by this Court on August 21, 2013 [Docket No. 2794], and which provided approximately $61 million in sale proceeds. As part of the liquidation process, the Debtors also entered into a number of other, smaller purchase and sale transactions involving the sales of vehicles, trailers, rail cars, intellectual property and stand-alone real estate assets, many of which were assisted by Hilco.

12.     As a result of these sale processes, by the end of 2013, all of the Debtors' real property, personal property and intellectual property assets of any material value had been

sold. As such, beginning in late 2013 and into 2014, the Debtors focused substantial efforts on liquidating their intangible assets. Various lawsuits and administrative proceedings were commenced by the Debtors in this Court and in other courts seeking recoveries from state governments, insurance companies, customers and other parties in interest. These actions have resulted in the direct recovery of millions of dollars for the benefit of the Debtors' estates. Presently, the Debtors have no pending matters in which they are actively prosecuting an action for the return of collateral or liquidation of other intangible assets. Certain of the Debtors' intangible assets, however, are residual interests or reversionary rights that will take years to mature before they can be liquidated into cash.

**Status of Debt Repayment and Payment of Liens**

13.     As this Court is aware, with the sale proceeds from the sale processes described above, the Debtors have paid down a significant amount of their secured debt. Pursuant to the Stipulation and Agreed Order by and Among the Debtors, the DIP Agent and the Pre-Petition Agents Modifying the Final Orders in Certain Respects [Docket No. 2521] (the "Paydown Stipulation") and the Winddown Order, in early 2013 the Debtors repaid their debtor-in-possession financing facility, repaid a $30 million loan supplied by Hilco and repaid their pre-petition credit agreement for which General Electric Capital Corporation served as administrative and collateral agent. In addition, the First Lien Term Loan Pre-Petition Indebtedness (as such term is defined in the Paydown Stipulation) was repaid in full by the Debtors through a series of payments made in April and July 2013. In addition, the Third Lien Term Loans (as such term is defined in the Paydown Stipulation) were also repaid by the Debtors in July 2013.

-4-

14.     Accordingly, since the commencement of the winddown and liquidation of the Debtors' estates in November 2012, the Debtors have paid all funded secured debt obligations other than those associated with (a) $85.8 million of 5% Secured Convertible PIK-Election Series A Notes due 2019; (b) $85.8 million of 5% Secured Convertible PIK-Election Series B Notes due 2019; and (c) $30.0 million of 10% Secured Convertible PIK-Election Series C Notes, due 2019 (collectively, the "2019 Notes"). The 2019 Notes were issued pursuant to the Indenture, dated as of February 3, 2009, among: (x) Old HB, as issuer; (y) certain others of the Debtors, as guarantors; and (z) The Bank of New York Mellon Trust Company, N.A., as trustee and collateral trustee (in such capacity, the "2019 Notes Trustee"). The 2019 Notes represent debt secured by all of the assets of the Debtors. On August 20, 2013, a payment of $8.2 million, including accrued prepetition interest, was made with respect to a partial repayment of the 2019 Notes. Subsequently, on September 23, 2013 and on October 18, 2013, additional payments, including prepetition interest, of $45.0 million and $3.5 million, respectively, were made on the 2019 Notes. On February 6, 2014, an additional payment of $5.0 million, including prepetition interest, was made on the 2019 Notes and, on December 18, 2014, an additional payment of $12.5 million was made on the 2019 Notes. While $74.2 million has been paid to the 2019 Notes Trustee to date, at least $156.6 million in principal amount remains outstanding under the 2019 Notes. If interest had continued to accrue on the 2019 Notes after the Petition Date, approximately $57.2 million in such interest would have accrued through September 1, 2015.

15.     In addition, the Debtors have worked diligently to identify liens against the Debtors' estates and believe that all claims that give rise to statutory liens, including mechanics liens, possessory liens and property tax liens have been paid in full, with no further amounts outstanding. Indeed, most mechanics liens and materialman's liens would have arisen

NAI-181954384v6

prior to the winddown process while the Debtors were still operating. Accordingly, proofs of claim or administrative claim request forms for such claims would have been filed either by the April 24, 2012 prepetition bar date or by the bar date for payment of administrative claims that arose prior to January 31, 2013. The Debtors reviewed such claims and either (a) paid the claims or (b) such claims were disallowed by an order of this Court. None remain outstanding.

### The Remaining Assets

16.     While substantially all of the Debtors' tangible and intangible assets have been sold in the aforementioned sale processes, none of the purchasers chose to purchase the Remaining Assets, which consist largely of intangible assets, including the rights to recover funds against certain third-parties through litigation or after the passage of time. The Debtors have been working diligently to resolve the matters that can be appropriately and efficiently resolved within their chapter 11 cases. That said, parties-in-interest in the Debtors' chapter 11 cases have expressed reservations with the Debtors remaining in chapter 11 for an extended period of time. After consultation with certain of their creditor constituencies, in late 2014 the Debtors commenced extended discussions regarding the process of transferring their remaining assets for the benefit of their remaining secured lenders (the holders of the 2019 Notes), dismissing these chapter 11 cases and dissolving their corporate existence.

17.     Accordingly, the Debtors have entered into the Purchase Agreement with the Purchasers, which are two entities that have been created for the benefit of holders of the 2019 Notes. The Remaining Assets proposed to be sold pursuant to the Sale Transaction comprise nearly all of the Debtors' remaining assets that have not been the subject of an approved sale motion before the Court and include all of the Debtors' remaining cash. One of the Purchaser entities will take possession of various of the Debtors' documents and the other

NAI-181954384v6

Purchaser entities will take possession of the other Remaining Assets. The Sale Transaction contemplates the sale and transfer, free and clear of liens, claims, interests and encumbrances of all of the Debtors' assets of any kind or nature, other than certain limited excluded assets. The identity of the Remaining Assets is disclosed in the Purchase Agreement and the schedules thereto in greater detail. Most of the Remaining Assets are litigation rights, refund rights, reversionary rights, intangible assets and rights to pursue refunds and accounts receivable. The Remaining Assets are not assets that could be utilized in a bakery business or of a type traditionally bought and sold.

## Value of Remaining Assets

18.     The Debtors have conclusively determined that the value of the Remaining Assets is insufficient to pay the amount that remains outstanding under the 2019 Notes. In particular, the Debtors believe that the $156.6 million in principal amount that remains outstanding under the 2019 Notes exceeds any reasonable estimation of the value of the Remaining Assets, including:

- the approximately $15.8 million in cash held by the Debtors' estates as of September 1, 2015 (expenses incurred by the Debtors between now and the closing of the sale, and certain cash to be retained by the Debtors after closing, will mean that less than this amount of cash will be transferred to the Purchaser);

- the remaining value in revisionary rights in the $5 million Protected Persons Trust Agreement by and among the Debtors and The Private Trust Company, N.A.;

- the utility deposits, tax refunds, accounts receivable and other related rights; and

- the rights against insurers or governmental entities with respect to the letter of credit proceeds, bond proceeds or cash deposits from governmental entities or insurance companies with respect to the Debtors' workers' compensation obligations.

-7-

19.     While the Debtors believe there exists material value in these assets, it is unlikely, taken as a whole that the Remaining Assets are worth more than $50 million and it is inconceivable that such assets could be worth more than $75 million. Accordingly, the Debtors believe it appropriate for the Purchaser to receive the value of all of the Remaining Assets. The Purchase Agreement involves a credit bid by the 2019 Notes Trustee of the entire $156.6 million in principal amount of 2019 Notes. As such, the Sale Transaction will effectuate the exercise of remedies by the 2019 Notes Trustee, and provide for the transfer of the Remaining Assets to the Purchasers for the benefit of the holders of the 2019 Notes.

20.     After the transfer of the Remaining Assets to the Purchaser, there will be no further assets of the Debtors to administer within chapter 11. With no assets, there will be no prospect of payment of unsecured claims, whether general unsecured, priority or administrative claims (unless such claims are claims incurred in connection with the winddown that are payable pursuant to the Winddown Order). Without the ability to pay outstanding administrative claims, the Debtors will be unable to confirm a plan in these chapter 11 cases.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated: September 24, 2015

By: _____
David Rush

NAI-1501954384v6

# **EXHIBIT C**

## **(Proposed Sale Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                            :
In re                                                       :  Chapter 11
                                                            :
Old HB, Inc.                                                :  Case No. 12-22052 (RDD)
(f/k/a Hostess Brands, Inc.), *et al.*,[1]                  :
                                                            :  (Jointly Administered)
                                  Debtors.                  :
                                                            :
-------------------------------------------------------------x

## ORDER (I) AUTHORIZING THE SALE OF THE DEBTORS' REMAINING ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO TWO ENTITIES CREATED FOR THE BENEFIT OF THE DEBTORS' SECURED CREDITORS AND (II) GRANTING RELATED RELIEF

This matter coming before the Court on the Motion (the "Sale Motion") (Docket No. [_])

of Debtors and Debtors in Possession, for an Order (I) Authorizing the Sale of Their Remaining

Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Two Entities Created for

the Beneift of the Debtors' Secured Creditors and (II) Granting Related Relief, filed by the

above-captioned debtors and debtors-in-possession (the "Debtors") seeking, among other things,

the entry of this order (the "Sale Order"), pursuant to sections 105 and 363 of the United States

Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules 2002 and 6004 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New

York (the "Local Bankruptcy Rules"), authorizing and approving the sale of certain of the

Debtors' assets described in the Motion (the "Remaining Assets"); and, after due notice, the

Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Asset

---

[1]    The Debtors are the following six entities (the last four digits of their respective taxpayer identification
       numbers follow in parentheses):  Old HB, Inc. (f/k/a Hostess Brands, Inc.) (0322), IBC Sales Corporation
       (3634), IBC Services, LLC (3639), IBC Trucking, LLC (8328), Interstate Brands Corporation (6705) and
       MCF Legacy, Inc. (0599).

Purchase Agreement (the "Purchase Agreement"), substantially in the form attached hereto as Exhibit A, dated September 25, 2015, by and among Ostess, LLC and Ostess Services LLC (collectively, the "Purchasers") and Old HB, Inc., Interstate Brands Corporation, IBC Sales Corporation, IBC Services, LLC, IBC Trucking LLC and MCF Legacy, Inc., whereby the Debtors have agreed, among other things, to sell the Remaining Assets to the Purchasers (the "Sale Transaction") and to assume and assign to the Purchasers certain executory contracts and unexpired leases of the Debtors in connection with the Sale Transaction (collectively, the "Purchased Contracts"), all as more particularly set forth in the Purchase Agreement, (iii) the Declaration of David Rush in Support of the Sale Motion, and (iv) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion and the form of order (substantially in the form of this Order) proposed by the Debtors to be entered granting the Sale Motion and approving the sale of the Remaining Assets (the "Proposed Sale Order") has been provided; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors and all parties in interest in these bankruptcy cases; and upon the record of the Sale Hearing and these cases; and after due deliberation thereon; and good cause appearing therefor, it is hereby **FOUND AND DETERMINED THAT:**

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

A.      This Court has jurisdiction over the Sale Motion, the transactions contemplated by the Purchase Agreement and any other ancillary documents and agreements related thereto pursuant to 28 U.S.C. §§ 157(a) and (b)(1) and 1334(a).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.     The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105(a), 362 and 363(b), (k), (f), (m) and (n) of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, Local Bankruptcy Rule 6004-1, and the Amended Guidelines for the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

C.     This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

## SOUND BUSINESS PURPOSE

D.     The Debtors have (1) demonstrated good, sufficient, and sound business purposes and justifications for the Sale Transaction and (2) appropriately exercised their business judgment by entering into the Sale Transaction.  The business justifications for the Sale Transaction are that it provides a means by which the Remaining Assets can be transferred to Purchasers for the benefit of the Debtors' secured lenders, who are entitled by law to the value of those assets, and thereby permits the Debtors to conclude the winddown of their estates and these chapter 11 cases.

## CREDIT BID

E.     Under the terms of the indenture governing the 2019 Notes (the "Indenture") and applicable nonbankruptcy law, the 2019 Notes Trustee is fully authorized, and has full authority, to submit the credit bid and consummate the transactions as contemplated by the Purchase Agreement.

F.     The credit bid was a valid and proper offer pursuant to sections 363(b) and 363(k) of the Bankruptcy Code.

- 3 -

G.    The credit bid consideration to be provided for the Remaining Assets by the 2019 Notes Trustee on behalf of the Purchasers pursuant to the Purchase Agreement constitutes the highest and best offer for the Remaining Assets under the circumstances and provides fair and reasonable consideration therefor.

**BEST INTEREST OF THE DEBTORS' ESTATES**

H.    Approval of the Purchase Agreement and the consummation of the Sale Transaction with Purchasers at this time are in the best interests of the Debtors and their estates.

**GOOD FAITH AND NO COLLUSION**

I.    The Purchasers are not "insiders" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code.

J.    The Purchase Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and Purchasers in good faith, and each Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.

K.    There is no evidence that the Purchasers colluded with other potential bidders for the Remaining Assets to control the price of the assets.

**NOTICE OF THE SALE MOTION**

L.    The Court previously approved the notice of the Sale Motion, the proposed Sale Transaction and the Sale Hearing pursuant to the Order Approving (A) Form and Manner of Notice of (I) the Sale and Transfer of the Remaining Assets of the Debtors to Certain Entities Created for the Benefit of All Holders of the Debtors' Fourth Lien Debt; (II) Debtors' Request to Transfer or Destroy Their Remaining Documents; and (III) Debtors' Motion to Dismiss Their Chapter 11 Cases and Dissolve Their Corporate Existence; and (B) the Release

and Exclulpation of the Fourth Lien Trustee and Collateral Trustee in Connection Therewith Pursaunt to Fed. R. Bankr. P. 9019  [Docket No. 3678] (the "Noticing Order").  The Debtors have complied with the noticing requirements of the Noticing Order.  Accordingly, the Court finds that (1) proper, timely, adequate and sufficient notice of the Sale Motion, the proposed Sale Transaction, the Sale Hearing and the Proposed Sale Order was provided by the Debtors, (2) such notice was good, legally sufficient and appropriate under the circumstances, and (3) no other or further notice of the Sale Motion, the proposed Sale Transaction, the Sale Hearing or the Proposed Sale Order is or shall be required.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein was afforded to all interested persons and entities.

### SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALE

M.      There are no outstanding and unpaid liens (including, but not limited to, all judgment, statutory, tax, mechanics', carriers', workers', repairers' and similar liens arising prior to or after the Petition Date) ("Liens") as of the date of this Order.

N.      The Debtors may sell the Remaining Assets free and clear of all Liens, charges, claims, security interests, title defects, title exceptions, other encumbrances and any claims, whehter known or unknown, now existing or hereafter arising, fixed or contingent, derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever (collectively, "Claims"), except for any Assumed Liabilities, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Without limiting the generality of the foregoing, "Claims" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to:  (1) any of the multiemployer pension plans to which any of the Debtors is or was a contributing employer and any of the single employer defined benefit plans to which any

of the Debtors is or was a contributor, (2) any claims related to unpaid contributions or current or potential withdrawal or termination liability, (3) any of the Debtors' collective bargaining agreements, (4) the Worker Adjustment and Retraining Notification Act of 1988, (5) any of the Debtors' current and former employees or (6) any property tax liabilities. Those holders of Claims who did not object (or who ultimately withdrew their objections) to the Sale Transaction or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the Remaining Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code. All persons having Claims of any kind or nature whatsoever against the Debtors or the Remaining Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Claims against Purchasers or any of its assets, property, successors, assigns, or the Remaining Assets (other than the Assumed Liabilities).

O.     Purchasers would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, if the sale of the Remaining Assets was not free and clear of Claims on the terms set forth herein, or if Purchasers would, or in the future could, be liable for any such Claims.

### ASSUMPTION AND ASSIGNMENT OF THE PURCHASED CONTRACTS

P.     The assumption and assignment of the Purchased Contracts are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment.

Q.     With respect to each of the Purchased Contracts, the Debtors have met all requirements of section 365(b) of the Bankruptcy Code. Further, Purchaser Ostess, LLC has

provided all necessary adequate assurance of future performance under the Purchased Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.

<u>**V**ALIDITY **O**F **T**HE **T**RANSFER</u>

R.      As of the effective time of the consummation of the Sale Transaction pursuant to the Purchase Agreement (the "<u>Closing</u>"), the transfer of the Remaining Assets to Purchasers will be a legal, valid and effective transfer of the Remaining Assets, and will vest Purchasers with all right, title and interest of the Debtors in and to the Remaining Assets, free and clear of all Claims (other than Assumed Liabilities).

S.      The Debtors have full corporate power and authority to enter into the Purchase Agreement and carry out the Debtors' obligations thereunder and the execution, delivery and performance of the Purchase Agreement by the Debtors and the consummation by the Debtors of the transaction contemplated thereby have been duly authorized by all requisite corporate action.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

<u>**G**ENERAL **P**ROVISIONS</u>

1.      The Sale Motion is granted as set forth herein, and the Sale Transaction is approved as set forth in this Sale Order.

2.      The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

- 7 -

3.　All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

### APPROVAL OF THE PURCHASE AGREEMENT

4.　The Purchase Agreement, credit bid, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.

5.　Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors are authorized to perform their obligations under and comply with the terms of the Purchase Agreement and to consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

6.　The Debtors and their officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement, the Purchase Agreement, in substantially the same form as attached hereto as Exhibit A, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions as may be (a) reasonably requested by Purchasers for the purpose of assigning, transferring, granting, conveying and conferring to Purchasers, or reducing to possession, the Remaining Assets or (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement, all without further order of the Court.

### TRANSFER OF ASSETS FREE AND CLEAR

7.　Pursuant to sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Remaining Assets in accordance with the terms of the Purchase Agreement.  The Remaining Assets shall be transferred to Purchasers, and upon

- 8 -

consummation of the Purchase Agreement, such transfer shall (a) be legal, valid, binding and effective; (b) vest Purchasers with all right, title and interest of the Debtors in the Remaining Assets; and (c) be free and clear of all Claims, except for Assumed Liabilities.

8.     All persons and entities (and their respective successors and assigns) including, without limitation, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans, multiemployer pension plans, labor unions, trade creditors and any other creditors holding Claims, except for Assumed Liabilities, are hereby forever barred, estopped and permanently enjoined from asserting or pursuing such Claims against Purchasers, their successors or assigns, their property or the Remaining Assets, including without limitation, taking any of the following actions with respect to a Claim (other than an Assumed Liability): (a) commencing or continuing in any manner any action or other proceeding against Purchasers, or their successors, assigns, assets, or properties; (b) creating, perfecting or enforcing any liens, claims, encumbrances, or other interests against Purchasers or their successors or assigns, assets or properties; or (c) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order, the Purchase Agreement or the agreements or actions contemplated or taken in respect thereof.  No such person or entities shall assert or pursue against Purchasers or their successors or assigns, assets or properties any such Claim, except for Assumed Liabilities.

9.     Except as expressly set forth in the Purchase Agreement, Purchasers and their successors and assigns shall have no liability for any Claim.  By virtue of the Sale Transaction, Purchasers shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all

Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors. Further, except for Assumed Liabilities, Purchasers shall have no liability for any Claim, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether as a successor, vicariously, or otherwise, of any kind, nature or character whatsoever, including Claims arising under, without limitation: (i) any employment or labor agreements including without limitation any collective bargaining agreements of any of the Debtors or the termination thereof; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's Affiliates or predecessors or any current or former employees of any of the foregoing; (iii) any employee, worker's compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Multiemployer Pension Plan Amendments Act of 1980, (k) state discrimination laws, (l) state unemployment compensation laws or any other similar state laws, (m) state workers' compensation laws or (n) any other state or federal employee benefit laws, regulations or rules or other state or federal laws, regulations or rules relating to employment with any or all Debtors or any predecessors; (iv) any antitrust laws; (v) any product liability or similar laws, whether state or federal or

otherwise; (vi) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (vii) any bulk sales or similar laws; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (xi) any common law doctrine of *de facto* merger or successor or transferee liability, successor in- interest liability theory or any other theory of or related to successor liability; (x) or from the Debtors' business operations or the cessation thereof; and (xi) or from any litigation involving one or more of the Debtors.

10.     This Sale Order (a) shall be effective as a determination that, as of the Closing, all Claims, other than Claims that constitute Assumed Liabilities under the Purchase Agreement, have been unconditionally released, discharged and terminated as to Purchasers and the Remaining Assets, and that the conveyances and transfers described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

### ASSUMPTION AND ASSIGNMENT OF PURCHASED CONTRACTS

11.     The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Purchased Contracts to Purchaser

Ostess, LLC free and clear of all Claims, and to execute and deliver to Purchaser Ostess, LLC such documents or other instruments as may be necessary to assign and transfer the Purchased Contracts as provided in the Purchase Agreement.

12. The Purchased Contracts shall be transferred to, and remain in full force and effect for the benefit of, Purchaser Ostess, LLC in accordance with their respective terms, including all obligations of Purchaser Ostess, LLC as the assignee of the Purchased Contracts, notwithstanding any provision in any such Purchased Contracts (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no rent accelerations, escalations, assignment fees, increases or any other fees charged to Purchasers or the Debtors as a result of the assumption or assignment of the Purchased Contracts. Upon the Closing of the Sale Transaction, Purchaser Ostess, LLC shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Purchased Contracts.

13. All Cure Costs, if any, shall be paid by the Purchasers. Payment of the Cure Costs shall be in full satisfaction and cure of any and all defaults under the Purchased Contracts, whether monetary or non-monetary. Each nondebtor party to a Purchased Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors or Purchasers, their successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

### ADDITIONAL PROVISIONS

14. Ostess Services LLC is authorized and directed to retain all WC/AL Claims Documents relevant to a particular Unresolved WC/AL Claim (as such terms are defined in the Purchase Agreement) until such claim is either (i) closed by ACE American or its affiliate,

ESIS, Inc., in its claims management database or (ii) Purchasers otherwise determine that the claim has been finally resolved (including by settlement, final judgment, court order, the expiration of an applicable statute of limitation or other indication that the applicable claimant no longer desires to pursue the claim in question).  Ostess and Ostess Services will cooperate with ACE American in the defense of Unresolved WC/AL Claims that are subject to coverage under insurance policies between one or more of the Sellers and ACE American by making the WC/AL Claims Documents available to ACE American for inspection and copying at ACE American's cost and expense.

15.     Pursuant to section 554 of the Bankruptcy Code, the Debtors are authorized to abandon and destroy all documents in their possession, including electronic records or other files of any kind or nature, that are not being purchased by the Purchasers under the Purchase Agreement, with the costs of destruction to be borne by the Debtors' estates.

16.     The rights of the chapter 11 estate of Debtor Old HB, Inc. to the return of certain funds upon the termination of the trust created by the Protected Persons Trust Agreement dated as of December 12, 2012 shall be deemed transferred to Purchaser Ostess, LLC upon the closing of the Sale Transaction.

17.     Upon the closing of the Sale Transaction:  (a) the obligations of the 2019 Notes Trustee under the Indenture and all other documents evidencing the 2019 Notes claims shall be released and discharged; (b) the transfer ledger or ledgers maintained by the 2019 Notes Trustee shall be closed, and there shall be no further changes in the record holders of any 2019 Notes; and (c) upon payment in full of all the 2019 Notes Trustee's reasonable fees and expenses, including reasonable counsel fees and expenses, the 2019 Notes, the Indenture, and all other

documents evidencing the 2019 Notes claims shall be deemed automatically canceled and terminated.

18.     This Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects), to adjudicate disputes related to this Sale Order or the Purchase Agreement, and to enforce the injunctions set forth herein.

19.     No bulk sales law, or similar law of any state or other jurisdiction, shall apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion and this Sale Order.

20.     The transactions contemplated by the Purchase Agreement are undertaken by the Purchasers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the transfer of the Remaining Assets to Purchasers, free and clear of Claims, unless such authorization is duly stayed before the Closing pending such appeal.

21.     The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors, Purchasers, and their respective successors and assigns, and any affected third parties including all persons asserting Claims, notwithstanding any subsequent dismissal of these cases or appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such

NAI-181953348v10

trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or receiver.

22.     The Purchase Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Purchase Agreement.

23.     In the event that there is a direct conflict between the terms of this Sale Order and the terms of (i) the Purchase Agreement, or (ii) any other order of this Court, the terms of this Sale Order shall control.

24.     Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

25.     Notwithstanding Bankruptcy Rules 6004 and 7062, General Order M-383, and Local Bankruptcy Rule 6004-1, this Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a), and shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the stay contemplated by Bankruptcy Rule 6004(h) is waived and the Debtors and the Purchasers are authorized to close the sale following entry of this Order in accordance with the terms of the Purchase Agreement.

Dated:     **[_____]**, 2015
              White Plains, New York

                                                          _____
                                                          HONORABLE ROBERT D. DRAIN
                                                          UNITED STATES BANKRUPTCY JUDGE

NAI-181953348v10

# EXHIBIT A

# PURCHASE AGREEMENT